# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                Plaintiff,

      v.

HI JI,
LI MINJUN,
TU LAN,
ZHU FENG,
also known as "Johnny Zhu,"
KUANG ZEBIN,
also known as "Vincent Kuang,"
MICHAEL MCMAHON,
ZHAI YONGQIANG,
ZHENG CONGYING and
ZHU YONG,
also known as "Jason Zhu,

                Defendants.

Case No. 1:21-cr-00265 (PKC) (S-1)

*Filed electronically*

---

## BRIEF IN SUPPORT OF DEFENDANT MICHAEL MCMAHON'S MOTION FOR DISCOVERY AND AN EVIDENTIARY HEARING REGARDING PROSECUTORIAL MISCONDUCT

---

**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
*On the brief:*
Lawrence S. Lustberg, Esq.
Genna A. Conti, Esq.

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................... 1

STATEMENT OF FACTS ............................................................................................................. 2

ARGUMENT ................................................................................................................................ 18

      I.     THE COURT SHOULD GRANT MR. MCMAHON DISCOVERY AND
            AN EVIDENTIARY HEARING REGARDING THE GOVERNMENT'S
            MOTIVE IN INDICTING MR. MCMAHON .................................................... 18

CONCLUSION ............................................................................................................................. 30

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Barzilay v. City of New York*,
  No. 20-cv-4452 (LJL), 2022 WL 2657169 (S.D.N.Y. July 8, 2022)......................................24

*Bergrin v. United States*,
  No. 2:16-cv-03040-JLL (3d Cir. Nov. 30, 2017)..................................................................7, 20

*Conn v. Gabbert*,
  526 U.S. 286 (1999).....................................................................................................................24

*Craig v. Boren*,
  429 U.S. 190 (1976).....................................................................................................................23

*Eisenstadt v. Baird*,
  405 U.S. 438 (1972).....................................................................................................................23

*Green v. Lee*,
  964 F. Supp. 2d 237 (E.D.N.Y. 2013) .......................................................................................22

*Greiner v. Wells*,
  417 F.3d 305 (2d Cir. 2005).......................................................................................................22

*Kimmelman v. Morrison*,
  477 U.S. 365 (1986).....................................................................................................................22

*Kosinski v. Conn. State Dep't of Educ.*,
  No. 3:10-CV-0805 (CSH), 2011 WL 1134236 (D. Conn. Mar. 24, 2011)............................24

*Maniscalco v. New York City Dep't of Educ.*,
  563 F. Supp. 3d 33 (E.D.N.Y. 2021) .........................................................................................23

*McCollough v. Bennett*,
  No. 02-cv-114253, 2020 WL 114253 (E.D.N.Y. Jan. 12, 2020).............................................22

*Neu v. Corcoran*,
  869 F.2d 662 (2d Cir. 1989).......................................................................................................24

*Powers v. Ohio*,
  499 U.S. 400 (1991).....................................................................................................................23

*Rosario v. Ercole*,
  582 F. Supp. 2d 541 (S.D.N.Y. 2008).......................................................................................22

*Singleton v. Wulff*,
   428 U.S. 106 (1976).....................................................................................23

*Strickland v. Washington*,
   466 U.S. 668 (1984)...............................................................................21, 22

*Towns v. Smith*,
   395 F.3d 251 (6th Cir. 2005) ....................................................................22

*United States v. Aviv*,
   923 F. Supp. 35 (S.D.N.Y. 1996) ..............................................................19

*United States v. Barbou*,
   813 F.2d 1232 (D.C. Cir. 1987) .................................................................22

*United States v. Baskerville*,
   448 F. App'x 234 (3d Cir. 2011) .................................................................4

*United States v. Benson*,
   941 F.2d 598 (7th Cir. 1991) .....................................................................19

*United States v. Bergrin*,
   599 F. App'x 439 (3d Cir. 2014) ................................................................10

*United States v. Bergrin*,
   650 F.3d 257 (3d Cir. 2011)....................................................................4, 10

*United States v. Bergrin*,
   682 F.3d 261 (3d Cir. 2012).......................................................3, 4, 10, 20

*United States v. Bergrin*,
   707 F. Supp. 2d 503 (D.N.J. 2010) ............................................................10

*United States v. Bergrin*,
   885 F.3d 416 (6th Cir. 2018) ......................................................................9

*United States v. Bergrin*,
   No. 09-369, 2020 WL 5015532 (D.N.J. Aug. 25, 2020) ...........................10

*United States v. Bergrin*,
   No. 09-369 (DMC), 2013 WL 3864393 (D.N.J. July 23, 2013)................10

*United States v. Bergrin*,
   No. 19-CV-9681 (VSB), 2022 WL 912280 (S.D.N.Y. Mar. 28, 2022)............9, 10

*United States v. Bergrin*,
   No. 2:09-cr-000369-JLL (D.N.J. Apr. 28, 2017), ECF No. 659 .........................5, 6

*United States v. Bergrin*,
   No. 2:09-cr-00369-JLL (D.N.J. June 27, 2016), ECF No. 630-1 ............................................11

*United States v. Bergrin*,
   No. 2:09-cr-00369-WJM (D.N.J. Oct. 19, 2011) ....................................................................3, 9

*United States v. Bergrin*,
   No. 20-2828, 2022 WL 1024624 (3d Cir. Apr. 6, 2022) ..........................................................10

*United States v. Bergrin*,
   No. 20-2828 (3d Cir. June 22, 2021), ECF No. 30 ........................................................7, 17, 24

*United States v. Berrios*,
   501 F.2d 1207 (2d Cir. 1974) ...................................................................................................19

*United States v. Bout*,
   731 F.3d 233 (2d Cir. 2013) ..........................................................................................18, 19, 20

*United States v. Dean*,
   119 F. Supp. 2d 81 (D. Conn. 2000) ..................................................................................18, 23

*United States v. Farahani*,
   No. 21-CR-430 (RA) (S.D.N.Y.) ......................................................................15, 16, 26, 27

*United States v. Goodwin*,
   457 U.S. 368 (1982) ..................................................................................................................19

*United States v. Jenks*,
   No. 20-4023, 2022 WL 1252366 (10th Cir. Apr. 28, 2022) .....................................................21

*United States v. Johnson*,
   171 F.3d 139 (2d Cir. 1999) .....................................................................................................18

*United States v. Koh*,
   199 F.3d 632 (2d Cir. 1999) .....................................................................................................19

*United States v. Lin*,
   No. 22-MJ-251-MMH (E.D.N.Y.) ......................................................................16, 17, 27, 28

*United States v. Liu*,
   No. 1:22-CR-00311 (LDH) (VMS) (E.D.N.Y.) .......................................................................29

*United States v. Mohammed*,
   863 F.3d 885 (D.C. Cir. 2017) .................................................................................................22

*United States v. Parker*,
   No. 08-CR-6270L, 2009 WL 3754017 (W.D.N.Y. Oct. 21, 2009) .........................................19

*United States v. Sanders*,
    211 F.3d 711 (2d Cir. 2000)......................................................................18, 19, 20, 24

*United States v. Sattar*,
    314 F. Supp. 2d 279 (S.D.N.Y. 2004)..................................................................19

*United States v. Schmucker*,
    721 F.2d 1046 (6th Cir. 1983) ............................................................................30

*United States v. Stewart*,
    590 F.3d 93 (2d Cir. 2009)............................................................................18, 20

*United States v. White*,
    972 F.2d 16 (2d Cir. 1992)....................................................................................18

*United States v. Williams*,
    No. 20-CR-55, 2020 WL 5960689 (E.D. La. Oct. 8, 2020) ................................29

*United States v. Zhu*,
    No. 21-cr-265 (E.D.N.Y.) ..............................................................................17, 24

**Statutes**

18 U.S.C. § 2 ..........................................................................................................15

18 U.S.C. § 371 ................................................................................................12, 15

18 U.S.C. § 1512(c)(2) ..........................................................................................15

18 U.S.C. § 1512(k) ..............................................................................................15

18 U.S.C. § 3006A ..........................................................................................2, 10

18 U.S.C. § 3551 ....................................................................................................15

22 U.S.C. § 611 ........................................................................................................1

28 U.S.C. § 2255 ......................................................................................................7

**Other Authorities**

*Five Individuals Charged Variously with Stalking, Harassing and Spying on U.S.*
    *Residents on Behalf of the PRC Secret Police*,
    https://www.justice.gov/opa/pr/five-individuals-charged-variously-stalking-
    harassing-and-spying-us-residents-behalf-prc-0 ...........................................16, 27

*Five Men Indicted from Crimes Related to Transnational Repression Scheme to Silence Critics of the People's Republic of China Residing in the United States*, https://www.justice.gov/opa/pr/five-men-indicted-crimes-related-transnational-repression-scheme-silence-critics-people-s ......................................................29

*Iranian Intelligence Officials Indicted on Kidnapping Conspiracy Charges*, https://www.justice.gov/opa/pr/iranian-intelligence-officials-indicted-kidnapping-conspiracy-charges ................................................................16, 27

Jason Grant, *At closing arguments, Bergrin pleads innocence as prosecutor says he plotted murders*, https://www.nj.com/news/2013/03/bergrin_pleads_his_innocence_a.html ............................5

Jason Grant, *Opening arguments grip courtroom in murder trial of star attorney Paul Bergrin*, https://www.nj.com/news/2011/10/opening_arguments_begin_in_mur.html..........................4

Jason Grant, *Opening arguments in murder-racketeering trial of attorney Paul Bergrin contrast sharply*, https://www.nj.com/news/2013/01/opening_arguments_in_murder-ra.html ...........................5

Jason Grant, *Paul Bergrin murder trial: Mistrial ends tense, often theatrical Newark case*, https://www.nj.com/news/2011/11/paul_bergrin_murder_trial_mist.html ..............................5

Jason Grant, *Paul Bergrin murder trial: Powerful words to jury lead attorney's closing argument*, https://www.nj.com/news/2011/11/paul_bergrin_murder_trial_powe.html;............................9

Jason Grant, *Paul Bergrin sentenced to six life sentences for murder, racketeering*, https://www.nj.com/news/2013/09/lawyer_sentenced_to_life_in_prison_on_murder_racketeering_charges.html ..............................................5

Joe Atmonavage, *Disgraced attorney serving six life sentences for murder, racketeering continues fight for new trial*, https://www.nj.com/news/2020/09/disgraced-attorney-serving-six-life-sentences-for-murder-racketeering-continues-fight-for-new-trial.html..................................3

Justin Rohrlich, *Honey Traps, Child Porn and Violence: Feds Bust Chinese Plot to Destroy NY Candidate*, https://www.thedailybeast.com/fbi-alleges-chinese-community-party-and-retired-agent-qiming-lin-tried-to-ruin-ny-candidate-xiong-yan ....................................................................................17, 28

Katherin Erickson, *This Is Still A Profession: Special Administrative Measures, the Sixth Amendment, and the Practice of Law*, 50 COLUM. HUM. Rts. L. Rev. 283, 320 (2018) ...............................................................8

Marc Jacobson, *The Baddest Lawyer in the History of Jersey*,
https://nymag.com/news/features/paul-bergrin-2011-6/ ........................................................3, 4

MaryAnn Spoto, *Slain informant in high-profile attorney murder case sought witness protection, FBI agent testifies*,
https://www.nj.com/news/2011/10/slain_informant_in_high-profil.html; ..............................9

School, Allard K. Lowenstein Human Rights Clinic, The Darkest Corner: Special Administrative Measures and Extreme Isolation in the Federal Bureau of Prisons, at 4 (Sept. 2017), available at
https://law.yale.edu/sites/default/files/area/center/schell/document/sams_report.final.pdf ........................................................................................................................8

Shannon Tiezzi, *US Alleges 'Transnational Repression' Scheme Involving China's Secret Police*, https://thediplomat.com/2022/03/us-alleges-transnational-repression-scheme-involving-chinas-secret-police/ ....................................17, 28

**Rules**

Fed. R. Crim. P. 33 ....................................................................................................5, 6, 21

Fed. R. Crim. P. 33(b)(1) ................................................................................................10, 20

## PRELIMINARY STATEMENT

For defendant Michael McMahon and his counsel, this case has long presented a puzzle: even after the discovery process is materially complete, there is literally no evidence that he was aware, at any time, that he was, in performing standard private investigative work, tracing the assets and ascertaining the whereabouts of an alleged embezzler, working on behalf of the Chinese government.  Though he has produced to the Government a wealth of evidence that, if he was in fact doing so, it was because he was deceived and that he had nothing but innocent intent—including, for example, that he repeatedly revealed his own actions to law enforcement—the prosecution has never revealed a single statement, taped or otherwise, showing that Mr. McMahon understood or was told that he was working for any foreign power.  Nor, in the more than three years between the time that Mr. McMahon had any involvement in the investigation at issue and his arrest did the Government inform him that he was being used by the Chinese authorities, or seek his cooperation in their investigation.  Why, Mr. McMahon asks, is he being prosecuted this way?  And why, in that regard, is he being treated so differently from other private investigators, in this and other matters, who often get caught up in these kinds of Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611, *et seq.*, cases?

Of course, the Government is granted broad prosecutorial discretion to prosecute whom they wish, and it is an easy answer, which the Court will certainly hear in response to this motion, that Mr. McMahon's contentions are for the jury.  But, as is set forth in detail below, there is evidence that these questions may be answered by reference to Mr. McMahon's lawful—indeed, constitutionally protected—activities.  That is, Mr. McMahon is legitimately concerned, particularly in light of comments that were made at the time of his arrest, that his prosecution can be explained by the fact that he performed investigative activities on behalf of one of the most notorious and despised defendants in the federal criminal justice system, one who was seeking a

new trial for, among other offenses, the murder of a federal government informant, whose FBI handler was apparently the officemate of an investigating agent in this matter. Indeed, Mr. McMahon—whose investigative services were reimbursed under the Criminal Justice Act, 18 U.S.C. § 3006A—was in the process of uncovering new evidence based upon which a new trial would be sought in that matter; notably, among the Government's responses was that Mr. McMahon should not be believed because he had been indicted here.

These circumstances at least raise the specter of vindictive prosecution, that Mr. McMahon is being prosecuted because he performed investigative activities for an indigent, if notorious, criminal defendant. This motion seeks discovery as to that issue and an evidentiary hearing on it, so that the Court can assure itself that this otherwise inexplicable prosecution is not, in fact, motivated by a desire to punish an investigator for legitimately doing his job in another case. If, at the end of that process, the conclusion is that this is not the basis of the Government's actions, then so be it—the matter will continue to trial. If, on the other hand, Mr. McMahon's theory—that he has been targeted for prosecution based upon his lawful, indeed constitutionally necessary, activities—is correct, then further relief, up to and including the dismissal of the Superseding Indictment in this case, will be required. For now, though, a full record must be developed to explore this serious issue.

## STATEMENT OF FACTS

Defendant Michael McMahon is "a 53-year-old U.S. citizen" and was "a licensed private detective in New Jersey." ECF No. 77, ¶ 6. Mr. McMahon worked as a private investigator since August 5, 2005, following his retirement from the New York City Police Department (NYPD) in 2003. Certification of Michael McMahon ("McMahon Cert."), ¶ 1. Specifically, Mr. McMahon had worked for over 14 years as an NYPD police officer, a detective in the Bronx Narcotics Division, and a Sergeant at the 43rd Precinct in the Bronx. *Id.*, ¶ 2. In that capacity, Mr. McMahon

conducted or participated in hundreds of investigations, in such areas as drugs, money laundering, insurance fraud, homicide, burglary, narcotics, and weapons possession. *Id.* As a private investigator, Mr. McMahon conducted surveillance, performed searches through various databases to obtain information such as personal identifying information, motor vehicle records, criminal records, asset information, and marriage data, as well as conducted witness interviews. *Id.*, ¶ 1.

In or around March of 2013, Mr. McMahon was retained to act as an investigator in the matter of *United States v. Bergin*, Docket No. 2:09-cr-000369-JLL, one of the most notorious, high-profile cases in New Jersey legal history, *see* Marc Jacobson, *The Baddest Lawyer in the History of Jersey*, https://nymag.com/news/features/paul-bergrin-2011-6/, in which Paul Bergrin, a former New Jersey state and federal prosecutor and later a "flashy" criminal defense attorney, *see* Joe Atmonavage, *Disgraced attorney serving six life sentences for murder, racketeering continues fight for new trial*, https://www.nj.com/news/2020/09/disgraced-attorney-serving-six-life-sentences-for-murder-racketeering-continues-fight-for-new-trial.html, had been convicted of, conspiracy to commit murder, among other offenses, arising from his representation of members of a drug-trafficking organization in Newark, New Jersey.  McMahon Cert., ¶ 3.  In particular, Bergrin's conviction stemmed from his alleged "role in facilitating the murder of a man named Kemo McCray ('Kemo'), who was to have been a witness against one of Bergrin's clients," William Baskerville,[1] "an associate in a drug-trafficking organization run by Hakeem Curry," who

---

[1] Specifically, in the course of Bergrin's representation of William Baskerville, Baskerville "told Bergrin that he suspected Kemo to be the likely source of the government's evidence against him." *Bergrin*, 682 F.3d at 266.  Bergin then called Curry and informed "him that Kemo was to be the confidential witness against Baskerville." *Id.*  Anthony Young, "a member of Curry's organization and the government's key witness" at trial testified that approximately one week after William Baskerville was arrested, Paul "Bergrin met with him and other Curry organization members" and "told the group that 'if Kemo testif[ied] against [Baskerville], [Baskerville] w[ould] never see the streets again, but that he could 'get [Baskerville] out if Kemo d[id]n't testify," and "twice reiterated 'No Kemo, no case,'" as well as "emphasized that the group should not 'let that kid testify against

"was arrested on federal drug charges in November 2003 for drug sales that he made to Kemo."

*United States v. Bergrin*, 682 F.3d 261, 264, 266 (3d Cir. 2012).[2]

As mentioned, the Bergrin case attracted an extraordinary amount of press coverage. *See The Baddest Lawyer in the History of Jersey*, https://nymag.com/news/features/paul-bergrin-2011-6, *supra* at 3 (describing Bergrin as an "[a]dvocate to killers, whorehouse proprietors, bum-check-passing beauty queens, Lil' Kim, and a thousand forgotten street hoodlums from Newark's bad wards" who at the time, was "await[ing] trial in a federal lock-up facing charges that [we]re a good bet to keep him behind bars for the rest of his life").[3]  It has also been particularly hard fought by

---

[Baskerville].'"  *Id.* (citations omitted).  Thereafter, "[m]embers of Curry's organization . . . discussed how to find and kill Kemo, and, in March of 2004, Young found Kemo and shot him to death."  *Id.  See also United States v. Baskerville*, 448 F. App'x 234, 245 (3d Cir. 2011) ("Federal law enforcement officials enlisted the help of Kemo McCray ('McCray') in their investigation of a New Jersey drug ring that included Baskerville.  McCray worked as a paid informant, making numerous controlled purchases of drugs from Baskerville between February and November of 2003.  Based upon reports and recordings of his interactions with McCray, Baskerville was eventually arrested and charged with participating in a drug distribution conspiracy.  Prior to Baskerville's trial on the drug conspiracy charges at which he was to testify, McCray was shot and killed.  The Government then also charged Baskerville with ordering McCray's murder, alleging that through his attorney, Paul Bergrin ('Bergrin'), Baskerville directed associates of his to kill McCray.").

[2] In addition, Bergrin was also charged with: (1) "[u]nder the guise of providing legitimate attorney services," assisting Vicente Esteves, "who was charged with federal drug crimes in Monmouth County, New Jersey," with "arranging to have a witness against [Esteves] murdered"; (2) bribing a witness to change his testimony against his client, who was charged with robbery in Essex County, New Jersey; (3) trafficking "in kilogram quantities of cocaine" through his law office, a realty company, and a restaurant, which was also operating a "stash house"; (4) assisting a client who operated a prostitution business in New York to "evade New Jersey Parole Board restrictions by telling the Board that [the client] worked at" his law office, running the prostitution business while the client was incarcerated, and soliciting the murder of a witness against Bergrin after Bergrin was arrested "for his role in the business"; and (5) "committing wire fraud relating to the sale of real estate properties to individuals" known "to have fraudulently obtained mortgage loans."  *United States v. Bergrin*, 650 F.3d 257, 261-62 (3d Cir. 2011).

[3] *See also* Jason Grant, *Opening arguments grip courtroom in murder trial of star attorney Paul Bergrin*, https://www.nj.com/news/2011/10/opening_arguments_begin_in_mur.html (summarizing opening arguments in the 2011 trial against Paul Bergrin, reporting that prosecutor John Gay "held the courtroom's rapt attention, setting out a meticulous argument built around facts

the Government, as the language of its briefs consistently demonstrates. Typical is the language of

its most recent briefs in both the District Court and the Court of Appeals. *See* Opposition to

Defendant's Rule 33 Motion for a New Trial on the Basis of Supposedly "Newly Discovered"

Evidence at 5, *United States v. Bergrin*, No. 2:09-cr-000369-JLL (D.N.J. Apr. 28, 2017), ECF No.

659 ("Bergrin's contempt for the rules of the criminal justice system matched his disregard for

---

that painted Bergrin as a cruel man who considered a person's life to be worth less than the drug
money he could collect" and that Bergrin, representing himself, "unleashed an explosion of words
that shook alive a packed Newark courtroom as jurors and spectators bolted upright in their seats"
and "claimed to the jury that he was being set up in his murder trial by felons who were about to
take the stand and lie for government prosecutors so that, in exchange for their testimony, they
would get less time in prison for their crimes"); Jason Grant, *Paul Bergrin murder trial: Mistrial
ends       tense,       often       theatrical       Newark       case*,
https://www.nj.com/news/2011/11/paul_bergrin_murder_trial_mist.html (reporting that "[f]or
more than five days, the jury had wrestled with trying to reach a unanimous decision in the [2011]
murder trial of Paul W. Bergrin"; "a trial based on testimony that lacked hard evidence and tape
recordings" and ultimately resulted in a hung jury); Jason Grant, *Opening arguments in murder-
racketeering       trial       of       attorney       Paul       Bergrin       contrast       sharply*,
https://www.nj.com/news/2013/01/opening_arguments_in_murder-ra.html (summarizing
openings arguments in the 2013 trial, reporting that "John Gay, the federal prosecutor who has
spent many years trying to convict once-prominent lawyer Paul Bergrin of crimes ranging from
witness-murder to running a prostitution ring flashed an image on the screen in federal court of a
9-year-old-girl," and arguing that Bergrin "had helped coerce the girl into lying on the witness
stand about her father stabbing her mother," before "nearly two hours of Gay painstakingly laying
out at least seven plots and crimes, Bergrin . . . allegedly helped spearhead from 2001 to 2009"
after which Bergrin "came out swinging full force . . . alleg[ing] as he did at his 2011 trial – one
that focused on two counts linked to the killing of FBI informant Kemo Deshawn McCray, as
opposed to the 26 counts he now faces – that Gay's allegations were all part of a grand
prosecutorial conspiracy against him"); Jason Grant, *At closing arguments, Bergrin pleads
innocence       as       prosecutor       says       he       plotted       murders*,
https://www.nj.com/news/2013/03/bergrin_pleads_his_innocence_a.html (summarizing closing
arguments at the 2013 trial against Bergrin, reporting that it was "a day rife with high drama[;
o]ver more than seven hours, the day featured alternatively booming and nearly begging arguments
by Bergrin[, c]ontrasted with lower-key and at times nearly mocking arguments by [Assistant U.S.
Attorney Joseph] Minish, who often seemed incredulous about the many claims Bergrin has made
while defending himself throughout an eight-week trial"); Jason Grant, *Paul Bergrin sentenced to
six       life       sentences       for       murder,       racketeering*,
https://www.nj.com/news/2013/09/lawyer_sentenced_to_life_in_prison_on_murder_racketeering
_charges.html (reporting that "Paul W. Bergrin, the once-prominent defense lawyer and former
federal prosecutor who was convicted of murder, cocaine trafficking, racketeering and other
crimes, was sentenced . . . to six life sentences").

human life."); *id.* at 2 ("Moreover, since a month before his first trial, Bergrin has benefitted from an extraordinary form of hybrid representation. . . . With Gibbons backstopping him at both trials, Bergrin was able to plead his case directly to the jury without ever taking the stand and subjecting himself to cross-examination."); *id.* at 22 ("Although Bergrin intimates otherwise, the Government produced the Curry Calls on compact disks in a well-organized format that provided easy access to the recordings though [sic] a series of icons that opened up successive windows containing data. Each call on a disk had its own icon, and those icons appeared in chronological order with an identified date, time and sequentially designated call number.  All Bergrin and his many counsel had to do was load a compact disk, read the file names and play whatever file they desired. Moreover, assuming Bergrin had any difficulties accessing the files before his trials, he apparently has had no such difficulties accessing those files since being found guilty." (citation omitted)); *id.* at 24 ("To call that 'reasonable diligence' makes a mockery of the term."); *id.* at 30 ("Bergrin's excuses for not calling any of these witnesses border on the frivolous."); *id.* at 42 ("To appreciate fully the preposterous nature of many of the statements that Bergrin attributes to Savina Suaseda, requires familiarity with the means by which her supposed boyfriend, Oscar Cordova, obtained damning recordings of Bergin." (citation omitted)); *id.* at 49 ("Bergrin now claims that Exhibit 8A to his brief, an unsigned document that purports to exonerate him of all wrongdoing, contains Jauregui's truthful statements.  But Bergrin fails to disclose to this Court that he and his lackeys created Exhibit 8A without any input from Jauregui and offered her a bribe in an unsuccessful attempt to induce her to sign it."); *id.* at  57 ("Bergrin's trial defense and Rule 33 argument rely on his ridiculous claim that although Young was innocent of shooting Kemo, he decided to falsely implicate himself, Bergrin, Curry, William Baskerville, Rakim Baskerville and others in the Kemo murder."); *see also* Brief for Appellee at 3-4, *United States v. Bergrin*, No. 20-2828 (3d Cir. June

22, 2021), ECF No. 30 ("With Gibbons backstopping him at both trials, Bergrin pled his case to the jury without being cross-examined.  Only after two interlocutory appeals and the reassignment of this case could the Government try Bergrin on all 23 racketeering, witness tampering and drug-trafficking charges for which he has been indicted.  Although the second trial lasted seven weeks, the jury took less than two days to convict Bergrin on every count."); *see also* Memorandum of Law in Opposition to Paul Bergrin's Motion to Vacate, Set Aside, or Correct His Sentence Under 28 U.S.C. § 2255, *Bergrin v. United States*, No. 2:16-cv-03040-JLL (3d Cir. Nov. 30, 2017), ECF No. 27 (arguing, *inter alia*, that "Bergrin's bald assertions of actual innocence ring even hollower now than when the jury rejected them over four years ago.  Procedural bars notwithstanding, Bergrin's claims are patently frivolous.  Take his claim—raised multiple times and in multiple ways—that the Government violated its *Brady* obligations by suppressing the favorable content of wiretap recordings it produced to Bergrin in discovery *3½ years before his January 2013 trial*. Ironically, the Government must quote Bergin to refuse his claim: 'when people are facing potentially spending the rest of their natural life in jail . . . they will say and they will do anything to gain their release.' Settled precedent—if not basic common sense—forecloses Bergrin's claim." (emphasis in original; citation omitted)); *id.* at 24 ("Finally, the few claims that are not procedurally barred fall somewhere on the spectrum between meritless and frivolous.  Each claim is based on either a false legal premise or a false factual assumption—often both.  That is reminiscent of Bergrin's conduct both at trial and on direct appeal, and it explains why Judge Cavanaugh grew impatient with Bergrin's antics and why the Third Circuit summarily affirmed his conviction without oral argument.").

To this day, the Government has gone to great lengths to keep Bergrin incarcerated under so-called Special Administrative Measures (SAMs) at the super-max ADX prison in Florence,

Colorado, under what is essentially permanent solitary confinement, *see* Certification of Lawrence S. Lustberg ("Lustberg Cert."), ¶ 11, with the nation's most heinous criminals.  *See* Yale Law School, Allard K. Lowenstein Human Rights Clinic, The Darkest Corner: Special Administrative Measures and Extreme Isolation in the Federal Bureau of Prisons, at 4 (Sept. 2017), available at https://law.yale.edu/sites/default/files/area/center/schell/document/sams_report.final.pdf.

("SAMs are a regime of prison restrictions that control a prisoner's access to all forms of human contact and information.  They are typically imposed on prisoners already held in solitary confinement – that is, prisoners who are confined alone in a cell for over twenty-two hours per day.  SAMs intensify that experience and restrict the few remaining rights afforded to prisoners in solitary: the right to communicate with individuals outside of prison, the right to have privileged discussions with an attorney, and the right to acquire information."); *see also* Katherin Erickson, *This Is Still A Profession: Special Administrative Measures, the Sixth Amendment, and the Practice of Law*, 50 COLUM. HUM. Rts. L. Rev. 283, 320 (2018) ("SAMs create isolation that is even more extreme than solitary confinement.").[4]

Throughout, FBI Special Agent Shawn Brokos has been the lead FBI Agent in the investigation of Bergrin; she was also the FBI Agent who recruited Kemo McCray as a confidential informant against William Baskerville.  Special Agent Brokos testified at the first trial against Bergrin regarding the circumstances of Kemo McCray's death; Bergrin, representing himself, vigorously cross-examined Special Agent Brokos, "challenging the consistency of the FBI agent"

---

[4] Year after year, the Government has requested that Bergrin be subject to SAMs restrictions, even as the notion that he could be a danger to anyone, while incarcerated and out of contact for years with anyone involved in his prior life, recedes.  *See* Lustberg Cert., ¶ 11.  Indeed, while the Government's applications are not here provided, in deference to the strict restrictions imposed by SAMs, they continue to be based upon outdated allegations, or appropriate activities of his court-appointed counsel.  Upon request of the Court and with the permission of the Government, they will certainly be provided, under seal or otherwise.

and attempting to discredit her investigation of the matter, "prompting U.S. District Judge William Martini to ask him to lower the volume," MaryAnn Spoto, *Slain informant in high-profile attorney murder case sought witness protection, FBI agent testifies*, https://www.nj.com/news/2011/10/slain_informant_in_high-profil.html; *see also* Transcript of Proceedings at 59-247, *United States v. Bergrin*, No. 2:09-cr-00369-WJM (D.N.J. Oct. 19, 2011); Transcript of Proceedings at 9-26, *United States v. Bergrin*, No. 2:09-cr-00369-WJM (D.N.J. Oct. 20, 2011).  He also argued at closing "that lead FBI investigator Shawn Brokos had mishandled her FBI informant, McCray – and that ultimately her inability to protect McCray led to his killing." Jason Grant, *Paul Bergrin murder trial: Powerful words to jury lead attorney's closing argument*, https://www.nj.com/news/2011/11/paul_bergrin_murder_trial_powe.html; *see also* Transcript of Proceedings at 84-89, *United States v. Bergrin*, No. 2:09-cr-00369-WJM (D.N.J. Nov. 15, 2011).[5] Then, after the second jury trial in 2013 resulted in Bergrin's conviction and sentence to six terms of life in prison, Bergrin's cousin, Ronald Bergrin "sought revenge for his cousin's convictions" and threatened Special Agent "Shawn Brokos, the lead FBI agent in his cousin's case."  *United States v. Bergrin*, 885 F.3d 416, 418 (6th Cir. 2018).[6]

---

[5] Given the volume of the Trial Transcripts, Mr. McMahon has not provided the Transcripts herewith; Mr. McMahon, will of course, provide them if the Court or Government counsel so desires.

[6] Specifically, after Special Agent Shawn "Brokos was transferred from New Jersey to Pittsburgh, Pennsylvania[,]" Ronald Bergrin "obtained Broko's [sic] home address through Google, and sent her 'Easter Cards.'"  *United States v. Bergrin*, No. 19-CV-9681 (VSB), 2022 WL 912280, at *3 (S.D.N.Y. Mar. 28, 2022).  Ronald Bergrin also sent an email, stating that "he was in Cleveland, Ohio, '[l]ess than 1 hour from' Brokos's home, that he 'will be stopping by to say hello' to the agent.'"  *Bergrin*, 885 F.3d at 418 (citations omitted).  Ronald Bergrin also commented that Special Agent Brokos "thinks she's living in a safe place.  A place where nobody can find out where she lives and nobody could get her" and that he was "going to teach her that [he] could crush her like the bug she is" and that "[s]he will never sleep at night again.  She will have nightmares."  *Bergrin*, 2022 WL 912280, at *3 n.3.

Thereafter, Mr. McMahon was retained, to perform investigative services in connection with Paul Bergrin's post-conviction motion for a new trial based upon newly discovered evidence pursuant to Federal Rule of Criminal Procedure 33(b)(1), which were reimbursed pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A.  McMahon Cert., ¶ 3.[7]  In that capacity, working under the supervision of the same counsel as is representing defendant McMahon in this matter, who had been assigned to represent Bergrin both as standby counsel at his trial and on his appeal and in post-conviction proceedings, *see* Lustberg Cert., ¶ 10, Mr. McMahon conducted over one-hundred (100) interviews and background searches between 2013 and 2018 in connection with the

---

[7] By way of summary procedural history, on November 10, 2009, Paul Bergrin was charged in a thirty-nine count Superseding Indictment, which alleged "an array of criminal activity, ranging from conspiracy to murder [of] a government witness and witness bribery to mortgage fraud and drug conspiracy, with a prostitution charge in between."  *United States v. Bergrin*, 707 F. Supp. 2d 503, 505-06 (D.N.J. 2010).  On April 21, 2010, the United States District Court for the District of New Jersey dismissed the RICO charges against Bergrin because "the indictment did not adequately allege a racketeering 'enterprise' or a 'pattern of racketeering activity'"; the Government appealed and the Third Circuit reversed.  *See United States v. Bergrin*, 650 F.3d 257, 263, 274 (3d Cir. 2011).  "After remand, the government filed a 33-count second superseding indictment . . . charging Bergrin with RICO violations, witness tampering, participating in a cocaine-trafficking conspiracy, and tax evasion."  *United States v. Bergrin*, 682 F.3d 261, 264 (3d Cir. 2012).  The District Court ordered that the two "witness-tampering counts charg[ing] Bergrin for his role in facilitating the murder of a Government witness," Kemo McCray, "be severed and tried first and separately from the rest of the crimes charged;" that trial ended in a hung jury on November 23, 2011.  *Id.*  After that verdict, and the District Court's determination to adhere to its severance-of-counts determination, as well as certain evidentiary rulings excluding Government evidence, the Government appealed again and sought the reassignment of the case.  The Third Circuit agreed, again reversing and remanding, and, as the Government requested, reassigning the case.  *See United States v. Bergrin*, 682 F.3d 261, 265 (3d Cir. 2012).  On remand, after an approximately eight-week trial, verdicts of guilty were returned against Mr. Bergrin on all counts, *United States v. Bergrin*, No. 09-369 (DMC), 2013 WL 3864393, at *1 (D.N.J. July 23, 2013), and Bergrin was sentenced to six concurrent terms of life in prison.  *See United States v. Bergrin*, 599 F. App'x 439, 440 (3d Cir. 2014).  The conviction was affirmed by the Third Circuit on December 18, 2014.  *See id.* at 443.  Thereafter, Bergrin filed a motion for a new trial based upon newly discovered evidence pursuant to Federal Rule of Criminal Procedure 33(b)(1).  This was the motion as to which Mr. McMahon was retained.  Though not pertinent here, the district court ultimately denied that motion, *see United States v. Bergrin*, No. 09-369, 2020 WL 5015532 (D.N.J. Aug. 25, 2020), a decision which was affirmed by the Third Circuit earlier this year.  *See United States v. Bergrin*, No. 20-2828, 2022 WL 1024624 (3d Cir. Apr. 6, 2022).

investigative services performed for defendant Bergrin.  McMahon Cert., ¶ 4.  Most significantly, Mr. McMahon interviewed a number of witnesses who provided evidence that witnesses at Bergrin's second  trial had testified falsely.[8]  *See id.*, ¶¶ 4(a)-(d).

In September, 2016, while Mr. McMahon was performing investigative services for Paul Bergrin, Zhu Yong (also known as "Jason Zhu") "together with [Co-Conspirator #1] and others, hired [Mr. McMahon] to investigate and surveil John Doe #1," ECF No. 77, ¶ 18.  As the Court

---

[8]As just a few examples, Mr. McMahon interviewed Kamau Muntasir, a federal inmate who had been incarcerated with Eugene Braswell, a witness against Bergrin; Muntasir informed Mr. McMahon that while he was incarcerated with Braswell, "Braswell would say anything and put together anything to get out of jail" and that Braswell admitted to Mr. Muntasir that he lied at Bergrin's trial for this purpose, *see* McMahon Cert., ¶ 4(a); Theresa Vannoy Womack, who stated to Mr. McMahon that she would have been willing to provide testimony at Bergrin's trial in a way that would have provided powerful exculpatory evidence with regard to the drug charges against Bergrin, including that those responsible for these offenses (Yolanda Jauregui and Alejandro Castro) hid their actions from Bergrin, but that she did not receive the subpoena that Bergrin had issued to her, *see id.*, ¶ 4(b); and Savina Sauseda, the girlfriend of Oscar Cordova, an important witness against Bergrin at trial, who told Mr. McMahon that Cordova had tampered with critical recordings of Bergrin, recordings which played a significant role in the prosecution of Bergrin, *see id.*, ¶ 4(c).  As well, Mr. McMahon interviewed, for example, Hassan Miller, the cellmate of Anthony Young, the key witness against Bergrin with regard to the Kemo murder –Miller's testimony provided that Anthony Young admitted to Miller his plan to provide false testimony specifically about Bergrin to "get out faster," by claiming to have knowledge about "the dude . . . that he supposedly had – had shot, whatever – on South Orange Avenue," *i.e.* Kemo McCray, *see id.*, ¶ 4(d) ; and Syed Rehman, a cell mate of Abdul Williams, who testified against Bergrin at trial, *see id.*, ¶ 4(e).  Indeed, Mr. McMahon interviewed Williams himself, *see id.*, ¶ 4(f), as well as such significant witnesses as Jose Jimenez, the father of Yolanda Jauregui who served time in federal prison for being part of Paul Bergrin's alleged drug operation, who testified against Paul Bergrin at his first trial and was alleged by Bergrin to be the true perpetrator of the drug offenses of which Bergrin was convicted, *see id.*, ¶ 4(g); and Thomas Moran Sr., the father of Thomas Moran Jr., who also testified against Bergrin at trial, *see id.*, ¶ 4(h).  Many of Mr. McMahon's interviews, including some of these, provided the basis of Bergin's motion for a new trial.  *See* Brief in Support of Defendant Paul Bergrin's Motion for a New Trial Grounded on Newly Discovered Evidence at 8-9, 18-22, 28, *United States v. Bergrin*, No. 2:09-cr-00369-JLL (D.N.J. June 27, 2016), ECF No. 630-1; Reply Brief in Support of Defendant Paul Bergrin's Motion for a New Trial Grounded on Newly Discovered Evidence at 50 n.14, *United States v. Bergrin*, No. 2:09-cr-00369-JLL (D.N.J. Nov. 21, 2018), ECF No. 681.

has learned, the co-conspirators concealed the true purpose of Mr. McMahon's investigation from him, repeatedly informing Mr. McMahon that the subject was being investigated because the subject had embezzled assets from a private Chinese company.  *See* Lustberg Cert., Ex. Nos. 1, 2, 3, 4.  Between October of 2016 and April of 2017, Mr. McMahon performed lawful investigative services in connection with the matter, which was largely focused on asset recovery; specifically, Mr. McMahon "conduct[ed] surveillance of John Doe #1" over the course of five days – on each of which Mr. McMahon informed local police of his surveillance activities.  ECF No. 77, ¶ 19.  He also obtained banking and other "information regarding John Doe #1 and his family."  *Id.*

On October 28, 2020, over three years after the last day on which Mr. McMahon performed investigative services with regard to John Doe #1, Mr. McMahon was suddenly arrested and charged in a two-count criminal complaint with Conspiracy to Act as an Agent of a Foreign Government Without Prior Notification to the Attorney General in violation of 18 U.S.C. § 371 and with Conspiracy to Engage in Interstate Stalking in violation of 18 U.S.C. § 371.  *See* ECF No. 1.  Specifically, at approximately 6:00 A.M. on that date, some four or five FBI Agents arrived at Mr. McMahon's home in Mahwah, New Jersey, pounded on the front door, waking up Mr. McMahon, his wife, Mary Martha McMahon, and his son, Michael T. McMahon.  McMahon Cert., ¶ 5; *see also* Certification of Michael T. McMahon ("Michael T. McMahon Cert."), ¶ 2; Certification of Mary Martha McMahon ("Martha Cert."), ¶ 2.  Through the windows on the front door and sidelights, Mr. McMahon saw flashlights and heard loud voices yelling "Michael McMahon, open the door!"  McMahon Cert., ¶ 6; *see also* Martha Cert., ¶ 3.  After Mr. McMahon opened the front door, his wife, Mary Martha McMahon, and his son, Michael T. McMahon, were in the upstairs living room; Mr. McMahon's son sat on a couch facing the front door approximately ten (10) feet from the entrance and Mr. McMahon's wife was standing a few feet behind him.

McMahon Cert., ¶ 7; *see also* Michael T. McMahon Cert., ¶ 4; Martha Cert., ¶ 4.  Upon opening

the door, FBI Agents announced themselves and stated that Mr. McMahon was under arrest, but

did not tell him why he was being arrested. McMahon Cert., ¶ 8; *see also* Michael T. McMahon

Cert., ¶ 3.

Understanding the notoriety of the case in which he had been involved as an investigator,

Mr. McMahon asked the FBI Agents: "Is this about Paul Bergrin?"  McMahon Cert., ¶ 9; *see also*

Michael T. McMahon Cert., ¶ 4; Martha Cert., ¶ 5.  Special Agent Sean McCarthy responded:

"No, but I know you from that case.  You've been on my board more than once."  McMahon Cert.,

¶ 9; *see also* Michael T. McMahon Cert., ¶ 4; Martha Cert., ¶ 6.  The FBI Agents then allowed Mr.

McMahon to go to his bedroom to get dressed and use the bathroom.  McMahon Cert., ¶ 10.  While

getting dressed, Mr. McMahon asked the FBI Agent who accompanied him to his bedroom what

the charges were against him.  *Id.*  The Agent answered that the charges were "working for the

Chinese Government."  *Id.*  Mr. McMahon informed the FBI Agent that he recalled working on a

Chinese case a few years prior, and asked if the agents wanted his computers, phones, and other

materials related to the case, but the agents did not take him up on that offer or go to his office to

retrieve the materials.  *Id.*  After Mr. McMahon got dressed, the FBI Agents escorted Mr.

McMahon out of his home without handcuffs.  *Id.*, ¶ 11; *see also* Michael T. McMahon Cert., ¶ 6;

Martha Cert., ¶ 7.  Halfway down the driveway, Special Agent Sean McCarthy put handcuffs on

Mr. McMahon.  McMahon Cert., ¶ 11.

A female agent drove the vehicle to Mr. McMahon's post-arrest interview, and Special

Agent McCarthy rode in the rear passenger's seat.  McMahon Cert., ¶ 12.  While in the vehicle,

Special Agent McCarthy asked Mr. McMahon: "Was your son in the living room the one on A

Baby Story?"[9] *Id.*   Mr. McMahon did not answer, but Mr. McMahon asked Special Agent McCarthy: "So you know me from Paul Bergrin?"  *Id.*  Special Agent McCarthy stated: "The case agent was my office mate."  *Id.*  Mr. McMahon replied: "Shawn Brokos?" *Id.*  Special Agent McCarthy said: "Yes.  Let's wait until we get to the office to discuss anything else."  *Id.* Special Agent McCarthy was one of the agents who conducted Mr. McMahon's post-arrest interview.  *Id.*, ¶ 14.

Following Mr. McMahon's arrest, on or about February 22, 2021, Mr. McMahon and his counsel made a detailed presentation to the Government, demonstrating his innocence and showing through documents such as emails and text messages that Mr. McMahon had no idea that he was performing investigative services on behalf of the People's Republic of China, but rather, believed based upon what he was told by those who retained him, that he was performing investigative services in connection with an individual who embezzled assets from a private Chinese company. *See* Lustberg Cert., ¶ 7.  At this presentation, Mr. McMahon shared with the Government the pertinent portions of his file in connection with the investigation of John Doe #1, which he meticulously maintained, and which he showed, exculpated him.  *Id.*, ¶ 8.  During this presentation and in at least one other phone call, and perhaps more, Mr. McMahon, through his counsel, offered to provide any information that the Government might need in order to prosecute those responsible, and to otherwise cooperate with the Government in any way it wished.  *Id.*, ¶ 9.  The Government has not accepted this offer, or at least has not done so without Mr. McMahon admitting wrongdoing, which he cannot do without perjuring himself.  *Id.*

---

[9] In 2002, Mr. McMahon's family was featured on "A Baby Story" on TLC for his son Max's birth.  McMahon Cert., ¶ 12.

Nonetheless, on May 15, 2021, a Grand Jury sitting in the Eastern District of New York returned an indictment charging defendants Hu Ji, Li Minjun, Zhu Feng (also known as "Johnny Zhu"), Michael McMahon, Zheng Congying, and Zhu Yong (also known as "Jason Zhu") with Conspiracy to Act as an Agent of a Foreign Government Without Prior Notification to the Attorney General in violation of 18 U.S.C. § 371 and 18 U.S.C. § 3551 (Count I) and with Conspiracy to Engage in Interstate Stalking in violation of 18 U.S.C. § 371 and 18 U.S.C. § 3551 (Count II).  *See* ECF No. 54.  A Superseding Indictment, adding an additional defendant and substantive charges related to the conspiracy counts, was returned on July 21, 2021.  *See* ECF No. 77.[10]

Although allegations such as these are the basis of a number of other cases around the country, those cases do not, given similar charges, include allegations against investigators, like Mr. McMahon, though investigators are often used by foreign governments for their purposes.  For example, in *United States v. Farahani*, No. 21-CR-430 (RA) (S.D.N.Y.), the Government charged the defendants, an Iranian intelligence official and Iranian intelligent assets, with having "procured the services of private investigators to surveil, photograph and video record [the victim's] household members in Brooklyn" by means of "misrepresenting their identities and the purpose of the surveillance to the investigators" in connection with a conspiracy to kidnap "a journalist, author, and human rights activist residing in Brooklyn" for "mobiliz[ing] public opinion in Iran and around the world to bring about changes to the regime's laws and practices." Superseding Indictment at ¶¶ 2, 6, *United States v. Farahani*, No. 21-CR-430 (RA) (S.D.N.Y.); *see also Iranian Intelligence Officials Indicted on Kidnapping Conspiracy Charges*,

---

[10]The Superseding Indictment also charges defendants Tu Lan and Zhu Feng (also known as "Johnny Zhu") with Obstruction of Justice in violation of 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 2, and 18 U.S.C. § 3551 (Count V) and Conspiracy to Obstruct Justice in violation of 18 U.S.C. § 1512(k) and 18 U.S.C. § 3551 (Count VI).

https://www.justice.gov/opa/pr/iranian-intelligence-officials-indicted-kidnapping-conspiracy-charges.  But no charges were brought against the private investigators.  Similarly, in *United States v. Lin*, No. 22-MJ-251-MMH (E.D.N.Y.), the defendant, "a former police officer in the PRC who later joined the" Ministry of State Security ("MMS"), a "foreign intelligence and secret police agency of the PRC government responsible for counterintelligence, espionage and political security," retained a private investigator  in New York to disrupt the campaign of the victim, who was running for U.S. Congress and was a "student leader of the Tiananmen Square protests from 1989, who later escaped to the United States and served in the U.S. military." Amended Complaint and Affidavit in Support of Arrest Warrant at ¶¶ 4, 7-9, *United States v. Lin*, No. 22-mj-251 (MMH/JRC) (E.D.N.Y.), ECF No. 4; *see also Five Individuals Charged Variously with Stalking, Harassing and Spying on U.S. Residents on Behalf of the PRC Secret Police*, https://www.justice.gov/opa/pr/five-individuals-charged-variously-stalking-harassing-and-spying-us-residents-behalf-prc-0.   When the defendant retained the private investigator, he suggested the private investigator physically attack the Victim and further "indicated  that, if the Victim 'passes the approvals' in the primary elections 'next May,' 'then he will be elected to be a legislator.  Right now we don't want him to be elected.'" Amended Complaint and Affidavit in Support of Arrest Warrant at ¶ 13, *United States v. Lin*, No. 22-mj-251 (MMH/JRC) (E.D.N.Y.), ECF No. 4.  The defendant also requested that the private investigator provide "compromising information about the Victim," or if no such information could be found, "manufacture something."  *Id.* at ¶¶ 11, 19.  The defendant told the private investigator that "we will have a lot more-more of this [work] in the future . . . Including right now [a] New York State legislator," and that he was working with other unidentified individuals in the PRC to stop the Victim from being elected to the U.S. Congress.  *Id.* at ¶ 14.  Faced with this obviously unlawful activity, the private

investigator "contacted the FBI about the case, allowing the U.S. law enforcement agency to listen in on the calls" between the private investigator and the defendant and was not charged.  Shannon Tiezzi, *US Alleges 'Transnational Repression' Scheme Involving China's Secret Police*, https://thediplomat.com/2022/03/us-alleges-transnational-repression-scheme-involving-chinas-secret-police/; *see* Justin Rohrlich, *Honey Traps, Child Porn and Violence: Feds Bust Chinese Plot to Destroy NY Candidate*, https://www.thedailybeast.com/fbi-alleges-chinese-community-party-and-retired-agent-qiming-lin-tried-to-ruin-ny-candidate-xiong-yan ("[A] private investigator contacted the FBI and said he had been approached by a now-retired Chinese police officer and Ministry of State Security agent named Qiming Lin . . . ."); *see also* Amended Complaint and Affidavit in Support of Arrest Warrant, ¶ 3 n.2, *United States v. Lin*, No. 22-mj-251 (MMH/JRC) (E.D.N.Y.), ECF No. 4.

Meanwhile, following Mr. McMahon's indictment, the Government, in arguing against Bergrin's motion for a new trial on appeal, specifically sought to undermine Mr. McMahon's investigative findings upon which Bergrin depended in his argument, by citing this very prosecution, informing the Third Circuit Court of Appeals that "McMahon has his own credibility problems," given that "McMahon has been charged with Federal felonies." Brief for Appellee at 38, *United States v. Bergrin*, Case No. 20-2828 (3d Cir. June 22, 2021), ECF No. 30 (citing *United States v. Zhu*, No. 21-cr-265 (E.D.N.Y.)).

Mr. McMahon has entered not guilty pleas to the charges against him.  His initial motions, seeking dismissal based on the allegations in the Superseding Indictment were denied, *see* ECF No. 123, but Mr. McMahon reserved the right to file this motion, based upon the prosecutorial misconduct inherent in the Government's otherwise inexplicable determination to prosecute Mr.

McMahon because, he alleges, of his lawful investigative activities on behalf of Paul Bergrin. This brief seeks discovery and an evidentiary hearing in support of this motion.

## ARGUMENT

**I.    THE COURT SHOULD GRANT MR. MCMAHON DISCOVERY AND AN EVIDENTIARY HEARING REGARDING THE GOVERNMENT'S MOTIVE IN INDICTING MR. MCMAHON.**

Although "'the decision as to whether to prosecute generally rests within the broad discretion of the prosecutor,' and a prosecutor's pretrial charging decision is presumed legitimate," it is well established that "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort[.]" *United States v. Sanders*, 211 F.3d 711, 716 (2d Cir. 2000) (quoting *United States v. White*, 972 F.2d 16, 18-19 (2d Cir. 1992)); *see also United States v. Stewart*, 590 F.3d 93, 122 (2d Cir. 2009). Indeed, "penalizing those who choose to exercise constitutional rights, would be patently unconstitutional." *Sanders*, 211 F.3d at 716; *see also Stewart*, 590 F.3d at 122 ("a prosecution brought with vindictive motive, penalizing those who chose to exercise constitutional rights, would be patently unconstitutional." (citation omitted)). Thus, "a prosecution brought with a vindictive motive, such as exercise of authority motivated to penalize or retaliate against a defendant for the valid exercise of a constitutional or statutory right to an appeal or habeas proceeding is prohibited by the Due Process Clause of the Fourteenth Amendment[,]" *United States v. Dean*, 119 F. Supp. 2d 81, 82 (D. Conn. 2000), and "an indictment will be dismissed if there is a finding of 'actual' vindictiveness, or if there is a presumption of vindictiveness that has not been rebutted by objective evidence justifying the prosecutor's action." *Sanders*, 211 F.3d at 716 (quoting *United States v. Johnson*, 171 F.3d 139, 140 (2d Cir. 1999)); *see also Stewart*, 590 F.3d at 122 (same); *United States v. Bout*, 731 F.3d 233, 238 (2d Cir. 2013) (same).

In order to make the required showing, "a defendant is entitled to discovery on a claim of vindictive . . . prosecution where the defendant 'provide[s] some evidence tending to show the existence of the essential elements of the defense.'" *Sanders*, 211 F.3d at 717 (quoting *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974)); *see United States v. Sattar*, 314 F. Supp. 2d 279, 314 (S.D.N.Y. 2004) ("[T]o obtain discovery on a claim of vindictive prosecution, a defendant must provide 'some evidence tending to show the existence of the essential elements of the claim.'" (citation omitted)); *see also United States v. Parker*, No. 08-CR-6270L, 2009 WL 3754017, at *5 (W.D.N.Y. Oct. 21, 2009) (recognizing that "the standard for obtaining discovery on a claim of vindictive prosecution . . . demands 'some evidence tending to show the existence of the essential elements' of the claim of vindictive prosecution" and that the "standard for granting an evidentiary hearing should be" the same). And to obtain a hearing on a vindictive prosecution claim, "the defendant must 'raise a reasonable doubt the government acted properly in seeking the indictment.'" *United States v. Aviv*, 923 F. Supp. 35, 27 (S.D.N.Y. 1996) (quoting *United States v. Benson*, 941 F.2d 598, 611 (7th Cir. 1991)).

Ultimately, "[t]o establish an actual vindictive motive, a defendant must prove objectively that the prosecutor's charging decision was a 'direct and unjustifiable penalty,' that resulted 'solely from the defendant's exercise of a protected legal right.'" *Sanders*, 211 F.3d at 716-17 (quoting *United States v. Goodwin*, 457 U.S. 368, 384 & n.19 (1982)). This requires that the defendant "show that '(1) the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse,' and (2) [the defendant] would not have been prosecuted except for the animus.'" *Id.* at 717 (quoting *United States v. Koh*, 199 F.3d 632, 640 (2d Cir. 1999)); *see also Bout*, 731 F.3d at 233 (same). And "[t]he 'animus' that is prohibited typically occurs in situations where 'a

prosecutor's charging decision is a direct and unjustifiable penalty that resulted solely from the defendant's exercise of a protected legal right.'" *Bout*, 731 F.3d at 239 (quoting *Stewart*, 590 F.3d at 123).

As is discussed below, Mr. McMahon has established at least a reasonable doubt as to whether the Government acted properly in seeking the indictment in this matter, including that he has provided "some evidence tending to show" that he was vindictively prosecuted in the instant matter based upon his actions in acting as an investigator for a notorious criminal defendant, Paul Bergrin, whom he was assisting to exercise his established right to seek a new trial based upon newly discovered evidence under Federal Rule of Criminal Procedure 33(b)(1).   As such, discovery should be granted and an evidentiary hearing held to ascertain what role Mr. McMahon's assistance of Paul Bergrin played in the determination to prosecute him, including what communications or documentation exist among and between the Government's investigative and prosecution team with regard to Mr. McMahon's involvement in the *Bergrin* case.

Certainly, Mr. McMahon can establish "some evidence tending to show" that "the prosecutor harbored genuine animus toward" him, as that term is defined by the caselaw.  *See Sanders*, 211 F.3d at 717.  Here, the Government's animus against Mr. McMahon stemmed both from the notoriety of the case in which he was involved as an investigator – one that was not only extremely high profile, but as to which the Government has particularly strong feelings, as is evidenced in its briefs, its actions with regard to the defendant's conditions of confinement and otherwise.  *See supra* at 4-7.  Indeed, those strong feeling were understandable given the offense at issue— the murder of a Government informant. *See Bergrin*, 682 F.3d at 264, 266.

There is also at least "some evidence," *see Sanders*, 211 F.3d at 717, connecting that animus to this case.  Thus, Special Agent Sean McCarthy, who arrested and then interviewed Mr.

McMahon, was the officemate of Special Agent Shawn Brokos, the lead FBI Agent who handled the investigation of Paul Bergrin and was the FBI Agent responsible for recruiting and supervising Kemo McCray, the murdered informant against one of Bergrin's clients. Moreover, as set forth above, Bergrin, who represented himself at trial, aggressively cross-examined Special Agent Brokos, challenging her testimony and ultimately arguing that she mishandled her confidential informant, ultimately leading to his death. And even after Bergrin was convicted and sentenced to life in prison, his cousin, Ronald Bergrin, located Special Agent Brokos's address and threatened her safety. The Government's reaction to these offenses was understandably strong. That they are expressed in this case, through Special Agent McCarthy's multiple statements to Mr. McMahon on the date of his arrest regarding his involvement in the Paul Bergrin case, including that he "know[s Mr. McMahon] from [the Bergrin] case," that Mr. McMahon has "been on [his] board more than once," and that Shawn Brokos was his office mate, *see* McMahon Cert., ¶¶ 9, 12, provide objective evidence that the Government harbored genuine animus towards Mr. McMahon for his involvement in attempting to vindicate Bergrin by assisting him with his Rule 33 motion for a new trial based upon newly discovered evidence. But that assistance, in furtherance of Bergrin's legal rights, and indeed, as approved by the Court, simply cannot be a permissible basis upon which to prosecute Mr. McMahon here.

Of course, the constitutional rights at stake are not controversial. Bergrin, however notorious, however culpable, and however serious his crimes, had the right to the effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984); *see also United States v. Jenks*, No. 20-4023, 2022 WL 1252366, at *1 (10th Cir. Apr. 28, 2022) ("But even alleged perpetrators of heinous crimes have the right to the assistance of counsel in their defense."). Even more specifically, the caselaw, including *Strickland* itself, makes clear that "counsel has a duty to

make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "Counsel's duty to investigate includes the obligation to investigate all witnesses who may have information concerning [the defendant's] guilt or innocence." *McCollough v. Bennett*, No. 02-cv-114253, 2020 WL 114253, at *11 (E.D.N.Y. Jan. 12, 2020) (quoting *Rosario v. Ercole*, 582 F. Supp. 2d 541, 575 (S.D.N.Y. 2008)); *see also Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). "The duty to investigate is essential to the adversarial testing process '[b]ecause th[e] testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies.'" *Green v. Lee*, 964 F. Supp. 2d 237, 256 (E.D.N.Y. 2013) (quoting *Greiner v. Wells*, 417 F.3d 305, 320 (2d Cir. 2005)); *see generally, e.g., Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) ("Because [the adversarial] testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies, we noted that 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" (citation omitted)); *see also United States v. Mohammed*, 863 F.3d 885, 890 (D.C. Cir. 2017) ("'It is especially important that counsel adequately investigate the case,' because '[o]nly when reasonable investigation has been performed is counsel in a position to make informed tactical decisions.'" (quoting *United States v. Barbou*, 813 F.2d 1232, 1234 (D.C. Cir. 1987))). Here, Bergrin and his legal team retained Mr. McMahon in 2013 to investigate witnesses who, it was believed, could provide information showing that Bergrin had been convicted based upon the false statements of witnesses, including statements that those witnesses had recanted. In accepting the defense's request that he provide investigative services for a criminal defendant in the course of that defendant's pursuit of legitimate (if unsuccessful) motion practice brought under the Federal Rules of Criminal

Procedure, Mr. McMahon not only vindicated Bergrin's rights, but also his own right to pursue his vocation.

With regard to the rights that Mr. McMahon was retained to vindicate on behalf of his client, there can be little question: "a prosecution brought with a vindictive motive, such as exercise of authority motivated to penalize or retaliate against a defendant for the valid exercise of a constitutional or statutory right to an appeal or habeas proceeding is prohibited by the Due Process Clause of the Fourteenth Amendment." *Dean*, 119 F. Supp. 2d at 82.  Certainly, professionals like Mr. McMahon, can and must be able to "raise third-party rights" where that third party is unable "to protect his or her own interest." *Powers v. Ohio*, 499 U.S. 400, 411 (1991); *see id.* at 410-11 (holding that parties in a litigation were allowed to raise the claims of prospective jurors to be free from discriminatory jury selection); *Singleton v. Wulff*, 428 U.S. 106, 114–17 (1976) (holding that physicians had standing to challenge state statute that prohibited Medicaid payments for nontherapeutic abortions); *Craig v. Boren*, 429 U.S. 190, 193 (1976) (finding that a male bartender had standing to challenge a law permitting eighteen-year-old women, but not men, to buy 3.2% beer); *Eisenstadt v. Baird*, 405 U.S. 438, 443–44 (1972) (finding that a doctor prosecuted for distributing contraceptives was allowed to assert rights of his patients to have access to contraceptives).  That, of course, was the case here, where Mr. Bergrin was destitute and incarcerated; the Court's appointment of counsel, and of Mr. McMahon as in investigator, recognized this reality.

Further, as to his own rights, Mr. McMahon obviously had the right to earn a living as an investigator without risking criminal prosecution just because he was acting as an investigator for a notorious client.  *See Maniscalco v. New York City Dep't of Educ.*, 563 F. Supp. 3d 33, 38 (E.D.N.Y. 2021) ("The Supreme Court 'has indicated that the liberty component of the Fourteenth

Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment.'" (quoting *Conn v. Gabbert*, 526 U.S. 286, 291-92 (1999))); *see also Barzilay v. City of New York*, No. 20-cv-4452 (LJL), 2022 WL 2657169, at *40 (S.D.N.Y. July 8, 2022) ("[L]iberty, as protected by the Fourteenth Amendment, include[s] a number of rights, including the right 'to engage in any of the common occupations of life.'" (quoting *Neu v. Corcoran*, 869 F.2d 662, 666 (2d Cir. 1989))); *Kosinski v. Conn. State Dep't of Educ.*, No. 3:10-CV-0805 (CSH), 2011 WL 1134236, at *5 (D. Conn. Mar. 24, 2011) ("The Due Process Clause of the Fourteenth Amendment does indeed protect an individual's liberty to engage in an occupation . . . .").

In sum, the rights at issue – both Bergrin's and McMahon's – are clear, and there is at least "some evidence tending to show" that he "would not have been prosecuted except for the animus." *See Sanders*, 211 F.3d at 717.  The proffered facts, discussed above, make clear that there is at least a colorable concern that Mr. McMahon was targeted for prosecution because of his affiliation with and lawful investigation on behalf of Bergrin.  Not only do the comments of the agents who arrested him comprise the "some evidence" required to justify—at the very least—discovery and a hearing, but of perhaps even greater concern, the Government sought to use Mr. McMahon's prosecution here as a basis for denying relief to Bergrin, whose conviction and severe punishment it has so aggressively pursued.  Thus, in arguing against Bergrin's motion for a new trial, the Government specifically sought to undermine Mr. McMahon's investigative findings that favored the relief sought by Mr. Bergrin by citing this prosecution, informing the Third Circuit Court of Appeals that "McMahon has his own credibility problems," due to the fact that "McMahon has been charged with Federal felonies."  Brief for Appellee at 38, *United States v. Bergrin*, Case No. 20-2828 (3d Cir. June 22, 2021), ECF No. 30 (citing *United States v. Zhu*, No. 21-cr-265

(E.D.N.Y.)).  Thus viewed, the Government itself provides powerful evidence not only through its statements at the time of arrest but also in its briefing since then, that prosecuting Mr. McMahon is at least in part an effort to continue the Bergrin prosecution.

This logic is particularly inexorable when one considers the facts of this matter.  Thus, this prosecution has continued even after Mr. McMahon, in a detailed presentation to the Government following his arrest, demonstrated his innocence.  *See* Lustberg Cert., ¶ 7.  Thus, before indictment, Mr. McMahon took the extraordinary step of revealing his defense, showing—through documents such as emails and texts—that Mr. McMahon had no idea that he was performing investigative services on behalf of the People's Republic of China, but rather, believed based upon what he was told by those who retained him, that he was performing investigative services in connection with an individual who embezzled assets from a private Chinese company.  *Id.*  Significantly, Mr. McMahon's position has been confirmed by the discovery provided since, which includes absolutely no evidence of Mr. McMahon's knowledge that he was acting on behalf of another country—no documents, no communications, no testimony (of which he has been made aware). Unlike the way it has treated other investigators in very similar circumstances, especially those who, like Mr. McMahon, offered to cooperate with the Government, *see id.*, ¶ 9, including by providing it with his entire file, *see id.*, ¶ 8, the Government proceeded to indict and has continued, notwithstanding the evidence, to prosecute Mr. McMahon.[11]

Indeed, this is not the way other private investigators have been treated even in this case. That is, Mr. McMahon was not the only private investigator whom the alleged co-conspirators

---

[11] This evidence includes the fact that, for example, Mr. McMahon, a retired NYPD police officer, detective in the Bronx Narcotics Division, and Sergeant at the 43rd Precinct of the Bronx, *see* McMahon Cert., at ¶ 2, with no criminal record, contacted multiple law enforcement officials in the course of his investigation in connection with this matter, including local law enforcement, DEA Agent Greg Finning, and FBI Agent Brian O'Rourke.

hired to investigate John Doe #1: according to the Complaint, the co-conspirators also retained a private investigator in California to obtain "location information for certain persons in the United States on behalf of the PRC government, including John Doe-1 and his family, to assist in Operation Fox Hunt," *see* ECF No. 1, ¶ 14(g).  Specifically, "[i]n or about June 2017, the PI purported to investigate and surveil John Doe-2 for RONG JIN," in efforts "'to find the dad,' *i.e.* John Doe-1." *Id.*, ¶¶ 96, 102.  However, the private investigator in California, "a United States citizen with no criminal history," was not indicted in this matter, as Mr. McMahon was, but rather was given the opportunity to act as "a confidential human source for the FBI" and "received financial compensation and a certificate of appreciation for his efforts on behalf of law enforcement." *Id.*, ¶ 81 n.6.  Here, by contrast, Mr. McMahon was never given that opportunity: the FBI never contacted Mr. McMahon, as it did the California private investigator, to act as a confidential information, though Mr. McMahon later made clear he would certainly have gladly done, and offered to do thereafter.[12]  *See* McMahon Cert., ¶ 15; Lustberg Cert., ¶ 9.

That the Government had particular animus against Mr. McMahon is further demonstrated by the Government's actions with regard to other private investigators retained by individuals acting on behalf of a foreign government seeking to locate a resident of the United States in other similar matters but whom it has not prosecuted.  For example, in *United States v. Farahani*, No. 21-CR-430 (RA) (S.D.N.Y.), the Government charged the defendants, an Iranian intelligence

---

[12] It also bears noting that, in the course of the Government's investigation in this case, the Government interviewed at least one of the defendants in this matter, Zhu Feng (also known as "Johnny Zhu"), as early as April 12, 2017, as well as on three additional dates prior to the arrests in this matter, on November 9, 2017, November 10, 2017 and June 20, 2018.  However, the Government chose not to interview Mr. McMahon during the course of its investigation, and, most importantly, failed to warn Mr. McMahon and his family that he was being used in connection with a dangerous operation run by the PRC, even though Mr. McMahon and his family could have been in danger.  Mr. McMahon would have been an asset to the Government in its investigation of this matter.

official and Iranian intelligent assets, with having "procured the services of private investigators to surveil, photograph and video record [the victim's] household members in Brooklyn" by means of  "misrepresenting their identities and the purpose of the surveillance to the investigators" in connection with a conspiracy to kidnap "a journalist, author, and human rights activist residing in Brooklyn" for "mobiliz[ing] public opinion in Iran and around the world to bring about changes to the regime's laws and practices." Superseding Indictment at ¶¶ 2, 6, *United States v. Farahani*, No. S1 21 Cr. 430 (RA) (S.D.N.Y.); *see also Iranian Intelligence Officials Indicted on Kidnapping Conspiracy Charges*,   https://www.justice.gov/opa/pr/iranian-intelligence-officials-indicted-kidnapping-conspiracy-charges.  However, no criminal charges were brought against the private investigators in that case, as they have been against Mr. McMahon.

Likewise, in *United States v. Lin*, No. 22-MJ-251-MMH (E.D.N.Y.), the defendant, "a former police officer in the PRC who later joined the" Ministry of State Security ("MMS"), a "foreign intelligence and secret police agency of the PRC government responsible for counterintelligence, espionage and political security," retained a private investigator in New York to disrupt the campaign of the victim, who was running for U.S. Congress and was a "student leader of the Tiananmen Square protests from 1989, who later escaped to the United States and served in the U.S. military." Amended Complaint and Affidavit in Support of Arrest Warrant at ¶¶ 4, 7-9, *United States v. Lin*, No. 22-mj-251 (MMH/JRC) (E.D.N.Y.), ECF No. 4; *see also Five Individuals Charged Variously with Stalking, Harassing and Spying on U.S. Residents on Behalf of the PRC Secret Police*, https://www.justice.gov/opa/pr/five-individuals-charged-variously-stalking-harassing-and-spying-us-residents-behalf-prc-0.  When the defendant retained the private investigator, he suggested the private investigator physically attack the Victim and further "indicated  that, if the Victim 'passes the approvals' in the primary elections 'next May,' 'then he

will be elected to be a legislator.  Right now we don't want him to be elected.'" Amended Complaint and Affidavit in Support of Arrest Warrant at ¶ 13, *United States v. Lin*, No. 22-mj-251 (MMH/JRC) (E.D.N.Y.), ECF No. 4.  The defendant also requested that the private investigator provide "compromising information about the Victim," or if no such information could be found, "manufacture something."  *Id.* at ¶¶ 11, 19.  The defendant told the private investigator that "we will have a lot more-more of this [work] in the future . . . Including right now [a] New York State legislator," and that he was working with other unidentified individuals in the PRC to stop the Victim from being elected to the U.S. Congress.  *Id.* at ¶ 14.  Faced with this obviously unlawful activity, the private investigator "contacted the FBI about the case, allowing the U.S. law enforcement agency to listen in on the calls" between the private investigator and the defendant and was not charged.  Shannon Tiezzi, *US Alleges 'Transnational Repression' Scheme Involving China's Secret Police*, https://thediplomat.com/2022/03/us-alleges-transnational-repression-scheme-involving-chinas-secret-police/; *see* Justin Rohrlich, *Honey Traps, Child Porn and Violence: Feds Bust Chinese Plot to Destroy NY Candidate*, https://www.thedailybeast.com/fbi-alleges-chinese-community-party-and-retired-agent-qiming-lin-tried-to-ruin-ny-candidate-xiong-yan ("[A] private investigator contacted the FBI and said he had been approached by a now-retired Chinese police officer and Ministry of State Security agent named Qiming Lin . . . ."); *see also* Amended Complaint and Affidavit in Support of Arrest Warrant at ¶ 3 n.2, *United States v. Lin*, No. 22-mj-251 (MMH/JRC) (E.D.N.Y.), ECF No. 4.

Of course, Mr. McMahon was not being asked to do anything nearly as obviously unlawful, or even illegal, especially because he was consistently deceived as to who he was working for. But it is alarming that, from the conclusion of his actions in this matter, on April 11, 2017, until his arrest in this matter on October 28, 2020, Mr. McMahon was never asked to provide assistance

to the authorities, as certainly he would have done, and indeed, offered to do as soon as he understood for whom he was, apparently working for as a result of being charged.  *See* McMahon Cert., ¶ 15; Lustberg Cert., ¶ 9.  The question thus naturally arises: why was he treated so differently?  Could it have been that he was the private investigator for a despised defendant?  Certainly, that is a real, and very troubling, question—and is the basis of his application here.[13]

In sum, Mr. McMahon has, at the very least, established reasonable doubt as to whether the Government acted properly in seeking an indictment against him, and then continued this prosecution, in light of the facts of this case.  To that end, he has provided troubling evidence tending to show that he was vindictively prosecuted.  As such, this Court should allow Mr. McMahon discovery into any communications or documentation discussing Mr. McMahon's involvement in the Bergrin case among those investigating or prosecuting this matter, and then hold a hearing to explore the Government's actual intent in prosecuting Mr. McMahon.  *See United States v. Williams*, No. 20-CR-55, 2020 WL 5960689, at *11, 16 (E.D. La. Oct. 8, 2020) (finding

---

[13] To be sure, in *United States v. Liu*, No. 1:22-CR-00311 (LDH) (VMS) (E.D.N.Y.), a private investigator, who was a retired Department of Homeland Security law enforcement agent, was charged in connection with "various crimes pertaining to a transnational repression scheme orchestrated on behalf of the Government of the People's Republic of China."  But there, the offense with which he was charged was "obstruction of justice of allegedly destroying evidence after [being] approached by FBI agents and asked about [his] procurement and dissemination of sensitive and confidential information from a restricted federal law enforcement database . . . ." *Five Men Indicted from Crimes Related to Transnational Repression Scheme to Silence Critics of the People's Republic of China Residing in the United States*, https://www.justice.gov/opa/pr/five-men-indicted-crimes-related-transnational-repression-scheme-silence-critics-people-s.  Here, Mr. McMahon, far from obstructing a government investigation, contacted law enforcement officials on multiple occasions throughout the course of his investigation – which he would not have done if he was aware he was working as an agent for the PRC – maintained all of his records in connection with the investigation of John Doe #1, including, but not limited to, text messages, emails, invoices, and investigative reports, which Mr. McMahon has freely shared with the Government since finding out that he was used by agents of the PRC, and has, on multiple occasions, offered to cooperate with the Government, which the Government has declined each time.

that the defendants were entitled to "development of the facts supporting their vindictive prosecution claim" through discovery and an evidentiary hearing where "the circumstantial evidence offered, the timing of the indictment, the timing of other government conduct in relation to the defendants' motions, and the government's own admissions concerning the investigating agents' motivations counsel[ed the Court] against prematurely stifling the development of the defendants' claims that the[ government's] prosecution crosse[d] Constitutional boundaries"); *see also United States v. Schmucker*, 721 F.2d 1046, 1049 (6th Cir. 1983) (finding that the defendant was "entitled to a full evidentiary hearing on his claim that the federal government selectively prosecuted him because of his opposition to registration based on his exercise of first amendment rights" where the defendant presented evidence that the defendant was singled out while similarly situated violators were not prosecuted).

## CONCLUSION

For the foregoing reasons, Mr. McMahon respectfully requests that the Court grant his motion and allow discovery into, and a hearing upon, his potential claim that his prosecution has resulted from his work as an investigator on behalf of a criminal defendant in another, albeit very notorious, case.

Respectfully submitted,
**GIBBONS P.C.**
*Attorneys for Defendant*
*Michael McMahon*


By:     /s/ Lawrence S. Lustberg
        Lawrence S. Lustberg, Esq.

Date: August 8, 2022