**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

                Plaintiff,

      v.

HI JI,
LI MINJUN,
TU LAN,
ZHU FENG,
also known as "Johnny Zhu,"
KUANG ZEBIN,
also known as "Vincent Kuang,"
MICHAEL MCMAHON,
ZHAI YONGQIANG,
ZHENG CONGYING and
ZHU YONG,
also known as "Jason Zhu,

                Defendants.

Case No. 1:21-cr-00265 (PKC) (S-1)

*Filed electronically*

---

**REPLY BRIEF IN FURTHER SUPPORT OF DEFENDANT MICHAEL MCMAHON'S MOTION FOR DISCOVERY AND AN EVIDENTIARY HEARING REGARDING PROSECUTORIAL MISCONDUCT**

---

**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

*On the brief:*
Lawrence S. Lustberg, Esq.
Genna A. Conti, Esq.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................................................ii

PRELIMINARY STATEMENT ....................................................................................... 1

ARGUMENT .................................................................................................................... 2

     I.    THE DISTRICT COURT CAN, AND SHOULD, HOLD A LIMITED EVIDENTIARY HEARING TO ENSURE THAT THE GOVERNMENT'S OTHERWISE INEXPLICABLE PROSECUTION OF MR. MCMAHON IS NOT MOTIVATED BY VINDICTIVENESS DUE TO THE INVESTIGATIVE SERVICES THAT MR. MCMAHON PROVIDED TO PAUL BERGRIN. ....................................................................2

CONCLUSION .............................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Mavity v. Caruso*,
 No. 207-CV-13955, 2009 WL 6409366 (E.D. Mich. Dec. 10, 2009) ......................................7

*United States v. Adams*,
 870 F.2d 1140 (6th Cir. 1989) ...............................................................................16

*United States v. Amberslie*,
 312 F. Supp. 2d 570 (S.D.N.Y. 2004)......................................................................16

*United States v. Aviv*,
 923 F. Supp. 35 (S.D.N.Y. 1996) ...........................................................17, 19, 20

*United States v. Benson*,
 941 F.2d 598 (7th Cir. 1991) ...............................................................17, 20

*United States v. Bergrin*,
 No. 20-2828 (3d Cir. June 22, 2021) .....................................................9, 10

*United States v. Berrios*,
 501 F.2d 1207 (2d Cir. 1974).......................................................... *passim*

*United States v. Bout*,
 731 F.3d 233 (2d Cir. 2013).......................................................2, 7, 19

*United States v. Dean*,
 119 F. Supp. 2d 81 (D. Conn. 2000).........................................................18

*United States v. Farahani*,
 No. 21-CR-430 (RA) (S.D.N.Y.) ............................................................11

*United States v. Goodwin*,
 457 U.S. 368 (1982).................................................................................17

*United States v. Hill*,
 93 F. App'x 540 (4th Cir. 2004) .............................................................20

*United States v. Johnson*,
 171 F.3d 139 (3d Cir. 1999)......................................................................18

*United States v. Koh*,
 199 F.3d 632 (2d Cir. 1999).........................................................2, 19

*United States v. Lanoue*,
    137 F.3d 656 (1st Cir. 1998) ...........................................................................17

*United States v. Lin*,
    No. 22-MJ-251 (E.D.N.Y.) ..............................................................................12

*United States v. Parker*,
    No. 2:08-CR-6270L, 2009 WL 3754017 (W.D.N.Y. Oct. 21, 2009) ................9, 18

*United States v. Romano*,
    487 F. App'x 607 (2d Cir. 2012) ......................................................................7

*United States v. Sanders*,
    211 F.3d 711 (2d Cir. 2000)...............................................................2, 6, 8, 20

*United States v. Sattar*,
    314 F. Supp. 2d 279 (S.D.N.Y. 2004).............................................................8, 18

*United States v. White*,
    972 F.2d 16 (2d Cir. 1992)................................................................................17

*United States v. Williams*,
    No. 20-CR-55 (LMA), 2020 WL 5960689 (E.D. La. Oct. 8, 2020)................15, 16

*United States v. Ying*,
    No. 1:22-MJ-01711-UA (S.D.N.Y.) ...................................................................12

*United States v. Young*,
    231 F. Supp. 3d 33 (M.D. La. 2017) ................................................................17

*United States v. Zhu*,
    No. 21-CR-265 (E.D.N.Y.) ................................................................................10

*Xinba Construction Grp. Co., LTD v. Xu*,
    No. ESX-L-00289-18 (N.J. Super. Ct. May 8, 2019) ..........................................6

**Statutes**

29 U.S.C. § 504 .....................................................................................................14

Driver's Privacy Protection Act ..............................................................................4

N.J.S.A. 39:2-3.3 ....................................................................................................4

N.J.S.A. 39:2-3.4(c) ...............................................................................................4

RICO .....................................................................................................................18

**Other Authorities**

Prosecutorial Discretion, 33 Geo. L.J. Ann. Rev. Crim. Proc. 223 (2010)....................................20

## PRELIMINARY STATEMENT

Defendant Michael McMahon, a long-time law enforcement officer himself, does not bring this motion alleging government misconduct lightly.  But his prosecution for acting as an unregistered agent of China, which is so unsupported by the facts—particularly given the Government's failure of these many months to produce any evidence that he was ever told that, contrary to the representations made by those who hired him, his real client was a foreign nation— that it begs for a reason.  This is especially so given the very different way in which other private investigators hired in similar circumstances have been treated: rather than prosecuted, they were warned; rather than becoming criminal defendants, they were given the opportunity to serve their country as cooperating witnesses, as Mr. McMahon certainly would have done if only given the opportunity.

So why was Mr. McMahon prosecuted?  This motion raises at least the concern— supported, as the law requires, by "some evidence," including statements made at the time of Mr. McMahon's arrest—that this is a vindictive prosecution, based upon Mr. McMahon's lawful activities as a private investigator on behalf of a particularly notorious and despised criminal defendant.  That would, of course, be completely improper and would not be permitted under our system of justice.  As set forth below and in Mr. McMahon's moving papers, this Court has the discretion to convene a limited evidentiary hearing at which the reasons for this prosecution could be probed, and to require the production of documents bearing upon the Government's actual motivation in bringing these charges.

Respectfully, and though such a hearing is not, fortunately, the kind of proceeding that is ordinarily necessary, and notwithstanding this Government's objection to holding such a hearing—itself, perhaps, telling—the Court should take those modest steps to lift the cloud hanging over these charges.  In doing so, it will be able to assure itself, the parties and the public

that this case is, in fact, a proper one under our Constitution and laws.  Mr. McMahon's motion should be granted.

**ARGUMENT**

I.    **THE DISTRICT COURT CAN, AND SHOULD, HOLD A LIMITED EVIDENTIARY HEARING TO ENSURE THAT THE GOVERNMENT'S OTHERWISE INEXPLICABLE PROSECUTION OF MR. MCMAHON IS NOT MOTIVATED BY VINDICTIVENESS DUE TO THE INVESTIGATIVE SERVICES THAT MR. MCMAHON PROVIDED TO PAUL BERGRIN.**

There is much in the motion before the Court as to which the parties agree.  The parties agree that the Court has the discretion to grant discovery to defendant McMahon and conduct an evidentiary hearing. *See* ECF No. 148, Government's Memorandum of Law in Opposition to the Defendant Michael McMahon's Motion for Discovery and an Evidentiary Hearing Regarding Prosecutorial Misconduct ("Gov't Opp.") at 10 (citing *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000)); ECF No. 146-1, Brief in Support of Defendant Michael McMahon's Motion for Discovery and an Evidentiary Hearing Regarding Prosecutorial Misconduct ("Def. Br.") at 19 (citing *United States v. Berrios*, 501 F.2d 1207, 1212 (2d Cir. 1974)).  And the parties also agree that it should do so if defendant McMahon has shown that there is "*some evidence* tending to show the existence of the essential elements of" vindictive prosecution—that is, "that (1) the prosecutor harbored genuine animus towards [him] . . . and (2) [that he] would not have been prosecuted except for the animus."  *Sanders*, 211 F.3d at 716-17 (emphasis added), *cited in* Gov't Opp. at 10; Def. Br. at 19 (also citing *United States v. Koh*, 199 F.3d 632, 640 (2d Cir. 1999); *United States v. Bout*, 731 F.3d 233, 233 (2d Cir. 2013)).

The parties also agree, in significant part, on the facts of the case, as well as those underlying this motion.  Thus, the Government's narrative, *see* Gov't Opp. at 3-6, once again includes absolutely no proof—because it has alleged none and has none to present—that Mr.

McMahon was ever informed that he was performing investigative services on behalf the Chinese government. Indeed, the Government's discussion of the case is revealing: it discusses acts performed entirely by others, of which it does not even claim Mr. McMahon was or could have been aware, *see* Gov't Opp. 5[1], 6[2]. It then goes on to recount that Mr. McMahon was hired to perform undisputedly lawful investigative services, *see* Gov't Opp. at 4 (Mr. McMahon "was first hired to investigate the Victims in approximately September 2016 by co-defendant Jason Zhu."); *id.* ("[O]ver the course of October 2016, McMahon . . . provided information about the [subjects] to his co-conspirators, including surveillance photographs, banking information, and private personal data such as dates of birth and Social Security numbers.")[3]; *id.* ("On or about October 27,

---

[1] Thus, the Government summarizes its allegations as follows, never mentioning McMahon: "Around the same time, other co-conspirators were traveling to New Jersey to facilitate the scheme. Co-defendant Zhu Feng [("Johnny Zhu")], a Queens resident at that time, contacted Hongru Jin, another Queens resident, and directed Jin to travel and pick up several 'team members' from the airport. Zhu specifically told a co-conspirator that they were working for the PRC government. Zhu Feng also helped prepare false information to help ensure that John Doe #2 would be permitted to enter the United States when he traveled. On or about April 3, 2017, Zhu Feng and co-defendant Tu Lan flew from the PRC and landed at Newark International Airport and, on or about April 5, 2017, John Doe #2 was brought to New Jersey from the PRC by co-defendant Li Minjun, and also landed at Newark International Airport. After landing in the United States, PRC Official Tu Lan met with Zhu Feng and another conspirator (both of whom at the time resided in the Eastern District of New York) at a hotel in New Jersey, and strategized about how to carry out the operation." (citations omitted).

[2] And here too, the Government again includes detailed allegations which do not include McMahon, let along charge that he was told, at any point, that he was working for the Chinese government: "On or about April 7, 2017, PRC official Tu Lan departed from John F. Kennedy International Airport, in Queens, New York ('JFK Airport') on a flight to Beijing, PRC and, on or about April 8, 2017, Li Minjun departed from Newark Airport on a flight to Beijing, PRC. McMahon continued to take directions from his co-conspirators, including the PRC official who returned to the PRC from the Eastern District of New York. For example, on or about April 9, 2017, Tu Lan directed Zhu Feng to '[t]ell Mike' (referring to McMahon) that 'he still needs to help find where is [John Doe #1's] father, at [Jane Doe #1's sister's] place or at [John Doe #1's actual residence]?" (citations omitted).

[3] The Government omits that the co-conspirators were in possession of this information even before Mr. McMahon provided it to them. *See* ECF No. 1, ¶ 20 ("On or about September 26, 2016, JASON ZHU texted Co-conspirator-1 to finalize the contract with MICHAEL MCMAHON

2016, McMahon met Jason Zhu and PRC Official Hu Ji [("Eric Yan")] in person at a restaurant in Paramus, New Jersey."); *id.* ("In or about late March 2017, [Eric Yan] emailed McMahon and told him that John Doe #2 (John Doe #1's father) was coming from the PRC to the United States and requested that McMahon 'trace' the elderly man they were bringing into the country.  [Eric Yan] also sent McMahon photographs of the Victims, as well as John Doe #2 and his spouse."); *id.* at 5 (On April 5, 2017, "McMahon, and other co-conspirators were conducting surveillance in front of the residence where John Doe #2 was brought."); *id.* (On April 6, 2017, "McMahon obtained records about John Doe #1 from a government database . . . .")[4]; *id.* ("McMahon and other co-conspirators continued to surveil John Doe #2 and the Victims.").

Of course, none of this is denied by Mr. McMahon, who has always admitted—and indeed fully documented in his files and for the Government—his retention for this purpose.  Def. Br. at

---

because '[o]ur requirement is to have this done as soon as possible.'  ZHU then sent Co-conspirator-1 personal information, including driver's license numbers and social security numbers for John Doe-1, Jane Doe-1, and Jane Doe-2, and directed Co-conspirator-1 to provide that information to MCMAHON.").

[4] Mr. McMahon does dispute that he "obtained records about John Doe #1 from a government database . . . contrary to the regulations for the use of that database."  Gov't Opp. at 5.  The Government has never set forth the specific "regulations" that Mr. McMahon is alleged to have violated, while Mr. McMahon has shown that he legally obtained any and all information he did in connection with his investigation.  Indeed, as Mr. McMahon has informed the Government on several occasions, he had an account with the New Jersey Motor Vehicle Commission (NJMVC) Customer Abstract Information Retrieval (NJ CAIR) in order to run vehicle license plates while conducting surveillance; as a licensed private investigator, Mr. McMahon was authorized to do so for this purpose, as he admits to having done in this case.  Specifically, on April 6, 2017, Mr. McMahon ran the license plate for John Doe #1's vehicle and texted the findings to Johnny Zhu. This was entirely lawful, and the Government has never shown how it is not.  *See* N.J.S.A. 39:2-3.4(c) (The Driver's Privacy Protection Act provides that "personal information," defined in N.J.S.A. 39:2-3.3 as "information that identifies an individual, including an individual's photograph; social security number; driver identification number; name; address other than the five-digit zip code; telephone number; and medical or disability information," may be disclosed, in pertinent part, "[f]or use in the normal course of business by a legitimate business or its agent, employees or contractors . . . to verify the accuracy of personal information submitted by the individual to the business or its agents, employees, or contractors.").

14; ECF No. 146-2, Certification of Lawrence S. Lustberg in Support of Motion for Discovery and an Evidentiary Hearing Regarding Prosecutorial Misconduct ("Lustberg Cert."), ¶ 8.  Nor is it disputed that Mr. McMahon knew that the subject of his investigative services was wanted by both the Chinese government and his clients, another focus of the Government's narrative.  *See* Gov't Opp. at 4 ("On or about October 5, 2016, McMahon sent an email to another individual who worked with him as a private investigator; the subject line read 'tlo report says wanted by interpole [sic].'")[5]; *id.* at 6 (arguing that "while conducting surveillance, McMahon again showed that he knew he was working for the PRC government, emailing himself a link to an English-language website that discussed the PRC's 'Global Dragnet,' the PRC's issuance of red notices, and which specifically identified the Victims as two of the targets of this campaign.")[6].  But, of course, the mere fact that the subject of Mr. McMahon's investigation was also wanted by the Chinese, or any other authorities, does not mean that Mr. McMahon was aware that he was working for those authorities, in the absence of evidence—still never provided by the Government—that he was told he was.[7]

---

[5] It is also undisputed, but the Government fails to note, that Mr. McMahon also shared this Interpol notice with "Emily Hsu," the translator who assisted those who hired Mr. McMahon, an action which would have not have made sense if he was aware that she had hired him on behalf of the Chinese government.

[6] The link to the English-language website that discussed the PRC's "Global Dragnet" was available to the public by searching on an internet search engine; Mr. McMahon found the Wanted Poster on Google images.  Significantly, however, the referenced website does not mention "Operation Foxhunt," and also does not provide details regarding "Operation SkyNet," including the methods that the Chinese government used to apprehend the subjects of "Operation SkyNet."  There is no evidence that Mr. McMahon knew about any of that.

[7] As Mr. McMahon showed the Government before it indicted this case, he understood that he had been retained by a Chinese construction company that had been the victim of an embezzlement, that was appropriately attempting to locate the perpetrator, and his assets.  *See* Def. Br. at 14; Lustberg Cert., ¶ 7.  Of course, the fact that Mr. McMahon was aware that the subjects of his investigation were also wanted by the Chinese government is common, especially where, as here,

It is not even disputed that, as the Government repeatedly emphasizes, Mr. McMahon proposed that his surveillance become overt, rather than covert, in order to gather additional information, though this open surveillance was—again undisputedly—neither agreed to nor conducted. *See* Gov't Opp. at 6 ("On or about April 11, 2017, McMahon and Zhu Feng [("Johnny Zhu")] discussed additional steps to take targeting John Doe #1, including more aggressive harassment. [Johnny Zhu] stated, 'I have to go to China [tomorrow] morning for the meeting. I will let you know what's the next plan.' McMahon responded, 'I think if we harass [John Doe #1]. Park outside his home and let him know we are there. I did that before on another case.' [Johnny Zhu] responded, 'We can't harass [John Doe #1] like that lol.'"). *See also* Gov't Opp. at 15 (emphasizing that Mr. McMahon "proposed" a "harassment campaign" based upon these facts).

Contrary to the Government's argument, then, *see* Gov't Opp. at 16, Mr. McMahon does not here seek to litigate his guilt or innocence. The question before the Court is only the legal significance of those facts. Here, those facts, at their core—and especially in the absence of evidence that has never been disclosed and apparently does not exist that Mr. McMahon was ever told by anyone at any time that he was in fact being employed by the Chinese government—only serve to establish the complete inexplicability of Mr. McMahon's prosecution, unless it is a vindictive one. And the Government's effort to dismiss those arguments as a matter that must await trial, *see* Gov't Opp. at 16, simply fails to acknowledge that the weakness of the Government's case is an essential element of the Court's inquiry as to whether to grant discovery and an evidentiary hearing on Mr. McMahon's claim of vindictive prosecution. *See Sanders*, 211 F.3d at 716 (recognizing that "[t]o establish an actual vindictive motion, a defendant must prove

there actually is parallel civil litigation. *See Xinba Construction Grp. Co., LTD v. Xu*, No. ESX-L-00289-18 (N.J. Super. Ct. May 8, 2019).

objectively that the prosecutor's charging decision was a 'direct and unjustifiable penalty,' that resulted 'solely from the defendant's exercise of a protected legal right'" (citation omitted)); *see also Bout*, 731 F.3d at 239 (the Court, in assessing "the government's motivation to prosecute" the defendant, considered that the prosecution "stemmed from widespread concern that he was engaged in criminal conduct, as evidenced by his placement on numerous United States and United Nations 'sanctions lists' since the early 2000s" despite "media reports stating that" high ranking officials "had him in their 'cross-hairs'"); *United States v. Romano*, 487 F. App'x 607, 609 (2d Cir. 2012) (looking to the timing of the underlying investigation to determine that the defendant "offered no evidence that the federal prosecutors would not have filed charges but for the state prosecutor's animus"); *Mavity v. Caruso*, No. 207-CV-13955, 2009 WL 6409366, at *10 (E.D. Mich. Dec. 10, 2009) (assessing the sufficiency of the underlying felony-firearm charges against the defendant in denying petitioner's vindictive prosecution, finding that "there [was] no evidence that the prosecutor vindictively employed his charging powers by charging crimes not supported by the evidence").   Far from the inappropriate argumentation that the Government labels it, this analysis is, then, necessary in order to show that, really, the only possible explanation for Mr. McMahon's prosecution was his involvement, as an investigator, in another case—that of Paul Bergrin, a defendant particularly detested by the Government.   The insufficiency of the Government's allegations compellingly makes this point, as the caselaw requires, and, at the very least, it should inform the Court's exercise of discretion, *see Berrios*, 501 F.2d at 1212 ("[T]he decision to permit a hearing and, in anticipation thereof, to authorize a subpoena of evidence in the government's possession, lies largely in the trial judge's discretion."), in determining whether it should grant discovery and a hearing at which the Government's *actual* purpose is revealed.

In opposing an inquiry that would dispel these suspicions, the Government contends that the evidence that Mr. McMahon's involvement as an investigator for Mr. Bergrin is insufficient to warrant the further inquiry that is all that is requested here.  But here too, the pertinent facts— which even the Government seems to conceded raise a "specter" of misconduct, Gov't Opp. at 8— are not disputed.  Thus, the Government does not deny the sequence of events to which Mr. McMahon, *see* ECF No. 146-7, his wife, Martha McMahon, *see* ECF No. 146-8, and his son Michael T. McMahon, *see* ECF No. 146-9, have certified.  *See* Gov't Opp. at 7.  That is, although the Government makes much of the fact that "it was McMahon himself who introduced the Bergrin matter into the dialogue during his arrest" by asking the arresting agents: "Is this about Paul Bergrin?" when the Government would not tell him why he was being arrested,  Gov't Opp. at 1; ECF No. 146-7, ¶ 9, the Government does not deny that, instead of simply informing Mr. McMahon that his arrest had nothing to do with the Bergrin matter, Special Agent Sean McCarthy stated: "No, but I know you from that case.  You've been on my board more than once."[8]  ECF No. 146-7, ¶ 9; *see also* ECF No. 146-9, ¶ 4; ECF No. 146-8, ¶ 6.  Though the Government insults—even as it does not deny—these facts as "specters, questions, speculation, and conjecture," Gov't Opp. at 8; *see also id.* at 11, the Government's statement during Mr. McMahon's arrest indisputably constitutes "some evidence," *see Sanders*, 211 F.3d at 716; *see also United States v. Sattar*, 314 F. Supp. 2d 279, 314 (S.D.N.Y. 2004) ("[T]o obtain discovery on

---

[8] Special Agent McCarthy also told Mr. McMahon that he was the office mate of Shawn Brokos, the lead FBI investigator in the Bergrin case.  ECF No. 146-7, ¶ 12. But that, of course, is not the entire basis for the motion, as the Government implies.  Gov't Opp. at 7 ("At most, McMahon establishes that one of the agents who was involved in his arrest knew who McMahon was, because that agent used to work with another agent, and that other agent knew who McMahon was because McMahon had worked on another case that the other agent had worked."). Indeed, this statement ignores that Agent McCarthy specifically said "I know who you are," and "You've been on my board more than once," facts that the Government has chosen not to dispute.

a claim of vindictive prosecution, a defendant must provide 'some evidence tending to show the existence of the essential elements of the claim.'" (citation omitted)); *United States v. Parker*, No. 2:08-CR-6270L, 2009 WL 3754017, at *5 (W.D.N.Y. Oct. 21, 2009) (recognizing that "the standard for obtaining discovery on a claim of vindictive prosecution . . . demands 'some evidence tending to show the existence of the essential elements' of the claim of vindictive prosecution," which is also the "standard for getting an evidentiary hearing"), that the Government harbored genuine animus towards Mr. McMahon, which in turn warrants discovery and a hearing as to whether it was that animus that is the reason for this prosecution, especially given the lack of any real basis for bringing the case.

This is especially so given the extremely high-profile nature of the *Bergrin* case—also a matter that the Government does not contest. *See* Gov't Opp. at 7.[9]   In his moving brief, Mr. McMahon showed just how strong the Government's feelings were about that case (understandably, given the allegations, including the murder of a Government informant), *see* Def. Br. at 3-11, as that was revealed in the way it litigated the matter; he also showed how a part of Bergrin's defense was an attack upon the very Agent who was affiliated with the arresting agent in this case, *id.* at 8-9.  And, although the Government's argument that Mr. McMahon's "Motion does not even attempt to show that McMahon did anything in the Bergrin prosecution that would theoretically draw the government's vindictive ire," Gov't Opp. at 8, it does not deny Mr.

---

[9] So that it is absolutely clear, contrary to the Government's allegation, Mr. McMahon is not here criticizing the Government's treatment of Paul Bergrin. *See* Gov't Opp. at 8 ("The Motion also implies that the government has committed some sort of overzealous impropriety for restricting Bergrin's access to communications via special administrative measures – when Bergrin was convicted of conspiring to murder a government informant." (citation omitted)).  Rather, Mr. McMahon only notes the status of Bergrin's confinement to demonstrate how strongly the Government feels about Bergrin's case, so much so that it has taken steps to place him in indefinite solitary confinement.

McMahon's involvement in that matter, or the Government's awareness of it.  *See* Def. Br. at 10-11.

Perhaps most significantly, even as it repeatedly complains that there is nothing to link this prosecution with the *Bergrin* case, Gov't Opp. at 7-8, the Government's brief pointedly ignores specific evidence of the concrete connection between the two.  That is, in its brief opposing Bergrin's appeal from the denial of his motion for a new trial, the Government specifically sought to undermine Mr. McMahon's investigation, upon which Bergrin depended in his argument, by citing to this very prosecution, informing the Third Circuit Court of Appeals that "McMahon has his own credibility problems," given that "McMahon has been charged with Federal felonies." Brief for Appellee at 38, *United States v. Bergrin*, No. 20-2828 (3d Cir. June 22, 2021), ECF No. 30 (citing *United States v. Zhu*, No. 21-CR-265 (E.D.N.Y.)).  *See* Def. Br. at 17.  Simply put, it is undisputed that the United States Department of Justice—whether in the person of two United States Attorney's Offices or one—has, without question, used this prosecution to further its efforts to sustain Paul Bergrin's conviction.  Discovery and a hearing would shed light on whether that was its intent.  It is, at the very least, a matter of concern that the Court should dispel, as the process proposed by the defense—discovery and, if necessary, a hearing would do.  And the Government's vehement opposition to such an inquiry itself raises the question: what is it hiding?  Are there documents in the Government's files tying the (in our view, otherwise inexplicable) decision to prosecute Mr. McMahon to his work for Mr. Bergrin?  Enough has been shown, under the caselaw, to warrant the Court's exercise of discretion in favor of dispelling these very real concerns.

That is particularly so, given the very different way in which others like Mr. McMahon (*i.e.*, other private investigators) have been treated in very similar cases.  To briefly summarize what is set forth in Mr. McMahon's moving papers, *see* Def. Br. at 26-28, and in his supplemental

submission, *see* ECF No. 147, the Government's treatment of Mr. McMahon in this case is different from its treatment of not only the other private investigator hired in this case, but also of similarly situated private investigators in other cases.  In the present case, the co-conspirators also retained a private investigator in California to obtain "location information for certain persons in the United States on behalf of the PRC government, including John Doe-1 and his family, to assist in Operation Fox Hunt," *see* ECF No. 1, ¶ 14(g), as well as to "investigate and surveil John Doe-2 for RONG JIN," in efforts "'to find the dad,' *i.e.* John Doe-1," *id.*, ¶¶ 96, 102.  But that investigator was not charged in this matter, as Mr. McMahon was; instead, that investigator was given the opportunity, which Mr. McMahon was not, to act as "a confidential human source for the FBI," for which he "received financial compensation and a certificate of appreciation for his efforts on behalf of law enforcement" (this despite the fact that, "[d]uring the course of his relationship with the FBI, there [were] several instances where the PI made statements or engaged in conduct that w[as] assessed to be adverse to his credibility," *id.*, ¶ 81 n.6).  There is little doubt that Mr. McMahon would have reacted favorably had that opportunity also been afforded to him; if necessary, a hearing would reveal that as well.

Likewise, in *United States v. Farahani*, No. 21-CR-430 (RA) (S.D.N.Y.), the Government charged the defendants, an Iranian intelligence official and Iranian intelligence assets, with having "procured the services of private investigators to surveil, photograph and video record [the victim's] household members in Brooklyn" by means of "misrepresenting their identities and the purpose of the surveillance to the investigators" in connection with a conspiracy to kidnap "a journalist, author, and human rights activist residing in Brooklyn" for "mobiliz[ing] public opinion in Iran and around the world to bring about changes to the regime's laws and practices," *id.*,

Superseding Indictment at ¶¶ 2, 6.  Again, no criminal charges were brought against the private investigators in that case.

Then, in *United States v. Lin*, No. 22-MJ-251 (MMH/JRC) (E.D.N.Y.), the defendant, "a former police officer in the PRC who later jointed the" Ministry of State Security ("MMS"), a "foreign intelligence and secret police agency of the PRC government responsible for counterintelligence, espionage and political security," retained a private investigator in New York to disrupt the campaign of the Victim, a "student leader of the Tiananmen Square protests from 1989, who later escaped to the United States and served in the U.S. military" who was running for Congress; the private investigator was also asked to provide "compromising information about the Victim," or if no such information could be found "manufacture something."  Amended Complaint and Affidavit in Support of Arrest Warrant at ¶¶ 4, 7-9, 11, 13, 19, *United States v. Lin*, No. 22-MJ-251 (MMH/JRC) (E.D.N.Y.), ECF No. 4.  However, the private investigator was allowed to cooperate with the FBI and not charged.

Finally, in a case particularly similar to this one, *United States v. Ying*, No. 1:22-MJ-01711-UA (S.D.N.Y.), the defendant "conducted operations in the United States on behalf of the PRC Government to pressure, threaten, and collect personal information regarding victims of Operation Fox Hunt" and, "as part of his operations at the direction of the PRC Government, hired private investigators in the United States to gather personal information on Operation Fox Hunt targets, labeled as 'fugitives' by the PRC Government, and provided some of that information to the PRC Government[.]"  *Ying*, ECF No. 1 (S.D.N.Y. Feb. 18, 2022), ¶ 8.  In fact, one of the private investigators in *Ying* was told by the defendant that he was "the owner of a PRC-based company that holds itself out as an insurance loss-adjusting company" and that the investigation was to be conducted for that purpose, and obtained a photograph of the subject, as well as provided the co-

conspirators with a report, which "included database research on [the subject], the home address for [the subject], and a photograph of [the subject]." *Id.*, ¶¶ 13(b), (d). But that private investigator too was not charged for his conduct, despite the fact that he actually went to the subject's home and spoke to the subject's family members to ask for the subject's location and take photographs of the subject and the subject's family members, "all of which caused fear and concern" to the subject," *id.*, ¶ 13(f). Of course, Mr. McMahon did no such thing, yet he finds himself charged, again raising the question—given the other, undisputed facts of this case—whether that was retaliation for his other, lawful activities.

The Government hardly responds to these examples of cases in which others similarly situated to Mr. McMahon were treated differently, other than by summarily contending that in those cases, the defendants cooperated with the authorities. *See* Gov't Opp. at 15. But as Mr. McMahon has shown, he was never given the opportunity to do so, and the question that discovery and a hearing will seek to answer is "why not?" The answer is obviously not—based upon the current record as well as the one that would be created at the requested hearing—that he would not have done so.[10] The facts, instead, constitute at least "some evidence" that he was treated differently for inappropriate reasons, *i.e.*, his Court-approved work for a despised criminal defendant.

---

[10] Although the Government unfairly excoriates Mr. McMahon for continuing his routine investigative activities after he had contacted law enforcement, *see* Gov't Opp. at 15-16 (citing Def. Br. at 25 n.11)—again a fact that it does not deny—it does not mention that none of the authorities that Mr. McMahon contacted, let alone those responsible for this case, were in a position to or did provide him with the opportunity to cooperate in this investigation. Nonetheless, that he did seek to bring this matter to their attention demonstrates that if they, or anyone else, had advised him that what he was doing was wrong, he would have discontinued it and been willing—as he always has been—to cooperate with the authorities.

The Government, however, contends that the law does not support Mr. McMahon's request, criticizing him for citing only one case in the Second Circuit where discovery or an evidentiary hearing was granted on a claim of vindictive or selective prosecution and seeking to distinguish that case, *United States v. Berrios*, 501 F.2d 1207 (2d Cir. 1974), from the instant matter. Gov't Opp. at 12. But *Berrios*—though only one case, still precedent binding on this Court—squarely supports Mr. McMahon's request for discovery and an evidentiary hearing. In *Berrios*, the defendant was "accused of holding union office in violation of 29 U.S.C. § 504, which provides that no person who has been convicted of the crime of arson, among others, shall within five years of such conviction serve as an officer or employee of a labor organization." *Id.* at 1209. The defendant "was convicted of the crime of arson," but "notwithstanding that conviction, within five years thereafter became Trustee and a member of the Executive Board of Teamsters Union Local 840" and was subsequently charged with violating 29 U.S.C. § 504. *Id.* The defendant argued that "he was chosen for prosecution because he was counted among the few Teamster officials who were in 1972 outspoken in their support of Senator McGovern for President as against President Nixon and because he was at the time spearheading an effort to unionize the Marriot Restaurant Chain, an enterprise that apparently enjoys close ties with President Nixon and his family." *Id.* In support of his defense, the defendant pointed to the fact (citing a newspaper article in support) that "there ha[d] been only three prosecutions under §504 since 1969," as well as that "Mr. Marriott has been a close friend of the President and a substantial contributor to his political campaign"; that "Donald Nixon, the President's brother, is a vice-president of Marriott"; that "Herbert Kalmbach, attorney for Marriott, was also the President's personal attorney"; that "Charles Colson, formerly counsel to the President and later counsel to the Teamsters Union was a 'prime mover in the prosecution',"; and that "there are hundreds of unions with officers who

14

have prison records." *Id.* at 1209-1210.  Based on this showing, the defendant moved for an evidentiary hearing, which the District Court granted and the Second Circuit upheld, reasoning that "the decision to permit a hearing and, in anticipation thereof, to authorize a subpoena of evidence in the government's possession, lies largely in the trial judge's discretion." *Id.* at 1210, 1212.

Here, Mr. McMahon's allegations are far more persuasive than the showing made by the defendant in *Berrios.* Thus, Mr. McMahon has established (through means beyond merely the press) that there have been at least four other cases in which the Government chose *not* to indict a private investigator in similar situations, a showing that was not made in *Berrios*; moreover, he also established a link between those actually investigating Mr. McMahon in this matter (as opposed to high level Government officials or relatives of the President) and those involved with the Paul Bergrin case, both through their relationships and their statements at the time of his McMahon's arrest.  Nor, as discussed above, is this a circumstances, as in *Berrios*, in which guilt is nearly so clear.  *See supra* at 15-16.  In sum, if the showing in *Berrios* was sufficient, than the one made here is much more so.  Certainly, it is sufficient so that this Court should exercise its discretion and grant Mr. McMahon discovery and an evidentiary hearing to dispel the concerns that the record so troublingly raises.

The same is true with regard to the other cases cited by Mr. McMahon which the Government seeks to distinguish or disparage.  *See* Gov't Opp. at 14-16.  For example, the Government argues that in *United States v. Williams*, No. 20-CR-55 (LMA), 2020 WL 5960689 (E.D. La. Oct. 8, 2020), there was "a comparatively more significant pre-hearing record of animus," contending that because Mr. "McMahon cannot point to a host of hundreds of private investigators who did the same work for the same foreign power but were not prosecuted," Gov't

Opp. at 14-15, his request for a fuller airing of the issue fails. But *Williams* certainly does not hold, nor is it the standard, that a defendant must show that "hundreds" of other similarly situated individuals have not been prosecuted to prevail on a claim of vindictive prosecution. To the contrary, *Williams* supports Mr. McMahon's request for discovery and a hearing in order to determine why Mr. McMahon is being prosecuted. Indeed, in *Williams*, the defendant was granted an evidentiary hearing on a similar claim, where he argued that he was "being punished with a criminal tax indictment because, as the government explicitly stated, he 'failed to meet with'" one Special Agent despite the fact that the defendant "had a constitutional right to refuse to" do so and due to the fact that "he was targeted by law enforcement investigators because he was a public official;" specifically, because "the government knew he was a declared candidate for District Attorney." *Williams*, 2020 WL 5960689, at *14-15. In granting the defendant in *Williams* an evidentiary hearing, the Court determined that the record, including "the circumstantial evidence offered . . . counsel[ed] against prematurely stifling the development of the defendants' claims that their prosecution crosse[d] Constitutional boundaries." *Id.* at *16. And that, in essence is the case here as well, where Mr. McMahon has here shown much more, and an evidentiary hearing so that he can fully develop his claims is, in the absence of the kinds of statements that were provided in *Williams*, even more necessary.

And *Berrios* and *Williams* are not the only cases in which Courts have held that defendants were entitled to discovery and an evidentiary hearing on the issue of vindictive (or selective) prosecution, often on far less than the showing made here. *See United States v. Adams*, 870 F.2d 1140, 1141 (6th Cir. 1989) (granting discovery on vindictive prosecution claim where evidence showed former employer, EEOC, "instigated and pushed" investigation on tax fraud of former employee in retaliation for employee's sex discrimination action against agency); *United States v.*

*Amberslie*, 312 F. Supp. 2d 570, 571-72 (S.D.N.Y. 2004) (granting an evidentiary hearing on the defendant's claim of vindictive prosecution where "the Government obtained a superseding indictment that added a broad conspiracy count embracing all four" prior narcotics deals which were ruled inadmissible at the defendant's first trial that ended in a hung jury); *United States v. Young*, 231 F. Supp. 3d 33 (M.D. La. 2017) (denying the defendant's motion to dismiss for selective and vindictive prosecution only following two evidentiary hearings and multiple rounds of briefing); *see also United States v. Lanoue*, 137 F.3d 656, 665 (1st Cir. 1998) (the First Circuit was "satisfied that the district court held the equivalent of an evidentiary hearing" where the defendant pointed to specific facts which raised a likelihood of vindictiveness requiring an evidentiary hearing on the issue). To the contrary, hearings are, and should be, held whenever the defendant "raise[s] a reasonable doubt the government acted properly in seeking the indictment." *United States v. Aviv*, 923 F. Supp. 35, 36 (S.D.N.Y. 1996) (quoting *United States v. Benson*, 941 F.2d 598, 611 (7th Cir. 1991)).

Nor is this case is akin to the cases in which a claim of vindictive prosecution was denied or overturned without an evidentiary hearing, a number of which are cited by the Government, *see* Gov't Opp. at 12-13. Thus, this is not a case, as are many of those cited by the Government, in which Courts held that the filing of a superseding indictment, a prior acquittal, or a refusal to plead guilty, is not, as a matter of law, an inappropriate basis for a prosecution. *See, e.g., United States v. Goodwin*, 457 U.S. 368, 380-81 (1982) (no hearing was held in a case involving "a pretrial decision to modify the charges against the defendant" where the defendant was indicted and convicted of a felony charge arising from the same incident as previously pending misdemeanor charges after the defendant decided not to plead guilty and requested trial by jury on the misdemeanor charges); *United States v. White*, 972 F.2d 16, 19 (2d Cir. 1992) (finding that an

evidentiary hearing was not warranted on the defendant's claim of prosecutorial misconduct where the defendant argued that the prosecutor retaliated against him in making "a pretrial decision to modify charges against [the] defendant" to include unprosecuted narcotics charges because the defendant challenged the forfeiture of his vehicle, due to the fact that the defendant "placed no controlling facts in dispute to warrant a hearing"); *United States v. Johnson*, 171 F.3d 139, 140, 141 (3d Cir. 1999) (reversing dismissal of indictment based upon finding of vindictive prosecution without granting discovery or an evidentiary hearing where the Government did not initiate a federal weapons prosecution, "until after defendant had exercised his right to a jury trial and had been acquitted on separate RICO charges" because "a new federal prosecution following an acquittal on separate federal charges does not, without more, give rise to a presumption of vindictiveness"); *United States v. Dean*, 119 F. Supp. 2d 81, 83-84 (D. Conn. 2000) (finding that the defendant was "not entitled to discovery or an evidentiary hearing on his claim of vindictive prosecution" where the defendant failed "to present any evidence of genuine animus," as the defendant "concede[d] that the mere referral of the state charges to the United States Attorney's Office and its motion to detain him d[id] not reflect such animus," and further failed to "present any evidence that the state prosecutor harbored actual animus against him based on his refusal to plead guilty in lieu of trial"); *United States v. Parker*, No. 08-CR-6270 (MWP), 2009 WL 3754017, at *4-5 & n.9 (W.D.N.Y. Oct. 21, 2009) (finding that the defendant could not make a showing of "a realistic likelihood of vindictiveness" where the defendant alleged "that the government ha[d] initiated [a second] prosecution in order to retaliate against him for having avoided punishment in a prior federal prosecution and having received a lenient sentence in a prior state prosecution" where "the challenged prosecution was initiated following the conclusion of a prosecution by a separate sovereign"); *Sattar*, 314 F. Supp. 2d at 312, 314 (finding that the defendants were not

18

entitled to discovery or an evidentiary hearing on their claims of vindictive prosecution where the defendants alleged that "the Government allegedly brought new charges against them in the S1 Indictment as a penalty for having successfully challenged certain charges in the original indictment").

This is also not a case where there was "widespread concern" that Mr. McMahon was engaged in criminal conduct. *See Bout*, 731 F.3d at 239 (finding that the defendant did not meet the "threshold necessary to prevail on a vindictive prosecution claim" where "the government's motivation to prosecute [the defendant] stemmed from widespread concern that he was engaged in criminal conduct, as evidenced by his placement on numerous United States and United Nations 'sanctions lists' since the early 2000s" despite "media reports stating that" high ranking officials "had him in their 'cross-hairs'"). Indeed, Mr. McMahon—a celebrated former police officer—has never before been suspected of any wrongdoing, and as discussed at length here, the evidence against him is extremely weak.

This is also not a case in which the timing of the investigation dispels any question that the reason for the prosecution was solely vindictive in nature. *Koh*, 199 F.3d at 640, 641. And it is obviously, not one in which, as in *Aviv*, 923 F. Supp. at 37, the defendant did not make "any showing that he would not have been prosecuted even in the absence of the vindictive motive" because he did not present evidence "that the government has declined to prosecute persons similarly situated to" the defendant. To the contrary, Mr. McMahon has made precisely that showing here.

At the end of the day, whatever the holdings of these cases, the Government does not dispute that it would be problematic if this prosecution were the product of the Government retaliating against Mr. McMahon for his performance of investigative services on behalf of Paul

19

Bergrin.  Instead, the Government essentially argues that Mr. McMahon cannot, at this time, show that those activities were the basis of the Government's prosecution of him here.  But the showing that Mr. McMahon has made—including that his prosecution is impossible to explain, given the evidence and the treatment of similarly situated private investigators, and that the Government, and the investigative team in particular, was aware of his work on the Bergrin case, as they admitted at the time of his arrest—provides, at the very least, facts constituting "some evidence tending to show the existence of the essential elements of the defense," *Sanders*, 211 F.3d at 717 (citation omitted) and which "raise a reasonable doubt the government acted properly in seeking the indictment," *Aviv*, 923 F. Supp. at 27 (quoting *United States v. Benson*, 941 F.2d 598, 611 (7th Cir. 1991)).

This Court, like all courts, has the responsibility not to permit an unconstitutional prosecution to proceed. *See, e.g., United States v. Hill*, 93 F. App'x 540, 547 (4th Cir. 2004) ("[P]rosecutorial discretion, though broad, is not unlimited, and courts must protect individuals form prosecutorial misconduct whether premised on an unconstitutional motive or bad faith."); *see generally* Prosecutorial Discretion, 33 Geo. L.J. Ann. Rev. Crim. Proc. 223, 227 (2010) ("Although prosecutorial discretion is broad, it is not unlimited, and courts have a responsibility to protect individuals from prosecutorial decisions based on unconstitutional motives or carried out in bad faith.").  In furtherance of that responsibility, it should exercise its discretion to hold an evidentiary hearing, *see Berrios*, 501 F.2d at 1212, at which these suspicions, well-grounded in the record as they are, may be dispelled by testimony and documentation setting forth the actual basis for proceeding against Mr. McMahon in this matter.

## **CONCLUSION**

For the reasons set forth above and in Mr. McMahon's moving brief, Mr. McMahon respectfully requests that the Court grant his motion and allow discovery into, and a hearing on,

his potential claim that his prosecution has resulted from his work as an investigator on behalf of

a criminal defendant in another case.

<div style="margin-left:50%">

Respectfully submitted,
**GIBBONS P.C.**
*Attorneys for Defendant*
*Michael McMahon*


By:     /s/ Lawrence S. Lustberg
        Lawrence S. Lustberg, Esq.

</div>

Date: November 14, 2022