## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>          v.<br><br>MICHAEL MCMAHON,<br>ZHENG CONGYING and<br>ZHU YONG,<br>          also known as "Jason Zhu,"<br><br>                    Defendants. | Case No. 1:21-cr-00265 (PKC) (S-1)<br><br>*Filed electronically* |

## BRIEF IN SUPPORT OF DEFENDANT MICHAEL MCMAHON'S POST-TRIAL MOTIONS

**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

*On the brief:*
Lawrence S. Lustberg, Esq.
Genna A. Conti, Esq.

<u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT ....................................................................................... 1

ARGUMENT .................................................................................................................... 4

I.     A JUDGMENT OF ACQUITTAL MUST BE ENTERED ON COUNTS II, III,
AND IV OF THE SUPERCEDING INDICTMENT BECAUSE THE
GOVERNMENT FAILED TO INTRODUCE EVIDENCE AT TRIAL
SUFFICENT TO SUPPORT THE CONVICTIONS AGAINST MR.
MCMAHON. ............................................................................................................ 4

     A.     There is Insufficient Evidence to Sustain A Conviction For Acting as An
Agent of a Foreign Government Without Prior Notification to the Attorney
General (Count II). ...................................................................................... 7

          1.     The China Daily Article .......................................................... 10

          2.     April 4, 2017 Panera Bread Meeting ....................................... 13

          3.     Michael McMahon's Post-Arrest Statement ........................... 18

          4.     Propensity Evidence Regarding Access to Information .......... 21

               i.     New Jersey Motor Vehicle Commission Records ....... 22

               ii.     Department of Homeland Security Records ................. 25

          5.     The Alleged Concealment ........................................................ 28

               i.     Conversations .............................................................. 28

               ii.     Payments ...................................................................... 29

               iii.     Taxes ........................................................................... 34

     B.     There Is Insufficient Evidence To Sustain A Conviction For Conspiracy
To Engage In Interstate Stalking (Count III). ........................................... 37

     C.     There Is Insufficient Evidence To Sustain a Conviction on Interstate
Stalking (Count IV) ................................................................................... 45

II.     MR. MCMAHON IS ENTITLED TO A JUDGEMENT OF ACQUITTAL
BECAUSE OF THE JURY'S INCONSISTENT VERDICT. ................................ 59

Table of Contents (continued)

Page

III.   THE COURT SHOULD GRANT MR. MCMAHON A NEW TRIAL
       PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 33. ...................... 64

       A.   Legal Standard ...................................................................................64

       B.   Mr. McMahon is Entitled to a New Trial Based Upon the Insufficiency of
            the Evidence. ...................................................................................66

       C.   The Government's Tandem Reading of Text Messages Improperly
            Dramatized the Evidence and Usurped the Jury's Role in Interpreting
            Their Meaning. .................................................................................66

       D.   The Government's Improper Rebuttal Warrants A New Trial. ............................73

            1.   The Government Inappropriately Made Brand New Arguments in
                 its Rebuttal Summation. ..........................................................74

            2.   The Government's False Or Unsupported Statements During its
                 Rebuttal, Which Mr. McMahon Could Not Correct, Warrant a New
                 Trial. ...................................................................................80

       E.   Mr. McMahon Is Entitled to a New Trial Because the Government Relied
            on Evidence that Should Not Have Been Admitted under Rule
            801(d)(2)(E). ...................................................................................86

       F.   Mr. McMahon Is Entitled to a New Trial Because the Government Made
            False Representations Regarding Mr. McMahon's Alleged Wrongful
            Access to Government Databases and Failing to Report Certain Income on
            His Tax. ...................................................................................94

            1.   The Evidence at Trial Did Not Establish that Mr. McMahon
                 Improperly Accessed NJ MVC Records In Connection with this
                 Matter. ...................................................................................95

            2.   The Evidence at Trial Did Not Establish that Mr. McMahon
                 Improperly Obtained Department of Homeland Security Records ......... 100

            3.   Tax Payments ...................................................................... 107

CONCLUSION ...................................................................................... 109

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. United States*,
    417 U.S. 211 (1974)............................................................................................91, 92

*Benfield v. Mocatta Metals Corp.*,
    No. 91-CIV-8255 (LJF), 1992 WL 58879 (S.D.N.Y. Mar. 13, 1992)....................................50

*Bourjaily v. United States*,
    483 U.S. 171 (1987), *aff'd*, 782 F. App'x 72 (2d Cir. 2019) .............................................86, 87

*Coates v. Cincinnati*,
    402 U.S. 611 (1971)............................................................................................55

*Fusco v. Gen. Motors Corp.*,
    11 F.3d 259 (1st Cir. 1993)....................................................................................69

*In re: Gen. Motors LLC Ignition Switch Litig.*,
    No. 14-2543 (JMF), 2016 WL 4077117 (S.D.N.Y. Aug. 1, 2016).........................................69

*Gordon v. United States*,
    344 U.S. 414 (1953)............................................................................................72

*Langston v. Smith*,
    630 F.3d 310 (2d Cir. 2011)..............................................................................5, 6, 90

*Mallis v. Bankers Trust Co.*,
    717 F.2d 683 (2d Cir. 1983)...................................................................................65

*Moore v. United States*,
    344 F.2d 558 (D.C. Cir. 1965)................................................................................74

*Ratzlaf v. United States*,
    510 U.S. 135 (1994)............................................................................................8

*Rosemond v. United States*,
    572 US. 65 (2014)..........................................................................................49, 50

*Sealfon v. United States*,
    332 U.S. 575 (1948)........................................................................................60, 64

*Siewe v. Gonzales*,
    480 F.3d 160 (2d Cir. 2007)...................................................................................5

*Smith v. Lightning Bolt Prods., Inc.*,
    861 F.2d 363 (2d Cir. 1988)...................................................................................65

*Staples v. United States*,
  511 U.S. 600 (1994)............................................................................................8

*Sutton v. Warden*,
  3:21-CV-897-MGG, 2022 WL 1555008 (N.D. Ind. May 17, 2022) ......................................73

*United States v. Abouammo*,
  No. 19-CR-00621-EMC-1, 2022 WL 17584238 (N.D. Cal. Dec. 12, 2022)............................8

*United States v. Ackell*,
  907 F.3d 67 (1st Cir. 2018)..................................................................................58

*United States v. Aguiar*,
  737 F.3d 251 (2d Cir. 2013)............................................................................65, 66

*United States v. Al-Moayad*,
  545 F.3d 139 (2d Cir. 2008)..................................................................................92

*United States v. Alegria*,
  No. 90-cr-450 (RWS), 1991 WL 238223 (S.D.N.Y. Nov. 6, 1991)..................................74, 75

*United States v. Allums*,
  S6 15-CR-153 (VSB), 2020 WL 3790610 (S.D.N.Y. July 7, 2020), *aff'd sub*
  *nom. United States v. Jones*, 858 F. App'x. 420 (2d Cir. 2021) ................................68

*United States v. Alston*,
  899 F.3d 135 (2d Cir. 2018)..................................................................................65

*United States v. Archer*,
  977 F.3d 181 (2d Cir. 2020)............................................................................65, 66

*United States v. Arras*,
  373 F.3d 1071 (10th Cir. 2004) ..............................................................................6

*United States v. Ballard*,
  727 F. App'x 6 (2d Cir. 2018) ..............................................................................81

*United States v. Barcy*,
  No. 20-CR-483 (ARR), 2022 WL 17801133 (E.D.N.Y Dec. 19, 2022) ................................17

*United States v. Biaggi*,
  909 F.2d 662 (2d Cir. 1990)............................................................................19, 20

*United States v. Bland*,
  237 F. App'x 268 (9th Cir. 2007) ..........................................................................93

*United States v. Bonventre*,
  No. 10CR228-LTS, 2014 WL 3673550 (S.D.N.Y. July 24, 2014) ......................................80

*United States v. Bowen,*
    969 F. Supp. 2d 546 (E.D. La. 2013) .................................................................70

*United States v. Brown,*
    765 F.3d 278 (3d Cir. 2014) ...............................................................74, 80, 81, 82

*United States v. Byrd,*
    934 F.2d 145 (8th Cir. 1987) .....................................................................75

*United States v. Cabrera,*
    13 F.4th 140 (2d Cir. 2021) ......................................................................93

*United States v. Campa,*
    529 F.3d 980 (11th Cir. 2008) ....................................................................8

*United States v. Canady,*
    126 F.3d 352 (2d Cir. 1997) ......................................................................5

*United States v. Capanelli,*
    479 F.3d 163 (2d Cir. 2007) ....................................................................38

*United States v. Certified Envtl. Servs., Inc.,*
    753 F.3d 72 (2d Cir. 2014) ...................................................................68, 82

*United States v. Chung,*
    633 F. Supp. 2d 1134 (C.D. Cal. 2009) ..............................................................8

*United States v. Chung,*
    659 F.3d 815 (9th Cir. 2011) .....................................................................8

*United States v. Citron,*
    853 F.2d 1055 (2d Cir. 1988) ....................................................................60

*United States v. Conrad,*
    507 F.3d 424 (6th Cir. 2007) ....................................................................92

*United States v. Cordry,*
    No. 18-20033 (DDC), 2020 WL 4200858 (D. Kan. July 22, 2020) .......................................76

*United States v. Coriaty,*
    No. 99 Cr. 1251, 2001 WL 1910843 (S.D.N.Y. July 16, 2001)), *aff'd,* 385 F.
    App'x. 20 (2d Cir. 2010) .......................................................................65

*United States v. Curley,*
    639 F.3d 50 (2d Cir. 2011) ......................................................................21

*United States v. D'Amato,*
    39 F.3d 1249 (2d Cir. 1994) ......................................................................5

*United States v. Davis*,
   801 F. App'x 80 (4th Cir. 2020) ..................................................58

*United States v. Delligatti*,
   No. 15-CR-491 (KBF), 2018 WL 1033242 (S.D.N.Y. Feb. 23, 2018) ...................89

*United States v. Drummond*,
   481 F.2d 62 (2d Cir. 1973)..........................................................80

*United States v. Dukagjini*,
   326 F.3d 45 (2d Cir. 2003)..........................................................17

*United States v. Elder*,
   592 F. Supp. 3d 48 (E.D.N.Y. 2022) ................................................64

*United States v. Eldridge*,
   860 F. App'x 773 (2d Cir. 2021) ..................................................94

*United States v. Elias*,
   285 F.3d 183 (2d Cir. 2002)..........................................................80

*United States v. Eppolito*,
   543 F.3d 25 (2d Cir. 2008)...........................................................4

*United States v. Farhane*,
   634 F.3d 127 (2d Cir.2011)..........................................................86

*United States v. Ferguson*,
   246 F.3d 129 (2d Cir. 2001)..........................................64, 65, 66, 73

*United States v. Figueroa*,
   No. 08 CR 749 (ARR), 2010 WL 11463852 (E.D.N.Y. Mar. 2, 2010)...................94

*United States v. Fleury*,
   20 F.4th 1353 (11th Cir. 2021) ....................................................57

*United States v. Flores-De-Jesus*,
   569 F.3d 8 (1st Cir. 2009)..........................................................73

*United States v. Folks*,
   No. 20-cr-3267, 2021 WL 5987009 (2d Cir. Dec. 17, 2021) .........................80

*United States v. Forlorma*,
   94 F.3d 91 (2d Cir. 1996)..........................................................95

*United States v. Friedman*,
   909 F.2d 705 (2d Cir. 1990)..........................................................81

*United States v. George*,
   11-CR-250 DLI, 2012 WL 2564373 (E.D.N.Y. June 29, 2012)..........................68

*United States v. Gigante,*
    166 F.3d 75 (2d Cir. 1999)........................................................................71, 86, 88

*United States v. Gil,*
    604 F.2d 546 (7th Cir. 1979) ................................................................................89

*United States v. Giovanelli,*
    945 F.2d 479 (2d Cir. 1991)..................................................................................74

*United States v. Gleason,*
    616 F.2d 2 (2d Cir. 1979)................................................................................75, 76

*United States v. Goodrich,*
    12 F.4th 219 (2d Cir. 2021) ..................................................................................38

*United States v. Gray,*
    876 F.2d 1411 (9th Cir. 1989) ..............................................................................80

*United States v. Graziano,*
    616 F. Supp. 2d 350 (E.D.N.Y. 2008) ...................................................................6

*United States v. Harriss,*
    347 U.S. 612 (1954)...............................................................................................55

*United States v. Heras,*
    609 F.3d 101 (2d Cir. 2010)..................................................................................44

*United States v. Jackson,*
    636 F.3d 687 (5th Cir. 2011) ................................................................................92

*United States v. Jackson,*
    849 F.3d 540 (3d Cir. 2017)..................................................................................72

*United States v. Jacob,*
    194 F. Supp. 3d 216 (E.D.N.Y. 2016) ..................................................................36

*United States v. James,*
    712 F.3d 79 (2d Cir. 2013)....................................................................................86

*United States v. Jones,*
    44 F.3d 860 (10th Cir.1995) ...................................................................................6

*United States v. Kennedy,*
    46 F. App'x 200 (4th Cir. 2002) ...........................................................................71

*United States v. Landesman,*
    17 F.4th 298 (2d Cir. 2021), *cert. denied sub nom. Nordlicht v. United States,*
    143 S. Ct. 86 (2022)................................................................................5, 7, 33, 65

*United States v. Levy*,
    594 F. Supp. 2d 427 (S.D.N.Y. 2009) ....................................................................65

*United States v. Lorenzo*,
    534 F.3d 153 (2d Cir. 2008) ..........................................................................7, 38, 49

*United States v. Mack*,
    S11 18 CR. 834, 2020 WL 114509 (S.D.N.Y. Jan. 10, 2020), *aff'd*, 20-3881-
    CR, 2022 WL 4391802 (2d Cir. Sept. 23, 2022) .......................................................64

*United States v. Magluta*,
    418 F.3d 1166 (11th Cir. 2005) ............................................................................93

*United States v. Malka*,
    602 F. Supp. 3d 510 (S.D.N.Y. 2022) ....................................................................86

*United States v. Maloney*,
    755 F.3d 1044 (9th Cir. 2014) ..............................................................................75

*United States v. Martinez*,
    54 F.3d 1040 (2d Cir. 1995) ..............................................................................5, 6

*United States v. Martinez*,
    921 F.3d 452 (5th Cir. 2019) ................................................................................6

*United States v. McDermott*,
    245 F.3d 133 (2d Cir. 2001) ................................................................................38

*United States v. Miller*,
    No. 2:11-CR-161-1, 2012 WL 3192739 (D. Vt. Aug. 7, 2012) ..................................49

*United States v. Mulder*,
    273 F.3d 91 (2d Cir. 2001) ..................................................................................87

*United States v. Murphy*,
    942 F.3d 73 (2d Cir. 2019) ....................................................................................9

*United States v. Nguyen*,
    507 F.3d 836 (5th Cir. 2007) ................................................................................76

*United States v. Osinger*,
    753 F.3d 939 (9th Cir. 2014) ................................................................................58

*United States v. Ouedraogo*,
    531 F. App'x 731 (6th Cir. 2013) ............................................................................6

*United States v. Pauling*,
    924 F.3d 649 (2d Cir. 2019) ......................................................................... *passim*

*United States v. Persing*,
   436 F. App'x 13 (2d Cir. 2011) ...................................................................................93

*United States v. Petrovic*,
   701 F.3d 849 (8th Cir. 2012) ....................................................................................58

*United States v. Rafiekian*,
   68 F.4th 177 (4th Cir. 2023) .......................................................................................9

*United States v. Richter*,
   826 F.2d 206 (2d Cir. 1987).....................................................................................81

*United States v. Rigas*,
   No. S102-cr-1236 (LBS), 2004 WL 2434965 (S.D.N.Y. Nov. 1, 2004) ...............60

*United States v. Robinson*,
   430 F.3d 537 (2d Cir. 2005)......................................................................................65

*United States v. Rubinson*,
   543 F.2d 951 (2d Cir. 1976)......................................................................................81

*United States v. Ruiz*,
   105 F.3d 1492 (1st Cir. 1997) ....................................................................................6

*United States v. Sanchez*,
   969 F.2d 1409 (2d Cir. 1992)..............................................................................65, 66

*United States v. Saneaux*,
   365 F. Supp. 2d 493 (S.D.N.Y. 2005)..................................................................91, 92

*United States v. Shareef*,
   190 F.3d 71 (2d Cir. 1999).......................................................................................80

*United States v. Sheehan*,
   838 F.3d 109 (2d Cir. 2016).....................................................................................80

*United States v. Shepard*,
   No. CR 10-1032-TUC-CKJ, 2012 WL 113027 (D. Ariz. Jan. 13, 2012) ...............50

*United States v. Shrader*,
   737 F. Supp. 2d 589 (S.D.W.V. 2010).....................................................................51

*United States v. Sierra*,
   923 F. Supp. 2d 501 (S.D.N.Y. 2013)........................................................................4

*United States v. Solorio-Soto*,
   300 F. App'x 487 (9th Cir. 2008) .............................................................................92

*United States v. Stewart-Carrasquillo*,
   997 F.3d 408 (1st Cir. 2021).....................................................................................69

*United States v. Svoboda*,
   347 F.3d 471 (2d Cir. 2003)......................................................................37, 44

*United States v. Taylor*,
   728 F.2d 930 (7th Cir. 1984) ............................................................................74

*United States v. Tellier*,
   83 F.3d 578 (2d Cir.1996)................................................................................87

*United States v. Temple*,
   447 F.3d 130 (2d Cir. 2006)...............................................................................5

*United States v. Tines*,
   70 F.3d 891 (6th Cir. 1995) .............................................................................70

*United States v. Triumph Capital Grp., Inc.*,
   544 F.3d 149 (2d Cir. 2008)...............................................................................5

*United States v. Varanese*,
   417 F. App'x 52 (2d Cir. 2011) .........................................................................6

*United States v. Vizcarra-Millan*,
   15 F.4th 473 (3d Cir. 2021) .............................................................................92

*United States v. Washington*,
   263 F. Supp. 2d 413 (D. Conn. 2003).............................................................68

*United States v. Wilson*,
   879 F.3d 795 (7th Cir. 2018) .............................................................................6

*United States v. Yakobowicz*,
   427 F.3d 144 (2d Cir. 2005).............................................................................75

*United States v. Yevakpor*,
   501 F.Supp.2d 330 (N.D.N.Y.2006).................................................................68

*United States v. Yung*,
   37 F.4th 70 (3d Cir. 2022) ...............................................................................57

*United States v. Zane*,
   495 F.2d 683 (2d Cir. 1974)........................................................................60, 64

*United States v. Zhou*,
   428 F.3d 361 (2d Cir. 2005).............................................................................39

*Veile v. Martinson*,
   258 F.3d 1180 (10th Cir. 2001) .......................................................................57

**Statutes**

5 U.S.C. § 552a ...................................................................................101

18 U.S.C. § 2 ...............................................................................1, 50, 59

18 U.S.C. § 371 .........................................................................1, 37, 59

18 U.S.C. § 951(a) ................................................................1, 7, 8, 59

18 U.S.C. § 1512(c)(2) ..................................................................1

18 U.S.C. § 1512(k) .......................................................................1

18 U.S.C. § 1905 ..........................................................................102

18 U.S.C. § 2261A ...................................................................51, 57

18 U.S.C. § 2261A(1)(B) .................................................1, 46, 50, 53

18 U.S.C. § 2261A(2) .............................................................51, 53

18 U.S.C. § 3551 .......................................................................1, 59

31 U.S.C. § 5324 ...........................................................................8

United States Code, Section 2 Title 18 ...............................................47

United States Code, Section 2721 Title 18 .........................................95

Classified Information Procedures Act Section 5 ...................................2

Freedom of Information Act (5 U.S.C. 552) ........................................102

Interstate Stalking Punishment and Prevention Act of 1996 .................52

Violence Against Women Act ...........................................................51

**Other Authorities**

Charles Alan Wright *et al., Federal Practice and Procedure* § 588 (4th ed. 2011).....................80

Interstate Stalking Punishment And Prevention Act Of 1996, 104 Cong. Rec.
    H4458 (1996) .............................................................................51

IRS, *Self-Employment Individuals Tax Center,*
    https://www.irs.gov/businesses/small-businesses-self-employed/self-
    employed-individuals-tax-center#Obligations.........................................36

1 L. Sand et al., *Modern Fed. Jury Instructions* 18-6 ................................44

Merriam-Webster Legal Dictionary, *Stalking*, https://www.merriam-webster.com/legal/stalking ......................................................................................51

National Center for Victims of Crime, Victim Connect Resource Center, *Stalking*, https://victimconnect.org/learn/types-of-crime/stalking/ ....................................................51, 52

Stephen E. Arthur & Robert S. Hunter, 2 Federal Trial Handbook: Criminal § 52:6 (2022-2023 Edition) ..........................................................................................7

United States Attorney's Office, Eastern District of New York, *Federal Jury Convicts Three Defendants of Interstate Stalking of Chinese Nationals in the U.S. and Two of Those Defendants for Acting or Conspiring to Act on Behalf of the People's Republic of China*, https://www.justice.gov/usao-edny/pr/federal-jury-convicts-three-defendants-interstate-stalking-chinese-nationals-us-and .................................................................4

United States Department of Justice, Office on Violence Against Women, *Stalking*, https://www.justice.gov/ovw/stalking ....................................................51

## Rules

Fed. R. Crim. P. 29 .................................................................................... *passim*

Fed. R. Crim. P. 29(c) ...................................................................................4, 7

Fed. R. Crim. P. 29.1 ...................................................................74, 75, 76, 81

Fed. R. Crim. P. 33 .................................................................................... *passim*

Fed. R. Crim. P. 33(a) ..............................................................................64, 73

Fed. R. Crim. P. 52(b) .....................................................................................68

Fed. R. Evid. 404(b)(2) ...................................................................................21

Fed. R. Evid. 702 .............................................................................................17

Fed. R. Evid. 801(d)(2)(E) ........................................................................ *passim*

Fed. R. Evid. 1002 ...........................................................................................72

## Treatises

*Prosecute*, Black's Law Dictionary (11th ed. 2019)......................................20

2 *Wigmore on Evidence* § 293 (J. Chadbourn rev. ed. 1979) .......................20

## PRELIMINARY STATEMENT

On May 15, 2021, a Grand Jury sitting in the Eastern District of New York returned an indictment charging defendants Hu Ji, Li Minjun, Zhu Feng (also known as "Johnny Zhu"), Michael McMahon, Zheng Congying, and Zhu Yong (also known as "Jason Zhu") with Conspiracy to Act as an Agent of a Foreign Government Without Prior Notification to the Attorney General in violation of 18 U.S.C. § 371 and 18 U.S.C. § 3551 (Count I) and Conspiracy to Engage in Interstate Stalking in violation of 18 U.S.C. § 371 and 18 U.S.C. § 3551 (Count II). *See* ECF No. 54. Thereafter, on July 21, 2021, the Grand Jury returned a Superseding Indictment adding substantive counts and now charging nine defendants—Hu Ji, Li Minjun, Tu Lan, Zhu Feng (also known as "Johnny Zhu"), Kuang Zebin (also known as "Vincent Kuang"), Michael McMahon, Zhai Yongqiang, Zheng Congying and Zhu Yong (also known as "Jason Zhu")—with Conspiracy to Act as an Agent of a Foreign Government Without Prior Notification to the Attorney General in violation of 18 U.S.C. § 371 and 18 U.S.C. § 3551 (Count I), Acting as an Agent of a Foreign Government Without Prior Notification to the Attorney General in violation of 18 U.S.C. § 951(a), 18 U.S.C. § 2, and 18 U.S.C. § 3551 (Count II), Conspiracy to Engage in Interstate Stalking in violation of 18 U.S.C. § 371 and 18 U.S.C. § 3551 (Count III), and Stalking in violation of 18 U.S.C. § 2261A(1)(B), 18 U.S.C. § 2, and 18 U.S.C. § 3551 (Count IV).[1] *See* ECF No. 77.

Five of the defendants charged in the Indictment (Hu Ji, Li Minjun, Tu Lan, Zhu Feng, also known as "Johnny Zhu," and Zhai Yongqiang), including the first four listed, remain at large and did not appear for trial; another (Kuang Zebin, also known as "Vincent Kuang"), pleaded

---

[1] The Superseding Indictment also charges defendants Tu Lan and Zhu Feng (also known as "Johnny Zhu") with Obstruction of Justice in violation of 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 2, and 18 U.S.C. § 3551 (Count V) and Conspiracy to Obstruct Justice in violation of 18 U.S.C. § 1512(k) and 18 U.S.C. § 3551 (Count VI).

guilty and is pending sentencing.  Following pretrial motions, *see* ECF Nos. 114, 146, which were denied, *see* ECF Nos. 123, 163,[2] and *in limine* motions, which were addressed by the Court at a pretrial conference on May 30, 2023, *see* May 15, 2023 Docket Text, trial in this matter commenced on May 31, 2023 against the remaining three defendants, and proceeded over the course of 12 trial days.  The jury deliberated over the course of 3 days, and returned its verdict on June 20, 2023.  Defendant McMahon was acquitted of Count I, but convicted on Counts II, III, and IV of the Superseding Indictment; Defendant Zhu was convicted on Counts I, II, III, and IV of the Superseding Indictment; and Defendant Zheng was acquitted of Counts I and II, but convicted on Counts III and IV of the Superseding Indictment.  The Court permitted post-trial motions to be filed on or before July 20, 2023, *see* June 20, 2023 Docket Text, a date that was later extended once by the Court on its own motion, *see* July 11, 2023 Docket Text, and once at the request of defendant McMahon, *see* ECF No. 275; those motions are now timely filed, under the Court's Orders.

Defendant McMahon now moves for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29 or a new trial, pursuant to Federal Rule of Criminal Procedure 33, as well as other relief, as set forth herein.  For the reasons set forth below, Mr. McMahon's convictions should not stand.  That is so first because the evidence on all Counts was insufficient as a matter of law.  With regard to his conviction on Count II, itself fatally inconsistent with his acquittal on Count I, the wholly circumstantial case that he was aware that he was working for the Government of China—after all, there was no evidence that he ever admitted, or anyone ever specifically told him that he was engaged by and working for the Chinese government—fails because it was based

---

[2] A number of proceedings under Section 5 of the Classified Information Procedures Act ("CIPA") were also held during the pendency of this matter.  *See, e.g.,* ECF Nos. 138, 139, 140, 141, 160, 164, 175, 178.

on the stacking of impermissible inference on impermissible inference, all discussed below.  And while that is true, with regard to Counts III and IV as well, those Counts also fail because the essential elements of the offense revolving around whether Mr. McMahon's entirely covert surveillance had the purpose and effect of harassing, intimidating and causing significant emotional distress to those whom he was surveilling, were not—again, as a matter of law—satisfied.  Indeed, the convictions of Mr. McMahon on Counts III and IV essentially outlaw the practice of private investigation, criminalizing the surveillance and record gathering that is the essence of that licensed profession, of which Mr. McMahon was a practitioner.

As well, the interests of justice which govern Federal Rule of Criminal Procedure 33, require that Mr. McMahon be granted a new trial, both for the same reasons set forth in his Rule 29 motion, and for other reasons, including the unique manner in which the case was presented by the Government through play-acting the written record; the Government's abuse of the extraordinary advantage that it realizes by having the right of rebuttal, which it used to raise new arguments at a time when the defense could not respond to them; and its failure to fulfill the promises it made to the Court based upon which it was permitted to elicit certain prejudicial evidence against Mr. McMahon.

Each of these grounds is set forth in detail below.  Taken together or separately, they provide the Court with the opportunity, provided by the Rules and by the law, to avoid the most terrible thing that can happen in the American system of justice—an innocent person being convicted of a crime.  For unless the Court acts, that will be the case here.  Even giving the Government every benefit to which it is entitled following a jury verdict like this one, and even acknowledging the nobility of the Government's purpose in seeking to redress the kind

transnational oppression that has occurred at the hands of China[3]—including in this case—Michael McMahon, however tragic his involvement in this matter, was himself, the record shows, a victim of the deceptive actions of the Chinese Government, rather than a culpable participant in any crime. His post-trial motions should be granted.

## ARGUMENT

I.    **A JUDGMENT OF ACQUITTAL MUST BE ENTERED ON COUNTS II, III, AND IV OF THE SUPERCEDING INDICTMENT BECAUSE THE GOVERNMENT FAILED TO INTRODUCE EVIDENCE AT TRIAL SUFFICENT TO SUPPORT THE CONVICTIONS AGAINST MR. MCMAHON.**

Under Federal Rule of Criminal Procedure Rule 29(c), after the jury returns a guilty verdict "[a] defendant may move for a judgment of acquittal" and the court may set aside the verdict and enter an acquittal. *See, e.g., United States v. Sierra*, 923 F. Supp. 2d 501, 502 (S.D.N.Y. 2013) ("Pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure, a defendant may move for a judgment of acquittal, following a jury verdict of guilty, on the ground that the evidence was insufficient to sustain a guilty verdict."). "The test for sufficiency . . . is whether a rational jury could conclude beyond a reasonable doubt that a defendant is guilty of the crime charged." *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (quotation omitted). The court must make this determination with "the evidence against a particular defendant . . . viewed in a light that is most favorable to the government . . . and [with] all reasonable inferences . . . resolved in favor of the government." *Id.* (quotation omitted). To view the evidence in "the light most favorable to the

---

[3] Indeed, following the verdicts in this matter, the United States Attorney's Office, Eastern District of New York, issued a press release, which stated, in pertinent part that it "will remain steadfast in exposing and undermining efforts by the Chinese government to reach across our border and perpetrate transnational repression schemes targeting victims in the United States in violation of our laws." *See* United States Attorney's Office, Eastern District of New York, *Federal Jury Convicts Three Defendants of Interstate Stalking of Chinese Nationals in the U.S. and Two of Those Defendants for Acting or Conspiring to Act on Behalf of the People's Republic of China*, https://www.justice.gov/usao-edny/pr/federal-jury-convicts-three-defendants-interstate-stalking-chinese-nationals-us-and.

government," the court must "credit[] every inference that the jury might have drawn in favor of the government," *United States v. Temple*, 447 F.3d 130, 136-37 (2d Cir. 2006), and "resolve all issues of credibility in the government's favor," *United States v. Canady*, 126 F.3d 352, 356 (2d Cir. 1997).

Notwithstanding, the court "must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that [each] element . . . is established beyond a reasonable doubt." *United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 159 (2d Cir. 2008) (quoting *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995)); *accord United States v. Landesman*, 17 F.4th 298, 320 (2d Cir. 2021), *cert. denied sub nom. Nordlicht v. United States*, 143 S. Ct. 86 (2022). "An inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019) (quoting *Siewe v. Gonzales*, 480 F.3d 160, 168 (2d Cir. 2007)); Leonard B. Sand et al., Modern Federal Jury Instructions § 6.01 (2011) ("The process of drawing inferences from facts in evidence is not a matter of guesswork or speculation. An inference is a deduction or conclusion which . . . the jury [is] permitted to draw . . . from facts which have been established by either direct or circumstantial evidence."). Although the Court "must defer a jury's reasonable inferences, [the Court] give[s] no deference to impermissible speculation." *Pauling,* 924 F.3d at 656 (citing *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994)). Indeed, "a conviction based on speculation and surmise alone cannot stand, and courts cannot credit inferences within the realm of possibility when those inferences are unreasonable[.]" *Langston v. Smith*, 630 F.3d 310, 314 (2d Cir. 2011) (cleaned up). "At times it may be difficult to distinguish between inference and speculation, as some speculation may indeed be reasonable. Reasonable speculation occurs when the finder of fact concludes that a disputed fact exists that is within the realm of possibility, but the conclusion reached is nevertheless unreasonable because it

5

is not logically based on another fact known to exist." *Pauling*, 924 F.3d at 656 (citing *Langston*, 630 F.3d at 314, 319).

Moreover, "where a fact to be proved is also an element of the offense . . . it is not enough that the inferences in the government's favor are permissible." *Id.* at 657 (citation omitted). The Court "must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *Id.* (quoting *Martinez*, 54 F.3d at 1043); *see also United States v. Varanese*, 417 F. App'x 52, 53 (2d Cir. 2011) (same).

Nor, of course, may a conviction be obtained by "stack[ing] 'inference upon inference.'" *United States v. Graziano*, 616 F. Supp. 2d 350, 371 (E.D.N.Y. 2008) ("[T]he Court is 'loath to stack inference upon inference in order to uphold the jury's verdict.'" (quoting *United States v. Ruiz*, 105 F.3d 1492, 1500 (1st Cir. 1997))); *see also United States v. Martinez*, 921 F.3d 452, 466 (5th Cir. 2019) ("The verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." (quotation omitted)); *United States v. Wilson*, 879 F.3d 795, 802 (7th Cir. 2018) ("In a case that hinges on circumstantial evidence, we must not permit a verdict based solely on the piling of inference upon inference." (quotation omitted)); *United States v. Ouedraogo*, 531 F. App'x 731, 739-40 (6th Cir. 2013) ("Although the evidence need not eliminate all reasonable hypotheses except that of guilt, we must guard against 'piling inference upon inference.'") (quotation omitted); *United States v. Arras*, 373 F.3d 1071, 1073 (10th Cir. 2004) ("While the jury may draw reasonable inferences from direct or circumstantial evidence, an inference must be more than speculation and conjecture to be reasonable, and caution must be taken that the conviction not be obtained by piling inference on inference." (quoting *United States v. Jones*, 44 F.3d 860, 865 (10th Cir.1995)). In this regard, "[a]n inference which is based solely and entirely upon another inference, and which is unsupported by an additional fact

or an inference from other facts is an inference upon an inference."  Stephen E. Arthur & Robert S. Hunter, 2 Federal Trial Handbook: Criminal § 52:6 (2022-2023 Edition).  In application, a jury "may not . . . treat a fact inferred as a fact established that, in turn, can serve as the basis for a further inference and thereby spin out a chain of inferences into the realm of pure conjecture."  *Id.*

Perhaps most significantly, "[i]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt."  *Landesman*, 17 F.4th at 320 (citation omitted).  "[I]t would not satisfy the Constitution to have a jury determine that the defendant is probably guilty."  *Pauling*, 924 F.3d at 657 (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)).

As explained below, because there was, as a matter of law, insufficient evidence adduced by the Government to establish by proof beyond a reasonable doubt all of the essential elements of Counts II, III, and IV of the Superseding Indictment, the Court must, pursuant to Federal Rule of Criminal Procedure 29(c), grant Mr. McMahon's motion for a judgment of acquittal.

### A.     There is Insufficient Evidence to Sustain A Conviction For Acting as An Agent of a Foreign Government Without Prior Notification to the Attorney General (Count II).

First, the Court should enter a judgment of acquittal as to Count II, charging Mr. McMahon with acting as an agent of a foreign government without prior notification to the attorney general in violation of 18 U.S.C. § 951(a), because the Government failed to present any evidence from which a jury could permissibly find, or even infer, that Mr. McMahon knew that he was acting as an agent of a foreign government.  As the Court instructed the jury with respect to Count II, the Government was required to prove, beyond a reasonable doubt:

> First, the defendant acted as an agent of a foreign government or official, specifically of China.  Second, the defendant failed to notify the Attorney General that he would be acting as an agent of the

7

> government or an official of China in the United States prior to so acting. Third, the defendant acted knowingly. And fourth, the defendant acted, at least in part, as an agent for the Government or an official of China while in the United States.

Tr. at 2191:25-2192:9. Thus, a person violates 18 U.S.C. § 951(a) if he "acts in the United States as an agent of a foreign government without prior notification to the Attorney General if required in [Section 951(b)]." The statute defines a person as an "agent of a foreign government" if he "agrees to operate within the United States subject to the direction or control of a foreign government or official." *Id.* § 951(d). Fundamental to the statute is the requirement that "the Government . . . prove Defendant had knowledge of [the state actor's] status as a foreign official." *United States v. Abouammo*, No. 19-CR-00621-EMC-1, 2022 WL 17584238, at *7 (N.D. Cal. Dec. 12, 2022); *see also United States v. Chung*, 659 F.3d 815, 823 (9th Cir. 2011) (explaining that, to prove a § 951 violation, the Government must establish both that the defendant intended to operate subject to a foreign government's direction or control and the foreign official directed or controlled his actions); *United States v. Campa*, 529 F.3d 980, 999 (11th Cir. 2008) ("The government was required to prove a mens rea of general intent. The district court instructed the jury that the defendants must have acted 'knowingly.'"); *cf. Staples v. United* States, 511 U.S. 600, 614-15 (1994) (noting that "the Government's construction of the statute potentially would impose criminal sanctions on a class of persons whose mental state—ignorance . . .—makes their actions entirely innocent"); *id.* at 622 n.3 (Ginsburg, J., concurring) (noting the presumption that crimes "require[] knowledge . . . of the facts that make the defendant's conduct illegal"); *United States v. Chung*, 633 F. Supp. 2d 1134, 1145 (C.D. Cal. 2009) ("Federal courts have also consistently held that a defendant must have knowledge of the underlying facts that make his conduct illegal." (collecting cases)); *see generally Ratzlaf v. United States*, 510 U.S. 135, 138 (1994) (holding criminal convictions in violation of 31 U.S.C. § 5324 could be maintained only when the

8

government proved that defendant knew he was violating the statute at the time he committed the offense); *United States v. Murphy*, 942 F.3d 73, 79, 88 (2d Cir. 2019) (vacating defendant's conviction because the government did not prove defendant's knowledge that his intended victim was under the age of 16 and explaining that "[t]his strikes at the heart of fairness, integrity, and public reputation of judicial proceedings.").

The Court further instructed the jury that:

> Simply acting in accordance with foreign interests does not make a person an agent of a foreign government. To be an agent of a foreign government, a person must do more than act in parallel with a foreign government's interest or pursue a mutual goal. The Government must prove that the defendant acted pursuant to an agreement to operate subject to the direction or control of China, and that a Chinese official directed or controlled the defendant's actions. . . . To find the defendant guilty of this offense, you must find that the defendant knew that he was acting as an agent of the Government or an official of China and knew that he had not provided prior notification to the Attorney General.

Tr. at 2192:21-2194:2; *see United States v. Rafiekian*, 68 F.4th 177, 192 (4th Cir. 2023) ("[T]he alleged agent must do more than simply . . . act[] in accordance with foreign interests or privately pledg[e] allegiance. Instead, he must agree with that foreign government to act in furtherance of its interests." (cleaned up)).

Here, the Government failed to prove, beyond a reasonable doubt, the existence of the third element of acting as an agent of a foreign government; specifically, that Mr. McMahon acted knowingly. Instead, as is set forth in detail below, the evidence adduced by the Government in this case amounted to no more than piling unreasonable inference upon unreasonable inference, all supported by no more than suspicion or speculation, and none sufficient to amount to guilt beyond a reasonable doubt—the most fundamental element of our system of criminal justice. Each of those inferences is set forth, and analyzed below. None allow the Court to uphold a conviction which cannot withstand the scrutiny that justice requires. *See Rafiekian*, 68 F.4th at 190-92

(affirming district court's grant of a new trial under Rule 33 based on sufficiency of the evidence of FARA violation where "all of the key evidence in the case point[ed] to [the defendant's] innocence, while the convictions relied on weak inferences, many built upon one another, drawn from narrowly framed circumstantial evidence, without regard to a broader context that substantially undercuts any inculpatory inferences" (internal quotation marks and citations omitted)).

### 1.    The China Daily Article

At trial, the Government introduced Exhibit 434, a China Daily article about which Mr. McMahon was concededly aware, entitled "Interpol Launches Global Dragnet for 100 Chinese Fugitives," to support the inference that Mr. McMahon knew that he was working as an agent for the Chinese government.  Thus, the Government alleged in its opening that, "[s]ince almost immediately after he was hired, Defendant McMahon found out through the internet that the victim and his wife were publicly wanted by the Chinese government to face criminal allegations," Tr. at 30:2-5.  It also argued on summation that Mr. McMahon "sent himself the China Daily article," which "included photos and information about both Xu Jin and Liu Fang . . . in April 2017 with the subject line 'China most wanted.'  But by that point he already knew.", Tr. at 1975:24-1976:5, and further argued on rebuttal that the China Daily article informed Mr. McMahon that "Operation Skynet is an operation to get people back to China", Tr. at 2129:12-13.

Although it is undisputed that Mr. McMahon conducted a Google search and read the publicly available China Daily article in October of 2016, and thus understood Xu Jin, the subject of his private investigation, was alleged to have committed crimes in China, Exhibit 434 did not, in contrast to the Government's argument, either explain Operation SkyNet or otherwise inform Mr. McMahon that he was working as an agent for the Chinese government, as opposed to for a Chinese construction company which was investigating, in the hope of seeking the return of a

person who had embezzled millions of dollars from that company, and of the funds with which he had absconded.[4]

Initially, the China Daily article does not, as the Government portrayed it, explain that Operation Skynet was, in fact, an illicit repatriation program, let alone that Mr. McMahon was a part of it. It did not, for example, explain that this campaign is one that proceeds through the use of private investigators, or campaigns of harassment, including the kind that occurred—unbeknownst to Mr. McMahon—here.[5] The article, entitled "Interpol Launches Global Dragnet for 100 Chinese Fugitives," contained the sub-headline: "It's called Operation Sky Net, Amid the nation's intensifying anti-graft campaign, arrest warrants were issued by Interpol China for former State employees and others suspected of a wide range of corrupt practices." Indeed, the Government's own witness, Special Agent George Dietz, conceded that the China Daily Article did not explain what Operation SkyNet was. *See* Tr. at 409 ("Q. It says, 'It's called Operation Skynet.' Have you ever heard of Operation Skynet? A. I have never heard of Operation SkyNet. Q. And you examined these documents; correct? A. Yes. Q. And they don't explain what

---

[4] Indeed, as is further discussed *infra*, Mr. McMahon's conversations with Hu Ji ("Eric Yan") and Zhu Feng ("Johnny Zhu"), which specifically referenced a Chinese company, *see* Exhibit 3047; Exhibit 3056; Exhibit 805B at 13, 14, 15, 19, 21, 24, 26, 28, as well as the fact that Mr. McMahon's investigation was focused largely on asset recovery, *see, e.g.,* Exhibit 1022; Exhibit 3026; Exhibit 3056, all demonstrate that Mr. McMahon believed that he was performing lawful investigative services on behalf of a private Chinese construction company.

[5] As is also further discussed *infra*, there was and is no evidence, and the Government did not contend, that Mr. McMahon was involved with posting notes—or even aware that notes would be posted—on the door of the Warren address in September of 2018 or that Mr. McMahon was in any way involved with the Facebook posts sent to Xu Xinzi's friends in California in May of 2018, both of which occurred over a year after Mr. McMahon's last investigative activities in this matter. *See, e.g.,* Exhibit 713 at 16:11-16 ("Q. I want to direct you to May of 2018. Did anything having to do with you or your loved ones' Facebook accounts stand out to you? A. Yes. My friends received Facebook messages from an account named Tony Lee that contained . . . derogatory information about me and my parents."); *id.* at 27:14 ("Q. So the question was: The first time that you received any messages of this sort was in early . . . 2018, correct? A. Correct. Q. Okay. And before that, there were no messages of this kind harassing you; is that right? A. Correct.").

Operation Skynet is, do they?  A.  I don't recall 100 percent of the content on here so it may, but to my recollection it does not.").  To be sure, this article would, then, have alerted Mr. McMahon to the fact that lawful processes, including "arrest warrants . . . issued by Interpol China" were being undertaken by China for the subject of his investigation, but there was nothing that would have told Mr. McMahon that he was a part of this process.  Indeed, Agent Dietz further recognized, and as is well known to the Court and counsel as a matter of experience and common sense, parallel civil and criminal investigation and litigations is commonplace.  *See* Tr. at 414 (Q.  "In your experience and you have a good amount of experience, it occurs, right, that there are criminal investigations at the same time as there are parallel civil cases; right?  A.  You're talking about parallel proceedings?  Yes.  Q.  That's something that you've seen before?  A.  And I've also participated in them as well.").[6]  Thus, although the fact that Xu Jin was wanted by the Chinese Government—as Government Exhibit 434 showed—was known by Mr. McMahon, there is nothing in that Exhibit or otherwise that showed that Mr. McMahon knew that he was working with the Chinese Government on that campaign.  Indeed, and to the contrary, there was ample evidence that he was affirmatively deceived into believing, exactly to the contrary, that he had been retained by a Chinese company in order to recover assets stolen from it.  *See, e.g.,* Exhibit 1022 ("Sorry Mike, I forgot to indicate Jin Xu's gender, Jin Xu is a gentleman who owned [sic] a lot of money from Mr. Jason Zhu.  Instead of repaying the money he owned, [sic] Mr. Xu chose to run away, and Mr. Zhu needs to find where does Jin Xu live and other relate[d] information.  Mr. Zhu said there's no attorneys involved."); Exhibit 3047 ("Hi mike I have already back [sic] to

---

[6] Of course, there was, in fact, a parallel litigation which, as the Court acknowledged, "mirror[ed] . . . the alleged criminal charges against John Doe and Jane Doe 1 in China," *id.* at 24:1-3, though the Court did not allow discussion of that civil case at trial because "Mr. McMahon couldn't have known about this lawsuit as it hadn't been filed yet." *See* Pre Trial Conference Tr. at 26:20-21.

China and reported all we found to my boss of the company."); Exhibit 3056 ("Hi mike: our finance [manager] wire you the money this morning."); Exhibit 805B at 13 ("Ok mc I spoke with my company last nite they want u to monitor on Monday but with one person."); *id.* at 15 ("The company wants the property list which be long j lifetime can u do that?"); *id.* at 19 ("Standby I will inform your suggestion to the company tonight."); *id.* at 21 ("I will stay here as long as the company require."); *id.* at 26 ("I will speak with the company tonight."); *id.* at 28 ("Mc I will deposit 1k to ur account tmr morning.  Company want to switch to lightweight surveillance with one person tmr until further notice."); *id.* at 14 ("So your company only wants one investigator for Monday?"); *id.* at 24 (McMahon: "How did the company in China find you and Eric to work on this case??"  Zhu: "Eric works for them in China.  I used to send cars to them from US so they know me"); *see also* Exhibit 3026 ("He wanted to know if you can get any of Jin Xu and his wife, Fang Liu's records of latest purchases through their SSN and driver license."); Exhibit 3056 ("From the financial record of our company, Xu transferred the money to those 8 account, so we need check these accounts first.  [S]everal accounts are from united states.").  Indeed, if anything, Exhibit 434 confirmed his belief, specifically mentioning as it did, that Xu Jin was wanted for "embezzlement," as well as "abuse of power, [and] accepting bribes."

In sum, Exhibit 434 did not explain Operation SkyNet or discuss an illicit repatriation scheme by the Chinese government, let alone inform Mr. McMahon that he was working as an agent of a foreign government.  Accordingly, Exhibit 434 did not establish evidence from which a permissible inference—as opposed to pure speculation—could flow that Mr. McMahon knew that he was performing investigative services for the Chinese government.

### 2.    April 4, 2017 Panera Bread Meeting

The Government also introduced evidence at trial of a sequence of events that occurred between April 3, 2017 and April 5, 2017, to support the inference that Mr. McMahon was aware

that he was working as an agent for the Chinese government.  First, the Government introduced evidence of a meeting between Zhu Feng (hereinafter "Johnny Zhu"), Tu Lan, and Hongru Jin, that occurred at the Embassy Suites in Elizabeth, New Jersey on April 3, 2017, during which Tu Lan told Johnny Zhu to "[t]ell [Mr. McMahon] clearly, I mean, you need to tell [Mr. McMahon] clearly about everything." *See* Exhibit 704A.  Second, the Government introduced evidence that on the next day, April 4, 2017, Johnny Zhu and Mr. McMahon met at a Panera Bread in Paramus, New Jersey, for approximately one hour.  *See* Exhibits 103A-F.  Finally, the Government introduced a text message from Johnny Zhu to Mr. McMahon on April 5, 2017, which stated "I just got the package eta 7:40pm".  *See* Exhibit 4010.

The Government, for the first time in its summation (this was not a part of its opening, or otherwise a theory of prosecution disclosed to the defense), and then again in its rebuttal, argued that the purpose of the April 4, 2017 meeting at Panera Bread between Johnny Zhu and Mr. McMahon was to tell McMahon about the scheme to repatriate Xu Jin, and that a subsequent text message referring to a "package" purportedly referred to the arrival of Xu Jin's father in the United States, about which—the Government speculates—Mr. McMahon was informed at the April 4, 2017 Panera Bread meeting.  *See* Tr. at 1983:16-1984:8 (Government summation) ("Back on April 3rd, 2017, there was a meeting with Tu Lan and Zhu Feng.  That meeting, Tu Lan – again, the Chinese prosecutor tasked with brining Xu Jin back to China – specifically said, talking about McMahon:  Tell him clearly, I mean, you need to tell him clearly about everything.  That's GX 704-1.  April 4th, 2017 is the meeting at Panera Bread that you've heard about.  You can see from these surveillance photos that the meeting lasted almost an hour.  That was the day after the hotel meeting at which Tu Lan instructed that McMahon should be told clearly about everything.  And then the following day, April 5th, 2017, [Xu] Jin's father arrived in the United States.  This is a text message from Zhu Feng to McMahon saying:  I just got the package.  That's a reference to

14

Xu Jin's father. It's a coded word in a text exchange that McMahon never questioned or sought to clarify because he didn't need to; he had already been told exactly what that meant. That's GX 4010."); Tr. at 2133:13-2134:11 (Government rebuttal) ("Again, context is everything. The surveillance photo of Mr. McMahon walking into the Panera Bread with his co-conspirators is not the only evidence. The evidence is the day before, Prosecutor Tu Lan directed Johnny Zhu to tell McMahon everything. Then they had a meeting, an hour-long meeting. Defense counsel conceded as much, yes, it is an hour-long meeting. They weren't talking about the weather for an hour. After that hour-long meeting, the next day when the operation goes into effect, when the father is brought there, it's seamless. There's no confusion. There's no questions. Johnny Zhu says, I just got the package, ETA 7:40. The man does not say, What? What package? What do you mean? He knows what's going on. And when later Johnny Zhu says do you see the old man? Again, no confusion. He knows who he's talking about, what he's looking for and what he needs to be observing in the middle of the night, because they spent an hour talking about it. It's fair to infer in circumstances like this that based on the things they said in the writing and what they did after meetings, you can infer what happened at those meetings and you can infer fair that it was part of the illegal scheme and providing further information and knowledge to Michael McMahon.").

However, absolutely no evidence at trial was established that Johnny Zhu told Mr. McMahon "clearly about everything," or indeed, about anything at all. Certainly, there is absolutely no evidence that Johnny Zhu told Mr. McMahon that either of them were working for the Chinese government (and indeed, Mr. Zhu's numerous representations, all of which occurred after the April 4, 2017 meeting at Panera Bread, to Mr. McMahon that he was working for a "company," confirmed Mr. McMahon's understanding of precisely what he was doing, *see* Exhibit 805B at 13 ("Ok mc I spoke with my company last nite they want u to monitor on Monday but with one person."); *id.* at 15 ("The company wants the property list which be long j lifetime can u

15

do that?"); *id.* at 19 ("Standby I will inform your suggestion to the company tonight."); *id.* at 21 ("I will stay here as long as the company require."); *id.* at 26 ("I will speak with the company tonight."); *id.* at 28 ("Mc I will deposit 1k to ur account tmr morning. Company want to switch to lightweight surveillance with one person tmr until further notice.")). That is, neither Johnny Zhu nor Mr. McMahon, the only two participants in the meeting at Panera Bread on April 4, 2017, testified at trial. Hongru Jin, who was present at the Panera Bread when the meeting occurred, testified that he did not sit with Johnny Zhu and Mr. McMahon at the Panera Bread and did not hear or was otherwise informed of the contents of the conversation. *See* Tr. at 1090:6-14 (Q. "Do you know what Johnny Zhu said to the private investigator? A. Sorry, I don't know. Q. Okay. Because you never spoke to Johnny Zhu about what he said to the private investigator; is that correct? A. Yes, it was because when Johnny Zhu was talking to the private investigator, at the time I was staying at another table there was some distance, so I don't know what was discussed."); Tr. at 1092:8-18 ("Q. Mr. Jin, you sat at some distance from Johnny Zhu and the private investigator, correct? A. Yes. Q. So you couldn't hear any of their conversation; am I right? A. Yes. Q. . . . I think you testified yesterday that after Johnny Zhu spoke to the private detective, that he did not tell you what they had discussed; is that correct? A. Yes."). Accordingly, any conclusion about the substance of Johnny Zhu and Mr. McMahon's discussion during the hour-long meeting at the Panera Bread on April 4, 2017 is pure speculation and, therefore, cannot rise to the level of a permissible inference. *See Pauling*, 924 F.3d at 656. Nor does the mere length of this meeting, in a public place, do anything to shed light on its substance, during a time when, to be sure, Mr. McMahon was undertaking a number of tasks that could certainly have been the subject of the discussion.

Nor is the fact that Mr. McMahon was the recipient of a text message referencing a "package" evidence of anything at all, let alone that he was told that he was working for the

16

Chinese government.  Certainly, no evidence whatsoever was presented at trial that Johnny Zhu

and Mr. McMahon spoke in "coded word[s]" while texting, let alone what those coded words

meant[7] (*i.e.*, that Xu Jin's father was coming to the United States, something that Mr. McMahon

already knew and understood was consistent with an effort to get Xu Jin to own up to his

embezzlement and return the embezzled funds, *see* Exhibit 4019B at 62 ("They are thinking of

what to do.  They are hoping his father convinces him.  To return the money"); Exhibit 701A

("DOJ AGENT:  Was the goal to have somebody return to China on their own?  MCMAHON:

Yeah.  I think he had mentioned to me that they were trying to get him to come back to China . . .

And then the father had flown in from I think he said China . . . To convince the son because of,

you know, out of honor for the name. . . . DOJ AGENT:  Did they say what the consequences

were, like, you know was he gonna – MCMAHON:  No, he didn't say nothing, just, you know,

pay back the money basically.")).  Nor is the fact that Mr. McMahon responded to the text message

referencing a "package" by saying "ok," sufficient evidence that Mr. McMahon and Johnny Zhu

were speaking in an understood code language—and thus were co-conspirators—given that the

very next message between the two was a text from Mr. McMahon saying "?" (*i.e.*, just a question

mark).  At the end of the day, one thing is clear: nothing about this interchange shows anything

that could, directly or otherwise, lead to an inference that Mr. McMahon was told that he was

---

[7] Indeed, to prove the meaning of any alleged "coded word[s]," the Government would have had to either call a participant of the conversation—which the Government could not do, as Johnny Zhu was inexplicably permitted to leave the United States–or an expert witness, *see United States v. Dukagjini*, 326 F.3d 45, 53 (2d Cir. 2003) (Although an expert witness [in a criminal case] must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense, under Fed. R. Evid. 704, an expert may explain relevant "code words" for the jury.); *see also United States v. Barcy*, No. 20-CR-483 (ARR), 2022 WL 17801133, at *10 (E.D.N.Y Dec. 19, 2022) (admitting expert translations of coded language "beyond the ken of the average juror," pursuant to Federal Rule of Evidence 702)—which the Government chose not to do.

working for the Chinese government, the subject of this motion for a judgment of acquittal. That motion should be granted.

### 3.     Michael McMahon's Post-Arrest Statement

The Government also introduced Exhibit 701A, a portion of Mr. McMahon's post-arrest statement, at trial. The Government argued in its summation, and again in its rebuttal, that Mr. McMahon's statement during his post-arrest interview that "I think he had mentioned to me that they were trying to get him to come back to China . . . So they could prosecute him" created an inference that Mr. McMahon knew that he was working for the Chinese government. *See* Tr. at 1983:1-12 (Government summation) ("And for even further proof that McMahon knew exactly what he was doing, we can look at his very own words. In his post-arrest interview, he said: And then the father had flown in from, I think he said, China to convince the son because of – you know, our of honor for the name. Professor Wedeman explained to you the significance of family honor in Chinese culture. He told you that by approaching the family and by potentially pressuring the family, you are signaling to the individual that they are putting – they are – their refusal or lack of return to China is putting the family in danger. McMahon's post-arrest statement reflects that he understood that."); Tr. at 1984:9-14 (Government summation) ("After his arrest, McMahon said: I think he had mentioned to me that they were trying to get him to come back to China. The 'him' there is Xu Jin. And then McMahon said: So they could prosecute him. In other words, Tu Lan said that Zhu Feng should tell McMahon everything. And the evidence demonstrates that's exactly what they did."); Tr. at 2134:12-19 (rebuttal) ("And of course, I would be remiss if I didn't mention during that post arrest interview when Mr. McMahon admits, well, I knew they were going to prosecute him. And again, they were going to prosecute him. That's never in any writing. That's not written down anywhere. How did he know that? Because he was told it in those

18

meetings and on phone calls.  He was asked, well, how did you learn about all of this?  And he answers, I think they told me on a phone call.").

Even as it argues that "context is everything," Tr. at 2133:13, it is the Government that yanks Mr. McMahon's statement out of context.  Leaving aside that there is nothing, in Mr. McMahon's statement or otherwise, that ties what he says—over three years later, first thing in the morning—to the Panera Bread meeting, as the Government, exercising exquisite 20-20 hindsight seeks to do now, full consideration of even the highly excerpted, admitted portion of Mr. McMahon's post-arrest statement[8] reveals that the inference that the Government seeks to draw from Mr. McMahon's statement is simply not a fair one, ignoring as it does other statements voluntarily provided by Mr. McMahon.[9]  Thus, immediately after stating that "they were trying to

---

[8] Other portions of Mr. McMahon's post-arrest statement, which were not admitted at trial, also support this.  That is, in answer to the Government's questions about whether Mr. McMahon was informed by those who had retained him that this was a criminal case, *see* ECF No. 228, Ex. 4 at 62:42-43, Mr. McMahon said, during his post-arrest statements that "I thought it was a civil case, he stole money from the company and that was it, we were just trying to –", *id.* at 63:3-6, at which point he was cut off.  Mr. McMahon also stated, *id.* at 23:25-31, that he understood that the people with whom he was meeting—the same people who were, according to the Government, known by Mr. McMahon to be working for the Chinese government—were a "part of the construction company," further explaining Mr. McMahon's view that he was working on behalf of a private entity seeking to recover its losses and not on behalf of China's interests in bringing a criminal case.  Finally, Mr. McMahon said he was told, *id.* at 10:32-35, that he was trying to "locate an individual who stole money or a couple million dollars from a construction company in China," which implies that his role was to recover those losses and not to assist with a criminal prosecution.

[9] Indeed, as Agent Ross testified, Mr. McMahon spoke with law enforcement freely and fully cooperated after his arrest, a fact that is consistent with his innocence.  *See* Tr. at 1491:11-1494:8 ("Q.  And we just looked at excerpts of the video, of the interview.  You've – do I take it that you've reviewed the entire video at some point?  A.  I have.  Q.  And it's obviously much longer than that; right?  A.  Yes.  Q.  Would you say a couple hours, something like that?  A.  It's probably an hour and a half, more.  Q.  Fair enough.  And I think you testified right upfront that it was a voluntary statement that Mr. McMahon made.  A.  It was.  Q.  He was administered his Miranda rights, he didn't invoke his right to counsel and made a voluntary statement; right?  A.  That's right. . . . Q.  Special Agent Ross, Mr. McMahon acknowledged that he was a private investigator who had worked on the case that you were discussing with him?  A.  He did.  Q.  Okay.  And he was cooperative; right?  A.  Yes.").  *See generally United States v. Biaggi*, 909 F.2d 662, 691-92 (2d Cir. 1990) (holding that when there is a dispute over the "basic defense [that defendant] was

get him to come back to China . . . So they could prosecute him", Mr. McMahon went on to explain that the consequences to be faced by Xu Jin was "just, you know, pay back the money basically" and further explained that "jail or doing time . . . was never discussed."  Exhibit 701A.  The inferences from these statements leave real, concrete, significant doubt as to whether, by his use of the word "prosecute," Mr. McMahon was acknowledging that he was assisting the Chinese Government.[10]  Nor does the Government's discussion of "the significance of family honor in Chinese culture" say anything about whether the matter was a criminal investigation, a civil matter or both.  The Government sought—successfully with the jury but that should not be the case with the Court—an inference that is entirely unsupported, and certainly cannot be piled upon other inferences, as the Government so clearly does here, to overcome the requirement that guilt beyond a reasonable doubt must actually be proved.  For this reason too, Mr. McMahon's post-trial motion for a judgment of acquittal should be granted.

---

unaware of any criminal wrongdoing," evidence of a defendant's innocent state of mind is "critical to a fair adjudication of criminal charges"); *see also id.* at 691 ("Let the accused's whole conduct come in; and whether it tells for consciousness of guilt or for consciousness of innocence, let us take it for what it is worth, remembering that in either case it is open to varying explanations and is not to be emphasized.  Let us not deprive an innocent person, falsely accused, of the inference which common sense draws from a consciousness of innocence and its natural manifestations." (quoting 2 *Wigmore on Evidence* § 293, at 232 (J. Chadbourn rev. ed. 1979))).

[10] In fact, as Mr. McMahon has argued to the court, "prosecute" can also, and often does, refer to civil actions. *See Prosecute*, Black's Law Dictionary (11th ed. 2019) ("1. To commence and carry out (a legal action) <because the plaintiff failed to prosecute its contractual claims, the court dismissed the suit>. 2. To institute and pursue a criminal action against (a person) <the notorious felon has been prosecuted in seven states>. 3. To engage in; carry on <the company prosecuted its business for 12 years before going bankrupt>.").  Accordingly, while the Government was certainly entitled to admit certain portions of Mr. McMahon's post-arrest statement to argue that Mr. McMahon used the term "prosecute" in a criminal context, Mr. McMahon should have been afforded a full and fair opportunity to admit the portions cited *supra* at 19 n.8 that clarified that Mr. McMahon was, indeed, referring to a civil lawsuit, particularly because one was, in fact, filed.

### 4.    Propensity Evidence Regarding Access to Information

The Government was permitted to introduce evidence at trial about the legality of Mr. McMahon's access to the New Jersey Motor Vehicle Commission CAIR database to run a license plate in connection with this matter, as well as of Gregory Finning's access to the Department of Homeland Security database to obtain travel information; the Government sought and, over Mr. McMahon's objection, the Court allowed it to introduce this evidence under Federal Rule of Evidence 404(b)(2) to somehow show that Mr. McMahon knew that he was working as an agent of the Chinese government.  But, even giving the Government the benefit of every permissible inference, this evidence showed nothing of the sort, as the Court, in ruling on its admissibility pretrial, anticipated it would.  That is, the Court admitted this evidence so that the Government could "rebut the [n]otion that he acted without a guilty conscience or to prove that he acted with a guilty conscience," *see* Tr. at 519:13-15 , but at the end of the day, the Government's presentation did not, in fact, show that Mr. McMahon did anything wrong or say anything about whether he acted with or without a guilty conscience.  Instead, and in truth, this evidence had no purpose— even if this purpose was not fulfilled—other than to demonstrate Mr. McMahon's propensity to disobey certain rules.  Apropos this motion, neither bore at all upon whether Mr. McMahon had any knowledge that he was working for the Chinese government.  Lacking a non-propensity purpose, this evidence should not have been considered by the jury.  *See United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011) ("To satisfy the relevance inquiry, the evidence must be 'sufficiently similar to the conduct at issue to permit the jury reasonably to draw from the act the [state of mind] inference advocated by the proponent of the evidence.' The district court must consider all the evidence presented to the jury and determine whether a reasonable jury could find the advocated inference.  The court abuses its discretion if the evidence is 'not sufficiently similar' to the charged conduct or if 'the chain of inferences necessary to connect [the] evidence with the ultimate fact to

be proved [is] unduly long.'" (citations omitted)).  But even, as considered, as set forth below, it only amounted to yet another impermissible inference, stacked upon other ones, that resulted in this tragic verdict here, one that should not, if real justice is to prevail, should not stand.

### i.    New Jersey Motor Vehicle Commission Records

The Government argued that the jury could infer that Mr. McMahon knew that he was working for the Chinese government because he violated the rules set forth by the New Jersey Motor Vehicle Commission ("MVC"), specifically because Mr. McMahon broke the rule that provides that information obtained from the New Jersey MVC can only be used to obtain information, in the Government's words, "relating to motor vehicle activity."  *See* Tr. 1976:14-1977:20 ("McMahon also improperly accessed and misused information he obtained from the New Jersey Motor Vehicle Commission, which you heard is also referred to as New Jersey CAIR. While conducting the surveillance, McMahon took a photo of a vehicle and he zoomed in on the license plate, as you can see on this exhibit.  He believed it belonged to Xu Jin and he then sent it on to Johnny Zhu.  Johnny Zhu, you can see in this text exchange, asks him:  MC, meaning McMahon, please run info check or plate and the house ASAP.  We don't need to monitor their activity until we have some info for those.  That's April 6, 2017.  McMahon responds "okay." And then he sends information.  He sends information about the car being owned, not leased, and who it's owned by, and their home address.  To pause on that, that's information that McMahon obtained and then passed along to someone who was working for the Chinese government.  That's information that McMahon had access to because he could access the database as a private investigator.  But as you heard, he wasn't allowed to access that database for just any reason; he was bound by an agreement which specifically limited how he could use the information he obtained.  When McMahon shared the information with Johnny Zhu, he violated that agreement. The purpose for which he shared the information, conducting surveillance and locating an

individual for reasons not relating to motor vehicle activity is exactly what he is not allowed to do. You can see that from the language of the agreement itself. It says the information shall be – that the participant, meaning McMahon, must hold the information in confidence. And it says that he is strictly prohibited from using Commission records to conduct surveillance or to investigate or locate an individual.").

It is undisputed, and the Government freely conceded, that Mr. McMahon ran exactly one license plate related to his investigative work on this matter through the New Jersey CAIR database on April 6, 2017 in order to confirm whether the car driven by Xu Jin was owned or leased. *See* Tr. at 1976:25-1977:1 ("He sends information about the car being owned, not leased, and who it's owned by[.]"). Accordingly, regardless of whether Mr. McMahon obtained the information legally, the real inference that flows from these facts is that Mr. McMahon was searching for assets, consistent with his belief that he was performing investigative services on behalf of a private Chinese company. Accordingly, far from the inference that the Government seeks—which again, amounts to inappropriate propensity evidence—the actual import of this evidence was the opposite and was consistent with innocence.

Perhaps most significantly, the evidence at trial showed that Mr. McMahon's use of the New Jersey CAIR database was, far from criminal, consistent with an innocent, not a guilty, mind. Thus, Mr. McMahon explained in his initial application for New Jersey CAIR that he was a private investigator and was intending to use the information obtained from the New Jersey MVC "to assist law firms with providing and verifying clients information", as well as "to assist [his] business with criminal and fraud investigations." Exhibit 408D. Mr. McMahon's application was granted for these purposes.[11] Moreover, when a user runs a license plate through the New Jersey

---

[11] Mr. McMahon's application was then renewed in 2016, *see* Exhibit 408C; although Mr. McMahon did not again specify that he would be accessing the New Jersey CAIR database "to

CAIR database, a report is created listing every license plate the user has ever run through the database. *See* Exhibit 408H. That occurred here. Thus, far from concealing his activities, Mr. McMahon conducted his search openly in connection with this matter on a public Government database, this though other, more secretive, ones could have been used instead. *See* Tr. at 1775:11-14 (testimony of Eric Gallowitz) ("Well, there are proprietary databases that exist that you have to either be law enforcement or a private investigator or some other type of professional to gain access to these databases).[12] And, the New Jersey MVC has the right to perform audits with respect to the purpose of any inquiry made through the New Jersey CAIR database. *See* Tr. 1543:8-12 (testimony of Neviene Habeeb) (Q. "I asked you the question of whether with regard to Exhibit 408H, which was the list of license plates, whether the MVC can perform audits with respect to the purpose of an inquiry. What is the answer to that? A. Yes, we can."). And the New Jersey MVC did, in fact, conduct audits of Mr. McMahon's searches; in one instance, similar to the instant

---

assist [his] business with criminal and fraud investigations," the New Jersey MVC was already aware of Mr. McMahon's use of the New Jersey CAIR database for this purpose, as it was disclosed on his initial application.

[12] Indeed, no evidence at trial was established that Mr. McMahon used any encrypted means of communication at all during the pendency of this matter. *See* Tr. at 464-465 (testimony of George Dietz) ("Q. Some of those exhibits were [WeChat] – let's actually show one just as an example. Exhibit 901D. You see at the top it say [WeChat]? A. Yes, sir. Q. Do you know what [WeChat] is? A. Yes, I do. Q. What is it? A. It's an encrypted communication. It's very similar to WhatsApp. Q. When you say encrypted, what does that mean? A. So in general terms, unless you have the phone . . . you can't actually read it or intercept it. Q. Got it. Q. Do you recall whether in the course of your reviewing exhibits whether any of the instant messages or e-mails or other communications from back and forth with Mr. McMahon were WeChat messages? . . . A. Not that I recall."); Tr. 1698:7-19 (testimony of Elizabeth Wheeler) ("Q. Of course, the map shows what it does because Mr. McMahon used his own cellphone, correct? A. I don't know. That was the number and the name provided to me. Q. That's the number [for Mr. McMahon], correct? A. Yes. Q. The records do not show that Mr. McMahon used WhatsApp or WeChat, correct? A. Those would not be reflected on the records I have access to. Those records would be used to make a record with any of those providers, applications, you would use a data session and the data session does not parse out individual locations and times that would correspond to messages.").

matter, Mr. McMahon informed the New Jersey MVC that he was using the New Jersey CAIR database in order "to investigate whether or not the defendant did in fact own said vehicle." *See* Exhibit 408I. *See also* Tr. at 1544:13-1545:4 (testimony of Neviene Habeeb) ("Q. If you flip through the document, my question is, does this document reflect an inquiry by the MVC of Mr. McMahon with regard to a particular inquiry that he had made? A. Yes. Q. The top entry on the first page of the document is a statement from Mr. McMahon that says: I was assigned to investigate whether or not the defendant did in fact own said vehicle. Do you see that? A. Yes. Q. The defendant lost a civil suit at trial and claimed to not own by lease said vehicle. Correct? A. Yes. Q. One of the things you testified earlier was that one of the things that one learns in doing the kind of search that you've been describing today, is whether a vehicle was leased or owned. Correct? A. Yes."). That Mr. McMahon was permitted to continue using the New Jersey CAIR database after the audit was conducted, *see* Exhibit 408H, undermines even the notion that the purpose of his running the single license plate he did was improper at all. And again, there is nothing that shows that these actions in any way reveal his knowledge that he was taking the actions he did—proper or otherwise—for the benefit of, or along with representatives of, the government of China.

### ii.    Department of Homeland Security Records

The Government also argued that the jury could infer that Mr. McMahon knew that he was working for the Chinese government because his friend, Drug Enforcement Administration Agent Gregory Finning impermissibly provided him with travel information obtained from the Department of Homeland Security. *See* Tr. at 1977:21-1979:1 (Government summation) ("From the evidence you have heard, you can infer that McMahon improperly obtained the information about Xu Jin and Liu Fang from his buddy, Greg Finning, who at the time was a special agent with the Drug Enforcement Administration or DEA. October 20th, 2016, McMahon spoke with Greg

for over 40 minutes.  You can see that in this phone record.  He also sent a text to Greg with sensitive victim information, including social security number, date of birth, New Jersey license plate.  That's GX 316 4006-B.  And then he followed up with Greg to ask if there was any update.  He said: My client flew in from China and I'm meeting them this eve.  DHS records make clear that Homeland Security data such as the information that was provided cannot be shared.  This is a warning on the documents in which the information was provided.  It says:  The information is to be controlled, stored, handled, transmitted, distributed and disposed of in accordance with DHS policy relating to FUOU – meaning "for official use only," as you can see on the warning itself – information and is not to be released to the public or other personnel who do not have a valid need to know without prior approval of an authorized DHS official.  Let's go back and see how we got that information.  You heard testimony from HSI Special Agent Neviene Habeeb, who is the individual who pulled the information that McMahon eventually passed along.  She told you that she remembered it had something to do with Greg Finning.  That was McMahon's friend.  And so to be clear, McMahon took U.S. government information which he obtained improperly and he passed it along to an official with the Chinese government.  That's not the only evidence reflecting that McMahon knew his actions relating to Xu Jin were illegal."); Tr. at 2132:21-2133:6 (rebuttal) ("Immediately after that meeting, McMahon hits up his buddy in the DEA, Greg Finning for international travel information.  That's Government Exhibit 4006-B, pages 830 to  841.  And then a few weeks later, McMahon starts communicating directly with Eric Yan, who you all know is Hu Ji, the Chinese police officer.  Eventually passing him Department of Homeland Security information about a person's travel outside of the United States.  They met in person to talk about getting that information because they knew that that was part of an illegal scheme.").

Just reading, at length, the Government's argument, casts doubt upon whether any inference at all, let alone a reasonable once, can arise from these facts that Mr. McMahon knew

26

that he was working for the Chinese government.  To the extent that there was impropriety in the manner in which the Department of Homeland Security records were obtained, as the evidence at trial showed that it was Gregory Finning—not Mr. McMahon—who violated the Department of Homeland Security policy.[13]  Specifically, Exhibit 429 included a disclaimer providing that Department of Homeland Security records are "to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to ["For Official Use Only"] information *and is not to be released to the public* or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official."  (emphasis added).  Certainly, the Government did not present any evidence at trial—direct or circumstantial—that Mr. McMahon knew that Gregory Finning provided these records to him in violation of Department of Homeland Security Police.  Nor, for that matter, even if Mr. McMahon knew that the records were improperly provided to him, is there any basis to believe that Mr. McMahon

---

[13] And, the Government did not call Gregory Finning, as it represented to the Court that it would— just one of several broken promises made by the Government.  *See* Tr. at 498-99 ("THE COURT: Have a seat everyone.  As far as I know there's really only one issue I need to address, I'll take care of that tomorrow morning and it has to do with the evidence relating to the alleged illegality and breach of the access agreement regarding Mr. McMahon's searches of the NJDMV database, then his request to the DEA agent to conduct a search of the DHS database.  I have one question for the government in that regard.  As I understand it, if the government is allowed to prove up those facts with respect to the New Jersey DMV access agreement that would require calling one witness to testify about that, correct?  MR. HEEREN: Yes, your Honor.  THE COURT:  And with respect to the agent I gather you['re] planning to call the DEA agent in any event or is it only to testify about that? . . . I think I saw his name on the witness list.  He's identified I guess as an agent, perhaps he isn't one anymore.  Mr. Finning, F-I-N-N-I-N-G. . . . MR. HEEREN:  With regard to the DEA information, at this time we are still anticipating calling DEA agent Greg Finning. . . THE COURT:  And that would be the person who would testify both as to the fact of being asked to do the search and also the purported illegality of him accessing the DHS database for that purpose.  MR. HEEREN:  Well, yes, it's just factually a little bit more complicated in that there is a second person who was physically at the keyboard who we would anticipate calling. . . . But both, yes, currently anticipate that both witnesses would be able to testify that it's there understanding based on their training and experience that they are not supposed to do that and that's a violation of law.").  As set forth *infra*, at 101, Finning did not testify and no testimony with regard to whether Mr. McMahon violated the law was ever adduced.

obtained the information in the manner he did because he knew that he was working for the Chinese government.  Indeed, all inferences are directly to the contrary: it is illogical that Mr. McMahon would discuss his private investigative work with a federal Drug Enforcement Agency Agent if he was trying to conceal that he was working as an agent of the Chinese government. Again, the Government seeks an inference that the facts do not support; accordingly, no inference was established that Mr. McMahon knew that he obtained the Department of Homeland Security records in violation of Department of Homeland Security policy, and cannot, in turn, be used to show that he knew that he was working as an agent of a foreign government.

### 5.    The Alleged Concealment

Finally, the Government presented evidence about Mr. McMahon's alleged concealment of conversations and of income that he received, as well as his purported failure to report his earnings for his investigative services in this matter on his tax returns, to support the inference that Mr. McMahon knew that he was working as an agent of the Chinese government.  But this inference was not supported by the evidence introduced at trial.

### i.    Conversations

The Government argued during its opening that phone records would show "that in April 2017, when the victim's father was forced to come to the United States, the Defendant McMahon was in frequent communication with his coconspirators to coordinate when and how to follow the victim." Tr. at 35:4-8.  To support this argument, the Government introduced Exhibits 316 and 317, summary charts of phone calls to and from Gregory Finning, Eric Gallowitz, Hu Ji, Lina Xu, Michael McMahon, Sun Hui, Xiao Jun, Yong Zhu, and Zhu Feng.  These records show the date, time, and duration of the calls, as well as who the calls were to and from.  However, as Mr. McMahon repeatedly showed at trial, neither the charts or the underlying phone records describe the contents of the conversations.  *See, e.g.,* Tr. at 930:3-8 (testimony of Eungee Hwang) ("Q.

Okay.  Of course there's nothing on these exhibits, 316 and 317, that would indicate that was said in those phone calls, correct?  A.  No.  The phone records will simply indicate the date, time, duration, outgoing, incoming, whether the call had failed, or whether the call was successful."); Tr. at 1698:3-6 (testimony of Elizabeth Wheeler) ("Q.  But neither of these cell tower data, the cell phone records, or your maps show us anything about the contents of these calls.  Correct?  A.  That is true.").  Obviously, then, the substance of those calls are a matter of pure guesswork and accordingly, give rise to no permissible inference.  On rebuttal, however, the Government seeks to turn this fact on its head by arguing that these communications occurred by telephone (as opposed to by email or text) specifically in order to conceal their content.  *See* Tr. at 2131:18-21 (rebuttal) ("And here, we know that the defendants and their conspirators deliberately left much of this criminal activity to in-person meets and telephone calls so the statements could not be later used against them.").  But that is the very definition of an inappropriate inference, at least in the absence of any evidence that the parties to these conversations agreed to conduct telephone conversations—conversations which, it bears repeating, were a matter of easily obtained records (rather than encrypted WhatsApp or WeChat records, as discussed *supra* at 24 n.12), which also resulted in being able to track Mr. McMahon's location and surveillance activities—in order to hide their discussions. Otherwise, any phone conversation by any defendant at any time would suddenly become circumstantial evidence, by inference.  But that is the very definition of the kind of inference that should never be drawn.  Nor, even if it were permissible, could it be used to infer Mr. McMahon's knowledge that he was working on behalf of the Chinese government.

### ii.    Payments

The Government also argued on opening, closing, and rebuttal that the methods by which Mr. McMahon received payments for his surveillance in this matter created an inference that Mr. McMahon knew that he was working for the Chinese government.  *See* Tr. at 35:9-13 (Government

opening) ("You will see bank records showing that McMahon only received payment into his business account for his work once. The records show that wire transfers and deposits for his work tracking the victim were otherwise diverted into his joint account with his wife and his son's student bank account."); Tr. at 1979:9-1981:10 (Government summation) ("On October 5th, 2016, at the outset of the case, McMahon received $5,000. That was a retainer fee. You can see there is a note that says: Retainer fee from Jason Zhu a/k/a Yong Zhu. That's the check we talked about earlier. And that was a check from Zhu Yong, passed along to the interpreter and then sent to McMahon, who then deposited that check into his business account, McMahon Investigative Group account. Again, that was on October 5th, 2016. Approximately two months later, on December 13, 2016, he received $5,945. That came by wire transfer from China. He was told to expect that wire transfer by Hu Ji, the Chinese police officer. And the wire transfer itself came from Li Feng, a Chinese prosecutor. Again, it was a wire transfer from China and McMahon knew it was from China. And he knew the description on that wire transfer, "Eric traveling fee," wasn't accurate. And then look at what he did with that wire transfer. He took that almost $6,000 and he deposited it into his checking account with his wife. He did not deposit it into his business account like he did the first payment. The next payment is April 4th, 2017. That's $5,000. This time there was a payment made in cash. McMahon got it from Hu Ji and from Johnny Zhu when he met them at the Panera Bread. $5,000 in cash at a Panera Bread. That's a lot of money to be receiving in cash in a public place or really in any place. No person doing legitimate business is handed a five-thousand-dollar wad of cash in a Panera Bread, it doesn't happen. Oh, I'm sorry, I misspoke. That was Zhu Feng, not Hu Ji for this payment. And we don't know what happened with that cash. We don't know what McMahon did with it, but we do know that it didn't go into the business account. On April 10th, 2017, there is another payment of $2,000, also from Zhu Feng or Johnny Zhu. This time it was deposited into his son's student checking account. The following day, he gets a

30

payment of another thousand dollars, which again from the same, also from Johnny Zhu, which he again deposits into his son's student checking account. McMahon subsequently, a couple weeks later, transferred that $3,000 – so the $2,000 from April 10, 2017 and the $1,000 from April 11, 2017 – transferred that $3,000 total to pay off a credit card with his wife. And then on April 27, 2017, he gets a payment of $200, this time from Hu Ji, using the name He Sheng, which McMahon deposits into the checking account with his wife. So for this one case, McMahon received payments from four different sources, including two Chinese government officials and two coconspirators, one of whom is the defendant before you. He received the payment in three different forms: Check, wire transfer, cash. And that wire transfer again was from China. And he deposited those payments in at least three different accounts: His business account, his checking account with his wife, and his son's student checking account."); Tr. 2140:11-2141:9 (Government rebuttal) ("Now, counsel pointed to our arguments about Mr. McMahon's financial activity in this scheme and argued that we were just claiming he was guilty because he was paid in cash. And that's obviously not true. Yes, people get paid in cash sometimes, we agree. The point is the nature of the financial transactions and how deeply suspicious they were. . . . This is not a single payment in cash. Just look at how this evolved over time. This is consistent with a person who knows this cash is coming from something illegal and he's trying to walk away from it, push it away from his business. Some of it he doesn't even put [in] an account. Just because he conceals it badly doesn't mean it's not an attempt to conceal it.").

Mr. McMahon quotes the Government's arguments above at length, to establish the inferences that the Government seeks to draw from the evidence here at issue. The actual evidence at trial, however, does not support the inference that the Government seeks—that he knew that he was working as an agent of the Chinese government, or for that matter doing anything at all wrong (though it bears noting that evidence of the latter does not support the required element of this

31

offense, *i.e.*, the former).  It would, again, be the height of improper inference to conclude, as the Government has urged, that the use of several different means of receiving payment is any indication of impropriety; if it were, then many businesses would be guilty of a crime, as receiving money in cash, by check and via wire, are all proper and indeed, all common (including in combination) in many businesses, including law firms and private investigators.  *See* Tr. at 1803:20-24 (testimony of Eric Gallowitz) ("Q.  Have you ever received cash from clients in the course of your business?  A.  Yes.  Q.  Is there anything wrong with that?  A.  No.").

Moreover, even the particulars of each payment cannot and do not create an inference that Mr. McMahon knew that he was working for the Chinese government, as no evidence was presented that Mr. McMahon was thereby attempting to conceal the payment.  For example, with respect to the cash payment, Mr. McMahon included this payment on a written McMahon Investigative Group invoice that was preserved and voluntarily turned over to the Government by Mr. McMahon.  *See* Exhibit 3073 ("Met with Mr Zhu in Paramus NJ and received a retainer fee of 5,000 cash.  Case of Jin Xu"); *see, e.g.,* Exhibit 204, ¶ 29 ("Government Exhibits 4004 to 4011 are true and accurate copies of records produced by defendant Michael McMahon.").  Beyond that, Mr. McMahon was given this cash payment in a highly public place with surveillance cameras— Panera Bread, during lunchtime.  *See* Exhibits 103A-F.  Moreover, it is undisputed that even after Mr. McMahon received the cash payment on April 4, 2017, he was paid via wire transfer, both to his son's account on April 10 and 11, 2017, *see* Exhibit 403I, and to his joint account with his wife on April 27, 2017, *see* Exhibits 403K, 403L.  These facts just do not bespeak concealment and the Government's attempt to concoct that inference is no more than an effort to make truly innocent actions appear sinister.

Likewise, that Mr. McMahon had money wired to his joint checking account with his wife, rather than to his McMahon Investigative Group account (which could have then be transferred to

his joint account with his wife, as he was the sole proprietor of his business), further contradicts the notion that Mr. McMahon was attempting to conceal the payments that he received for his investigative services in this matter; indeed, depositing money into his personal account would seem to be the very antithesis of hiding money, especially in the case of a sole proprietor like Mr. McMahon whose corporate and personal identities are—in terms of identifying characteristics (both are denominated "McMahon")—the same.  And, any inference that Mr. McMahon knew that he was working as an agent of the Chinese government because the money that was wired into Mr. McMahon and his wife's personal bank account by Li Feng, a Chinese government official, on December 13, 2016, *see* Exhibits 403A, 403K, was dispelled by the fact that Mr. McMahon was informed that the "finance manager" wired him the money, *see* Exhibit 3056, which is consistent with Mr. McMahon's belief that he was working on behalf of a private Chinese company.  Indeed, there is no evidence of record whatsoever—literally none—that Mr. McMahon had any knowledge that Li Fing, Hu Ji, or anyone else, were working for the Chinese government.

Finally, if Mr. McMahon was trying to conceal money, he certainly would not have put it into his son's bank account, *i.e.*, the account of son who shared the same name as him, and had an account at the exact same bank as he did.  *Compare* Exhibit 403F (TD Bank Student Checking Account for Michael T. McMahon), *with* Exhibit 403 (TD Bank Convenience Checking Account for Michael McMahon and Mary McMahon). Indeed, not mentioned in the Government's recitation of the inferences it sought to draw from these facts, are two sets of facts far more consistent with innocence.  *See Landesman*, 17 F.4th at 320. First, the trial evidence was that Mr. McMahon actually tried to have the money deposited into the McMahon Investigative Group account prior to having it wired into his son's account, further contradicting the Government's argument that Mr. McMahon was trying to conceal the payment, thereby creating an inference that he was working as an agent of the Chinese government.  *See* Exhibit 3061 ("the bank told the

wiring of money didn't go through because the account name and the account number wasn't consistent"). And second, it is clear that the money went into Mr. McMahon's son's account for necessary spending money (for pizza, bagels and the like) at a time when there was little money in that account, but that when Mr. McMahon's son received his paycheck, the money was then— several weeks later—transferred into Mr. McMahon's account to pay Mr. McMahon's own credit card bill, which had then become due, a series of transactions that were easily traceable right to Mr. McMahon, and thus, not the type of action that would be taken if one were trying to conceal a payment. *See* Exhibit 403I. Indeed, there was no evidence that Mr. McMahon was trying to conceal anything, let alone that he was working with—and knew it—the Chinese government.

### iii. Taxes

Finally, the Government has argued that Mr. McMahon did not report the income he received for his investigative services in this matter on his taxes in order to hide his activities from the United States Government. *See* Tr. at 1982:1-1982:25 (Government summation) ("And that's not even the only way that McMahon's financials demonstrate that he knew he was working for the Chinese government. He earned over $19,000 from the Xu Jin case. . . . And then you can see from this slide how he treated that money, or I should say more broadly, what he reported on his tax returns. There's a lot of information on this slide, but really what it boils down to is this: If you look at McMahon's business account, the deposits into that account in 2016 were more than what he reported on his 2016 tax returns. That's before you even consider the fact that, as we just saw, most of the money he earned on the Xu Jin case never even made its way into the business account. Again, this wasn't oversight. And it wasn't some small amount of money to McMahon. In fact, the money McMahon earned in this case was approximately 20 percent of his total reported earnings in his business account for 2016 and 2017 combined. McMahon didn't report his earnings from the Xu Jin case because he didn't want the U.S. government to know that he had been working

for the Chinese government."); Tr. at 2142:3-14 (Government rebuttal) ("And the tax returns that we pointed to just cement this point.  He received a large amount of money, and I'm not going to quibble about it; they claim its $11,000 not $19,000.  Even if we're talking about net instead of gross profit, $11,000 for what they claim is five days of work is quite a bit of money still.  He received a large amount of money that he ultimately did not report.  And as I expect you will hear, you are going to be instructed that willful intent or guilty knowledge may be inferred from the secretive or regular manner in which a transaction is carried out.  The way that money moved into McMahon's pockets is obviously irregular.").

This argument is really beyond the pale, and is completely unsupported by evidence, though it was promised by the Government in moving *in limine* to admit these proofs.  To start, though the Government promised, pretrial, to adduce evidence that Mr. McMahon failed to report income that he earned from the Xu Jin investigation, *see* Gov't Mot. *In Limine* at 35 ("Moreover, a comparison of McMahon Investigative Group bank records and tax returns filed by McMahon show that McMahon did not report the over $13,000 received for his work surveilling the Victims as income in 2016 and 2017."), as a result of which the Court allowed the testimony, the Government completely failed to make good on this promise, leaving proofs that were far more scurrilous than factual.  Thus, in fact, the Government did not provide any evidence that Mr. McMahon actually failed to declare his income from this matter on his taxes.  That is, in support of its argument, the Government introduced Exhibit 452, a purported summary chart containing Mr. McMahon's earnings in 2016 and 2017 and the total that Mr. McMahon declared on his 2016 and 2017 tax returns.  That exhibit did not, however, show in any regard that Mr. McMahon failed to include the income *from this matter* on his returns; instead, it simply showed Mr. McMahon's monthly and total deposits for 2016 and 2017, as compared to what Mr. McMahon declared on his 2016 and 2017 Tax Schedule C-Gross Profit.  Nor, as the actual proofs at trial showed—as opposed

35

what the Government promised to show in advance when it was successfully litigating its *in limine* motions—did the Government put on the type of evidence that could actually show what Mr. McMahon should have declared and what he did. Not only did it not call a tax expert, *see* Tr. at 1600:22-23—the way in which this is usually done, *see, e.g.*, *United States v. Jacob*, 194 F. Supp. 3d 216, 220 (E.D.N.Y. 2016) (permitting an I.R.S. agent to testify as a summary expert witness for the prosecution)—but it did not even provide a list of the specific items that Mr. McMahon declared on his tax returns. And most obviously, it did not include any consideration of Mr. McMahon's business expenses (which in this case alone amounted to some $8,000 of the $19,000 he was paid, *see* Exhibits 3101, 3095, 3056, 3054, but which obviously was required in order to correctly calculate his profit, *i.e.*, the net income upon which he was require to pay taxes. *See* IRS, *Self-Employment Individuals Tax Center*, https://www.irs.gov/businesses/small-businesses-self-employed/self-employed-individuals-tax-center#Obligations ("Before you can determine if you are subject to self-employment tax and income tax, you must figure your net profit or net loss from your business. You do this by subtracting your business expenses from your business income.").

Thus, the evidence introduced at trial did not demonstrate any failure to declare the income from this matter on his taxes, no matter how many times the Government conclusorily says it did after having so fervently promised that it would. As such, there was no inference, let alone an appropriate one, that Mr. McMahon knew that his conduct with regard to his taxes demonstrated that he knew that he was working for the Chinese government. Indeed, although the facts do not bear out that he did so, even if the Government had shown that Mr. McMahon failed to pay some taxes, they did not show that it was because he knew that he was working for the Chinese government as opposed to, for example, because he wanted to save money. In sum, this inference too is one that is not appropriate and ought not be allowed to result in the unjust conviction of an innocent man. Mr. McMahon's motion for a judgment of acquittal on Count II should be granted.

**B.      There Is Insufficient Evidence To Sustain A Conviction For Conspiracy To Engage In Interstate Stalking (Count III).**

The Court should also enter a judgment of acquittal as to Count III, which charged Mr. McMahon with conspiracy to engage in interstate stalking, because the Government failed to present any evidence from which a jury could permissibly find or infer that Mr. McMahon joined a conspiracy to engage in interstate stalking. As the Court instructed the jury with respect to Count III, the Government was required to prove, "beyond a reasonable doubt: First, two or more persons entered into the particular unlawful agreement charged in the indictment; second, the Defendant knowingly and intentionally became a member of the conspiracy; and third, that an overt act was committed in furtherance of the conspiracy." Tr. at 2174:20-25; *see also United States v. Svoboda*, 347 F.3d 471, 476 (2d Cir. 2003) ("A conspiracy conviction under § 371 requires proof of three essential elements: (1) an agreement among two or more persons, the object of which is an offense against the United States; (2) the defendant's knowing and willful joinder in that conspiracy; and (3) commission of an overt act in furtherance of the conspiracy by at least one of the alleged co-conspirators."). The Court explained, with respect to the first element of conspiracy, whether "two or more persons entered into the particular unlawful agreement charged in the indictment," that the Government was required to "prove that at least two . . . conspirators had a meeting of the minds, and that they agreed to work together to accomplish the act of the charged conspiracy." The Court further instructed that:

> To establish a conspiracy, the Government is not required to prove that the alleged members of the conspiracy met together and entered into any express or formal agreement. Similarly, you need not find that the alleged conspirators stated in words or writing what the scheme was, its object or purpose, or every precise detail of the scheme or the means by which its object or purpose was to be accomplished. What the Government must prove is that there was a mutual understanding, either spoken or unspoken, between two or more people to accomplish an unlawful act by means of a joint plan or common scheme. You may find that the existence of an

37

> agreement to disobey or violate the law has been established by direct proof. Because conspiracy is usually characterized by secrecy, you may also infer its existence from the circumstances and the conduct of the parties and others involved. You may consider the actions and statements of all of these persons in deciding whether a common design existed to act together for the accomplishment of an unlawful purpose.

*Id.* at 2175:1-22. Although an agreement to join a conspiracy can be proved by circumstantial evidence, as the Court instructed, "[s]uspicious circumstances are not enough to sustain a conviction for conspiracy, and mere association with those implicated in an unlawful undertaking is not enough to prove knowing involvement; likewise, a defendant's . . . association with conspirators does not constitute intentional participation in the conspiracy, even if the defendant has knowledge of the conspiracy[.]" *Lorenzo*, 534 F.3d at 159-60 (2d Cir. 2008) (cleaned up). Indeed, "[t]he individual conspirators can have incongruent intentions as to particular details or specific goals of the conspiracy," but they must "share a 'common purpose' and agree on the 'essential nature' of the enterprise." *United States v. Capanelli*, 479 F.3d 163, 166-67 (2d Cir. 2007). Thus, and in sum, as the Court instructed the jury, the Government was required to prove, beyond a reasonable doubt, that at some time during the existence of the conspiracy, Mr. McMahon, did, in fact, agree to join it. *See United States v. Goodrich*, 12 F.4th 219, 229 (2d Cir. 2021) (The Second Circuit "ha[s] frequently noted that the essence of conspiracy is the agreement and not the commission of the substantive offense." (quoting *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001))). For purposes of Count III, that agreement had to be an agreement to engage in interstate stalking, that is to travel in interstate commerce, in an effort to harass or intimidate or place under surveillance with intent to harass or intimidate Xin Jun and his family, and to cause them "substantial emotional distress." *See infra* at 45-46 (summarizing the elements of interstate stalking as set forth in the Court's jury instructions). That is, the Government could not, in order to satisfy its burden with regard to this offense, prove a conspiracy to do something

else (for example, to act as an agent of China, an offense of which Mr. McMahon was acquitted) but had to show that he conspired to engage in interstate stalking of Xu Jin and his family. *See, e.g., United States v. Zhou*, 428 F.3d 361, 365, 375-377 (2d Cir. 2005) (reversing conspiracy conviction based on insufficient evidence because "[a]t best, the evidence proves an uncharged conspiracy to [commit a different crime]").

The Government, however, failed to meet its burden at trial, as a matter of law. That is, perhaps best shown by measuring what the Government claimed to show against what it was required to show. To that end, during its summation, the Government argued:

> . . . to find the defendants guilty of this count, Count Three, you do not need to find that anyone actually carried out the interstate stalking, the interstate intimidation, the harassment. Here, it's the agreement itself to harass or to intimidate that's the crime.

> Let's look now at each of the defendants, starting with the evidence that proves that McMahon and Zhu Yong engaged in interstate stalking.

> As you know, Zhu Yong and McMahon were primarily responsible for the scheme to bring Xu Jin's father from China to New Jersey to coerce the victims to return to China. As we told you in our opening, McMahon himself did not travel between states or internationally, but he clearly aided and abetted others who did so, including Johnny Zhu and Tu Lan, and he did that with the intent or harassing the victims and causing them substantial emotional distress.

> McMahon's agreement to stalk Xu Ji when his father arrived was critical to Tu Lan's plan to finally find Xu Jin's home address. As we talked about earlier this morning, in October 2016, the evidence shows that Zhu Yong traveled back and forth from China to the United States and back again. And he did that as he helped the Chinese Government officials, like Hu Ji, gather information that the Chinese Government could use to carry out its stalking scheme against the victims.[14]

---

[14] The Government's discussion of aiding and abetting the interstate travel of others, though it appeared in the section of the prosecutor's summation with regard to conspiracy, goes instead to the substantive stalking count, discussed below at 45-59. In fact, the Government offered no argument that Mr. McMahon conspired to travel in interstate commerce, as certainly he did not; nor, even if he was aware that others traveled in interstate commerce, is that a basis for this

. . . .

McMahon may not have traveled outside of New Jersey himself, but he engaged in critical affirmative steps, such as surveillance of Liu Yan's home on the day his father was brought here. Those critical steps helped to ensure the success of this part of the stalking campaign. McMahon admitted in his post-arrest interview that he knew his co-conspirators traveled internationally to stalk Xu Jin and Liu Fang.

You can see he said: And then the father had flown in from, I think he said, China to convince the son because of, you know, honor for the name. That's GX-701A. McMahon knew what it meant. He knew that meant the father was brought across international lines as an intimidation and harassment tactic to force Xu Jin back to China.

Not only was this end goal apparent to McMahon, but he must also have explained it to the private investigator who you heard testimony from, Eric Gallowitz. You saw the evidence that the two of them joked about an abduction as they were waiting for further orders from Chinese officials about surveilling Xu Jin.

You see Gallowitz asked: Further surveillance?

McMahon responds: Not sure. Waiting for a call.

Gallowitz responds: Yeah, from New Jersey State Police about an abduction.

McMahon responds: LOL. Laugh out loud.

You also saw a text in which Gallowitz proposed to McMahon that the surveillance be escalated, that it go overt to more easily achieve the end goal here, scaring the victims into returning to China.

You can see he says: Maybe overt surveillance. In their face. Sit in front of the house. Pictures. Video. Scare them.

McMahon doesn't respond and say, no, absolutely not, that's a terrible idea. He says: Yeah, possibly. And of course you have McMahon's text to Johnny Zhu in which McMahon himself directly proposes that they harass Xu Jin. Look at the text. We read this

---

conspiracy conviction, for as discussed below, mere knowledge of others' travel—which is the most that the Government showed—does not suffice to prove the agreement necessary for a conspiracy conviction. *See infra* at 44.

earlier.  McMahon says:  I think if we harass Xu, park outside his home and let him know we are there.

McMahon sent that text because he understood the purpose of the international harassment campaign.  He didn't just work for Johnny Zhu and his co-conspirators; he worked with them to try to make their harassment campaign more successful.  And when McMahon was asked about his role in stalking the victims, he lied about what he did and he pretended that communication you just saw, the one in which he suggested harassing Xu, was a typo.

McMahon:  I don't know why I would even say something like that unless it was a typo or something.

It wasn't a typo.  It was McMahon trying to cover his tracks.

Tr. at 1955:2-1959:1.

This summary of the evidence at trial, which is included here in full, certainly views that evidence in the light most favorable to the Government, and draws every inference in the Government's favor, as a summation typically seeks to do.  Nonetheless, it highlights the insufficiency of the Government's case on Count III.  In particular, there was absolutely no evidence that Mr. McMahon was ever informed of any plans to harass Xu Jin, and he did not otherwise enter into an agreement to engage in interstate stalking.  Far from seeking to harass, intimidate or cause substantial emotional distress to Xin Ju and his family, Mr. McMahon's surveillance remained covert throughout, and thus could not have harassed, intimidated or caused substantial emotional distress to anyone.  Thus, both Fang Liu and Xu Xinzi, testified that they had never seen or met Mr. McMahon.  *See* Tr. at 786:9-15 (testimony of Liu Fang) ("Q. Have you ever met Mr. McMahon before?  A.  No.  Q.  Have you ever seen him before?  A.  No."); Exhibit 713 at 25:13-21 (testimony of Xu Xinzi) ("Maybe just to make it clear, Mr. McMahon, can you put up your hand. . . . Q.  Do you see the person who just put up his hand?  A.  Yes.  Now I see him, yes.  Q.  Thank you very much.  Have you ever seen him before today?  A.  No.").  And, although Xu Jin testified that he believed he was being followed on April 7, 2017, he did not know

41

who followed him,[15] but it could not have been Mr. McMahon, as it is undisputed that he did not conduct surveillance on April 7, 2017, *see, e.g.,* Exhibit 2011. Nor was there one whit of evidence that Mr. McMahon knew of the activities of others, either others doing surveillance, whose activities were expressly hidden from him,[16] those who appeared at Xin Ju's residence, on September 4, 2018, nearly a year-and-a-half after Mr. McMahon's last involvement with this matter, *see* Tr. at 1255:21-23,[17] or those who harassed, using Facebook, Xu Jin's daughter, Xu

---

[15] *See* Tr. at 1410:20-1411:7 (testimony of Xu Jin) ("Q. And then you said that on April 7th, 2017, you were in the car with your father and you did circles around town. Do you remember that? A. I remember. Q. And that was because you thought you were being followed that day, right? A. Yes. Q. And that was the date that you thought you were being followed by somebody in a gray Honda SUV, correct? A. Yes. Q. Did you see the person in the gray Honda SUV who was following you? A. I could not see it clearly.").

[16] *See* Tr. at 1093:1-23 (testimony of Hongru Jin) ("Q. Okay. But you were doing surveillance, too, at the same time as the private detective; is that correct? A. Yes. . . . Q. So let me ask you this. You testified yesterday that there came a time during your surveillance when you got bored and you drove around, right? A. Yes. Q. And during that time you passed by the private detective who was doing surveillance, too, correct? A. Yes. Q. And do you remember testifying yesterday that Johnny Zhu then yelled at you? That was your words. Because the private detective had seen you doing the surveillance? A. Yes.").

[17] Nor did the Government present any evidence that Mr. McMahon's surveillance activities were actually "critical to Tu Lan's plan to finally find Xu Jin's home address," as the Government argued. Tr. at 1955:19-20. Instead, the evidence at trial was that JLifetime LLC was the owner of the home in Warren, New Jersey— information that was publicly available. *See* Tr. at 786:16-19 (testimony of Liu Fang) ("Q. Okay. It's true, isn't it, that your home that we've seen all the pictures of today is owned by J Lifetime LLC, correct? A. Yes."); Tr. at 1231:3-14 (testimony of Jeffrey Tarkin) (Q. "Did you examine the material that was attached to understand the connection that it showed between the home in Short Hills and the home in Warren, New Jersey? A. I believe I did. Q. And what was the document that you reviewed because we didn't go through that, . . . the record that showed the connection between the home in Short Hills and the home in Warren? . . . A. I believe they were both in the name of the company J lifetime."). Especially given the evidence that Mr. McMahon was not the only individual doing surveillance, it is not at all clear that his surveillance was how the conspirators obtained the publicly available address where Xu Jin resided. But even if there was such evidence, that fact does not show that Mr. McMahon was finding that address so that Xu Jin and his family could be harassed, intimidated or caused substantial emotional distress, as opposed to located so that they could be sued, as eventually they were, to recover the assets that they had, as Mr. McMahon understood it, embezzled, or otherwise be made to repay them.

Xinzi, which occurred in May of 2018, a year after Mr. McMahon's last involvement with this matter, *see* Exhibit 713 at 16:11-16 (testimony of Xu Xinzi) ("Q. I want to direct you to May of 2018. Did anything having to do with you or your loved ones' Facebook accounts stand out to you? A. Yes. My friends received Facebook messages from an account named Tony Lee that contained . . . derogatory information about me and my parents."); *id.* at 27:14 ("Q. So the question was: The first time that you received any messages of this sort was in early . . . 2018, correct? A. Correct. Q. Okay. And before that, there were no messages of this kind harassing you; is that right? A. Correct.").

The Government, of course, makes much of the fact that, on the very last day of surveillance, April 11, 2017, Mr. McMahon texted Johnny Zhu: "I think if we harass Xu. Park outside his home and let him know we are there. I did that before on another case." Exhibit 805B at 32. But Johnny Zhu vetoed the idea (one that initially was proposed by Eric Gallowitz, *see* Exhibit 4019B at 66)[18], and replied "We can't harass Xu like that lol". Exhibit 805B at 32. This, of course, is the very antithesis of a conspiracy for it reveals that, far from an agreement to harass, intimidate or cause substantial emotional distress to Xu Jin and his family, even when proposed, such an agreement was expressly rejected.

---

[18] Mr. Gallowitz proposed to Mr. McMahon: "Maybe overt surveillance. In their face. Sit in front of the house. Pictures. Video. Scare them." Exhibit 4019B at 66. Mr. McMahon replied "Yeah possibly – we did that in little ferry. Not sure it worked." *Id.* at 67-68. The Government's argument that Mr. McMahon "must also have explained [the object of the conspiracy] to the private investigator who you heard testimony from, Eric Gallowitz" due to the fact that the two joked about an abduction is wholly without merit. When asked what Eric Gallowitz meant by his text message that read: "Yeah from New Jersey State Police about an abduction", he testified "So I'm that guy, the guy who tells the crude joke, says inappropriate things, and that's what that is. That's a joke", further explained that the text was "[d]ark police humor", and confirmed that Mr. McMahon replied "LOL" because Mr. McMahon knew that Eric Gallowitz's text message was a joke. Tr. at 1798:2-11.

Finally, the Government's expressed conspiracy theory turns on its assumption that because Mr. McMahon knew that Xu Jin's father was coming to the United States to attempt to convince Xu Jin to return to China—as Mr. McMahon admitted when he was interviewed at the time of his arrest, *see* Exhibit 701A ("MCMAHON:  And then the father had flown in from I think he said China. . . . To convince the son because of, you know, out of honor for the name. . . just to, you know, pay back the money basically.")—then he was part of a conspiracy to engage in interstate stalking.  But this contention is deeply and dangerously flawed.  Rather, the law, as the Court specifically charged it, is that mere knowledge of unlawful activity does not make one a conspirator in it.  *See* Tr. at 2177:21-2178:5 ("I further caution you that mere knowledge, without participation in the unlawful plan is not sufficient.  . . . What is necessary is that a defendant must have participated with knowledge of at least some of the purposes or objectives of the conspiracy and with the intention of aiding in the accomplishment of those unlawful ends."); *see also United States v. Heras*, 609 F.3d 101, 107 (2d Cir. 2010) ("To be sure, mere knowledge of a criminal objective . . . is not enough by itself to make a person a conspirator or an aider and abettor."); *Svoboda*, 347 F.3d at 480 n.8 (noting that the "[m]ere knowledge [of a criminal conspiracy] . . . without participation, in the unlawful plan is not sufficient" to establish a conspiracy (quoting 1 L. Sand et al., *Modern Fed. Jury Instructions* 18-6)).  Even more to the point, however, there was absolutely no evidence at trial that, as the Government argued, *supra, "*the father had flown in from, I think he said, China to convince the son because of, you know, honor for the name.  That's GX-701A.  McMahon knew what it meant.  He knew that meant the father was brought across international lines as an intimidation and harassment tactic to force Xu Jin back to China."  Tr. at 1957:8-13.  But even if it were enough, which it is not as a matter of law, there was in fact no evidence whatsoever to support the notion that Mr. McMahon knew that the arrival of Xu Jin's father was "an intimidation and harassment tactic," as opposed to an appeal to return to China to

clear the family name, including repaying the victim of an embezzlement—which the only evidence at trial showed was what Mr. McMahon believed. *See* Exhibit 701A ("MCMAHON: And then the father had flown in from I think he said China. . . . To convince the son because of, you know, out of honor for the name . . . just to, you know, pay back the money basically.").

In sum, the evidence at trial fell woefully short of proving, to the degree required by the law, that Michael McMahon entered into an agreement to stalk anyone. His motion for a judgment of acquittal must, if the phrase "beyond a reasonable doubt" is to have any meaning, be granted.

### C.    There Is Insufficient Evidence To Sustain a Conviction on Interstate Stalking (Count IV).

The Court should also enter a judgment of acquittal as to Count IV, charging Mr. McMahon with the substantive offense of interstate stalking, because the Government failed to present any evidence from which a jury could permissibly find or infer that Mr. McMahon engaged in that offense. Once again, starting with the Court's instruction, the Court charged the jury with respect to Count IV as follows:

> The first element that the Government must prove beyond a reasonable doubt is that the defendant traveled in interstate or foreign commerce as charged in the indictment. Travel in interstate or foreign commerce simply means travel between two states or between the United States and a foreign country.
>
> The second element that the Government must prove beyond a reasonable doubt is that the defendant traveled in interstate commerce with the intent to harass, intimidate, or place under surveillance with intent to harass or intimidate Xu Jin or Liu Fang. Harass means to annoy persistently or to create an unpleasant or hostile situation.
>
> Direct proof of a person's intent is almost never available. It would be a rare case where it would be shown that a person wrote or stated that as of a given time he or she committed an act with a particular intent. Such direct proof is not required. The ultimate fact of intent, though subjective, may be established by circumstantial evidence based upon the defendant's outward manifestations, his words, his conduct, his acts, and all the surrounding circumstances disclosed

45

by the evidence and the rational or logical inferences that may be drawn from them.

The third element that the Government must prove beyond a reasonable doubt is that the course of or as a result of such travel, the defendant engaged in conduct, the result of which caused, attempted to cause, or would be reasonably expected to cause substantial emotional distress to Xu Jin or Liu Fang or an immediate family member.

To establish this element, the Government must prove that as a result of the defendant's conduct during or after the travel in interstate commerce, Xu Jin or Liu Fang or an immediate family member of Xu Jin or Liu Fang suffered substantial emotional distress as a result of the defendant's conduct or that the defendant attempted or reasonably expected to cause that emotional distress.

The term "immediate family member" means a spouse, parent, brother, sister, child, or ward. The term also includes any other person living in Xu Jin's or Liu Fang's household and related to Xu Jin or Liu Fang by blood or marriage.

Tr. at 2198:7-2199:22; *see also* 18 U.S.C. § 2261A(1)(B) (To establish that a defendant engaged in interstate stalking, the Government must show that the defendant "travel[ed] in interstate or foreign commerce . . . with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, and in the course of, or as a result of, such travel or presence engage[d] in conduct that cause[d], attempt[ed] to cause, or would be reasonably expected to cause substantial emotional distress to" that person, that person's immediate family member, or that person's spouse or intimate partner.).

The first element of interstate stalking required the Government to prove, beyond a reasonable doubt, that Mr. McMahon traveled interstate. Of course, there is no dispute that Mr. McMahon did not travel outside of the State of New Jersey in connection with this matter; rather the Government relied on an aiding and abetting theory of liability to satisfy this element. *See* Tr. 1955:12-17 ("As we told you in our opening, McMahon himself did not travel between states or internationally, but he clearly aided and abetted others who did so, including Johnny Zhu and Tu

46

Lan, and he did that with the intent of harassing the victims and causing them substantial emotional distress."). *See also supra*, at 39 n.14. As the Court instructed the jury with regard to this theory:

> Aiding and abetting is defined under federal law in Title 18, United States Code, Section 2, which provides, in pertinent part, the following:

> Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures the commission of a crime is punishable as a principal. Under the federal aiding and abetting statute, it is not necessary to show that the Defendant himself physically committed the crime with which he is charged in order for you to find the Defendant guilty. A person who aids or abets another to omit an offense is just as guilty of that offense as if he committed it himself.

> Accordingly, you may find the Defendant guilty of the offense charged if you find beyond a reasonable doubt that the Government has proven that another person actually committed an offense with which the Defendant is charged, and that the Defendant aided and abetted that person in the commission of the offense.

> . . . .

> To aid and abet another to commit a crime, a defendant must do two things. First, he must knowingly associate himself in some way with the crime, and second, he must participate in the crime by doing some act to help make the crime succeed.

> To establish that the Defendant you are considering knowingly associated themselves with the crime, the Government must establish that the Defendants knew and intended that the crimes charged would be committed.

> To establish that the Defendant participated in the commission of the crime, the Government must prove that the Defendant engaged in . . . some affirmative conduct or overt act for the specific purpose of bringing about the crime. A defendant's mere presence where a crime is being committed, even coupled with the knowledge by a defendant that a crime is being committed, is not sufficient to establish aiding and abetting. One who has no knowledge that a crime is being committed or is about to be committed, but inadvertently does something that aids in the commission of that crime is not an aider or abettor. An aider or abettor must know that the crime is being committed and act in a way that is intended to bring about the success of the criminal venture.

To determine whether the Defendant you are considering aided and abetted the commission of the crime with which he is charged, ask yourself these questions:

Did he participate in the crime charged as something he wished to bring about?

Did he knowingly associate with the criminal venture?

Did he seek by his actions to make the criminal venture succeed?

If he did, then the Defendant is an aider and abettor, and therefore guilty of the offense. If, on the other hand, your answer to any of these questions is "no," then the Defendant is not an aider and abettor, you must find him . . . not guilty under that theory.

Tr. at 2180:22-2183:9.

Here, there was no evidence at trial, let alone legally sufficient evidence, that Mr. McMahon was aware that by performing the surveillance and other tasks he did as a licensed private investigator, he was assisting with any criminal venture, let alone the interstate stalking that he was alleged to have aided and abetted. Instead, the evidence at trial showed that Mr. McMahon believed that he was conducting investigative services (including uncovering assets that could be used to recover embezzled funds) on behalf of a private Chinese company—a completely legal activity, well within the purview of Mr. McMahon's profession as a private investigator. The record is replete with undisputed evidence of what was said to Mr. McMahon in this regard. *See, e.g.,* Exhibit 1022 ("Sorry Mike, I forgot to indicate Jin Xu's gender, Jin Xu is a gentleman who owned [sic] a lot of money from Mr. Jason Zhu. Instead of repaying the money he owned, [sic] Mr. Xu chose to run away, and Mr. Zhu needs to find where does Jin Xu live and other relate[d] information. Mr. Zhu said there's no attorneys involved."); Exhibit 3047 ("Hi mike I have already back [sic] to China and reported all we found to my boss of the company."); Exhibit 3056 ("Hi mike: our finance [manager] wire you the money this morning."); Exhibit 805B at 13 ("Ok mc I spoke with my company last nite they want u to monitor on Monday but with one person."); *id.* at

15 ("The company wants the property list which be long j lifetime can u do that?"); *id.* at 19 ("Standby I will inform your suggestion to the company tonight."); *id.* at 21 ("I will stay here as long as the company require."); *id.* at 26 ("I will speak with the company tonight."); *id.* at 28 ("Mc I will deposit 1k to ur account tmr morning. Company want to switch to lightweight surveillance with one person tmr until further notice."); *id.* at 14 ("So your company only wants one investigator for Monday?"); *id.* at 24 ("How did the company in China find you and Eric to work on this case??" "Eric works for them in China. I used to send cars to them from US so they know me"); *see also* Exhibit 3026 ("He wanted to know if you can get any of Jin Xu and his wife, Fang Liu's records of latest purchases through their SSN and driver license."); Exhibit 3056 ("From the financial record of our company, Xu transferred the money to those 8 account, so we need check these accounts first. [S]everal accounts are from united states."). With the facts as they have now come to light, but which were unknown to Mr. McMahon at the time, it is clear that Mr. McMahon's surveillance activities were a part of a criminal venture of which he had no knowledge. But unless there is evidence that Mr. McMahon took an affirmative act in furtherance of the offense at issue—here interstate stalking—"with the intent of facilitating the offense's commission," *Rosemond v. United States*, 572 US. 65, 71 (2014), he did not aid and abet that offense. Moreover, as with conspiracy, as the Court charged, that the defendant was present at the scene of the crime, knew about it, or was in some ways associated with those who committed it is completely insufficient. *See Lorenzo*, 534 F.3d at 159-60 ("[s]uspicious circumstances are not enough to sustain a conviction for conspiracy, and mere association with those implicated in an unlawful undertaking is not enough to prove knowing involvement; likewise, a defendant's mere presence at the scene of a criminal act or association with conspirators does not constitute intentional participation in the conspiracy, even if the defendant has knowledge of the conspiracy" (cleaned up)); *see also United States v. Miller*, No. 2:11-CR-161-1, 2012 WL 3192739, at *3 (D. Vt. Aug. 7, 2012) ("The

49

mere presence of a defendant where a crime is being committed, even coupled with his knowledge that a crime is being committed, or merely associating with others who were committing a crime is not sufficient to establish aiding and abetting.  One who has no knowledge that a crime is being committed or is about to be committed but inadvertently does something that aids in the commission of that crime is not an aider and abettor.  An aider and abettor must know that the crime is being committed and act in a way which is intended to bring about the success of the criminal venture.").

Here, the Government did not show—certainly not directly, but not even circumstantially—that Mr. McMahon shared the intent of those whom he was alleged to have aided and abetted to commit the offense of interstate stalking or, for that matter, any other offense. *See Rosemond*, 572 U.S. at 71 ("As at common law, a person is liable under [18 U.S.C.] § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission."); *see also Benfield v. Mocatta Metals Corp.*, No. 91-CIV-8255 (LJF), 1992 WL 58879, at *6 (S.D.N.Y. Mar. 13, 1992) ("The standard for aiding and abetting liability under the CEA parallels that under the criminal law—an aider and abettor must not only know of the principal's violation of law, they must willfully assist in the violation and share the principal's intent.").  For this reason, the first element of interstate stalking—interstate travel, as to which the Government's only possible theory is aiding and abetting— was not proven, and on this basis alone, the conviction on Count IV cannot stand.

But the Government also failed to prove either the second or third elements of interstate stalking: that Mr. Mr. McMahon intended "to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person," 18 U.S.C. § 2261A(1)(B), and that Mr. McMahon's actions actually caused substantial emotional distress to another person, *see United States v. Shepard*, No. CR 10-1032-TUC-CKJ, 2012 WL 113027, at

50

*9 (D. Ariz. Jan. 13, 2012) ("To violate 18 U.S.C. § 2261A, a defendant . . . must actually cause substantial emotional distress to another person."); *see also United States v. Shrader*, 737 F. Supp. 2d 589, 595 (S.D.W.V. 2010) ("The text of Section 2261A(2) indicates that the criminal act is not just the course of conduct, but also the impact of the course of conduct onto the 'person.' Without the requisite emotional distress or fear by the 'person,' a defendant's course of conduct alone will not allow for a conviction under Section 2261A(2)."). Indeed, the Government's proofs in this regard would, in effect, criminalize all surveillance activities, and thus, the private investigation profession itself. But that is certainly not what Congress intended. To the contrary, 18 U.S.C. § 2261A was enacted to fill gaps in the Violence Against Women Act and punish "stalking," defined, even by the United States Department of Justice, as repeated conduct causing substantial emotional distress towards an individual. *See* United States Department of Justice, Office on Violence Against Women, *Stalking*, https://www.justice.gov/ovw/stalking ("The term 'stalking' means engaging in a course of conduct directed at a specific person that would cause a reasonable person to fear for his or her safety or the safety of others or suffer substantial emotional distress."). Indeed, this is also consistent with the plain, dictionary definition of stalking. *See* Merriam-Webster Legal Dictionary, *Stalking*, https://www.merriam-webster.com/legal/stalking (defining stalking as "the act or crime of willfully and repeatedly following harassing another person in circumstances that would cause a reasonable person to fear injury or death especially because of express or implied threats"); *see also* National Center for Victims of Crime, Victim Connect Resource Center, *Stalking,* https://victimconnect.org/learn/types-of-crime/stalking/ ("Stalking is a course of conduct directed at a specific person that would cause a reasonable person to feel fear. Unlike other crimes that involve a single incident, stalking is a pattern of behavior."). That is, 18 U.S.C. § 2261A was enacted to criminalize repeated harassing conduct across state lines; not to criminalize legal private investigative services performed by licensed private investigators. *See* Interstate Stalking

Punishment And Prevention Act Of 1996, 104 Cong. Rec. H4458 (1996) (Statement of Edward Royce) ("[M]y legislation that is here today, H.R. 2980, does three things. First it makes crossing a State line to stalk someone a felony and thus for the first time it defines in law, in Federal law, the crime of stalking, and it brings certain penalties . . . . Second, it makes crossing a State line in violation of a restraining order a felony. And, third, it makes it a felony to stalk someone on Federal property such as a post office or a military base or a national park. The bill is needed because in each of these cases the victim loses the protection of their State laws. I was the author in 1990 of the first State antistalking law in the country, in California. . . The law [that] was passed by the California legislature defines stalking as an obsessive pattern of behavior and threats that would cause a reasonable person to fear for their life or fear for great bodily harm. Versions of that law have since been adopted in every State in the Nation and here in the District of Columbia, and they have been very useful in protecting stalking victims before they are attacked, before they are injured. The problem has been that when the victim leaves her State or when he leaves his State, they lose their protection. State laws are not the same and restraining orders obtained in one State may not be valid in another."); *see also id.* at H4458-59 (Statement of Randy Tate) ("This bill will fill a gap in the existing law and offer increased protection for those men and women who are the target of obsessive and terrifying predators. This crime is a crime of terror. . . . Stalkers are known to relentlessly hunt down their victims, creating emotional and physical terror in men and women who are their targets. The stalker invades every aspect of the victim's life, watching every movement, following every step. . . . The Interstate Stalking Punishment and Prevention Act of 1996 will punish those who repeatedly harass, follow, and threaten their victims from State to State.").

Although it is undisputed that Mr. McMahon intended to surveille Xu Jin, Liu Fang, and Liu Yan, and that Mr. McMahon provided information to Johnny Zhu regarding Xu Xinzi, no

evidence was presented at trial that Mr. McMahon either performed his investigative services with the intent to "kill, injure, harass, or intimidate another person," *see* 18 U.S.C. § 2261A(1)(B), or that his investigative activities caused these individuals "substantial emotional distress," *see id.* § 2261A(2). Certainly, he cannot fairly be described as an "obsessive and terrifying predator[]" or one who, during the five days that he conducted routine private investigative surveillance—one day in October, 2016 and four in April, 2017—"relentlessly hunt[ed] down [his] victims, creating emotional and physical terror in men and women who are their targets." Instead, as is discussed above, *see supra*, I.B., Mr. McMahon's surveillance activities remained completely covert, rendering them unable to " harass, or intimidate another person," let alone "kill" or "injure" them. 18 U.S.C. § 2261A(1)(B). Nor, since Mr. McMahon's surveillance activities remained covert, could he have caused substantial emotional distress to Xu Jin, Liu Fang, or Liu Yan. Indeed, as discussed *supra* at 41, Liu Fang testified that she had never seen or met Mr. McMahon; thus, Mr. McMahon could not have caused Liu Fang substantial emotional distress as required under 18 U.S.C. § 2261A(2). *See* Tr. at 786:9-15. Moreover, as further discussed *supra*, although Xu Jin testified that he believed he was being followed on April 7, 2017 while driving in the car with his father, *see* Tr. at 1410:20-1411:1, it is undisputed that Mr. McMahon did not conduct surveillance on April 7, 2017, *see e.g.* Exhibit 2011; thus, Mr. McMahon did not cause Xu Jin substantial emotional distress. And Liu Yan also testified that she had never seen or met Mr. McMahon before. *See* Tr. 128:14-19 ("Q. Ms. Lu, do you recognize Mr. McMahon? A. I do not. Q. You've never seen him before? A. No. Q. You've never met him before? A. No."). Although Liu Yan testified that she believed that she was being followed on April 6, 2017, she testified that she did not experience any fear because the individual purportedly following her was not Chinese.[19] *See*

---

[19] Moreover, although, as set forth below, the Government argued for the first time on rebuttal that Mr. McMahon followed Liu Yan to the Livingston Mall, *see* Tr. at 2143:15-2144:1 (rebuttal)

Tr. at 133:10-134:2 ("Q.  And you testified that when . . . you went to bring Uncle Xu to the Livingston Mall, that initially that you thought you were being followed, right?  A.  Okay.  I was being followed.  And I don't know whether it's a monitoring if someone is following me.  I think it would have been a Chinese.  Q.  But you looked – were you being followed by somebody who was Chinese?  A.  I did not see it.  I only see a non-Chinese person driving a vehicle behind me. Q.  Do you remember anything about that vehicle, what color it was, what type it was, anything like that?  A.  No, I did not, because, you know, I – it's not a Chinese that was following me, so I did not pay attention to that.  Q.  So because it was Chinese that was not following you, you weren't as concerned, so you went ahead and finished your trip to the Livingston Mall, right?  A.  Yes."). Finally, Mr. McMahon did not conduct surveillance of Xu Xinzi, and she too testified that she had never seen or met Mr. McMahon.  Exhibit 713 at 25:13-21.  In sum, Mr. McMahon did not intend to cause, and his actions could not have caused, Xu Jin, Liu Fang, Xu Xinzi, or Liu Yan substantial emotional distress.  To the contrary, he undisputedly remained under cover throughout and did not harass, intimidate or cause emotional distress of any kind to anyone, and never attempted or intended to do so.[20]  If covert actions like these constitute stalking, then surveillance has, in

---

("Counsel argued that McMahon was never seen during the surveillance operation so he couldn't have possibly harassed him or intended to harass him.  I just want to note, that's just wrong.  The evidence proves otherwise.  It was at the beginning of the case, but Liu Yan testified, the sister-in-law.  She testified, if you recall, that she saw someone that she thought was tailing her, following her, the morning she was driving her father to the mall.  Remember she described the person as non-Chinese.  And that's actually, she thought, you know, she was a little bit less stressed out by it, okay, probably just be a Chinese person who's following me.  That's at page 98 of the transcript."), no evidence was actually adduced that the picture that was taken of her upon which it relied for this false allegation, was taken at the Livingston Mall (Mr. McMahon proffers that it was not, a fact that did not come out at trial because the allegation was, quite unfairly, not raised until rebuttal) or that he in fact went there.  *See infra* at 82-84.

[20] Defense counsel have been unable to locate any interstate stalking cases where an individual's conduct remained completely covert, likely because the Government rightly does not, as it cannot,

54

essence, been outlawed.  But that could not have been and was not the intent of Congress, or of the states—like New Jersey—which continue to license private investigators, who often engage in the kind of conduct—including covert surveillance and the gathering of records—that Mr. McMahon took here, actions which he could never have anticipated would be deemed criminal.[21]

This is not to say that Xu Jin and his family were not put in fear, given the evidence, construed in the light most favorable to the Government, and crediting the testimony of Xu Jin, Liu Fang, Xu Xinzi, or Liu Yan.  But no evidence was presented at trial connecting Mr. McMahon to the actions that put them in fear.  That is, no trial evidence linked Mr. McMahon to the individuals who visited Liu Yan at her home in Short Hills in the Spring of 2016, which predated Mr. McMahon's activities in this matter, or in November of 2016.  *See* Tr. 128:21-129:12 (Q.  "I just want to go back through a few of the things that you testified to earlier, starting with – you said that in the spring of 2016, I believe you said that you were visited by somebody who you felt was someone who was working for the Chinese government; is that right?  A.  Yes.  Q.  And just to be clear, that person was not Mr. McMahon, was it?  A.  No.  Q.  And you said that around Thanksgiving in 2016, you had another contact with somebody who, I think you said, claimed to be a friend; is that right?  A.  Yes.  Q. And was that person Mr. McMahon.  A.  No.  It's a Chinese.  Q.  It was a Chinese person?  A.  Yes.").  Of course, no evidence established that Mr. McMahon

---

under the statute, prosecute individuals who do not harass, intimidate or cause emotional distress of any kind to another person.

[21] If Mr. McMahon's covert conduct in this matter—that is, the normal conduct of a licensed private investigator—can be  held to violate the interstate stalking conduct, then that raises a serious issue regarding whether the interstate stalking statute is impermissibly vague.  *See United States v. Harriss*, 347 U.S. 612, 617 (1954) ("[N]o man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.");  *see also Coates v. Cincinnati*, 402 U.S. 611, 612, 614 (1971) (striking down ordinance prohibiting "conduct annoying to persons passing by" because "conduct that annoys some people does not annoy others," and "men of common intelligence must necessarily guess as its meaning." (cleaned up)).

was involved with posting the notes on the door of the Warren address in September of 2018, which occurred nearly a year after Mr. McMahon completed his investigative services in this matter and was no longer involved in the matter; nor was there ever any evidence that Mr. McMahon was aware, a year-and-a-half beforehand, when Mr. McMahon ceased his work on the matter, that such notes would be posted.  Nor even, as discussed *supra* at 42 n.17, did any evidence connect Mr. McMahon's surveillance activities to how Kuang Zebin and Congying Zheng obtained Xu Jin's address in Warren, New Jersey, especially given that it was publicly available information that Xu Jin's home was owned by JLifetime LLC—which also owned Liu Fang's home in Short Hills, New Jersey, *see* Tr. at 1230:16-1231:14; Tr. at 786:16-19—and that other individuals, including Hongru Jin, were independently conducting surveillance of Xu Jin, and it is therefore entirely speculative that Mr. McMahon located the Warren address, *see* Tr. at 1955:18-20.

Likewise, there was and is no evidence that Mr. McMahon was in any way involved with the Facebook posts sent to Xu Xinzi's friends in California in May of 2018, which occurred over a year after Mr. McMahon's last investigative activities in this matter.  *See* Exhibit 713 at 16:11-16 ("Q. I want to direct you to May of 2018.  Did anything having to do with you or your loved ones' Facebook accounts stand out to you?  A.  Yes.  My friends received Facebook messages from an account named Tony Lee that contained . . . derogatory information about me and my parents."); *id.* at 27:14 ("Q. So the question was: The first time that you received any messages of this sort was in early . . . 2018, correct?  A.  Correct.  Q.  Okay.  And before that, there were no messages of this kind harassing you; is that right?  A.  Correct.").  Indeed, Mr. McMahon's only connection to Xu Xinzi was that he conducted computer searches related to her address and assets; however, the address that Mr. McMahon provided to Johnny Zhu for Xu Xinzi was incorrect, and, in any event, the information that Mr. McMahon provided had nothing to do with the Facebook

accounts that were used to harass Xu Xinzi. *Compare* Exhibit 3034 at 3 ("UPDATED REPORT OCTOBER18th 2016 . . . It appears Xinzi Xu is a graduate student at Stamford University. She lives in the Kennedy Graduate Residences."); Exhibit 713 at 29:16-18 ("Q. Okay. But . . . certainly, by the fall of 2016, you were no longer living in Stanford, correct? A. Yes.").

Finally, even if, *arguendo*, Mr. McMahon's activities did cause Xu Jin, Liu Fang, Xu Xinzi, or Liu Yan emotional distress, the emotional distress experienced was not, as a matter of law, "substantial," as is required to uphold Mr. McMahon's conviction under 18 U.S.C. § 2261A. *See also United States v. Yung*, 37 F.4th 70, 77 (3d Cir. 2022) ("the [s]ubstantial emotional distress must be fairly large, more than mere annoyance." (cleaned up)); *United States v. Fleury*, 20 F.4th 1353, 1370 (11th Cir. 2021) (upholding district court's jury instruction that provided: "Substantial emotional distress means significant mental distress, mental suffering or anguish, as well as physical pain. It therefore requires a serious invasion of mental tranquility" (internal quotation marks omitted)); *see also Veile v. Martinson*, 258 F.3d 1180, 1189 (10th Cir. 2001) (describing "emotional distress" to be "understood by persons of common intelligence" to mean "mental distress, mental suffering, or mental anguish, and includes depression, dejection, shame, humiliation, mortification, shock, indignity, embarrassment, grief, anxiety, worry, fright, disappointment, nausea, and nervousness, as well as physical pain," in the context of a state stalking statute). Indeed, Xu Jin testified that he did not move from his home after purportedly being followed on April 7, 2017 or after Kuang Zebin and Conying Zheng posted notes on Xu Jin's home in Warren, New Jersey in September of 2018. *See* Tr. at 1421:14-1422:5. Likewise, Liu Yan, though tearful on the stand, testified that she was "shocked" as a result of the events that occurred in this matter, but not that she was scared or suffered emotional distress, *see* Tr. at 126:3-5, and that she called the numbers that Xu Jin's father brought with him to her home, despite purportedly belonging to Chinese government officials, and asked these Chinese government

officials to come to her home and pick up Xu Jin's father to return him back to China, *see* Tr. at 85:20-86:3, also undermining the emotional distress that the Government describes. Likewise, Liu Fang testified that her father-in-law's presence in the United States made her feel "surprised, it was out of the blue," *see* Tr. at 697:2-6, not that she experienced substantial emotional distress. And although Liu Fang testified that Kuang Zebin and Congying Zheng's arrival at her home in September of 2018 made her feel "very unsafe" and brought "great fear to [her]", *see* Tr. at 714:20-715:1, as noted, Mr. McMahon had nothing to do with this episode. Finally, Xu Xinzi testified that as a result of the Facebook messages, she "felt stressed, unsafe. Yeah", *see* Exhibit 713 at 23:10-11, and that she would send her "mom an emoji every day to let her know that [she was] safe" and that her mom would send "an emoji back, or a hi, every day," *see id.* at 23:17-22. But feeling "stressed" and "unsafe" is not the same as the "substantial emotional distress" required by the statute. *Cf. United States v. Davis*, 801 F. App'x 80, 88 (4th Cir. 2020) (affirming stalking conviction because explicit and violent threats to victim and her family were reasonably expected to cause substantial emotional distress); *United States v. Ackell*, 907 F.3d 67, 83 (1st Cir. 2018) (rejecting defendant's argument that the government failed to adduce sufficient evidence that the victim suffered "substantial emotional distress" where victim testified she considered committing suicide as a means of escaping from her relationship with defendant); *United States v. Osinger*, 753 F.3d 939, 950 (9th Cir. 2014) (affirming stalking conviction because defendant's "threatening messages to [victim] and his sending of sexually explicit photographs to [victim's] co-workers and friends unquestionably evinced [defendant's] intent to harass and intimidate [victim] and cause substantial emotional distress."); *United States v. Petrovic*, 701 F.3d 849, 860 (8th Cir. 2012) (affirming stalking conviction and holding jury reasonably found victim suffered "substantial emotional distress" after victim testified she "had a breakdown, fe[lt] like somebody [had] rip[ped her] entire inside out of [her] which was the worst feeling in [her] life, became estranged from

58

family members, and was depressed and contemplated suicide." (internal quotation marks omitted)).

In sum, the evidence introduced at trial was insufficient to support Mr. McMahon's conviction for interstate stalking, under either an aiding and abetting theory or based upon his own actions. To the contrary, his everyday—and, significantly, covert—activities as a private investigator were not intended to, could not and did not, amount to harassment or intimidation and certainly did not cause the "substantial emotional distress" that the statute requires. Mr. McMahon's Rule 29 motion with respect to Counts III and IV should be granted on this basis.

## II. MR. MCMAHON IS ENTITLED TO A JUDGEMENT OF ACQUITTAL BECAUSE OF THE JURY'S INCONSISTENT VERDICT.

In what was a stunning turn of events for those involved in this matter, the jury returned a verdict against Mr. McMahon, acquitting him on Count I, Conspiracy to Act as an Agent of a Foreign Government Without Prior Notification to the Attorney General in violation of 18 U.S.C. § 371 and 18 U.S.C. § 3551 (the "FARA conspiracy" charge), but convicting him on Count II, Acting as an Agent of a Foreign Government Without Prior Notification to the Attorney General in violation of 18 U.S.C. § 951(a), 18 U.S.C. § 2, and 18 U.S.C. § 3551 (the "substantive FARA" count). This verdict makes no sense and at least contributes to the necessity for a retrial on the substantive FARA count, Count II. That is, given the factual evidence introduced at trial, which made clear that the substantive FARA count was charged and prosecuted as a crime involving a joint effort of multiple participants, it is logically impossible for Mr. McMahon to have violated FARA but not engage in a FARA conspiracy. This Court should not allow such a manifest injustice to stand.

While "the return of a not-guilty verdict on a conspiracy count does not ipso facto constitute a bar to conviction on the underlying substantive offense," an acquittal on a conspiracy count that

"constituted a 'determination favorable to the petitioner of the facts essential to conviction of the substantive offense'" bars a conviction on the substantive count under Second Circuit law. *United States v. Zane*, 495 F.2d 683, 691 (2d Cir. 1974) (quoting *Sealfon v. United States*, 332 U.S. 575, 579 (1948)); *accord United States v. Rigas*, No. S102-cr-1236 (LBS), 2004 WL 2434965, at *1 (S.D.N.Y. Nov. 1, 2004). Whether such a conviction is barred "depends upon the facts adduced at [] trial and the instructions under which the jury arrived at its verdict . . . ." *Zane*, 495 F.2d at 691 (quotation omitted). When performing this analysis, "the court should avoid making the defendant's burden overly difficult by straining to postulate hypertechnical and unrealistic grounds on which the jury could conceivably have rested its conclusion." *United States v. Citron*, 853 F.2d 1055, 1058 (2d Cir. 1988) (cleaned up).

As the Court instructed, Count I "charges each of the Defendants with conspiracy to act as agents of a foreign government without prior notification to the Attorney General of the United States." Tr. at 2173:6-9; ECF No. 256 at 31. In order to find Mr. McMahon guilty on the FARA conspiracy charge the jury was required to find that: (1) "two or more persons entered into the particular unlawful agreement charged in the Indictment"; (2) Mr. McMahon "knowingly and intentionally became a member of the conspiracy"; and (3) "an overt act was committed in furtherance of the conspiracy." ECF No. 256, at 20; Tr. at 2174:21-25. Most significantly, in order for the Government to have succeeded on Count I, it would had to have proven that Mr. McMahon "participated in [the conspiracy] with knowledge of its purpose and with the specific intention of furthering one or more of its objectives." Tr. at 2176:6-8.

With respect to the substantive FARA count, the Court instructed the jury that it was required to find that: (1) Mr. McMahon "acted as an agent of a foreign government or official, specifically of China"; (2) Mr. McMahon "failed to notify the Attorney General that he would be acting as an agent of the government or an official of China in the United States prior to so acting";

(3) Mr. McMahon "acted knowingly"; and (4) Mr. McMahon "acted, at least in part, as an agent for the government or an official of China while in the United States."  ECF No. 256 at 33; Tr. at 2191:22-2192:9.  The Court further explained that "[t]o find the defendant guilty of this offense, you must find that the defendant knew that he was acting as an agent of the Government or an official of China and knew that he had not provided prior notification to the Attorney General." Tr. at 2193:23-2194:2.

Here, the jury's finding that Mr. McMahon did not engage in a FARA conspiracy logically precludes his conviction on the substantive FARA charge.  This is so for two fundamental reasons. *First*, as Mr. McMahon made clear both prior to and at the trial itself, he did not dispute the actions the Government alleged that he performed in this matter.  *See* ECF No. 217, Defendant Michael McMahon's Memorandum of Law In Response To The Government's Motions *In Limine* To Admit Certain Evidence And Preclude Certain Evidence And Arguments At Trial, at 12-14; Tr. at 38:10-24 (McMahon Opening) ("In a lot of ways, members of the jury, this is a unique case not because the government got it wrong, which they sometimes do, and that's why your job here is so important, but because so many of the facts that you've just heard about, about what Mike did, are really not disputed.  You will hear, and he won't deny, that he was, in fact, engaged to perform private investigative tasks, that's true, with regard to a person who he understood had embezzled money from a Chinese construction company, including, especially, looking for assets that could be used to reimburse the resulting loss, which was in the millions of dollars.  It will be undisputed. We don't challenge that he performed surveillance and sought records that were available – that are available to private investigators about the subject of his surveillance, and especially about that subject's assets."); Tr. at 1991:18-21 (McMahon summation) ("When I stood up at the beginning of this case, I told you that a lot of the facts of the case with regard to Mike McMahon would be undisputed, and really, that's turned out to be true.").  That is, it is and was undisputed that Mr.

McMahon was engaged to perform investigative services in September of 2016, *see* Exhibit 3009, that Mr. McMahon conducted 5 days of surveillance on October 6, 2016, *see* Exhibit 3034, and April 5, 6, 10, and 11, 2017, *see* Exhibit 2011, and that Mr. McMahon ran reports and conducted searches, largely focused on asset recovery, at the request of the individuals who hired him, *see, e.g.,* Exhibit 3026 ("I have forwarded the report to Mr. Jason Zhu. . . . He wanted to know if you can get any of Jin Xu and his wife, Fang Liu's records of latest purchases through their SSN and driver license."); Exhibit 805B at 9 (MCMAHON: "Car is owned (not leased) . . . ." ZHU: "Got it no finance no lease?" MCMAHON: "Correct"); *id.* at 20 (ZHU: "Is there anyway to get all the assets and property info from the company but not only the bank records And indeed. Is there anyway you can track their hidden assets like stock, bonds, investment activities?" MCMAHON: "Yes I can possibly do that. I can run the company and the officers of the company. If I can get their social security numbers. I should be able to track down their numbers."); Exhibit 2029 (ERIC YAN: "our request 1 , background of Joseph yang 2, offshore poverty investigation of xu jin,liu fang and xu xinzi 3, investigation of 8 account"). The fundamental facts of the case, both with regard to Counts I and II of the Superseding Indictment, were not contested, including even the fact that, as it turns out, Mr. McMahon was working for the Government of China; the verdict on both Counts rested exclusively on Mr. McMahon's knowledge–that is, whether he knew at the time that he was working for China. And, given the undisputed nature of the facts, the jury–in order to acquit Mr. McMahon on Count I of the Indictment had to have determined, as it correctly did, that Mr. McMahon did not knowingly enter into an agreement with his alleged co-conspirators to act as an agent of the Chinese government. Indeed, the agreement to join a conspiracy, which necessarily would have required that Mr. McMahon knew that he was working on behalf of the Chinese government, and Mr. McMahon's purported knowledge that he was performing

investigative services on behalf of the Chinese government are, really, one in the same element – again, the only element that was contested in this matter, for purposes of both Counts.

*Second*, as the Government alleged and certainly proved, whatever his intent, Mr. McMahon did not act alone in this matter: he, undisputedly, was hired, initially by Zhu Yong, who Mr. McMahon knew as Jason Zhu, to conduct investigative services regarding an individual who embezzled money from Jason Zhu. *See* Exhibit 1022 ("Sorry Mike, I forgot to indicate Jin Xu's gender, Jin Xu is a gentleman who owned [sic] a lot of money from Mr. Jason Zhu. Instead of repaying the money he owned, [sic] Mr. Xu chose to run away, and Mr. Zhu needs to find where does Jin Xu live and other relate[d] information. Mr. Zhu said there's no attorneys involved."). Mr. McMahon's investigative activities, including surveillance and asset searches, were then done at the direction of other individuals who represented themselves to be employees of a Chinese company, namely, Hu Ji, whom Mr. McMahon knew as Eric Yan, and Zhu Feng, whom Mr. McMahon knew as Johnny Zhu, as discussed *supra*. But if Mr. McMahon did not agree to join in a conspiracy with these individuals–as the jury necessarily found he did not for purposes of Count I–then there was no other way that he could have knowingly acted, independently, as an agent of China, thus warranting his conviction on Count II.[22]

In sum, given the undisputed nature of the underlying facts of the case, and the nature of the Government's proofs on the substantive FARA count, which like the conspiracy involved the actions of multiple participants, the only possible basis for Mr. McMahon's acquittal on Count I

---

[22] Any argument that Mr. McMahon was not found to be a member of the conspiracy set forth in Count I because Mr. McMahon did not know other members, such as Tu Lan, must fail, given that, as the Court's jury instructions, made clear, "[a] defendant's knowledge is a matter of inference from the facts proved. To become a member of a conspiracy, a defendant need not have known the identities of every member of the conspiracy, nor need they have been apprised of all of their activities." ECF No. 256 at 21-22; *see also* Tr. at 2176:13-21.

was that the jury failed to find that he knowingly entered into an agreement to act as an agent of the Government of China – that is, to have "participated in [the conspiracy] with knowledge of its purpose and with the specific intention of furthering one or more of its objectives."  Tr. at 2176:6-8.  But if this is the case, as it must be, how could the jury have found that Mr. McMahon knew that he was acting as an agent of the Chinese government, as was necessary to satisfy the third element of the offense alleged in Count II, of which he was convicted?  It cannot, for, in the words of the Second Circuit, the jury decision on Count I logically "constituted a 'determination favorable to the petitioner of the facts essential to conviction of the substantive offense.'"  *Zane*, 495 F.2d at 691 (quoting *Sealfon*, 332 U.S. at 579).  Accordingly, the decision on Count II should be vacated and a judgment of acquittal entered on that Count.[23]

## III.    THE COURT SHOULD GRANT MR. MCMAHON A NEW TRIAL PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 33.

### A.    Legal Standard

It is well established that Federal Rule of Criminal Procedure 33 grants the Court "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice."  *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (internal quotation marks and citation omitted); *see also United States v. Elder*, 592 F. Supp. 3d 48, 61 (E.D.N.Y. 2022) (same).  Specifically, Rule 33(a) provides that "[u]pon the defendant's motion, the court may

---

[23] In the alternative, the Court may, pursuant to Rule 33, vacate Mr. McMahon's conviction and grant a new trial.  *See* Fed. R. Crim. P. 33(a) ("the court may vacate any judgment and grant a new trial if the interest of justice so requires").  While courts have recognized that "inconsistency among verdicts would not *ordinarily alone* support setting aside a verdict even under the more permissive standards under Rule 33," *United States v. Mack*, S11 18 CR. 834 (PAE), 2020 WL 114509, at *5 (S.D.N.Y. Jan. 10, 2020), *aff'd*, 20-3881-CR, 2022 WL 4391802 (2d Cir. Sept. 23, 2022) (emphasis added), this is, for the reasons set forth throughout this brief, not the "ordinary" case; nor is the inconsistency here at issue the only basis for the Court to, in the exercise of its discretion, find that "justice . . . requires" that the Court grant a new trial under Federal Rule of Criminal Procedure 33.  *See infra* at Point III.

vacate any judgment and grant a new trial if the interest of justice so requires."  The "ultimate test" for a Rule 33 motion is "whether letting a guilty verdict stand would be a manifest injustice." *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018) (quoting *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013)).  In other words, a new trial is warranted where the "evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand."  *United States v. Archer*, 977 F.3d 181, 187 (2d Cir. 2020) (citing *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).

The Court should grant a Rule 33 motion where there is "a real concern that an innocent person may have been convicted."  *Ferguson*, 246 F.3d at 134 (citation omitted); *see also Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 370 (2d Cir. 1988) (noting that if a court is "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice" it should grant a new trial (citing *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir. 1983)).  Thus, a defendant is entitled to a new trial where "the evidence was patently incredible or defied physical realities," an "evidentiary or instructional error compromised the reliability of the verdict," or "the government's case depend[ed] upon strained inferences drawn from uncorroborated testimony."  *Landesman*, 17 F.4th at 331 (cleaned up).

Unlike the case with regard to Rule 29 motions, in evaluating a Rule 33 motion, "the judge is not required to view the evidence in the light most favorable to the prosecution."  *United States v. Levy*, 594 F. Supp. 2d 427, 435 (S.D.N.Y. 2009) (quoting *United States v. Coriaty*, No. 99 Cr. 1251, 2001 WL 1910843, at *2 (S.D.N.Y. July 16, 2001)), *aff'd*, 385 F. App'x. 20 (2d Cir. 2010); *see also Ferguson*, 246 F.3d at 137 (the court is not required to give "blind deference to the jury verdict").  Rather, the Court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation."  *Ferguson*, 246 F.3d at 134; *see also United States v. Robinson*, 430 F.3d 537, 543 (2d Cir. 2005) ("the court is entitled to 'weigh the evidence

and in so doing evaluate for itself the credibility of the witnesses'" (quoting *Sanchez*, 969 F.2d at 1413)); *Archer*, 977 F.3d at 189 ("a district court faced with a Rule 33 motion must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis").  Ultimately, "[t]he trial court must be satisfied that 'competent, satisfactory and sufficient evidence' in the record supports the jury verdict."  *Ferguson*, 246 F.3d at 134 (quoting *Sanchez*, 969 F.2d at 1414).

### B.    Mr. McMahon is Entitled to a New Trial Based Upon the Insufficiency of the Evidence.

Beyond the relief available under Federal Rule of Criminal Procedure 29, under Rule 33, the Court may exercise its discretion to grant a new trial based upon the insufficiency of the evidence where letting a guilty verdict stand would be a "manifest injustice." *Archer*, 977 F.3d at 188.  In exercising that discretion, the Court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation."  *Aguiar*, 737 F.3d at 264 (quoting *Ferguson*, 246 F.3d at 134).  Thus, the Court should grant the motion where, as here, there is "a real concern that an innocent person may have been convicted."  *Ferguson*, 246 F.3d at 134 (citation omitted).

For the reasons set forth *supra*, Point I, that is the case here and, should it determine not to grant a judgment of acquittal, the Court should instead grant a new trial based on the insufficiency of the evidence, alone or in combination with the reasons set forth below; to let Mr. McMahon's conviction stand would, as set forth herein, be a manifest injustice that should not be permitted to occur.

### C.    The Government's Tandem Reading of Text Messages Improperly Dramatized the Evidence and Usurped the Jury's Role in Interpreting Their Meaning.

Mr. McMahon is entitled to a new trial pursuant to Rule 33 because the Government used "publishing witnesses" with no connection to the investigation in this matter to inappropriately

read through documents, causing undue prejudice to Mr. McMahon. At numerous times throughout the trial, the Government, rather than simply introducing the documents at issue and then arguing about them in summation, instead engaged in lengthy theatrical renditions of multiple text message chains. This procedural aberration allowed the Government to provide the jury with their own independent interpretation of the documentary evidence and presented needlessly cumulative evidence. Because this practice contributed to the guilty verdict in this matter, and the manifest injustice that such guilty verdict represents, a new trial should be granted at which this evidence will be introduced in an appropriate fashion.

As the Court will recall, throughout the approximately three week trial, the Government called four separate witnesses to read into the record multiple text message chains, often in a tandem performance with the Government. Thus, on June 1, 2023, the Government called Special Agent George Dietz to the stand, *see* Tr. at 342-44, and almost immediately asked the agent to engage in an exchange where the Government and Agent Dietz read through critical chat communications for the jury. *See* Tr. at 346 (Q: "Can you please read the chat communications on the right and I'll read the chat communications on the left."), 349, 352-53, 356, 358, 366-67, 374-75, 381-83, 404. On June 5 and 6, 2023, the Government called Eugene Hwang, an intelligence analysts for the United States Attorney's Office, *see* Tr. at 815-16, 898, and similarly delved into a tandem reading of Mr. McMahon's text message conversations. *See* Tr. at 855 (Q: "If you don't mind reading in blue on the right, I'll read in gray on the left."), 856-858, 864-69, 898-99, 901-919. On June 7 and 8, 2023, the Government presented testimony from Jeffrey Tarkin, a contract investigator at the United States Attorney's Office, *see* Tr. at 1113-14, and asked Mr. Tarkin to "please read the text messages from Johnny Zhu," while the Government "read the text messages from McMahon Michael." *See* Tr. at 1159; *see also* Tr. at 1148-51, 1160-62, 1192-94, 1199, 1203-1208, 1213-16, 1222-24. Finally, on June 12, 2023, Special Agent Marcus Rivera

took the stand for the Government, Tr. at 1552, engaging in  a similar colloquy with the Government, reading though Mr. McMahon's communications.   *See* Tr. at 1573-75; 1579-80. Each of these witnesses admitted that they had no knowledge of the case, or the Government's investigation of it, and had done nothing other than review the records at issue for the purpose of providing this highly unusual testimony.  *See* Tr. at 344-45, 818:8-17, 1115:6-9, 1553:11-16.

Mr. McMahon did not object to this process,[24] though the Court, at one point, acknowledged its inappropriateness.  *See* Tr. at 1173:16-1174:16; 1175:12-1176:1.  And, while reading properly admitted exhibits into the record–as these were, by stipulation–is ordinarily permissible, the Government in this case went too far, reading aloud documentary evidence that was never outwardly spoken in a performance to the jury, thus straying into the realm of prejudicial demonstratives.  Where a demonstrative re-creating an event "could easily seem to resemble the

---

[24] Although no objection was made at trial to the tandem reading, Mr. McMahon's post-trial motion is not barred; rather, the plain error standard applies.  *See United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 96 (2d Cir. 2014) ("Where the appellant fails to preserve an evidentiary challenge by lodging a timely objection, [courts] review for plain error.  Under that standard, we consider whether there was (1) error, (2) that is plain, and (3) that affects substantial rights." (cleaned up)); *see also United States v. Washington*, 263 F. Supp. 2d 413, 426 n.7 (D. Conn. 2003) (holding that district courts should utilize plain error standard of Fed. R. Crim. P. 52(b) with respect to issues not raise by contemporaneous objection); *United States v. Allums,* S6 15-CR-153 (VSB), 2020 WL 3790610, at *5 (S.D.N.Y. July 7, 2020) ("Courts in this circuit have held that a district court considering a claim of 'prosecutorial misconduct to which no objection [was] raised during trial is reviewed for plain error under Fed.R.Crim.P. 52(b).'" (quoting *Washington*, 263 F. Supp. 2d at 426 n.7)), *aff'd sub nom. United States v. Jones*, 858 F. App'x. 420 (2d Cir. 2021); *United States v. George*, 11-CR-250 DLI, 2012 WL 2564373, at *18 n.4 (E.D.N.Y. June 29, 2012) ("Because district courts perform a quasi-appellate role when reviewing objections to prosecutorial misconduct first raised during a Rule 33 motion, the courts review for plain error under Federal Rule of Criminal Procedure 52(b)."); *United States v. Yevakpor*, 501 F. Supp. 2d 330, 334 (N.D.N.Y. 2006) (applying the plain error standard where "[d]efense counsel never made any objection at trial embodying the arguments put forward in the instant [Rule 33] motion," and explaining that courts have found objections not raised at trial and first brought up in a Rule 33 motion are to be reviewed for plain error).  Here, the plain error standard is met, as the Court acknowledged the inappropriate nature of this tandem reading, and which, as set forth below, unduly prejudiced Mr. McMahon, causing the unjust verdict obtained here.

actual occurrence, courts have feared that the jurors may be misled because they do not fully appreciate how variations in the surrounding conditions, as between the original occurrence and the staged event, can alter the outcome." *Fusco v. Gen. Motors Corp.*, 11 F.3d 259, 263-64 (1st Cir. 1993); *accord United States v. Stewart-Carrasquillo*, 997 F.3d 408, 421 (1st Cir. 2021). With re-creation demonstratives, many circuits have adopted the "substantial similarity" test. *See Stewart-Carrasquillo*, 997 F.3d at 421-22; *see also In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-2543 (JMF), 2016 WL 4077117, at *8 (S.D.N.Y. Aug. 1, 2016) (applying *Fusco* and excluding a video recreation). Under this test, a court should exclude a demonstration "if it does not permit a fair comparison with the event at issue because it is insufficiently comparable." *Id.* (cleaned up).

Here, the lack of a "substantial similarity" between the text messages themselves and the way in which they were presented, as if an oral dialogue, is apparent. By their very nature, text messages reflect an individual's written, as opposed to spoken words. Thus, far from recreating a substantially similar event, the Government and its agents created events that never actually took place; they orally performed written messages. Moreover, by allowing the Government to direct its agents to read directly from the text messages, in a script like fashion with the AUSA, as if they were performers in a play, the Government was able to impart its own meaning to the written words in the text messages and unfairly slant those communications in an unduly favorable light to the Government's theory of the case. For example, the applicable AUSA, acting as if he or she was a participant in these text messages, was able to choose what words to place emphasis on when reading the often cherry-picked messages to the jury. And, whether intentional or not, the AUSAs' facial expressions and other body mannerisms while acting out these lengthy messages certainly served to influence the jury with respect to the nature of the "conversations" themselves and what inferences should be drawn from them.

Moreover, the prejudice stemming from the Government's continuous, theatric presentations was exacerbated by the fact that, as set forth above, the Government acted out these text messages with Government agents who, by their own admissions, were not involved in the investigation of this case and were involved only to the limited extent of reading the messages involved. The result was that Mr. McMahon's ability to thoroughly cross-examine these agents about the messages that they read aloud to the jury was severely hampered. Specifically, Mr. McMahon was significantly constrained in his ability to question the agents on the background and substance of the messages, precluding him from eliciting testimony that would have allowed the jury to put the messages into their appropriate context. Likewise, by allowing the Government to provide its own rendition of the messages through a back-and-forth reading between the AUSA and Government agents, the AUSA became a witness coequal (but with greater knowledge about, for example, how the excerpts had been chosen), but one who could obviously not be subjected to cross-examination as to, for example, why he chose to adopt certain mannerisms or emphasize certain words when reading the messages. This impermissible tactic, which left Mr. McMahon with no conceivable way to challenge the Government's reading of these messages, resulted in an unfair trial, one in which the persons who were "conversing" with Mr. McMahon were not called to the stand. *See United States v. Bowen*, 969 F. Supp. 2d 546, 623 (E.D. La. 2013) (finding, on the defendant's Rule 33 motion, that although transcripts were read to the jury "the defendants were deprived of live testimony subject to cross examination, which is always significantly better from the jury's perspective"); *see also United States v. Tines*, 70 F.3d 891, 897 (6th Cir. 1995) ("when a trial court permits any evidence to be restated or re-read to jurors, it must avoid two dangers: (1) that the jury may unduly emphasize the testimony, and (2) that the jury may take the

reviewed testimony out of context."); *United States v. Kennedy*, 46 F. App'x 200 (4th Cir. 2002) ("A decision to read transcripts to the jury must be accompanied by safeguards").[25]

Finally, the Government's multiple tandem readings of text conversations into the record presented the jury with lengthy cumulative testimony on evidence to which Mr. McMahon had already stipulated.  In fact, as discussed above, during trial, this Court expressed concern that the Government was spending a "fair amount of time" presenting "mere . . . publishing witnesses who [were] simply reading records into evidence."  Tr. at 1174:3-6.  The Court explained, that while "[s]ome things have to be presented through a witness, obviously, to get them in and make sense of them," this was "simply having the witness read in" evidence that the jury would later be re-presented with.  Tr. at 1175:14-22.  Thus, this tactic, in and of itself, was entirely unnecessary. *See* Tr. at 1173:16-19 ("But I want to suggest to the Government that it seems to me some of the evidence that's coming in through these witnesses were simply reading exhibits into the record, may not be necessary."); Tr. at 1175:23-24 ("it feels like there is some repetition here that may not be necessary").  Indeed, the Court itself recognized such, stating:

> But I want to suggest to the Government that it seems to me some
> of the evidence that's coming in through these witnesses were
> simply reading exhibits into the record, may not be necessary.
> Because remember, you have all the admitted exhibits to refer to
> during argument and show during argument when the jury will
> actually be able to put it all together based on your argument. I think
> right now, especially given that the jury is somewhat nervous, I
> think, about how long they're in this courtroom, it may be wise to
> try to short circuit some of that and just save it for argument, because

---

[25] While some of these text message chains involve communications between Mr. McMahon and his alleged co-conspirators, as set forth in section III.E. below, Mr. McMahon was acquitted on the conspiracy charge in Count I of the Superseding Indictment, and thus, their admissibility under Federal Rule of Evidence 801(d)(2)(E) would, at least, have been in doubt.  *See generally United States v. Gigante,* 166 F.3d 75, 82 (2d Cir. 1999) ("To admit a statement under the coconspirator exception to the hearsay definition, a district court must find two factors by a preponderance of the evidence: first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of that conspiracy.").

> this witness is not adding anything that you couldn't argue based on just reading the exhibits.

Tr. at 1173:16-1174:2.  The Court explained that the Government could "just simply show [the jury] [the text messages] during [their] argument and say, here's the chat, follow the story, as opposed to simply have this witness read in what [they're] going to re-present to them during closing." Tr. at 1175:12-17.

In fact, beyond the fact that the written text messages, did not require a witness to read their contents to the jury, they were also not the best evidence of what occurred – the actual text messages were.  *See*, *e.g., Gordon v. United States*, 344 U.S. 414, 421 (1953) ("The elementary wisdom of the best evidence rule rests on the fact that the document is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description."); *see also* Fed. R. Evid. 1002 ("An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise.").  Instead, the Government could have referenced the messages in its closing argument to the jury and the jurors could have easily reviewed the materials themselves, without the added emphasis of a live reading.

So why, then, did the Government proceed as it did?  It is because the manner in which it presented this evidence – really, the bulk of its presentation with regard to Mr. McMahon – would have, and we now know ended up having, the prejudicial effect of breathing life into exchanges that would not have had the same impact without a witness.  *Cf.*, *United States v. Jackson*, 849 F.3d 540, 554 (3d Cir. 2017) ("A case agent's testimony may not simply dress[ ] up [an] argument as evidence. . . . After all, the role of the prosecutor [is] to argue in summation what inferences to draw from the evidence." (cleaned up)).  The Government correctly counted on this method making its case more persuasive to the jury when, ultimately, they were discussed in summation, as they certainly were.  *See, e.g.,* Tr. at 1948:9-1949:1; 1957:14-1958:18; 1976:14-1977:2;

1977:21-1978:6; 1984:2-8 (Government summation); *see also* 2134:25-2136:17; 2143:15-2144:15 (rebuttal). That is, far from being merely cumulative, the Government benefited enormously from the repeated recitation of these statements. *See Sutton v. Warden*, 3:21-CV-897-MGG, 2022 WL 1555008, at *5 (N.D. Ind. May 17, 2022) (explaining that a defendant may be prejudiced by the "'drumbeat repetition' of an out-of-court assertion" (citation omitted)); *United States v. Flores-De-Jesus*, 569 F.3d 8, 26 (1st Cir. 2009) (acknowledging that the government's presentation of repetitive testimony "is problematic in itself"). For this reason, the interests of justice requires a new trial, even in the absence of the defense's objection to this manner of proceeding. *See* Fed. R. Crim. P. 33(a) ("[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires"); *Ferguson*, 246 F.3d at 134 ("The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice.").

### D.      The Government's Improper Rebuttal Warrants A New Trial.

Mr. McMahon is also entitled to a new trial under Rule 33 based upon the Government's rebuttal, which raised arguments never before advanced, at a time when the defense could not respond to them, and other arguments which were false but could not, because they were raised on rebuttal, be corrected. This occurred after the Government had the opportunity to draft, and carefully craft its rebuttal argument as to Mr. McMahon, full well knowing that – particularly given the time constraints that were in play – the defense would not have the opportunity to respond. That is, in its initial rebuttal on June 14, 2023, the Government addressed various arguments by all three defendants, arguments with which Mr. McMahon does not take issue. *See* Tr. at 2108:15-2119:1. The next day, however, in the continuation of its rebuttal, the Government targeted Mr. McMahon, devoting almost its entire argument to him. Tr. at 2128:17-2148:14. The Government's rebuttal comprises about 33 pages of the trial transcript; the initial 13 are a mix of arguments as to each defendant (largely summarizing the previous day's argument), *see* Tr. at

73

2108:15-2119:1; Tr. at 2126:16-2128:16, while the final 20 pages before the jury was sent to deliberate are aimed solely at Mr. McMahon and tainted by the improper arguments outlined above, *see* Tr. at 2128:17-2148:14.  This makes these new and false arguments, as will be discussed, all the more prejudicial.

### 1.    The Government Inappropriately Made Brand New Arguments in its Rebuttal Summation.

It is well established that "[c]losing arguments proceed in the following order: (a) the government argues; (b) the defense argues; and (c) the government rebuts."  Fed. R. Crim. P. 29.1. Rule 29.1 "is designed to control the order of closing argument," and "is drafted in the view that fair and effective administration of justice is best served if the defendant knows the arguments actually made by the prosecution in behalf of conviction before the defendant is faced with the decision whether to reply and what to reply."  Fed. R. Crim. P. 29.1, advisory committee's notes; *see also United States v. Giovanelli*, 945 F.2d 479, 496 (2d Cir. 1991) (Newman, J., concurring) ("[F]air and effective administration of justice is best served if the defendant knows the arguments actually made by the prosecution in behalf of conviction before the defendant is faced with the decision whether to reply and what to reply." (citation omitted)).

Although "[r]ebuttal by the Government is . . . allowed due to the heavy burden it must face to obtain a conviction beyond a reasonable doubt," *United States v. Alegria*, No. 90-cr-450 (RWS), 1991 WL 238223, at *12 (S.D.N.Y. Nov. 6, 1991), the law is clear:  "Government counsel should not be allowed to develop new arguments on rebuttal, but should be restricted to answering the arguments put forth by defense counsel," *id.* (quoting *United States v. Taylor*, 728 F.2d 930, 937 (7th Cir. 1984)); *see also United States v. Brown*, 765 F.3d 278, 296 (3d Cir. 2014) (same); *Moore v. United States*, 344 F.2d 558, 560 (D.C. Cir. 1965) (same).  Thus, "[t]he purpose of the Government's initial summation is to make all of its arguments from the evidence presented" but

"rebuttal is limited; the Government is presented with an opportunity to respond only to the defense's arguments." *Alegria*, 1991 WL 238223, at *12; *see also United States v. Byrd*, 834 F.2d 145, 147 (8th Cir. 1987) ("Rebuttal provides the government with the opportunity to respond to defendant's arguments. It does not allow the government to bring in new matters."). That is because "our system of justice anticipates that a criminal defendant is entitled to see the prosecution's whole case before deciding on a defense and to be judged by a jury that is strongly warned to keep an open mind until deliberations." *United States v. Yakobowicz*, 427 F.3d 144, 153 (2d Cir. 2005); *see also United States v. Maloney*, 755 F.3d 1044, 1046 (9th Cir. 2014) (commending the U.S. Attorney's Office for moving to summarily reverse the defendant's conviction after prosecutors watched closing arguments and realized that the Government violated Rule 29.1).

Thus, Rule 29.1 sets forth "a process that increasingly locks in the prosecution to a particular theory of the case while putting off the defense's commitment to a theory until the last practical moment and even then allowing the defense merely to seek to poke holes in the government's case"; "[i]mportant to this scheme is Rule 29.1's structure that the defendant's summation follows the prosecution's." *Yakobowicz*, 427 F.3d at 153. Therefore, the Government is not permitted to "adopt[] a 'wait-and-see' approach" to its case, as it deprives the defendant "his rightful opportunity to respond." *Alegria*, 1991 WL 238223, at *12; *see also United States v. Gleason*, 616 F.2d 2, 26 (2d Cir. 1979) ("Fairness would dictate that a [defendant not be confronted] with a new theory (albeit based on record evidence) at almost literally the last minute of a long trial."), *cert. denied*, 444 U.S. 1082 (1980). And where the Government violates this rules makes improper remarks on summation, the Court must vacate the defendant's conviction and grant the defendant's motion for a new trial, as it must do so here. *See Alegria*, 1991 WL 238223, at *12 (vacating the defendant's convictions and granting the defendant's motion for a

75

new trial, where the Government, in its summation, suggested that the defendant's "alibi was a fabrication, but did not explain why", but "[t]hen on rebuttal, several reasons for this [were] argued and a full blown attach on the witnesses' credibility [was] made"); *see also United States v. Cordry*, No. 18-20033 (DDC), 2020 WL 4200858, at *20 (D. Kan. July 22, 2020) (granting a new trial where the Government "meaningfully departed from the standard for a fair trial" by violating Rule 29.1 and introducing a "new, important theory of liability" on rebuttal); *United States v. Nguyen*, 507 F.3d 836, 838 (5th Cir. 2007) (granting a new trial where the Government made a new argument on rebuttal despite the Court giving defense counsel a last-minute opportunity to respond); *cf. Gleason*, 616 F.2d at 26 (recognizing that, "[h]ad no action been taken by the court after the Government's surprise reply summation," by allowing the defendants' "the opportunity to respond by way of a surrebuttal summation after they had sufficient time to confer and review the trial transcript and exhibits forming the basis of the Government's computation" a reversal would have been required).

Here, the Government's rebuttal ran afoul of these rules, thus gaining an enormous advantage by raising important new theories of the case at a time when–particularly given the time pressure under which counsel was operating–they had no opportunity to respond. Although the defense neither objected nor sought relief, as was understandable under the circumstances, but as set forth *supra* at 68 n.24, that failure cannot serve to preclude the manifest injustice of denying Mr. McMahon a fair trial. Specifically, the Government raised at least two new arguments on rebuttal: that Mr. McMahon consciously avoided recognizing that he was working for the Chinese government–an argument that was not advanced in its initial summation–and that Mr. McMahon used his calls to law enforcement, which the defense had long argued demonstrated a lack of consciousness of guilt to actually conceal his purportedly unlawful surveillance activities. Further, the Government also raised a number of new factual contentions which were false and/or

unsupported by the evidence, including that Liu Yan saw Mr. McMahon surveilling her while she was bringing Xu Jin's father to the Livingston Mall; that the China Daily article said "Operation Skynet is an operation to get people back to China", Tr. at 2129:8-13, when it did not; and that Mr. McMahon changed how he received money after learning about the China Daily article.

*First*, the Government argued, for the first time in rebuttal, that Mr. McMahon consciously avoided learning that he was working for the Chinese government, stating that Mr. McMahon, in light of his law enforcement background, "consciously avoided knowing what was going on." Tr. at 2139:14-24 ("I want to briefly address Mr. McMahon's law enforcement background a little bit more since it was a major point at the beginning of this case. Now, the evidence shows that McMahon knew what he was doing, regardless of his background. But to the extent that you need to consider whether McMahon consciously avoided knowing what was going on, consider this fact: If anyone should have known what he was doing was wrong, that there were major red flags that he should have looked into, that he was obviously participating in criminal activity, it was a former member of law enforcement."). That is, though Mr. McMahon's background as a former NYPD officer was, as the Government stated, "a major point at the beginning of this case," Tr. at 2139:14-16, the argument that it supported a finding of conscious avoidance was never raised in either the Government's opening or in its principal summation, at least with regard to Mr. McMahon.[26] Nor, accordingly, did the defense raise the issue during Mr. McMahon's summation. Instead, this argument–which could well have been the basis of Mr. McMahon's conviction on one or more counts, was one as to which the Government inappropriately waited to make until rebuttal, at a time when Mr. McMahon could not respond.

---

[26] Notably, in its initial summation, the Government did argue a conscious avoidance theory, but carefully limited that argument to only Defendant Congying Zheng. *See* Tr. at 1984:20-1985:12. Mr. McMahon accordingly did not address this contention in his summation.

*Second*, for the first time on rebuttal, the Government proffered an explanation for why Mr. McMahon contacted the police to put them on notice of his surveillance. That Mr. McMahon did so was, obviously, an extremely significant argument raised by the defense, in opening, in summation and during the course of the trial. For the first time on rebuttal, however, the Government sought to turn this argument against Mr. McMahon–again, at a time when he could not respond. Specifically, in its rebuttal, the Government argued as follows:

> Now let's talk about the contact to local police. He contacts them when he's doing surveillance. Not to tell them, hey, I've got this atypical operation here with an old man. He contacts the police so they don't come. Think about it.
>
> Go read the police report. There's nothing about the details of the operation in that police report. The police reports say, hey, just FYI, there's going to be some PI's here, don't worry about any suspicious activity calls. That's not designed to get the police's attention. That's designed to keep the police away. Eric Gallowitz told you that when I asked him that question. He said they're less likely to show up when you call. That's the transcript, at page 1831. And, remember, they discussed this in real time. They put it in an exhibit, Government Exhibit EG 3. Gallowitz asked McMahon, you're not going to tell the local police why we're here; correct? And McMahon said, no, I'm not going to do that.
>
> He called the police to avoid being caught committing a crime because he didn't want somebody to call and say, hey, there's several suspicious vehicles driving around the neighborhood, can you see what's up. They didn't want to be frustrated in their pursuit. He leveraged his role as a private investigator and former police officer. He used his experience to ensure that no one would come and help if anyone called now.

Tr. at 2138:13-2139:13. The Government was well aware of Mr. McMahon's argument that he would not have called law enforcement regarding his surveillance if he was engaging in illegal activity since well before the start of trial in this case, *see* ECF No. 146.1, Brief in Support of Defendant Michael McMahon's Motion for Discovery and an Evidentiary Hearing Regarding Prosecutorial Misconduct, at 1, 12; ECF No. 152, Reply Brief in Further Support of Defendant

Michael McMahon's Motion for Discovery and an Evidentiary Hearing Regarding Prosecutorial Misconduct, at 13 n.10; in fact, the Government was aware of this theory even before Mr. McMahon was indicted, as this was a matter that was raised in Mr. McMahon's reverse proffer. Mr. McMahon reiterated this argument at the start of trial, during his opening. *See* Tr. at 47:19-48:6 ("And perhaps most significantly of all, what you are going to learn is that Mr. McMahon in doing the surveillance he did in Short Hills, New Jersey, which you've heard about, and in Warren, New Jersey where he ultimately goes, informs law enforcement. He calls the police in Milburn, which is where Short Hills is for those of you who have ever been to the Short Hills Mall, and he calls the police in Warren and he tells them: I'm doing surveillance. . . . If he's trying to commit a crime, if he's secretly acting on behalf of the Chinese Government, is he going to call the cops and tell them? You will have an opportunity to answer that yourself and to answer the question: Is that what people who are committing crimes do."). At trial, Mr. McMahon adduced evidence of these reports to law enforcement. *See* Exhibit 407 (Township of Millburn Police Department Records); Exhibit 410 (Warren Township Police Department Records); *see also* Tr. at 1836:16-1837:8. The Government, though it had initially put witnesses from the Millburn and Warren police departments on its exhibit list, did not call them. And then the Government left this issue entirely unaddressed in its principal summation. Instead, it waited until Mr. McMahon argued – as he had made clear in his opening he would – that his calls to law enforcement demonstrated his lack of criminal intent, *see* Tr. at 2014:1-2015:19, and, having set this trap, waited until rebuttal to finally respond to this argument. And, as described above, it did so by articulating a theory never before raised, and doing so at a time that prevented Mr. McMahon from responding. This unfairness should not be permitted to stand. Instead, Mr. McMahon is entitled to a new trial under Rule 33.

**2.    The Government's False Or Unsupported Statements During its Rebuttal, Which Mr. McMahon Could Not Correct, Warrant a New Trial.**

Inappropriate prosecutorial comments during summation warrant reversal where they cause "substantial prejudice" to the defendant, denying him due process. *United States v. Elias*, 285 F.3d 183, 190 (2d Cir. 2002); *see also United States v. Folks*, No. 20-cr-3267, 2021 WL 5987009, at *3 (2d Cir. Dec. 17, 2021) ("To obtain a new trial based on prosecutorial misconduct during a summation, a defendant must show that when 'viewed against the entire argument to the jury, and in the context of the entire trial,' the misconduct was 'so severe and significant as to have substantially prejudiced him.'" (quoting *United States v. Sheehan*, 838 F.3d 109, 127-28 (2d Cir. 2016))); *United States v. Bonventre*, No. 10CR228-LTS, 2014 WL 3673550, at *12 (S.D.N.Y. July 24, 2014) ("Improper remarks or a 'prosecutor's misrepresentation of testimony may require reversal because of the inevitable prejudice to the defendant.'" (quoting *United States v. Drummond*, 481 F.2d 62, 63-64 (2d Cir. 1973))). "In assessing whether prosecutorial misconduct caused 'substantial prejudice,' [the Second Circuit] has adopted a three-part test: the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of the conviction absent the misconduct." *Elias*, 285 F.3d at 190; *see also Bonventre*, 2014 WL 3673550, at *12. Improper statements made during summation "cause[] the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999) (cleaned up); *see also Brown*, 765 F.3d at 296 (same); *United States v. Gray*, 876 F.2d 1411, 1417 (9th Cir. 1989) ("[I]t is improper to base closing arguments upon evidence not in the record."); Charles Alan Wright *et al., Federal Practice and Procedure* § 588 (4th ed. 2011) ("It is misconduct for a prosecutor to make an assertion to the jury of a fact, either by way of argument or by an assumption in a question, unless there is evidence of that fact.").

Of course, the prejudice from false statements on rebuttal are so much worse, for they come at a time when the defense has absolutely no opportunity to respond.  *Cf., United States v. Ballard*, 727 F. App'x 6, 10 (2d Cir. 2018) (remanding for a new trial and finding government's misconduct during rebuttal "undermine[d] [the] defendant's constitutional right to present a defense" and "appear[ed] to reduce the government's burden to prove guilt beyond a reasonable doubt at trial"); *United States v. Friedman*, 909 F.2d 705, 709 (2d Cir. 1990) (remanding for a new trial and holding that, during its rebuttal, "the prosecutor managed in one breath to undermine the presumption of innocence, the Government's obligation to prove guilt beyond a reasonable doubt, and the standards of propriety applicable to public prosecutors").  As set forth above, those kinds of statements, if never raised before, violate Federal Rule of Criminal Procedure 29.1.  But even if they address issues that were in fact discussed by the defense, it is inappropriate to argue facts that are unsupported by  the record.  That is, as the Second Circuit Court of Appeals has held, "[w]hile the prosecution in rebuttal may explain why it has not proven certain facts or respond to the interpretation which the defense has placed on its failure to present evidence, it may not use the defense's comments to justify the reference to facts or the assertion of claims which it could have, but did not, introduce at trial."  *United States v. Rubinson*, 543 F.2d 951, 966 (2d Cir. 1976); *Brown*, 765 F.3d at 296 (same).

Here, the Government offered three arguments on rebuttal that were unsupported or contradicted by the evidence admitted at trial, and were accordingly, false: (1) that Liu Yan saw Mr. McMahon surveilling her while she was bringing Xu Jin's father to the Livingston Mall; (2) the substance of the China Daily article; and (3) the change in how Mr. McMahon received money after learning about the China Daily article.  Each of these violations are alone sufficient to warrant retrial, *see United States v. Richter*, 826 F.2d 206, 209 (2d Cir. 1987) (finding false statements in Government's summation warranted new trial and holding criminal prosecutors have a "special

duty not to mislead, and should not deliberately misstate the evidence" (internal quotation marks and citations omitted)); *Brown*, 765 F.3d at 296-97 (vacating the judgment of the District Court and remanding the case for a new trial where the Government's rebuttal summation argument "inappropriately relied on facts not in evidence"); in combination these statements, and those discussed above, make such relief even more appropriate, *see Certified Env't Servs., Inc.*, 753 F.3d at 96 ("[W]e would hesitate to vacate and remand this case for a new trial based on any one of the errors discussed above in isolation, or perhaps even any one category of those errors. But considering the record as a whole, we are compelled to conclude a new trial is warranted.").

*First*, for the first time in its rebuttal, the Government argued that Liu Yan saw Mr. McMahon surveilling her. *See* Tr. at 2143:15-2144:1 ("Counsel argued that McMahon was never seen during the surveillance operation so he couldn't have possibly harassed him or intended to harass him. I just want to note, that's just wrong. The evidence proves otherwise. It was at the beginning of the case, but Liu Yan testified, the sister-in-law. She testified, if you recall, that she saw someone that she thought was tailing her, following her, the morning she was driving her father to the mall. Remember she described the person as non-Chinese. And that's actually, she thought, you know, she was a little bit less stressed out by it, okay, probably just be a Chinese person who's following me. That's at page 98 of the transcript."). However, there was absolutely no evidence presented at trial that Mr. McMahon was the individual who followed Liu Yan to the Livingston Mall. To the contrary, Liu Yan specifically testified that she had never seen Mr. McMahon before, and that she did not know who was following her. *See* Tr. 128:14-19 ("Q. Ms. Lu, do you recognize Mr. McMahon? A. I do not. Q. You've never seen him before? A. No. Q. You've never met him before? A. No."); Tr. at 133:10-134:2 ("Q. And you testified that when . . . you went to bring Uncle Xu to the Livingston Mall, that initially that you thought you were being followed, right? A. Okay. I was being followed. And I don't know whether it's a

monitoring if someone is following me. I think it would have been a Chinese. Q. But you looked – were you being followed by somebody who was Chinese? A. I did not see it. I only see a non-Chinese person driving a vehicle behind me. Q. Do you remember anything about that vehicle, what color it was, what type it was, anything like that? A. No, I did not, because, you know, I – it's not a Chinese that was following me, so I did not pay attention to that. Q. So because it was Chinese that was not following you, you weren't as concerned, so you went ahead and finished your trip to the Livingston Mall, right? A. Yes."). Even worse, the Government went on to fabricate related facts, including when and where certain photographs contained in Exhibit 4010 were taken, in an effort to make it appear that Mr. McMahon was the individual who purportedly followed Liu Yan to the Livingston Mall on April 6, 2017. *See* Tr. at 2144:2-15 ("And if you remember, around that time we showed her a picture that she identified as herself, right? She said yeah, that's me. And that was Government's Exhibit, I believe, 4010-A. Go look at Government's Exhibit 4010 at page 123. Those are text messages between Michael McMahon and Johnny Zhu from April 6th, 2017, in the morning. And he texts Johnny Zhu a picture of Liu Yan that he took on surveillance, while she was driving her father to the Livingston mall. It was not totally covert. He was seen."). However, when shown the photograph in Exhibit 4010A at page 123, Yan Liu testified that she did "not know who took the picture, and [she did] not know whether it was taken at the same time" that she was at the Livingston Mall on April 6, 2017. Tr. at 106:4-9. Thus, no evidence identified Mr. McMahon as the individual who purportedly followed Liu Yan to the Livingston Mall on April 6, 2017; had Mr. McMahon had the opportunity to respond, he could have highlighted these mischaracterizations and, in fact, shown that the pictures at issue were taken not at the Livingston Mall, but of Liu Yan as she came or went from her gym. *See* Exhibit 3034 ("1040 female Asian leaves home and enters her ME BE suv. She was observed driving to a fitness

centered [sic] located a few miles away.  (see photos)).  Yet the Government improperly and strategically deprived Mr. McMahon of that opportunity by reserving this argument for its rebuttal.

*Second*, the Government misrepresented on rebuttal the contents of the China Daily article. That is, the Government argued that "Counsel made much of the idea that the average American wouldn't know what Skynet or Fox Hunt is, but we don't need to wonder about the average American.  He had a document in his possession that he read and then forwarded to himself again in 2017 that said 'Operation Skynet is an operation to get people back to China.'"  Tr. at 2129:8-13.  A review of Exhibit 434 reveals that this is, quite simply, false: the heading of the China Daily Article states "Interpol launches global dragnet for 100 Chinese fugitives"; the subheading states "It's called Operation Sky Net.  Amid the nation's intensifying anti-graft campaign, arrest warrants were issued by Interpol China for former State employees and others suspected of a wide range of corrupted practices. . . ."  That is, the China Daily article does *not* state that "Operation Skynet is an operation to get people back to China," as argued by the Government, Tr. at 2129:13; instead, it describes a lawful process of proceeding by way of Interpol warrant, rather than by the kind of harassment or intimidation alleged here.  Indeed, as Mr. McMahon showed at trial, it nowhere explains the methodology of Operation SkyNet, including the use of private investigators by Chinese authorities and contrary to the Government's argument, says nothing that would have alerted Mr. McMahon that he was working for or with the Chinese government.  To argue that he knew he was based on this exhibit, when there was no opportunity to show that was not true, was false, misleading and unfair and has contributed to a profoundly unfair result.

*Third*, and relatedly, the Government falsely argued – again, for the first time – that Mr. McMahon changed how he received payments in this matter once he saw the China Daily article. *See* Tr. at 2137:1-9 ("He's told Jason Zhu is owed money and then Eric Yan, and then a guy named Johnny Zhu comes in.  Think about how he's paid.  It keeps changing.  He goes from getting a

wire to then – as soon as he's notably – after he does the research and finds that China daily article about Skynet, he transferred the cash, the $5,000 in cash that doesn't make its way into a bank account. That's not normal. That's not normal business activity."). However, even leaving aside that no evidence was adduced showing that receiving multiple forms of payment is "not normal business activity," as many law firms would attest, the premise of the argument–that Mr. McMahon changed the way he was paid to cash payment after seeing the China Daily article–is just not true.

Specifically, Mr. McMahon was first paid on October 5, 2016 via check from Transperfect Language Services. *See* Exhibits 403B; 403E. Mr. McMahon found the China Daily article, the next day, on October 6, 2016, *see* Exhibit 4004 at 11. On December 13, 2016, Mr. McMahon received a wire transfer in the amount of $5,945.00, which went into Mr. McMahon and his wife's joint checking account, *see* Exhibit 403A, 403K, but that was only after the wire failed to transfer into the McMahon Investigative Group business account several days earlier, on December 9, 2016. *See* Exhibit 3061. Indeed, it was not until April 4, 2017–nearly six months after Mr. McMahon found the China Daily article–that Mr. McMahon received a cash payment for the very first time. *See* Exhibits 3072, 3073. Accordingly, the Government's statement regarding the manner in which Mr. McMahon was paid after learning about the China Daily article was incorrect. And again this point was not made in opening or in the principle summation, when Mr. McMahon could have pointed this out, but on rebuttal, when he could not.

Especially in a case so lacking in direct evidence and so dependent on the piling of inference upon inference–many of them totally inappropriate–as is discussed above, Point I, the Government's tactically savvy but constitutionally problematic determination to raise new theories and unsupported facts on rebuttal that had not been raised in pretrial proceedings, in openings, at trial or even during its principal summation was inappropriate, unfair and may well have caused

the unjust result that ensued here.  For this reason, as well as the others set forth in this brief, the Court should grant this motion for a new trial at which Mr. McMahon's rights will be fully vindicated and a just verdict thus reached.

### E.    Mr. McMahon Is Entitled to a New Trial Because the Government Relied on Evidence that Should Not Have Been Admitted under Rule 801(d)(2)(E).

Mr. McMahon should also be granted a new trial because certain prejudicial hearsay evidence was, in light of the verdict, impermissibly admitted at trial under Federal Rule of Evidence 801(d)(2)(E).  The Court knows Rule 801(d)(2)(E) well: it provides, in relevant part, that "[a] statement . . . is not hearsay [if] [t]he statement is offered against an opposing party and was made by the party's coconspirator during and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E).  "To admit a statement under the coconspirator exception to the hearsay definition, a district court must find two factors by a preponderance of the evidence: first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of that conspiracy."  *Gigante*, 166 F.3d at 82; *see also United States v. Malka*, 602 F. Supp. 3d 510, 533 (S.D.N.Y. 2022) (same); *United States v. Greebel*, No. 15-CR-637 (KAM), 2018 WL 3900496, at *52 (E.D.N.Y. Aug. 14, 2018) ("To admit a statement pursuant to Federal Rule of Evidence 801(d)(2)(E), this Court must find that: (1) there was a conspiracy; (2) the members included the declarant and the party against whom the statement is offered; and (3) the statement was made both during the course of and in furtherance of the conspiracy." (quoting *Bourjaily v. United States*, 483 U.S. 171, 175 (1987))), *aff'd*, 782 F. App'x 72 (2d Cir. 2019).  Of course, the Government bears the burden of proving "(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy."  *United States v. James*, 712 F.3d 79, 105 (2d Cir. 2013) (quoting *United States v.*

86

*Farhane*, 634 F.3d 127, 161 (2d Cir.2011)); *see also United States v. Tellier*, 83 F.3d 578, 580 (2d

Cir.1996) ("Extra-judicial statements by co-conspirators may be admitted if the government

establishes by a preponderance of the evidence that there was a conspiracy, that both the declarant

and the party against whom the statements are offered were members of the conspiracy, and that

the statements were made during and in furtherance of the conspiracy." (citing *Bourjaily*, 483 U.S.

at 175-76)); *United States v. Mulder*, 273 F.3d 91, 103 (2d Cir. 2001) (same).

Here, the admission of the tape recording of a conversation that occurred between Johnny

Zhu, Tu Lan, and Hongru Jin at the Embassy Suites in Elizabeth, New Jersey on April 3, 2017

(and translated as Exhibit 704A) was admitted by the Court, over Mr. McMahon's objection,[27]

---

[27] Specifically, Mr. McMahon objected at trial to the admissibility of the tape recording, as translated as Exhibit 704A, as the recording could not be properly authenticated through Hongru Jin, as he did not make the recording. Despite this, the Court admitted the recording, as translated in Exhibit 704A, as authentic and a co-conspirator statement under Rule 801(d)(2)(E). *See* Tr. at 1005:2-1006:21 ("MR. LUSTBERG:  Judge, based on the testimony we just heard, this witness [Hongru Jin], this witness did not make the recording.  He said that what – he heard it, and it's a fair and accurate representation of a part of the conversation.  But I don't think that that's sufficient to authenticate the recording as a whole.  We've only had, I think, ever excerpts of it.  We've never understood until this moment who it was that made the recording, which I think is an important fact in understanding whether it's authentic, whether it's an accurate recording of what happened, whether it was tampered with.  You know, this has only been a mystery recording in this case, and I'm concerned that we don't have – there's not an adequate basis to admit it at this point.  MR: HEEREN:  Your Honor, just to clarify two factual points.  One is, this is the complete recording that the government has and it's a complete recording – we provided that same exact recording to defense counsel.  I don't think he was suggesting otherwise, but for clarity.  The second point is, I understand the witness to be saying that it's a portion of the conversation, because as you would hear, it starts in the middle of them speaking, that that there' excepts here and there.  I can elicit form the witness that it's a continuous recording, to the extent there's any question about that, but I would submit that the large point is it has been authenticated, which it just has to be shown to be what the witness said it is.  THE COURT:  And the witness was present for the entire conversation that's on the recording?  MR. HEEREN:  Yes.  THE COURT:  You don't have to go any further.  I don't view this as different from a photo that someone says, yes, that's a fair and accurate depiction of what happened, that I was present at or saw, so I don't view this as any kind of authenticity issue, and it seems relevant.  And I guess that's all I would say.  There are statements in it, I guess, that one can argue are hearsay, but that's a different issue.  But I presume they're not necessarily offered for their truth as much as explaining what the verbal acts occurred between

under Rule 801(d)(2)(E).  The pertinent portion of the recording, as translated in Exhibit 704A, is

as follows:

> Tu: Once I check a license plate, I'm gone. I check another license plate, I am gone again. I won't follow.
>
> Zhu: Then Mike [PH], um, he… I won't follow, Mike…
>
> Tu: Whatever Mike says, whomever Mike is, I am not going to worry about those stuff. But you need to clearly tell Mike about the different possibilities, the different possibilities I talked about today.
>
> Zhu: If you have a talk with Mike, Mike-Mike will think… Mike will, Mike-Mike will then say that it is you who told me to say so and so.
>
> Tu: I would not-I would not tell him to identify the license plate only. I would ask him to follow. But I would warn him that others may set a trap for him, and it is a possible situation.
>
> Zhu: Um.
>
> Tu: Tell him clearly, I mean, you need to tell him clearly about everything.
>
> Zhu: Okay.
>
> Tu: Do you understand what I'm saying? Because he… He is an American, I don't have much control.

Exhibit 704A at 3.

As it turns out, the Government failed to establish, by a preponderance of the evidence, the

first factor needed to admit the recording under Rule 801(d)(2)(E), *i.e.* "that a conspiracy existed

that included the defendant and the declarant." *Gigante*, 166 F.3d at 82.  As a preliminary matter,

Mr. McMahon's acquittal on Count I of the Superseding Indictment is, in and of itself, powerful

evidence that the Government did not establish—even by a preponderance of the evidence—that

---

these alleged co-conspirators, or if they are co-conspirator statements, they would be admissible. So I'm going to allow in the exhibit.").

Mr. McMahon was a member of a conspiracy to act as an agent of a foreign government. That is, while "an acquittal on a conspiracy count does not [post-hoc] destroy the admissibility of the declarations of coconspirators on the substantive charge," *United States v. Delligatti*, No. 15-CR-491 (KBF), 2018 WL 1033242, at *4 (S.D.N.Y. Feb. 23, 2018) (internal quotation marks and citation omitted), it is at least probative of the propriety of the admission, *see United States v. Gil*, 604 F.2d 546, 549 (7th Cir. 1979) ("[A]n acquittal might be relevant and persuasive in the determination of whether the Government has demonstrated the requisite criminal joint venture.").

But Mr. McMahon's acquittal on Count I is not the only evidence that the Government failed to show, by a preponderance of the evidence, that Mr. McMahon was a member of a conspiracy to act as an agent of China. Particularly when considered in conjunction with the statements contained in the recording as translated in Exhibit 704A, the evidence—now examined in its entirety, with the benefit of the hindsight that the completed trial provides—demonstrates that the Government failed to meet the standard for admission of Exhibit 704A under Rule 801(d)(2)(E). Indeed, Tu Lan plainly acknowledged during the conversation that Mr. McMahon "is an American, I don't have much control," Exhibit 704A at 3, a statement Tu Lan clearly would not have made if Mr. McMahon was part of a conspiracy to work for the Chinese government. Equally important is that there was no evidence presented at trial that Johnny Zhu actually told Mr. McMahon "everything." Rather, the Government asked the jury to infer, based on this passage of the tape recording, both in summation and rebuttal, that this was the reason for the meeting between Johnny Zhu and Mr. McMahon the next day at Panera Bread, and for the further inference that, although no one could (or did) testify to the substance of any conversation that Johnny Zhu had with defendant McMahon during that meeting, Mr. McMahon must have been "told everything," as Tu Lan directed. *See* Tr. at 1945:19-1946:15 (Government summation); Tr. at 2133:13-20 (rebuttal). But, as described above, in connection with Mr. McMahon's motion for a

judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, that was not an appropriate inference, but really amounted to no more than speculation—not the basis for a legally cognizable inference. *See supra* at 5 (citing *Pauling*, 924 F.3d at 656 (2d Cir. 2019); Leonard B. Sand et al., Modern Federal Jury Instructions § 6.01 (2011); *Langston*, 630 F.3d at 314).

Indeed, as is also discussed at length above, I.A.1., I.C., the communications between Mr. McMahon and others, including Johnny Zhu and Eric Yan, indicate that Mr. McMahon believed that he was conducting private investigative services on behalf of a Chinese company, again undermining the notion that the Government has shown Mr. McMahon having joined a conspiracy that would have allowed Exhibit 704A to be admitted under to Rule 801(d)(2)(E). *See, e.g.,* Exhibit 1022 ("Sorry Mike, I forgot to indicate Jin Xu's gender, Jin Xu is a gentleman who owned [sic] a lot of money from Mr. Jason Zhu. Instead of repaying the money he owned, [sic] Mr. Xu chose to run away, and Mr. Zhu needs to find where does Jin Xu live and other relate[d] information. Mr. Zhu said there's no attorneys involved."); Exhibit 3047 ("Hi mike I have already back [sic] to China and reported all we found to my boss of the company."); Exhibit 3056 ("Hi mike: our finance [manager] wire you the money this morning."); Exhibit 805B at 13 ("Ok mc I spoke with my company last nite they want u to monitor on Monday but with one person."); *id.* at 15 ("The company wants the property list which be long j lifetime can u do that?"); *id.* at 19 ("Standby I will inform your suggestion to the company tonight."); *id.* at 21 ("I will stay here as long as the company require."); *id.* at 26 ("I will speak with the company tonight."); *id.* at 28 ("Mc I will deposit 1k to ur account tmr morning. Company want to switch to lightweight surveillance with one person tmr until further notice."); *id.* at 14 ("So your company only wants one investigator for Monday?"); *id.* at 24 ("How did the company in China find you and Eric to work on this case??" "Eric works for them in China. I used to send cars to them from US so they know me"); *see also* Exhibit 3026 ("He wanted to know if you can get any of Jin Xu and his wife, Fang Liu's records

of latest purchases through their SSN and driver license."); Exhibit 3056 ("From the financial record of our company, Xu transferred the money to those 8 account, so we need check these accounts first.  [S]everal accounts are from united states.").

And, even if, *arguendo*, the Government did establish, by a preponderance of the evidence, that a conspiracy to act as an agent of a foreign government existed that included Mr. McMahon at some point in time, the Government cannot show, by a preponderance of the evidence, that the alleged conspiracy included Mr. McMahon at the time the recording was made.  *See Anderson v. United States*, 417 U.S. 211, 218 (1974) ("The hearsay-conspiracy exception applies only to declarations made while the conspiracy charged was . . . in progress, a limitation that this Court has 'scrupulously observed.'"); *see also United States v. Saneaux*, 365 F. Supp. 2d 493, 499 (S.D.N.Y. 2005) (noting that the Rule 801(d)(2)(E) requires that "the statements [were not] made after the cessation of the conspiracy or before its formation").  That is true, even under the Government's theory, whereby Mr. McMahon was informed of "everything" by Johnny Zhu, that occurred after the meeting at issue.  *See* Tr. at 1983:13-1984:19 (Government summation, arguing that Mr. McMahon was told everything at the Panera Bread, after the meeting at Embassy Suites).

In sum, the Government failed to show, by a preponderance of the evidence, that the recording, as translated in Exhibit 704A, was made at the time Mr. McMahon was a member of a purported conspiracy to act as an agent for the Chinese government.  And, of course, the same is true with regard to the conspiracy, alleged in Count III, to engage in interstate stalking.  For the reasons set forth in Point I.B. above, that conspiracy unproved by any legal standard, as Mr. McMahon never engaged in and certainly did not agree to engage in "stalking" as that term is defined by the statute, to encompass harassment or intimidation, for the purpose of causing

91

significant emotional distress. Indeed, Mr. McMahon's actions remained covert[28], and a proposal for them to be otherwise was specifically rejected. *See* Exhibit 4019B at 66-68 (Gallowitz: "Maybe overt surveillance. In their face. Sit in front of the house. Pictures. Video. Scare them." McMahon: "Yeah possibly – we did that in little ferry. Not sure it worked"); Exhibit 805B at 32 (McMahon: "I think if we harass Xu. Park outside his home and let him know we are there. I did that before on another case." Zhu: "We can't harass Xu like that lol" McMahon: "Ok lol"). Finally, again, four (4) of the five (5) days on which Mr. McMahon engaged in the surveillance at issue occurred after the conversation at issue, and even under the Government's theory, discussed above, the conversation at issue occurred before Mr. McMahon was told about, and joined, the conspiracy. *See supra* at 91 (citing *Anderson*, 417 U.S. at 218; *Saneaux*, 365 F. Supp. 2d at 499. Thus, even notwithstanding Mr. McMahon's conviction on Count III, the recording of that conversation should not have been admitted under Rule 801(d)(2)(E), as the showing necessitated by the Rule was not made; indeed, the improper admission of that recording may well be the reason that Mr. McMahon was convicted on that count, given its centrality to the Government's theory of prosecution. *See United States v. Al-Moayad*, 545 F.3d 139, 173-74, 178 (2d Cir. 2008) (vacating defendant's conviction and finding clear error by district court in admitting hearsay statements pursuant to the co-conspirator exception under Rule 801(d)(2)(E)); *United States v. Vizcarra-Millan*, 15 F.4th 473, 513-14 (3d Cir. 2021) (same); *United States v. Jackson*, 636 F.3d 687, 694, 698 (5th Cir. 2011) (same); *United States v. Solorio-Soto*, 300 F. App'x 487, 490 (9th Cir. 2008)

---

[28] As discussed *supra*, although the Government argued, for the first time in its rebuttal, that Liu Yan saw Mr. McMahon surveilling her, *see* Tr. at 2143:15-2144:1, the evidence established at trial does not support this theory; Liu Yan testified that she had never seen Mr. McMahon before and that she did not know who was following her. *See* Tr. at 128:14-19, *id.* at 133:10-134:2. As well, the photographs that Mr. McMahon took of Liu Yan were not taken at the Livingston Mall but at her gym. *See* Exhibit 3034.

(same); *United States v. Conrad*, 507 F.3d 424, 431-32 (6th Cir. 2007) (same); *United States v. Bland*, 237 F. App'x 268, 269-70 (9th Cir. 2007) (same); *United States v. Magluta*, 418 F.3d 1166, 1180 (11th Cir. 2005) (same); *see also United States v. Persing*, 436 F. App'x 13, 19-21 (2d Cir. 2011) (remanding for determination whether there was a conspiracy between defendant and purported co-conspirator, as would exempt certain statements pursuant to Rule 801(d)(2)(E)).  A new trial should thus be granted in which Government Exhibit 704 is excluded from evidence.[29]

---

[29] It should be noted that the tape recording introduced into evidence (and translated as Government Exhibit 704A) is somewhat shrouded in mystery.  No testimony was provided as to who recorded the tape recording and under what circumstances.  Post-trial, Mr. McMahon inquired of the Government as to these facts, including whether the recording was (a) made by Johnny Zhu, one of the three participants in the call and, if so, (b) whether it was done at the request, under the direction, or otherwise with the involvement of federal authorities, a reasonable inquiry given not only that he was one of only three participants in this conversation, one of whom (Hongru Jin) testified and denied making it and the other of whom (Tu Lan) seems unlikely to have done so given her apparently higher rank in the Chinese government, but that Johnny Zhu was, as the evidence both at trial and other unadmitted evidence revealed, allowed to leave the United States on several occasions, though he was obviously a central figure in the events at issue.  *See* Tr. at 1112:16-1113:2 (testimony of Kevin Hecht) ("Q.  Special Agent Hecht, I heard during the video that you were going to be very cognizant of the timing of Zhu Feng's flight.  Is that correct? . . . A.  Yes.  Q.  To the best of your knowledge, did Mr. Johnny Zhu make his flight?  A.  Yes, he did."); *see also* ECF No. 146-1 at 26 n.12 ("It also bears noting that, in the course of the Government's investigation in this case, the Government interviewed at least one of the defendants in this matter, Zhu Feng (also known as 'Johnny Zhu'), as early as April 12, 2017, as well as on three additional dates prior to the arrests in this matter, on November 9, 2017, November 10, 2017 and June 20, 2018).  This, at least, leads to the reasonable inference that Johnny Zhu may have been a Government informant, a fact which would have enormous ramifications for this case, given the direction provided to Mr. McMahon, and the many statements elicited from Mr. McMahon, by Johnny Zhu, facts that could raise the possibility of entrapment or due process defenses.  *See, e.g.*, *United States v. Cabrera*, 13 F.4th 140, 210 (2d Cir. 2021) (holding that a government confidential informant's "efforts to persuade [the defendant] constituted inducement," recognizing that the record fully supported the District Court's finding that, "beyond a shadow of a doubt that there would have been no crime here except the government instigated it, planned it, and brought it to fruition").  The Government, in essence, refused to respond to Mr. McMahon's inquiry, other than to say that "[t]he government is aware of its discovery obligations, has complied with those obligations and has no further information to share at this time."  The Court should require more and Mr. McMahon, by this motion, formally requests that it do so, by way of proper inquiry, even if *in camera* and, though Mr. McMahon's counsel believes that it would be unnecessary and inappropriate, if the Court wishes, *ex parte.*

**F.    Mr. McMahon Is Entitled to a New Trial Because the Government Made False Representations Regarding Mr. McMahon's Alleged Wrongful Access to Government Databases and Failing to Report Certain Income on His Tax.**

The Government, during its motions *in limine*, requested that the Court admit evidence that Mr. McMahon: (1) "solicited and obtained information about the Victims from law enforcement agents and the New Jersey Motor Vehicle Commission ('NJMVC') database in violation of relevant privacy laws," (2) improperly obtained the victims' U.S. travel information from Greg Finning; and (3) "failed to report monies received for his private investigator work done at the behest of his co-conspirators as income earned on his tax returns he filed for 2016 and 2017." *See* ECF No. 196, Government's Memorandum of Law in Support of the Government's Motions *In Limine* to Admit Certain Evidence and Preclude Certain Evidence and Arguments at Trial ("Gov't Mot. *In Limine*") at 30-31, 33. The Court granted these motions, based upon on the Government's representations as to what would be proven at trial. Now, however, the Court and the parties know that the Government did not fulfill the promises that it made to the Court in its efforts to prevail on its *in limine* motions. Those motions, then, should not have been granted but because they were and certain evidence with regard to the legality of how Mr. McMahon accessed Government databases and whether Mr. McMahon reported income from this matter on his tax returns was admitted as a result, and then argued on summation, the conviction thus obtained as a result should be set aside, and new trial ordered pursuant to Federal Rule of Criminal Procedure 33. *See United States v. Figueroa*, No. 08 CR 749 (ARR), 2010 WL 11463852, at *2 (E.D.N.Y. Mar. 2, 2010) (granting motion for a new trial based on Government's pre- and post-trial statements wholly inconsistent with arguments made during trial, which resulted in the defendant's conviction, recognizing that "it would constitute a manifest injustice to let stand a guilty verdict tainted by" an inaccurate argument); *but see United States v. Eldridge*, 860 F. App'x 773, 779 (2d Cir. 2021) (finding no prejudicial error where the Government said it would present certain evidence in its

94

opening but did not revisit the subject after it failed to adduce the requisite foundation for the testimony). *See also United States v. Forlorma*, 94 F.3d 91, 95-96 (2d Cir. 1996) (finding that the defendant was substantially prejudiced and deprived of a fair trial where the prosecutor made misleading arguments during his opening statement, summation, and rebuttal summation that were unsupported by the evidence in the case).[30]

> **1.    The Evidence at Trial Did Not Establish that Mr. McMahon Improperly Accessed NJ MVC Records In Connection with this Matter.**

First, the Government failed to show that Mr. McMahon violated the New Jersey Motor Vehicle Commission ("NJ MVC") rules and regulations, as it alleged in its *in limine* motions, but nonetheless argued during summation that Mr. McMahon did indeed violate the NJ MVC rules and regulations.  That is, in its *in limine* motions, the Government represented that:

> At trial, the government anticipates introducing evidence that on April 6, 2017 McMahon and Zhu Feng were texting, and McMahon told Zhu Feng that he was following John Doe-1 after John Doe-1 drives to pick up his father, John Doe-2, from his sister's home. McMahon followed John Doe-1 and obtained a photograph of the license plate on John Doe-1's car.  Zhu Feng then texted McMahon to "plz run info check for plate and the house asap.  We don't need to monitor their activity until we have some info for those."  NJMVC records show that on April 6, 2017, McMahon searched the NJMVC database for John Doe-1's license plate.   McMahon then sent a photograph to Zhu Feng depicting the owner and associated address for the vehicle and relayed how the car was financed.  Evidence at trial will also show that defendant McMahon had previously written in an application to obtain access to the NJMVC database that his reason for doing so was "to assist Law Firms regarding investigations."   Moreover, as McMahon's agreement with the NJMVC makes clear, his conduct must abide by applicable federal and New Jersey state privacy laws, including Title 18, United States

---

[30] This issue is discussed, in briefer form, in connection with Mr. McMahon's motions for a judgment of acquittal under Federal Rule of Criminal Procedure 29, above, upon which they bear. *See supra* at 35-36.  Should those motions be denied, the Government's failure to make good on its promises is the basis for a new trial, as set forth herein, and is accordingly discussed at somewhat greater length here.

Code, Section 2721, which prohibits the release and use of certain personal information from State motor vehicle records as McMahon did.

Gov't Mot. *In Limine* at 32-33.  The Government elaborated during the pretrial conference: "[w]ith respect to the New Jersey motor vehicle database, the Government [] intend[s] to introduce evidence that defendant, McMahon, both violated the user agreement which he personally signed which binds the uses of the information received from those databases, as well as state and federal law."  Pretrial Conference, Tr. at 57:5-10.  And it represented that "[o]ne of the witnesses that the Government intends to call is an individual who actually works for the New Jersey motor vehicle database that controls the records essentially that are at issue" and that she would "testify as to the user agreements, as to the laws that are specifically referenced in the user agreements," and "as to the appropriate uses of the information obtained including the legality of such use."  *Id.* at 58:11-19.

At trial, the Government not only failed to establish evidence to meet its representation to the Court that Mr. McMahon violated the NJ MVC rules and regulations, but the evidence directly contradicted it.  Thus, at trial, Jessica O'Connor, a Regulatory Officer from the NJ MVC, testified that private investigators are permitted to use the NJ CAIR database.  *See* Tr. at 1537:10-21 ("Q. And you mentioned on your direct examination that there's a number of different entities that apply to be a part of the [CAIR] program; correct?  A. Yes.  Q. And among those entities are, to your knowledge, private investigators?  A. Yes.  Q. Okay.  And once a private investigator is allowed to participate in the program, the [CAIR] program, that is, they can make the sorts of queries that you have been describing; right?  A. Correct.").  Ms. O'Connor also testified that when a user runs a license plate through the NJ CAIR database, a document is automatically generated and conveyed to the NJ MVC.  *See* 408H; *see also* Tr. at 1538:9-23 ("Q. So [Exhibit 408H] is an indication of all of the license plates that McMahon Investigative ran from the period from . . .

96

April 2016 through September 2019; is that correct?  A.  Yes.  . . . [Q.]  So if there is any inquiry of the database, this document is automatically generated; right?  A.  Correct.  Q.  Okay.  And, so, when an investigator runs a license plate, that is information that is automatically conveyed to the New Jersey Motor Vehicle Commission?  A.  Yes.").

Significantly, as well, Ms. O'Connor testified that the NJ MVC can conduct an audit regarding a participant's use of the NJ CAIR database.  Tr. at 1539:6-17 (Q. "It's the case, isn't it, once one of these entries appears that MVC can do an audit or otherwise make inquiry of the [CAIR] participant as to what the reason for the inquiry was; correct? . . . THE WITNESS:  Yes.");  Tr. at 1551:25-1552:1 ("Q.  Can MVC, however, audit any inquiry that it wishes to?  A.  Yes.").  And, in fact, Mr. McMahon was audited with respect to his use of the NJ CAIR database.  *See* Exhibit 408I; *see also* Tr. at 1544:9-16 ("Q.  In the middle of the page on 408I, it references an audit that was conducted of a record search by McMahon Investigative, correct?  A.  Yes.  Q.  If you flip through the document, my question is, does this document reflect an inquiry by the MVC of Mr. McMahon with regard to a particular inquiry that he had made?  A.  Yes.").  Specifically, Mr. McMahon was audited and, in connection with that audit, informed the NJ MVC that he was using the NJ CAIR database in order "to investigate whether or not the defendant did in fact own said vehicle."  *See* Exhibit 408I; *see also* Tr. 1544:13-1545:4 ("Q. If you flip through the document, my question is, does this document reflect an inquiry by the MVC of Mr. McMahon with regard to a particular inquiry that he had made?  A.  Yes.  Q.  The top entry on the first page of the document is a statement from Mr. McMahon that says:  I was assigned to investigate whether or not the defendant did in fact own said vehicle.  Do you see that?  A. Yes.  Q.  The defendant lost a civil suit at trial and claimed to not own but lease said vehicle.  Correct?  A.  Yes.  Q.  One of the things you testified earlier was that one of the things that one learns in doing the kind of search that you've been describing today, is whether a vehicle was leased or owned.  Correct?  A.  Yes.").

That Mr. McMahon was permitted to continue using the NJ CAIR database after the audit was conducted, *see* Exhibit 408H, undermines even the notion that running a single license plate for the purpose of determining whether Xu Jin's car was owned or leased his vehicle – completely consistent with believing that he was working on an embezzlement case on behalf of a private Chinese company – was improper at all.

As discussed, pretrial, the Government promised to show how Mr. McMahon's conduct was unlawful, and violative of the NJ MVC regulations. *See* Gov't Mot. *In Limine* at 32-33; Pretrial Conference, Tr. at 57:5-11. But it completely failed to do so in the testimony it offered, though it continued to argue to the jury as if it had. Thus, for example, although the Government's witness, Ms. O'Connor, testified in no uncertain terms that private investigators could join the NJ CAIR program and accordingly access the NJ MVC data base, *see* Tr. at 1537:10-21 ("Q. And you mentioned on your direct examination that there's a number of different entities that apply to be a part of the [NJ CAIR] program; correct? A. Yes. Q. And among those entities are, to your knowledge, private investigators? A. Yes. Q. Okay. And once a private investigator is allowed to participate in the program, the [NJ CAIR] program, that is, they can make the sorts of queries that you have been describing; right? A. Correct."), the Government argued that it was inappropriate for Mr. McMahon to use the information he gained for surveillance purposes – though this, of course, is what private investigators do. Even more illogically, and again although the NJ MVC's representative made clear that private investigators could use the data base, there was no testimony that explained how, given that private investigators always work and obtain information for someone else, it could be a violation of the applicable regulations when Mr. McMahon shared that information. Nonetheless, the Government's summation argued that which the Government *promised* to prove, not what it *actually* proved: "To pause on that, that's information that McMahon obtained and then passed along to someone who was working for the

Chinese government.  That's information that McMahon had access to because he could access the database as a private investigator.  . . . [The NJ CAIR Agreement] says the information shall be – that the participant, meaning McMahon, must hold the information in confidence.  And it says that he is strictly prohibited from using Commission records to conduct surveillance or to investigate or locate an individual." *See* Tr. 1977:3-20.  So the Government, without the support it had pledged, argued that Mr. McMahon violated NJ MVC rules and regulations.  As discussed in Point I above, this evidence does not support a contention that Mr. McMahon knew he was working for the Chinese government, or that he engaged in interstate stalking or a conspiracy to do so.  But the argument is also difficult to square with the notion that private investigators are approved users of NJ CAIR, though they in fact conduct surveillance (as anyone knows) and are, by definition, working on behalf of other parties with whom they share what they learn.

Likewise, and perhaps even more clearly, the Government failed to show, as it promised to do it in its pretrial motions, that Mr. McMahon violated the NJ MVC regulations because, as it argued in summation, "he wasn't allowed to access that database for just any reason; he was bound by an agreement which specifically limited how he could use the information he obtained.  When McMahon shared the information with Johnny Zhu, he violated that agreement.  The purpose for which he shared the information, conducting surveillance and locating an individual *for reasons not relating to motor vehicle activity* is exactly what he is not allowed to do."  Tr. at 1977:7-14 (emphasis added).  But, as the evidence actually adduced at trial showed, obtaining information to ascertain whether a car was owned or lease does relate to motor vehicle activity, and is permissible.  *See* Tr. at 1544:25-1545:4 ("Q.  One of the things you testified earlier was that one of the things that one learns in doing the kind of search that you've been describing today, is whether a vehicle was leased or owned.  Correct?  A.  Yes.").  Nor did the Government introduce any evidence,

expert or otherwise, to explain the term "motor vehicle activity" in a way that shows that Mr.

McMahon was doing anything wrong. *See* Exhibit 408A.

In sum, the Government persuaded the Court to allow it to introduce evidence that Mr.

McMahon violated NJ MVC rules and regulations on what turned out to be false pretenses, but

then argued it had proven that which it had not. The result was a serious injustice and one which,

among other reasons, led to Mr. McMahon's wrongful conviction. Accordingly, the Court should

grant Mr. McMahon's motion for a new trial pursuant to Rule 33 on this basis as well.

### 2.    The Evidence at Trial Did Not Establish that Mr. McMahon Improperly Obtained Department of Homeland Security Records.

The Government also failed to show that Mr. McMahon violated any federal law in

obtaining records from the Department of Homeland Security records through Gregory Finning,

as it alleged in its *in limine* motions, but nonetheless argued during summation that Mr. McMahon

did indeed violated federal law in obtaining the records. That is, in its *in limine* motions, the

Government represented that:

> [T]he government anticipates introducing evidence that in late October 2016, defendant McMahon provided the social security numbers, dates of birth and driver's license numbers of John Doe-1 and Jane Doe-1 to then-Drug Enforcement Administration Agent Gregory Finning in an effort to obtain information about the Victims from Homeland Security Investigation databases pertaining to their travel in and out of the United States. At trial, evidence will also show that McMahon did in fact obtain these records and passed them to co-conspirators working for the PRC government. Indeed, by soliciting and obtaining such information McMahon conspired to violate several federal laws prohibiting the disclosure of federal records without authorization.

Gov't Mot. *In Limine* at 33. Again, the Government further elaborated during the pretrial

conference, in seeking the admission of this evidence, that, "with respect to the law enforcement

databases or that of the DEA agent, the Government expects that the testimony will be that

defendant McMahon, solicited his friend, the DEA agent to commit a federal crime. In that he

sought that he would access the law enforcement database and then share the information, which

is contrary to federal law."  Pretrial Conference, Tr. at 56:23-57:4.  The Court initially reserved its

decision on the matter, and, before it ruled, the Court specifically asked the Government whether

it intended to call Mr. Finning; the Government, unequivocally, answered that it did.  *See* Tr. at

498-99 ("THE COURT:  Have a seat everyone.  As far as I know there's really only one issue I

need to address, I'll take care of that tomorrow morning and it has to do with the evidence relating

to the alleged illegality and breach of the access agreement regarding Mr. McMahon's searches of

the NJDMV database, then his request to the DEA agent to conduct a search of the DHS database.

I have one question for the government in that regard.  As I understand it, if the government is

allowed to prove up those facts with respect to the New Jersey DMV access agreement that would

require calling one witness to testify about that, correct?  MR. HEEREN:  Yes, your Honor.  THE

COURT:  And with respect to the agent I gather you['re] planning to call the DEA agent in any

event or is it only to testify about that? . . . I think I saw his name on the witness list.  He's identified

I guess as an agent, perhaps he isn't one anymore.  Mr. Finning, F-I-N-N-I-N-G. . . . MR.

HEEREN:  With regard to the DEA information, at this time we are still anticipating calling DEA

agent Greg Finning. . .  THE COURT:  And that would be the person who would testify both as to

the fact of being asked to do the search and also the purported illegality of him accessing the DHS

database for that purpose.  MR. HEEREN:  Well, yes, it's just factually a little bit more

complicated in that there is a second person who was physically at the keyboard who we would

anticipate calling.  . . . But both, yes, currently anticipate that both witnesses would be able to

testify that it's their understanding based on their training and experience that they are not

supposed to do that and that's a violation of law.").  But leaving aside the detail of who would

present this evidence, the Government specifically alleged that Mr. McMahon violated 5 U.S.C. §

552a, which provides that "*[n]o agency shall disclose* any record which is contained in a system

of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains [subject to certain exceptions]", and 18 U.S.C. § 1905, which provides that "[w]hoever, being *an officer or employee of the United States* or of any department or agency thereof, . . . . publishes, divulges, discloses or makes known in any manner to any extent not authorized by law any information coming to him in the course of his employment or official duties or by reason of any examination or investigation . . . shall be fined under this title, or imprisoner not more than one year, or both."  (emphases added).

That is, a plain reading of these statutes reveal that they apply to the agency and federal employee, who are charged with safeguarding information derived from federal data bases, not to an outside civilian, such as Mr. McMahon.  This is consistent with the evidence admitted at trial. That is, Exhibit 429, an email transmitting travel information related to Xu Jin and Liu Fang, contained the following disclaimer:

> WARNING: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO).  It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552).  It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.  No portion of this report should be furnished to the media, either in written or verbal form.

Thus, it is clear that the proper dissemination of information received from the Department of Homeland Security is the responsibility of the Department of Homeland Security employee.

Notwithstanding, no connection was even established that Mr. McMahon asked Mr. Finning to obtain travel information related to Xu Jin and Liu Fang, or that it was Mr. Finning who asked Special Agent Habeeb to run the inquiry.  That is, Special Agent Neviene Habeeb testified that although she ran inquiries for Xu Jin and Liu Fang through the Department of Homeland

Security Database, she did not "remember specifically who asked [her] to run the query."  Tr. at 1460:19-20; *see also* Tr. at 1471:4-10 ("Q.  With regard to – you said that the request that's at issue here, you don't remember receiving that request from Mr. Finning, right?  A.  Correct.  Q. In fact, you said you don't remember – receiving any particular request from Mr. Finning, right? A.  Correct.").  When the Government tried to use Special Agent Habeeb to connect the searches to McMahon, the Court recognized the impropriety of such line of questioning.  *See* Tr. at 1462:2-1464:3 ("THE COURT:  I'm assuming these are texts between the Defendant McMahon and Greg Finning.  MR. HEEREN:  That's right, your Honor.  What I want to show is that you will see in the text messages the information requested and I want her to compare that information to her records that – THE COURT:  You can do that during argument.  She's not an appropriate person for that. . . .  This is really the subject of argument, but I'll let you show just the one text that had that information.  Because right now what you're showing appears to be the request from Mr. McMahon to Mr. Finning to run the search[.]").  And, as noted, the Government, though it had specifically told the Court it would do so, and included him on its witness list for just that purpose, ultimately did not call Mr. Finning to testify regarding the searches; thus, no evidence was provided that Mr. McMahon knew that Mr. Finning would be violating federal law by running the searches or even if it was, in fact, Mr. Finning, who requested that Special Agent Habeeb run searches related to Xu Jin and Fang Liu at all.  Indeed, the Court itself recognized that the Government's failure to call Finning meant that the Government had not shown the lack of connection between the evidence at issue and Mr. McMahon, stating:

> I guess the last thing I'll say about it is it seems that Finning's testimony, and even the broader issue of whether or not Mr. McMahon's request to Agent Finning, and it's not entirely clear to me that that's been firmly established.  There was only the one witness who said that she received a request to do a search.  And obviously, the Government will argue that that had to be from Mr. McMahon asking Agent Finning.

> But I don't think even that relationship between Mr. McMahon and Agent Finning has been established.  But, obviously, there's a logical inference to be made because of the information that was produced and was requested, the search that was requested.  But putting that evidentiary tenuousness aside, it seems to me the point even that the search was somehow improper is really a tangential one.

Tr. at 1720:8-23.  But even beyond this lack of connection, and even assuming that it could be provided through the inferences that the Court described, the Government completely failed to show that Mr. McMahon had done anything wrong, let alone knew he was doing anything wrong in receiving Xu Jin and Fang Liu's travel information.  As just one example, the Government did not show whether Finning obtaining that information was proper because it was related to an ongoing, or prospective, investigation related to money laundering in China, a completely legal purpose of searching the travel information.  *See* Tr. at 1470:18-1471:3 (testimony of Naviene Habeeb) (Q.  "On direct examination, Mr. Heeren asked you whether it was appropriate to use the information that's requested of on for an ongoing criminal investigation.  Do you remember that?  A.  I do.  Q.  And you said, yes.  And my question is only:  When you say 'ongoing' it can also be at the outset of an investigation; that is to say, it would be appropriate for you to get a request for information that might lead to opening an investigation as well, correct?  A.  Correct.");  Tr. at 1471:19-24 (testimony of Naviene Habeeb) ("Q.  Okay.  And do you have any knowledge as to whether he was doing any investigations into foreign money laundering?  A.  I have no idea.  Q.  So you don't know whether he was doing investigations into money laundering in China?  A.  No.").  It was the Government's burden to show that Finning's obtaining this information was wrong and, more specifically, that Mr. McMahon's receipt of it was unlawful and, since this evidence purportedly went to intent, *see* Pretrial Conference, Tr. at 57:17-22 ("First, I think as all of the parties have identified here, the primary issue is certainly with respect to defendant,

McMahon, was his knowledge and intent at the time these acts were committed.  And certainly, the fact that he violated state and federal law in furtherance of the conspiracy goes to a guilty state of mind.”); *see also* Gov't Mot. *In Limine* at 34, that Mr. McMahon knew that it was unlawful.  As shown above, it failed to bear that burden.

Nonetheless, and despite the lack of evidence presented to establish that Mr. McMahon improperly obtained travel information about Xu Jin and Liu Fang, the Government persisted, arguing on summation that:

> From the evidence you have heard, you can infer that McMahon improperly obtained the information about Xu Jin and Liu Fang from his buddy, Greg Finning, who at the time was a special agent with the Drug Enforcement Administration or DEA.  October 20th, 2016, McMahon spoke with Greg for over 40 minutes.  You can see that in this phone record.  He also sent a text to Greg with sensitive victim information, including social security number, date of birth, New Jersey license plate.  That's GX 316 4006-B.  And then he followed up with Greg to ask if there was any update.  He said:  My client flew in from China and I'm meeting them this eve.  DHS records make clear that Homeland Security data such as the information that was provided cannot be shared.  This is a warning on the documents in which the information was provided.  It says: The information is to be controlled, stored, handled, transmitted, distributed and disposed of in accordance with DHS policy relating to FOUO – meaning "for official use only," as you can see on the warning itself – information and is not to be released to the public or other personnel who do not have a valid need to know without prior approval of an authorized DHS official.  Let's go back and see how we got that information.  You heard testimony from HSI Special Agent Neviene Habeeb, who is the individual who pulled the information that McMahon eventually passed along.  She told you that she remembered it had something to do with Greg Finning.  That was McMahon's friend.  And so to be clear, McMahon took U.S. government information which he obtained improperly and he passed it along to an official with the Chinese government.  That's not the only evidence reflecting that McMahon knew his actions relating to Xu Jin were illegal.

Tr. at 1977:21-1979:1.  Of course, as discussed above, this statement was full of speculation – as to what was said in a 40 minute conversation between Mr. McMahon and Agent Finning (who

were, as the Government described them, "buddies" and so could have been talking about almost anything), or as to Finning's involvement (and therefore McMahon's) in obtaining this information, based on testimony that the request had "something to do with Greg Finning." But the penultimate sentence of this quote, in which the Government alleges that Mr. McMahon obtained the information at issue "improperly," was completely unsupported by the proofs at trial, thus undermining the final sentence of this section of the summation, which concludes that this was evidence "reflecting that McMahon knew his actions relating to Xu Jin were illegal." Tr. at 1978:25-1979:1.

But the Government did not stop there; on rebuttal, the Government contended that:

> Immediately after that meeting, McMahon hits up his buddy in the DEA, Greg Finning for international travel information. That's Government Exhibit 4006-B, pages 830 to 841. And then a few weeks later, McMahon starts communicating directly with Eric Yan, who you all know is Hu Ji, the Chinese police officer. Eventually passing him Department of Homeland Security information about a person's travel outside of the United States. They met in person to talk about getting that information because they knew that that was part of an illegal scheme.

Tr. at 2132:21-2133:6. The Government thus proposed a simple syllogism: Mr. McMahon got information from Mr. Finning that he was not supposed to have, and therefore was a part of a conspiracy to act as an agent of China and to engage in interstate stalking, and that because it was illegal for him to do so, "they knew that was part of an illegal scheme." Tr. at 2133:5-6. But this syllogism not only depends upon showing the link between Mr. McMahon and the receipt of this evidence; more importantly, it depends upon showing that he knew that he was not supposed to have that evidence, and even that he did something wrong in obtaining it. The Government promised to put on proof of that, as a result of which the Court, relying upon the Government's proffer, allowed it to introduce the evidence of these events. But it did not in fact provide the promised proofs and as a result, sought and obtained Mr. McMahon's conviction on unsupported

grounds, supported by what it said it would prove but did not.  Mr. McMahon's motion for  new

trial should be granted.

### 3.    Tax Payments

The Government also represented in its *in limine* motions that it would introduce evidence

"of McMahon Investigative Group bank records and tax returns filed by McMahon [to] show that

McMahon did not report the over $13,000 received for his work surveilling the Victims as income

in 2016 and 2017."  Gov't Mot. *In Limine* at 35.  Based upon this promise, the Court allowed in

the financial records that the Government proffered.  But again, the Government broke its promises

to the Court, completely failing ever to establish that Mr. McMahon did not report the income

from this matter on his taxes.  To purportedly support its argument, the Government relied on a

summary chart of Mr. McMahon's deposits, *see* Exhibit 452, as well Mr. McMahon's tax returns

for 2016 and 2017, *see* Exhibits 432A and 433A.  However, Exhibit 452 was prepared by Special

Agent Marcus Rivera, who is not a tax expert, Tr. at 1600:22-23, and did not take into account Mr.

McMahon's business expenses for 2016 and 2017, let alone those for this case.[31]  Nor even did the

Government show that the income from this case – as opposed to any other income, if there was

any – remained unreported, though that, of course, was critical since the Government's argument

was that this specific income was unreported in order to conceal it from the authorities.

Specifically, Exhibit 452 is a summary chart purporting to show Mr. McMahon's deposits

in 2016 and 2017 as compared his 2016 and 2017 Tax Schedule C – Gross Profits; however, it

does not deduct Mr. McMahon's business expenses, which are factored into Mr. McMahon's total

---

[31]  Mr. McMahon's expenses in this matter total approximately $8,000, which the Government did
not account for.  *See* Exhibit 3101 (Absolute Investigations LLC invoice in the amount of
$755.02); Exhibit 3095 (Stuyvesant Investigative Group invoice in the amount of $1,215.25);
Exhibit 3056 (cost of United States Bank searches in the amount of $1,030.00); Exhibit 3054
(International Bank Searches in the amount of $5,000.00).

for Tax Schedule C – Gross Profit, because Special Agent Marcus Rivera was not "asked to compile any information whatsoever with regard to Mr. McMahon's business expenses," and so he did not prepare "a spreadsheet that shows what the business expenses that McMahon Investigative" were, Tr. at 1600:16-18, let alone any other deductions that could have been lawfully taken into account. And, Exhibits 432A and 433A, Mr. McMahon's tax returns for 2016 and 2017, respectively, do not contain an itemized list of what income Mr. McMahon declared on his taxes for those years; rather, Mr. McMahon's tax returns contain only total amounts. Thus, absolutely no evidence was set forth at trial that Mr. McMahon failed to report his income on this matter, this although the Government had promised in its in limine motion practice that "McMahon did not report the over $13,000 received for his work surveilling the Victims as income in 2016 and 2017." Gov't Mot. *In Limine* at 35.

Yet again, the Government's lack of evidence did not prevent it from asking the jury to find that Mr. McMahon had concealed his income. First, on summation, the Government argued:

> [I]t boils down to is this: If you look at McMahon's business account, the deposits into that account in 2016 were more than what he reported on his 2016 tax returns. That's before you even consider the fact that, as we just saw, most of the money he earned on the Xu Jin case never even made its way into the business account. Again, this wasn't oversight. And it wasn't some small amount of money to McMahon. In fact, the money McMahon earned in this case was approximately 20 percent of his total reported earnings in his business account for 2016 and 2017 combined. McMahon didn't report his earnings from the Xu Jin case because he didn't want the U.S. government to know that he had been working for the Chinese government.

Tr. at 1982:13-25. Then, again, on rebuttal:

> And the tax returns that we pointed to just cement this point. He received a large amount of money, and I'm not going to quibble about it; they claim it's $11,000 not $19,000. Even if we're talking about net instead of gross profit, $11,000 for what they claim is five days of work is quite a bit of money still. He received a large amount of money that he ultimately did not report. And as I expect you will

> hear, you are going to be instructed that willful intent or guilty knowledge may be inferred from the secretive or regular manner in which a transaction is carried out. The way that money moved into McMahon's pockets is obviously irregular.

Tr. at 2142:3-14. This argument–that Mr. McMahon failed to report his income from this case– was not only unproven, it was the height of speculation, unsupported by expert or even common sense testimony. But the Government very effectively argued it as fact, leaving the jury with the impression that Mr. McMahon (contrary to other evidence regarding his record-keeping, his use of non-encrypted phones, and his reports to law enforcement) was seeking to hide his income from this matter, so he must have known he was doing something wrong–going to a critical fact in the case. Moreover, in thus describing Mr. McMahon as a tax cheat, it also smeared him, amounting to impermissible propensity evidence, which the Court only allowed because the Government promised to show that which it ended up not showing. This also tainted the jury's verdict, and the Court should grant Mr. McMahon a new trial pursuant to Rule 33 on this basis as well.

## **CONCLUSION**

For the foregoing reasons, Mr. McMahon respectfully requests that the Court grant the relief requested herein.

Respectfully submitted,
**GIBBONS P.C.**
*Attorneys for Defendant*
*Michael McMahon*


By:    /s/ Lawrence S. Lustberg
       Lawrence S. Lustberg, Esq.

Date: August 10, 2023