**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:21-cr-00265 (PKC) (S-1) |
|         Plaintiff, | *Filed electronically* |
|     v. | |
| MICHAEL MCMAHON,<br>ZHENG CONGYING and<br>ZHU YONG,<br>      also known as "Jason Zhu," | |
|         Defendants. | |

---

**REPLY BRIEF IN FURTHER SUPPORT OF DEFENDANT
MICHAEL MCMAHON'S POST-TRIAL MOTIONS**

---

**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

*On the brief:*
Lawrence S. Lustberg, Esq.
Genna A. Conti, Esq.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ................................................................................................................. 2

    I.     THE GOVERNMENT PRESENTED INSUFFICIENT EVIDENCE TO
         CONVICT MICHAEL MCMAHON. ........................................................... 2

        A.    No Evidence Established that Mr. McMahon Knew He Worked for
            the PRC Government (Count II). ......................................................... 8

            1.    The Government's Purported "Direct" Evidence ................... 9

            2.    The Government's Circumstantial Evidence ........................ 12

                 a.    Impermissible Guesswork ............................................ 13

                 b.    Illogical Inferences ..................................................... 25

        B.    The Government Presented Insufficient Evidence to Convict Michael
            McMahon on Conspiracy to Commit Interstate Stalking (Count III)
            and Interstate Stalking (Count IV). ................................................... 32

    II.    THE VERDICTS RENDERED AGAINST MICHAEL MCMAHON WERE
         INCONSISTENT. ............................................................................... 43

    III.    THE GOVERNMENT'S PUBLICATION OF DOCUMENTARY
         EVIDENCE WAS IMPROPER. ............................................................ 46

    IV.    THE GOVERNMENT'S REBUTTAL WAS IMPROPER. ........................ 54

    V.    EXHIBIT 704A WAS NOT PROPERLY ADMITTED AT TRIAL,
         PURSUANT TO RULE 801(d)(2)(E). ................................................... 61

    VI.    THE GOVERNMENT FAILED TO FULFILL ITS PROMISES TO THE
         COURT AND INTRODUCED HIGHLY PREJUDICIAL AND
         INADMISSIBLE EVIDENCE AGAINST MR. MCMAHON. ................... 64

CONCLUSION ............................................................................................................ 70

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bank of Nova Scotia v. United States*,
    487 U.S. 250 (1988) ........................................................................................... 50

*Curley v. United States*,
    160 F.2d 229 (D.C. Cir. 1947) ........................................................................... 3

*Fanelli v. Centenary Coll.*,
    211 F.R.D. 268 (D.N.J. 2002) ........................................................................... 49

*Gordon v. United States*,
    344 U.S. 414 (1953) ........................................................................................... 53

*Kewazinga Corp. v. Microsoft Corp.*,
    No. 18-cv-4500, 2021 WL 4066597 (S.D.N.Y. Sept. 1, 2021) ............................ 4

*Lavender v. Kurn*,
    327 U.S. 645 (1946) ........................................................................................... 8

*Pointer v. Texas*,
    380 U.S. 400 (1965) ........................................................................................... 51

*Schlup v. Delo*,
    513 U.S. 298 (1995) ........................................................................................... 46

*Sealfon v. United States*,
    332 U.S. 575 (1948) ........................................................................................... 46

*Siewe v. Gonzales*,
    480 F.3d 160 (2d Cir. 2007) ............................................................................... 4

*Sunward Corp. v. Dun & Bradstreet, Inc.*,
    811 F.2d 511 (10th Cir. 1987) ........................................................................... 4

*Tellez v. OTG Interactive, LLC*,
    No. 15-8984, 2020 WL 704844 (S.D.N.Y. Feb. 12, 2020) ................................. 70

*United States v. Aiyer*,
    470 F. Supp. 3d 383 (S.D.N.Y. 2020) ............................................................... 62

*United States v. Alegria*,
    No. 90-cr-450, 1991 WL 238223 (S.D.N.Y. Nov. 6, 1991) ............................... 56

*United States v. Allums*,
   No. S6 15-CR-153, 2018 WL 2128372 (S.D.N.Y. May 9, 2018) ........................................ 50

*United States v. An Article of Device*,
   731 F.2d 1253 (7th Cir. 1984) ........................................................................................ 6

*United States v. Arboleda*,
   20 F.3d 58 (2d Cir. 1994) ............................................................................................... 21

*United States v. Arras*,
   373 F.3d 1071 (10th Cir. 2004) ...................................................................................... 10

*United States v. Baker*,
   923 F.3d 390 (5th Cir. 2019) .......................................................................................... 50

*United States v. Baker*,
   985 F.2d 1248 (4th Cir. 1993) .......................................................................................... 8

*United States v. Ballard*,
   727 F. App'x 6 (2d Cir. 2018) ......................................................................................... 60

*United States v. Beach*,
   80 F.4th 1245 (11th Cir. 2023) ....................................................................................... 12

*United States v. Burgos*,
   703 F.3d 1 (1st Cir. 2012) ................................................................................................. 8

*United States v. Calderon*,
   785 F.3d 847 (2d Cir. 2015) ........................................................................................... 12

*United States v. Charles*,
   313 F.3d 1278 (11th Cir. 2002) ...................................................................................... 41

*United States v. Coplan*,
   703 F.3d 46 (2d Cir. 2012) ....................................................................................... 57, 58

*United States v. Criden*,
   648 F.2d 814 (3d Cir. 1981) ........................................................................................... 49

*United States v. D'Amico*,
   734 F. Supp. 2d 321 (S.D.N.Y. 2010) ............................................................................ 46

*United States v. Denton*,
   944 F.3d 170 (4th Cir. 2019) .......................................................................................... 50

*United States v. Doyle*,
   130 F.3d 523 (2d Cir. 1997) ............................................................................................. 6

*United States v. Dukagjini,*
    326 F.3d 45 (2d Cir. 2003) ................................................................ 19

*United States v. Dunmire,*
    403 F.3d 722 (10th Cir. 2005) ............................................................ 6

*United States v. Eisenberg,*
    596 F.2d 522 (2d Cir. 1979) .............................................................. 63

*United States v. Eppolito,*
    543 F.3d 25 (2d Cir. 2008) ................................................................. 2

*United States v. Farhane,*
    634 F.3d 127 (2d Cir. 2011)............................................................... 63

*United States v. Friedman,*
    909 F.2d 705 (2d Cir. 1990) ............................................................. 60

*United States v. Gleason,*
    616 F.2d 2 (2d Cir. 1979) ................................................................. 55

*United States v. Gotti,*
    457 F. Supp. 2d 403 (S.D.N.Y. 2006) ...................................... 6, 13, 25

*United States v. Graziano,*
    616 F. Supp. 2d 350 (E.D.N.Y. 2008) ...................................... 8, 11, 17

*United States v. Jones,*
    291 F. Supp. 2d 78 (D. Conn. 2003) .................................................. 7

*United States v. Jones,*
    371 F.3d 363 (7th Cir. 2004) ........................................................... 42

*United States v. Jones,*
    393 F.3d 107 (2d Cir. 2004) ............................................................ 40

*United States v. Kennedy,*
    46 F. App'x 200 (4th Cir. 2002) ...................................................... 48

*United States v. Keys,*
    642 F. Supp. 3d 1294 (E.D. Okla. 2022) ............................................ 7

*United States v. Lee,*
    416 F. Supp. 3d 126 (D. Conn. 2019) ........................................... 6, 25

*United States v. Lui,*
    941 F.2d 844 (9th Cir. 1991) ........................................................... 69

*United States v. Martinez*,
    921 F.3d 452 (5th Cir. 2019) ............................................. 10

*United States v. Miller*,
    248 F. App'x 426 (3d Cir. 2007) ......................................... 53

*United States v. Mohel*,
    604 F.2d 748 (2d Cir. 1979) ............................................... 7

*United States v. Monteleone*,
    257 F.3d 210 (2d Cir. 2001) ............................................. 63

*United States v. Morgan*,
    385 F.3d 196 (2d Cir. 2004) ............................................. 12

*United States v. Moten*,
    582 F.2d 654 (2d Cir. 1978) ............................................. 65

*United States v. Navarrette-Aguilar*,
    813 F.3d 785 (9th Cir. 2015) ............................................ 25

*United States v. Ouedraogo*,
    531 F. App'x 731 (6th Cir. 2013) ....................................... 11

*United States v. Patel*,
    No. 31-cr-220, 2023 WL 2643815 (D. Conn. Mar. 27, 2023) ............ 64

*United States v. Pauling*,
    924 F.3d 649 (2d Cir. 2019) ...................................... 4, 13, 25

*United States v. Rigas*,
    No. S102CR1236, 2004 WL 2434965 (S.D.N.Y. Nov. 1, 2004) .......... 45

*United States v. Rojas Alvarez*,
    451 F.3d 320 (5th Cir. 2006) ............................................. 6

*United States v. Rufai*,
    732 F.3d 1175 (10th Cir. 2013) ......................................... 13

*United States v. Saneaux*,
    365 F. Supp. 2d 493 (S.D.N.Y. 2005) ................................... 64

*United States v. Santos*,
    541 F.3d 63 (2d Cir. 2008) .............................................. 41

*United States v. Smith*,
    223 F.3d 554 (7th Cir. 2000) ............................................ 34

*United States v. Sponaugle*,
    621 F. Supp. 3d 474 (D. Del. 2022) .................................................. 51

*United States v. Stewart-Carrasquillo*,
    997 F.3d 408 (1st Cir. 2021) ............................................................ 47

*United States v. Summers*,
    414 F.3d 1287 (10th Cir. 2005) ........................................................ 8

*United States v. Terrazas-Aguirre*,
    298 F. Supp. 3d 950 (W.D. Tex. 2018) ............................................ 7

*United States v. Torres*,
    604 F.3d 58 (2d Cir. 2010) ............................................................. 41

*United States v. Tragas*,
    727 F.3d 610 (6th Cir. 2013) .............................................. 47, 50, 51

*United States v. Wilson*,
    879 F.3d 795 (7th Cir. 2018) .......................................................... 10

*United States v. Yakobowicz*,
    427 F.3d 144 (2d Cir. 2005) ........................................................... 55

*United States v. Yannotti*,
    415 F. Supp. 2d 280 (S.D.N.Y. 2005) ............................................ 13

*United States v. Young*,
    745 F.2d 733 (2d Cir. 1984) ........................................................... 42

*United States v. Zane*,
    495 F.2d 683 (2d Cir. 1974) ........................................................... 45

*United States v. Zimmiti*,
    850 F.2d 869 (2d Cir. 1988) ................................................ 7, 8, 11

*In re Winship*,
    397 U.S. 358 (1970) ......................................................................... 6

**Statutes**

18 U.S.C. § 371 .................................................................................... 32

18 U.S.C. § 951 ............................................................................... 2, 44

18 U.S.C. § 951(a) .............................................................................. 32

18 U.S.C. § 2261A ........................................................................ 32, 43

18 U.S.C. § 2261A(1)(B) ........................................................................................... 35, 41

18 U.S.C. § 2721 ............................................................................................................. 66

**Other Authorities**

Andrew S. Pollis, *The Death of Inference*,
    55 B.C. L. Rev. 435 (2014) ....................................................................................... 3

Charles R. Nesson, *Reasonable Doubt and Permissive Inferences:*
    *The Value of Complexity*,
    92 Harv. L. Rev. 1187 (1979) ................................................................................... 3

3 F. Lee Bailey & Kenneth J. Fishman,
    Complete Manual of Criminal Forms (3d ed. 2023) ................................................ 5

1 Federal Evidence Courtroom Manual (2022) ............................................................. 4

3 Federal Evidence Practice Guide (2023) ............................................................... 9, 12

2 Federal Trial Handbook: Criminal (Dec. 2022) ....................................................... 55

1 McCormick on Evidence (8th ed.) ............................................................................ 53

T. Starkie, Evidence (1824) ......................................................................................... 46

**Rules**

Federal Rule of Criminal Procedure 6(d) ..................................................................... 50

Federal Rule of Criminal Procedure 29 .................................................................... 1, 70

Federal Rule of Criminal Procedure 33 ................................................................ *passim*

Federal Rule of Criminal Procedure 33(a) ............................................... 45, 55, 68, 70

Federal Rule of Evidence 403 ..................................................................................... 66

Federal Rule of Evidence 801(d)(2)(E) .................................................................. 48, 61

## PRELIMINARY STATEMENT

Defendant Michael McMahon, a private investigator who was repeatedly told—falsely—that he was working for a private Chinese company seeking to recover a private debt, never believed that he was working for the Chinese government or was involved in illegally stalking the subjects of his investigation when he surveilled them, acquired their records and otherwise did the kinds of things that private investigators do.  Nonetheless, and although acquitted of conspiring to act for the PRC government, he somehow stands convicted of having knowingly acted as an agent of China and of harassing and intimidating a family that never even saw him.

This brief asks, and seeks to answer, the question of how an innocent man could have been convicted.  The Government's submission on Mr. McMahon's post-trial motions provides a road map to how that happened: the jury accepted the Government's repeated invitations to draw inferences that were not inferences at all but instead impermissible guesses and speculation, especially when viewed in light of the record as a whole.  The jurors were asked to, and obviously did, draw inferences that were unreasonable and unsupported by logic.  The Government exploited every possible procedural advantage it could, from acting out email and text exchanges as if they were in-person interactions, to holding critical arguments for rebuttal so that the defense could not respond to them (though responses were certainly available), to introducing evidence based on promises in the form of offers of proof that were ultimately broken (leading to the introduction of inadmissible evidence, including critical evidence for which the Government continues to hide the evidentiary foundation).  Each of these arguments, and others, are fleshed out below, as they were in Mr. McMahon's Moving Brief.

The result of all of this (and in light of it, not very surprising) is an unjust conviction—and a nonsensical one, given Mr. McMahon's acquittal on Count I of the Indictment.  It should be set aside and judgments of acquittal entered under Federal Rule of Criminal Procedure 29, based upon

the legal insufficiency of the evidence.  In the alternative, a new trial should be ordered under Rule 33, in the interest of justice, based not only on the same insufficiency of the evidence (an argument to which the Government does not respond) but also on the irregularities discussed above, which taken together or separately, denied Mr. McMahon a fair shot at the just result that he should have obtained here.  His post-trial motions should be granted.

## ARGUMENT

## I.   THE GOVERNMENT PRESENTED INSUFFICIENT EVIDENCE TO CONVICT MICHAEL MCMAHON.

In response to Mr. McMahon's argument that the Government presented insufficient evidence to convict him of knowingly acting as an agent of the PRC government, the Government argues that "[a]t trial, overwhelming evidence established that Michael McMahon acted as an agent of the PRC government without prior notification to the Attorney General, in violation of 18 U.S.C. § 951," and specifically, that "[a]mple direct and circumstantial evidence at trial established that McMahon knew he was working on behalf of the PRC government," ECF No. 286 ("Gov't Opp.") at 53, or that "a rational jury could alternatively have concluded that McMahon consciously avoided the truth that he worked for the PRC, and thereby acted knowingly," *id.* at 61.  In doing so, the Government repeatedly attacks Mr. McMahon for failing "to draw all reasonable inferences in favor of the jury's verdict," *id.* at 53, 61, 67, 74, and for challenging "the government's evidence piecemeal," *id.* at 53, or failing to "view[] the evidence in its totality," *id.* at 62.

This constant refrain, no matter how many times the Government repeats it, cannot and does not cure the legal insufficiency of its evidence.  Of course, the Court must draw all reasonable inferences in favor of the jury's verdict, as Mr. McMahon himself pointed out in his Moving Brief. *See* ECF No. 279.1 ("McMahon Moving Br.") at 4 (citing *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008)). At the heart of the issue now before the Court, and of the dispute between the

Government and Mr. McMahon, is whether the Government's evidence really is based on reasonable inferences that Mr. McMahon was knowingly acting as an agent of the PRC government or whether, as Mr. McMahon argues in his Moving Brief, *see* McMahon Moving Br. at 5-7, and again below, the Government's evidence was (rather than based on reasonable inference) instead based on impermissible speculation or guesswork.

This is an age-old problem in the law. *E.g.*, Andrew S. Pollis, *The Death of Inference*, 55 B.C. L. Rev. 435, 448-49 (2014) ("Even in circumstantial-evidence cases, the party with the burden of proof must carry it; the party must establish that the available inferences in its favor are more likely to be accurate than the available inferences that are not. And the jury's historic prerogative to select from among competing inferences has always required the choices to be 'rational' or 'reasonable'; they cannot be based on 'conjecture and speculation.' But that standard is easier to articulate than to apply. Although courts purport to precisely weigh the relative likelihoods of competing inferences, accurate or consistent methods of doing so typically do not exist. Thus, courts have been unable to clearly delineate the boundary between 'rational inference' and 'speculation.'" (footnotes omitted)); Charles R. Nesson, *Reasonable Doubt and Permissive Inferences: The Value of Complexity*, 92 Harv. L. Rev. 1187, 1193 n.15 (1979) ("Courts have found the difference between rational inference and speculation difficult to define."); *Curley v. United States*, 160 F.2d 229, 233 (D.C. Cir. 1947) ("If [a trial judge] concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter. In a given case, particularly one of circumstantial evidence, that determination may depend upon the difference between pure speculation and legitimate inference from proven facts. The task of the judge in such case is not easy, for the rule of reason is frequently difficult to apply, but we know of no way to avoid that difficulty.").

A reasonable inference, the cases make clear, is "not a suspicion or a guess"; rather, "[i]t is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019) (quoting *Siewe v. Gonzales*, 480 F.3d 160, 168 (2d Cir. 2007)).   That said, "[t]he line between permissible inference and impermissible speculation 'is drawn by the laws of logic' and not 'judicial idiosyncrasies.'"  *Id.* (citation omitted); *see also, e.g.*, *Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 543 & n.8 (10th Cir. 1987) (rejecting the plaintiff's inferences because they "consist[ed] of 'reasoning from sequence to consequence, that is, assuming a causal connection between two events merely because one follows the other,'" and describing the *post hoc ergo propter hoc* logical fallacy (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 116 (3d Cir. 1980))); *cf. Kewazinga Corp. v. Microsoft Corp.*, No. 18-cv-4500, 2021 WL 4066597, at *23 (S.D.N.Y. Sept. 1, 2021) (granting motion to exclude expert testimony because the expert relied on "logical fallacies in his opinions" to support his conclusions and did not substantiate his opinions with "evidence or methodology").

One way to think of this is by reference to the wet-umbrella example used by the Court in its jury instructions on circumstantial evidence, itself defined as evidence that requires appropriate inferences.  *See* 1 Federal Evidence Courtroom Manual, ch. 301, § 1 (2022) ("An inference is a basic ingredient of all circumstantial inference.").  That instruction, *see* Tr. at 2154:2-18, illustrates the difference between logical inferences and speculative guesses.  Suppose, in an attempt to prove the defendant's knowledge of the weather on a particular day, the Government presents evidence that a defendant came to his office with a wet umbrella.  A jury could reasonably infer from that wet-umbrella evidence that the defendant knew it to be raining that day.  *See* Tr. at 2154:2-18 ("The other type of evidence – circumstantial evidence – is proof of a chain of circumstances that

points to the existence or nonexistence of certain facts.   A simple example of circumstantial evidence is as follows:   And Mr. Lustberg did talk about this – supposed you came to court on a day when the weather was clear, sunny and dry, just like today.   However, after several hours in the courtroom where there are no windows, you observe a person come in wearing a wet raincoat and another person shaking a wet umbrella.   Without you ever looking outside, you would not have direct evidence that it rained, but you might infer from these circumstances that while you were sitting in court, it rained outdoors.   That is all . . . there is to circumstantial evidence.   On the basis of reason, experience, and common sense, you infer the existence or nonexistence of a fact from one or more established facts.").   The example helps to define a reasonable inference.   But now suppose the Government presents evidence that the defendant left his house with an umbrella, but there is no evidence that the umbrella ended up being wet or dry.   In that scenario, a jury could reasonably infer only that the defendant knew that it might rain that day.   Without more evidence, the jury could not logically deduce that it *was* raining that day (let alone that the defendant *knew* that it rained); that conclusion would be nothing more than a guess.   *See also, e.g.*, 3 F. Lee Bailey & Kenneth J. Fishman, Complete Manual of Criminal Forms, ch. 81, § 81:22 (3d ed. 2023) ("A person testifies that she walked through a field of tall grass and the grass was all laying down through that field in a path, you can infer that something went through that field.   The person didn't see it.   But as you are a reasonable person you can infer something went through there and knocked the grass down, trampled it down.   But you cannot guess.   You cannot speculate.   You cannot pile inference on inference.   So, on that evidence that the grass is laying down, you can infer something went through the field.   But on that evidence you don't know what.   A jogger.   A kid on a bicycle. A big dog.   You don't know what went through the field.   You would need more evidence.").

It is this kind of distinction that the Government, in its submission, fails to appreciate, even though courts have consistently done so in determining whether to allow criminal convictions, with all of their extraordinary consequences, to stand in the face of the "sacrosanct" requirement of proof beyond a reasonable doubt. *United States v. Doyle*, 130 F.3d 523, 535 (2d Cir. 1997) ("[R]equiring the Government to carry the heavy burden of proving a defendant guilty beyond a reasonable doubt is sacrosanct law and derives from the Due Process Clause." (citing *In re Winship*, 397 U.S. 358, 361-64 (1970))); *see also, e.g.*, *United States v. An Article of Device*, 731 F.2d 1253, 1262 (7th Cir. 1984) ("[T]he process of inferential or circumstantial reasoning can, in some cases, reach far beyond the reasonable scope of the evidence, arriving at conclusions based more upon speculation or conjecture than upon the evidence at trial." (citation omitted)); *United States v. Dunmire*, 403 F.3d 722, 725-26 (10th Cir. 2005) (analyzing and rejecting the government's proffered inferences, which asked the court to infer that the defendant exchanged at least 2.03 grams of crack cocaine based on the testimony of a witness who "did not see [the defendant] actually hand off anything"); *United States v. Rojas Alvarez*, 451 F.3d 320, 336-37 (5th Cir. 2006) (analyzing and rejecting the government's "cobble[d] together" inferences, which asked the court to infer a defendant's knowledge of a drug cache in a trailer based on an empty envelope marked '$2,000' found alongside unopened mail in the trailer); *United States v. Gotti*, 457 F. Supp. 2d 403, 409 (S.D.N.Y. 2006) (concluding that a jury could not reasonably infer that a defendant received and invested illicit funds based on testimony that the defendant's family members received those funds); *United States v. Lee*, 416 F. Supp. 3d 126, 134-35 (D. Conn. 2019) (ruling that a jury impermissibly speculated when the government asked jurors to infer a defendant's knowledge of a plan to kidnap based on evidence that other co-defendants brought zip ties with them; "there was no evidence that [the defendant] knew that his co-defendants had zip ties with

6

them"); *United States v. Terrazas-Aguirre*, 298 F. Supp. 3d 950, 958 (W.D. Tex. 2018) (concluding that a jury could not reasonably infer from a positive dog sniff that a substance was marijuana when trial testimony revealed that the dog detected "numerous types of contraband . . . in the same way"); *United States v. Keys*, 642 F. Supp. 3d 1294, 1303 (E.D. Okla. 2022) (concluding that a jury could not reasonably infer a defendant's non-Indian status from evidence that she was not a member of, and did not grow up on, a particular pueblo).

Nor can the Government prove Mr. McMahon's purported knowledge by stacking one inappropriate inference on another. *United States v. Mohel*, 604 F.2d 748, 755 (2d Cir. 1979) ("[A] piling of indirect inference upon indirect inference is improper."); *United States v. Jones*, 291 F. Supp. 2d 78, 90 (D. Conn. 2003) (granting acquittal motion in part because the government put forth an "unreasonable" inference that was itself "piled on top" of another "factually unsupported inference"); *see also* McMahon Moving Br. at 6-7.  That is, though the Government—even as it pays lip service to this principle, Gov't Opp. at 64—complains that Mr. McMahon looks at the evidence piece-by-piece instead of as a whole, Gov't Opp. at 53, the only way to engage in the required analysis is to look at each piece of evidence, to determine whether the inference that the Government seeks to draw is reasonable and then to determine whether the evidence is insufficient, *without* "piling inference upon inference."  That is, a large number of inappropriate inferences does not a reasonable inference make, which is in essence what the Government argues.  *Compare* Gov't Opp. at 53-67, *with United States v. Zimmiti*, 850 F.2d 869, 873-76 (2d Cir. 1988) (rejecting nine government inferences as "contradicted" by testimony, "not supported by any evidence," and "impermissible as a matter of law").[1]

---

[1] In defense of its obvious inference-stacking, the Government seeks to limit the prohibition of cases involving the stacking of inference upon inference to circumstances when there are only "one or two pieces of circumstantial evidence."  Gov't Opp. at 64.  But no court has ever held that

Here, the Government's case suffered from the same "complete absence of probative facts," *Lavender v. Kurn*, 327 U.S. 645, 653 (1946), to support the conclusion that Mr. McMahon knew he was working for the PRC government, as would an argument that it rained just because he had an umbrella with him.  That is, as detailed below, the Government's circumstantial trial evidence—by definition, evidence relying on inferences (including that Mr. McMahon was aware of parallel criminal charges against Xu Jin)—could not and did not show that he was aware he was working for the PRC government, without piling one speculative inference on another.  In a just system of law, Mr. McMahon's conviction on Count II of the Superseding Indictment cannot stand.

A.      **No Evidence Established that Mr. McMahon Knew He Worked for the PRC Government (Count II).**

Assessed objectively, both individually or together, the proof at trial failed to establish beyond a reasonable doubt that Mr. McMahon knew he worked for the PRC government.

---

the applicability of this doctrine depends on the amount of circumstantial evidence or the number of inferences at issue.  *See Zimmitti*, 850 F.2d at 873-76 (analyzing and rejecting each government inference); *United States v. Graziano*, 616 F. Supp. 2d 350, 370-72 (E.D.N.Y. 2008) (analyzing, not the government's circumstantial evidence, but rather "the government's circumstantial inference tree").  The Court should decline the invitation to limit a rule which is so important to assuring that defendants are not convicted in the absence of proof beyond a reasonable doubt.  *See, e.g.*, *United States v. Summers*, 414 F.3d 1287, 1294-95 (10th Cir. 2005) ("In criminal cases, however, [the 'inference-upon-inference' rule's] common-sense dictate continues to bear currency. . . . [W]e find its underpinnings to be sound, arising as they do from the requirement that the government bears the burden to prove its case beyond a reasonable doubt."); *United States v. Baker*, 985 F.2d 1248, 1251 (4th Cir. 1993) ("The conviction must be overturned if the evidence here could only lead to a finding of guilt by an unacceptable process of raw speculation rather than by a reasoned process of inferring guilt beyond a reasonable doubt." (citation and quotation marks omitted)); *United States v. Burgos*, 703 F.3d 1, 10 (1st Cir. 2012) (reasoning that courts apply the reasonable-doubt standard by "not giving credence to evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative" (cleaned up)).

### 1.    The Government's Purported "Direct" Evidence

Initially, the Government argues that it "presented direct evidence of McMahon's knowledge" through "his post-arrest interview admissions of what he believed at the time of the events."   Gov't Opp. at 53.   As the Government contends, Mr. McMahon "admitted to understanding that he had been retained to locate Xu Jin in order to facilitate efforts to repatriate him to the PRC for prosecution."   *Id.*  But this argument that Mr. McMahon's post-arrest statement constituted "direct evidence" that he knew he was performing investigative services for the PRC government misunderstands the meaning of "direct evidence": direct evidence is "evidence, which if believed as the truth, proves the existence of the fact in issue *without the necessity for an inference or presumption*."  3 Federal Evidence Practice Guide, ch. 15, § 15.01 (2023) (emphasis added).   But that is not the case regarding Mr. McMahon's post-arrest statement cited by the Government.   Quite simply, Mr. McMahon never stated that he knew or was told that he was working as an agent of the PRC government.   *See* Gov't Opp. at 53 ("Yeah.  I think he had mentioned to me that they were trying to get him to come back to China. . . .   So they could prosecute him. . . .   And then the father had flown in from I think he said China. . . .   To convince the son because of, out of you know, out of honor for the name. . . .   You got to face the consequences back in China." (citing Gov't Ex. 701A)); *id.* at 54 ("Listen, if he [Xu Jin] knows you're sitting outside, he knows that . . . you're out there and that maybe he should turn himself in." (citing Gov't Ex. 701A)).

Rather, this statement fits squarely within the definition of circumstantial evidence, requiring the jury to reasonably infer, if possible (*i.e.*, without guessing or speculating) from Mr. McMahon's use of words like "prosecute," "consequences," and "he should turn himself in." Contrary to the Government's characterization of the evidence, none of this statement directly says that Mr. McMahon knew or was told that he was working for the PRC government.  It does not,

without more, specify who Mr. McMahon believed was looking to "prosecute" Xu Jin, what "consequences" Mr. McMahon believed Xu Jin was facing in China, or why or to whom Mr. McMahon believed Xu Jin "should turn himself in." This statement instead required the jury to unreasonably infer—indeed, to speculate—that Mr. McMahon's use of terms like "prosecute" meant that he knew he was hired to work on a Chinese criminal matter and that, in turn, meant that he knew he was working for the PRC government. Indeed, although the Government strongly criticizes the defense for arguing that there was no direct evidence in the case, *see* Gov't Opp. at 53, elsewhere in its brief it concedes that these proofs require the kind of inference that circumstantial evidence demands, *see id.* at 67 ("Here, a rational jury could certainly infer that by 'prosecute,' McMahon meant 'prosecute' in the criminal sense of the word.").

To be clear, that obviously does not mean that this evidence is, *per se*, insufficient: Mr. McMahon has never taken the position, and does not now, that a conviction cannot rest on circumstantial evidence. Certainly, it can. *See* McMahon Moving Br. at 5 (citing Leonard B. Sand et al., Modern Federal Jury Instructions § 6.01 (2011) ("An inference is a deduction or conclusion which . . . the jury [is] permitted to draw . . . from facts which have been established by either direct or circumstantial evidence.")). But, again, "[w]hile the jury may draw reasonable inferences from direct or circumstantial evidence, an inference must be more than speculation and conjecture to be reasonable, and caution must be taken that the conviction not be obtained by piling inference on inference." *United States v. Arras*, 373 F.3d 1071, 1073 (10th Cir. 2004) (citation omitted), *cited in* McMahon Moving Br. at 6; *see also United States v. Martinez*, 921 F.3d 452, 466 (5th Cir. 2019) ("The verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." (citation and quotation marks omitted)); *United States v. Wilson*, 879 F.3d 795, 802 (7th Cir. 2018) ("In a case that hinges on circumstantial evidence,

we must not permit a verdict based solely on the piling of inference upon inference . . . ." (citation and quotation marks omitted)); *United States v. Ouedraogo*, 531 F. App'x 731, 739-40 (6th Cir. 2013) ("Although the evidence need not eliminate all reasonable hypotheses except that of guilt, we must guard against piling inference upon inference." (citation and quotation marks omitted)).

That circumstantial evidence is permitted to provide the basis for a criminal conviction means that the Court must assess the inferences that the Government seeks to draw to ascertain their reasonableness for purposes of this motion practice.  *See Zimmitti*, 850 F.2d at 873-76 (analyzing and rejecting each government inference); *Graziano*, 616 F. Supp. 2d at 370-72 (same). And in doing so, the Court should—indeed, must—look to the record as a whole.  In the context of the Government's purportedly "direct evidence," *i.e.*, Mr. McMahon's post-arrest statement, this means looking at the evidence as a whole and in context, which the Government seeks to avoid doing, for obvious reasons.  Thus, even as the Government complains about how Mr. McMahon is "attacking the government's evidence piecemeal," Gov't Opp. at 53, it successfully sought to preclude the entirety of Mr. McMahon's post-arrest statement at trial.  But the remainder of Mr. McMahon's post-arrest statement shows that Mr. McMahon thought the "consequences" that Xu Jin faced in China were to "pay back the money basically"—indicating that Mr. McMahon believed that he was working on a civil debt-recovery matter.  Further, the broader post-arrest statement shows that jail time "was never discussed," again undercutting the Government's inference of criminal knowledge from the cherry-picked language that Mr. McMahon used early that morning.  Exhibit 701A.  Likewise, in response to the Government's questions about whether Mr. McMahon was informed by those who had retained him that this was a criminal case, Mr. McMahon unequivocally stated, "I thought it was a civil case, he stole money from the company and that was it, we were just trying to –", at which point he was cut off.  *See* ECF No. 2 ("Gov't

11

Mot. *in Lim.*") Ex. 4, at 63:3-6.  Mr. McMahon also stated during his post-arrest interview that he understood that the people with whom he was meeting—the same people who were working for the Chinese government—were a "part of the construction company," *id.* at 23:25-31, further confirming Mr. McMahon's view that he was working for a private company seeking to recover its losses and not on behalf of the PRC government's interests in bringing a criminal case.  And Mr. McMahon stated that he was told that he was trying to "locate an individual who stole money or a couple million dollars from a construction company in China," *id.* at 10:32-35, again undermining the inference that the Government seeks to draw, that he was aware that he was working for Chinese criminal authorities.  That inference is unreasonable, and cannot alone, or piled upon the other inferences which the Government seeks, support a conviction beyond a reasonable doubt.

## 2. The Government's Circumstantial Evidence

Next, the Government points to "ample" circumstantial evidence from which, it says, a rational jury could "readily infer" that Mr. McMahon knew he worked for the PRC government.  Gov't Opp. at 54-61.  But that is simply not the case; rather, all of the Government's circumstantial evidence is insufficient because it depended on the jury, and now depends on the Court, to make illogical and unreasoned inferences that amount to speculation or guesswork.

As stated, "circumstantial evidence requires an inference for it to carry weight."  3 Federal Evidence Practice Guide, *supra*, ch. 15, § 15.01.  And not just any inference will do; the inference must be reasonable. *See, e.g.*, *United States v. Calderon*, 785 F.3d 847, 850 (2d Cir. 2015) ("A guilty verdict may be based entirely on circumstantial evidence and guilt 'may be inferred from the evidence so long as the inference is reasonable.'" (quoting *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004))); *United States v. Beach*, 80 F.4th 1245, 1256 (11th Cir. 2023) ("But where the government seeks to meet its burden of proof based on circumstantial evidence, it must

rely on reasonable inferences in order to establish that a 'reasonable factfinder could conclude that the evidence establishes guilt beyond a reasonable doubt.'" (citation omitted)).  Put differently, and as discussed above, a reasonable inference is "not a suspicion or a guess"; "[i]t is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *Pauling*, 924 F.3d at 656.

Against this backdrop, the Government seeks to sustain the verdicts based on inferences that are either impermissible guesswork or are otherwise not based on "the laws of logic," which the Second Circuit requires this Court to apply to determine if the Government has drawn reasonable inferences. *See id.*

### a.      Impermissible Guesswork

First, numerous aspects of the Government's proofs require guesswork, rather than rational inference, to make the point for which the Government introduced them.  As discussed above, that is impermissible.  *See, e.g.*, *United States v. Yannotti*, 415 F. Supp. 2d 280, 289 & n.51 (S.D.N.Y. 2005) ("While a jury may draw reasonable inferences, it may not engage in impermissible speculation."); *Gotti*, 457 F. Supp. 2d at 409 ("An inference cannot be based on speculation or guesswork.  It must be based on the evidence in the record."); *accord United States v. Rufai*, 732 F.3d 1175, 1188 (10th Cir. 2013) ("Reasonable inferences supported by other reasonable inferences may warrant a conviction, but a jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility." (cleaned up)).

*First*, the Government contends that Mr. McMahon must have known that he was working for the PRC government because he had learned in the course of his research that Xu Jin was wanted by the Chinese authorities.  Gov't Opp. at 54 ("McMahon knew that the man he was hired to investigate and locate was 'wanted' by the PRC government for alleged PRC criminal offense.").  But even assuming, as the Government also argues, that the *China Daily* article

adequately revealed that Operation Sky Net was an illegal repatriation program—notwithstanding that the program invoked legitimate legal process, for example, by citing the involvement of Interpol, *see* Gov't Opp. at 54—this evidence did not show, without guesswork and without piling that guesswork on other impermissible inferences (discussed below), that Mr. McMahon was therefore working for the PRC government instead of doing an investigation for the "company" directly referenced by his purported co-conspirators in communications with him, in the hopes of seeking the return of a person who had embezzled millions of dollars from that company and of the funds with which he had absconded. *See, e.g.*, Exhibit 1022 ("Sorry Mike, I forgot to indicate Jin Xu's gender, Jin Xu is a gentleman who owned [sic] a lot of money from Mr. Jason Zhu. Instead of repaying the money he owned, [sic] Mr. Xu chose to run away, and Mr. Zhu needs to find where does Jin Xu live and other relate[d] information.  Mr. Zhu said there's no attorneys involved."); Exhibit 3047 ("Hi mike I have already back [sic] to China and reported all we found to my boss of the company."); Exhibit 3056 ("Hi mike: our finance [manager] wire you the money this morning."); Exhibit 805B at 13 ("Ok mc I spoke with my company last nite they want u to monitor on Monday but with one person."); *id.* at 15 ("The company wants the property list which be long j lifetime can u do that?"); *id.* at 19 ("Standby I will inform your suggestion to the company tonight."); *id.* at 21 ("I will stay here as long as the company require."); *id.* at 26 ("I will speak with the company tonight."); *id.* at 28 ("Mc I will deposit 1k to ur account tmr morning.  Company want to switch to lightweight surveillance with one person tmr until further notice."); *id.* at 14 ("So your company only wants one investigator for Monday?"); *id.* at 24 ("How did the company in China find you and Eric to work on this case??" "Eric works for them in China.  I used to send cars to them from US so they know me"); *see also* Exhibit 3026 ("He wanted to know if you can get any of Jin Xu and his wife, Fang Liu's records of latest purchases through their SSN and driver

license."); Exhibit 3056 ("From the financial record of our company, Xu transferred the money to those 8 account, so we need check these accounts first.  [S]everal accounts are from united states.").[2]

*Second*, and relatedly, the Government relies on a text-message exchange between Johnny Zhu and Mr. McMahon in which Mr. Zhu texted Mr. McMahon, "They definitely grant you a nice trip if they can get Xu back to China haha."  Gov't Opp. at 55 (citing Exhibit 805N, at 31-32).  But the Government introduced absolutely no evidence that "[t]hey" refers to the PRC government, as opposed to a company from which Xu had embezzled; certainly a private company could have offered such a trip as well.[3]  Nor does the Government point to any evidence to bolster that Mr. McMahon understood "get[ting] Xu back to China" was an aspect of a Chinese criminal process, as opposed to an effort to bring an embezzler to civil justice.  To reach the conclusion the Government seeks, the following pure guesses were required: (1) that "[t]hey" meant the Chinese government; (2) that "get Xu back to China" meant to repatriate Xu Jin as part of Operation Skynet; and, most significantly, (3) that Mr. McMahon accordingly understood that, contrary to everything he was being told, he was working for the PRC government.

---

[2] As discussed *infra* at pages 18 to 20, the Government asked the jury—and now asks the Court—to speculate that the term "company" was actually "code language used to further obscure the criminal operation," Gov't Opp. at 66.  Indeed, this is one of the most egregious instances of guesswork that the Government seeks, as absolutely no evidence was presented that Mr. McMahon was informed of or was using coded language.

[3] Nor is Mr. McMahon's argument one that, as the Government complains, asks the Court to draw a different inference from the one that the Government seeks, *i.e.*, that Mr. McMahon knew that it was the PRC government offering him "a nice trip" or that the purpose of "get[ting] Xu back to China" was so that Xu Jin could face criminal charges.  Rather, Mr. McMahon seeks to show only that the inference sought by the Government is unreasonable because it relies on pure speculation, not logic or reason.

*Third*, the Government seeks the inference that Mr. McMahon knew that he was being employed by the PRC government based on his having obtained information from two official databases, one federal and one state (New Jersey). Gov't Opp. at 59-60. As to the former, the Government argues that it can be reasonably inferred that Mr. McMahon knowingly worked for the PRC government because he "solicited sensitive border-crossing information pertaining to the victims from his friend, DEA Special Agent Greg Finning." Gov't Opp. at 59. But even leaving aside that this fact, even if true, does not demonstrate any such knowledge (as opposed to supporting Mr. McMahon's understanding that he was working for a private client), the facts do not even support, without pure guesswork, that Mr. McMahon solicited this information. As the Court is aware, although the Government represented, in response to the Court's direct questioning when it was arguing this evidence should be admitted, that DEA Special Agent Greg Finning would testify at trial, he did not. Accordingly, although the information at issue was apparently obtained after Mr. McMahon and Agent Finning spoke on the phone on October 20, 2016, *see* Exhibit 316, the contents of that call remain entirely unknown; accordingly, whether Agent Finning offered the information or Mr. McMahon "solicited" it can only be guessed at.[4] More

---

[4] In direct contrast to the Government's summary of Special Agent Naviene Habeeb's testimony, *i.e.*, "that Finning was involved in the request to run queries in DHS databases on Xu Jin and Liu Fang", *see* Gov't Opp. at 59-60 (citing Tr. at 1460:14-24), a review of Special Agent Habeeb's testimony actually reveals that she did not remember specifically who asked [her] to run the query", Tr. at 1460:19-20, that although she "remember[ed] that it had something to do with Greg Finning," she did not "remember exactly how or why," *id.* at 1460:23-24, and that she neither "remember[ed] receiving th[e] request from Mr. Finning" nor "receiving any particular request from Mr. Finning," *id.* at 1471:4-10. This tenuous relationship was recognized by the Court. *Id.* at 1720:8-23 ("I guess the last thing I'll say about it is it seems that Finning's testimony, and even the broader issue of whether or not Mr. McMahon's request to Agent Finning, and it's not entirely clear to me that that's been firmly established. There was only the one witness who said that she received a requested to do a search. And obviously, the Government will argue that that had to be from Mr. McMahon asking Agent Finning. But I don't think even that relationship between Mr. McMahon and Agent Finning has been established. But obviously, there's a logical inference to

---

16

importantly, either way, the evidence presented, including that of Special Agent Habeeb, *see* McMahon Moving Br. at 102-03 (citing Tr. at 1460:19-20, 1471:4-10), cannot and does not establish an inference that Mr. McMahon knew that Agent Finning violated Department of Homeland Security (DHS) policy by providing information to him, assuming that there was anything improper about the search that was run. In sum, as discussed at length in the Moving Brief, *see* McMahon Moving Br. at 26-27, the Government established only that Agent Finning violated the DHS policy by providing Xu Jin and Liu Fang's travel information to Mr. McMahon, *see* McMahon Moving Br. at 102; Exhibit 429, not that Mr. McMahon violated the policy, or was even aware that Agent Finning did so in providing him with the information. And, even if, *arguendo*, the Government established, through an inference, that Mr. McMahon was aware that Agent Finning violated DHS policy, the jury would then have had to stack yet another unreasonable inference on top of that to reach the conclusion that Mr. McMahon knew he was working on behalf of the PRC government. *See, e.g.*, *Graziano,* 616 F. Supp. 2d at 371 ("[T]he Court is loath to stack inference upon inference in order to uphold the jury's verdict." (citation and quotation marks omitted)).

The same analysis pertains to the Government's circumstantial evidence that Mr. "McMahon violated the terms of his access to a[] New Jersey Motor Vehicle Commission ('NJMVC') database, using records from the database to conduct surveillance on the victims." Gov't Opp. at 60. The Government contends that this evidence allowed the jury to reasonably infer that "Mr. McMahon did <u>not</u> act openly, honestly and lawfully in performing work for the PRC." *Id.* But once again, neither the premise nor the conclusion that the Government seeks to

---

be made because of the information that was produced and was requested, the search that was requested. But putting that evidentiary tenuousness aside, it seems to me the point even that the search was somehow improper is really a tangential one.").

draw is appropriate.  First, the Government did not even establish that Mr. McMahon violated the terms of his access to New Jersey Customer Abstract Information Retrieval ("NJ CAIR"); to the contrary, the evidence at trial established that Mr. McMahon disclosed his intended use of the NJ CAIR database on his initial application, Exhibit 408D; that private investigators are, in fact, permitted to use the NJ CAIR database, *see* Tr. at 1537:10-21 (testimony of Jessica O'Connor); that when a user runs a license plate through the NJ CAIR database, a record is automatically generated and conveyed to the NJMVC, *see* Tr. at 1538:9-23; Exhibit 408H; and that the NJMVC can—and in Mr. McMahon's case, did—conduct audits of a participant's use of the NJ CAIR database, *see* Tr. at 1539:6-17, including with Mr. McMahon's use of the NJ CAIR database in a similar matter, in which Mr. McMahon informed the NJMVC that he was using the NJ CAIR database as a private investigator (and not in a case involving lawyers), "to investigative whether or not the defendant did in fact own said vehicle," *see* Exhibit 408I, as Mr. McMahon did in the instant matter as well, which was allowed, because private investigators are permitted to use the NJ CAIR database to determine "whether a vehicle was leased or owned," *see* Tr. at 1544:13-1545:4 (testimony of Jessica O'Connor).  But second and again, much more importantly, even assuming—though it would be an unfair and unwarranted assumption—that Mr. McMahon's actions violated NJMVC and NJ CAIR rules, the inference that leads to the conclusion that he therefore knew that he was working for the PRC government instead of a private client is an unreasonable one.  Nor does the Government in its brief explain how it logically follows that Mr. McMahon's accessing the NJ CAIR database—properly or otherwise—shows that he was knowingly working for the PRC government.

*Fourth*, the Government contends that a jury could "have concluded that references to a supposed 'company' were merely code language used to further obscure the criminal operation."

Gov't Opp. at 66.  But how could the jury have so concluded?  The Government put on no lay or expert testimony saying that "company" was a code word or analyzing Mr. McMahon's conversations in light of such facts; nor was there any documentary evidence introduced to that effect.  *See, e.g.*, *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003) (describing the government's use of code-word experts).  Thus, the Government is left to address this critical issue by arguing that the repeated statements to Mr. McMahon that he was working for a "company" must have been code language.  *See, e.g.*, Exhibit 1022 ("Sorry Mike, I forgot to indicate Jin Xu's gender, Jin Xu is a gentleman who owned [sic] a lot of money from Mr. Jason Zhu.  Instead of repaying the money he owned, [sic] Mr. Xu chose to run away, and Mr. Zhu needs to find where does Jin Xu live and other relate[d] information.  Mr. Zhu said there's no attorneys involved."); Exhibit 3047 ("Hi mike I have already back [sic] to China and reported all we found to my boss of the company."); Exhibit 3056 ("Hi mike: our finance [manager] wire you the money this morning."); Exhibit 805B at 13 ("Ok mc I spoke with my company last nite they want u to monitor on Monday but with one person."); *id.* at 15 ("The company wants the property list which be long j lifetime can u do that?"); *id.* at 19 ("Standby I will inform your suggestion to the company tonight."); *id.* at 21 ("I will stay here as long as the company require."); *id.* at 26 ("I will speak with the company tonight."); *id.* at 28 ("Mc I will deposit 1k to ur account tmr morning.  Company want to switch to lightweight surveillance with one person tmr until further notice."); *id.* at 14 ("So your company only wants one investigator for Monday?"); *id.* at 24 (McMahon: "How did the company in China find you and Eric to work on this case??"  Zhu: "Eric works for them in China. I used to send cars to them from US so they know me"); *see also* Exhibit 3026 ("He wanted to know if you can get any of Jin Xu and his wife, Fang Liu's records of latest purchases through their SSN and driver license."); Exhibit 3056 ("From the financial record of our company, Xu

19

transferred the money to those 8 account, so we need check these accounts first.  [S]everal accounts are from united states.").  But this was and is a blatant request that the jury and now the Court engage in speculation and guesswork; our system of justice, however, demands much more than that.  It requires evidence; here, there was none.

*Fifth*, the Government relies heavily on seeking to establish the sufficiency of the evidence against Mr. McMahon on in-person meetings and phone calls, the content of which is concededly unknown, to argue that "[a] jury could infer that during these in-person meetings and phone calls, McMahon learned that he was working for a PRC law enforcement operation and planned and carried out steps to further this criminal objective."  Gov't Opp. at 55, 57-58.  But, as noted,  there is absolutely no evidence of what was said during these meetings, let alone that Mr. McMahon was specifically told in any of these that he was working for the PRC government.

Starting with the in-person meetings, they were as follows:

- **October 27, 2016 meeting.**  The evidence supports that Mr. McMahon, Jason Zhu, and Eric Yan met at a Panera Bread in Paramus, New Jersey, to discuss Xu Jin.  A jury could reasonably infer that the three discussed locating Xu Jin's daughter given that Mr. Zhu followed up with Mr. McMahon the next day, asking for the daughter's address.[5]  However, a jury could only guess or speculate that either Mr. Zhu or Mr. Yan told Mr. McMahon about his working for the PRC government, as there was no evidence that this occurred.

- **November 1, 2016 meeting.**  The evidence supports that Mr. McMahon, Jason Zhu, and Eric Yan met at a law office in Hackensack, New Jersey.  A jury could reasonably infer that the three discussed locating Xu Jin and Liu Fang given that Mr. McMahon obtained border-crossing information about Xu Jin and Liu Fang a few weeks later.  But again, a jury could only *guess* that either Mr. Zhu or Mr. Yan told Mr. McMahon that he was actually obtaining border-crossing information because he was performing investigative services for the PRC government, as opposed to for a private client who was investigating Xu Jin.

---

[5] The Government's argument that locating "the addresses of Xu Jin's daughter" could have "no relevance to a civil lawsuit involving asset recovery or debt collection," Gov't Opp. at 58, is plainly incorrect, as such a search could reasonably, and logically, have determined that Xu Jin owned the property in which Xu Xinzi resided in California.

- **April 4, 2017 meeting.**  The evidence supports that Mr. McMahon and Johnny Zhu met at a Panera Bread in Paramus, New Jersey.  Although Tu Lan had told Johnny Zhu to tell Mr. McMahon "everything" the day before the meeting, the Government presented no evidence as to what was actually said at the Panera Bread on April 4, 2017; as such, the jury could only guess what this vague instruction meant, and whether and to what extent it was carried out.[6]  Nor could the jury reasonable infer that Johnny Zhu and Mr. McMahon discussed the secret meaning of the word "package" at the April 4, 2017 meeting.  After Johnny Zhu's text to Mr. McMahon the next day, which stated "I got the package eta 7:40 p.m.," Mr. McMahon sent a text of a question mark, indicating that—far from understanding its meaning, as the Government argues, he did not actually know what the term was referring to. Again, the jury would have had to guess at what "package" meant because the Government called no lay or expert witness to say what the "package" was.[7] And, in any event, the jury could not have reasonably inferred—at least not without stacking unreasonable inferences on one another—that Mr. Zhu told Mr. McMahon that he worked for the PRC government.

As to phone calls, the Government's own witnesses consistently testified that the phone call logs did not shed any light on what was said during the conversations, *see* Tr. at 930:3-8 (testimony of Eungee Hwang) ("Q.  Okay.  Of course there's nothing on these exhibits, 316 and 317, that would indicate that was said in those phone calls, correct?  A.  No.  The phone records will simply indicate the date, time, duration, outgoing, incoming, whether the call had failed, or

---

[6] The only attendee of the April 4, 2017 meeting at Panera Bread testified that he did not sit near Mr. Zhu and Mr. McMahon, did not hear the contents of their conversations, and was not told about the contents of the discussions.  *See* Tr. at 1090:6-14 (testimony of Hongru Jin) (Q. "Do you know what Johnny Zhu said to the private investigator?  A.  Sorry, I don't know.  Q.  Okay. Because you never spoke to Johnny Zhu about what he said to the private investigator; is that correct?  A.  Yes, it was because when Johnny Zhu was talking to the private investigator, at the time I was staying at another table there was some distance, so I don't know what was discussed."); *id.* at 1092:8-18 ("Q.  Mr. Jin, you sat at some distance from Johnny Zhu and the private investigator, correct?  A.  Yes.  Q.  So you couldn't hear any of their conversation; am I right?  A. Yes.  Q. . . . I think you testified yesterday that after Johnny Zhu spoke to the private detective, that he did not tell you what they had discussed; is that correct?  A.  Yes.").

[7] Indeed, as detailed in the Moving Brief, *see* McMahon Moving Br. at 14-15, the first time the jury heard that the "package" could have referred to Xu Jin's father was in the prosecutor's summation, *see* Tr. at 1983:16-1984:8.  But summations are, of course, not evidence.  *See, e.g.*, *United States v. Arboleda*, 20 F.3d 58, 61 (2d Cir. 1994) ("A summation is not evidence.").

21

whether the call was successful."); *id.* at 1698:3-6 (testimony of Elizabeth Wheeler) ("Q.  But neither of these cell tower data, the cell phone records, or your maps show us anything about the contents of these calls.  Correct?  A.  That is true.").  Accordingly, any conclusion as to what was said during the in-person meetings and phone calls is mere speculation.  Nor is the inference that the conversations at issue occurred by phone or in person to avoid their being memorialized (in the way that emails or texts would be) even remotely reasonable or fair; the consequence of accepting such an argument would be to render any oral conversation suspicious.  Of course, it would be one thing if there were evidence that instructions had been provided to communicate that way as opposed to in writing so as to conceal certain activities.  But there was no such proof here, and, to the contrary, the volume of emails and non-encrypted texts that were introduced into evidence,  *see, e.g.*, McMahon Moving Br. at 24 n.12 (citing Tr. at 464-65 (testimony of George Dietz); and then citing Tr. at 1698:7-19 (testimony of Elizabeth Wheeler)), belies any "inference"—though it would really be just a guess—that such instructions were provided, though the Government speculates that there was, *see* Gov't Opp. at 58 ("A jury could reasonably infer that, during these in-person meetings and phone calls, McMahon learned that he was working for a PRC law enforcement operation and planned and carried out steps to further this criminal objective.").

  *Sixth*, and finally, the Government argues that certain aspects of Mr. "McMahon's financial activity related to his work for the PRC government was also consistent with consciousness of guilt."  Gov't Opp. at 58.  Specifically, the Government claims—as was undisputed—that Mr. McMahon "received money for his work from at least four different sources, with several payments made in cash," the Government presented no evidence to show that any of these means of receiving payment was in any way improper, or that it was somehow unusual or suspicious that

multiple means of payment were used.  For example, the Government did not show, and there is
no basis whatsoever to believe, that the fact that Mr. McMahon received cash for his services in
this matter was indicative of any criminal intent, let alone that it demonstrated Mr. McMahon's
knowledge that he was working for the PRC government; indeed, the evidence was that private
investigators can and are paid in cash, *see* Tr. at 1803:20-24 (testimony of Eric Gallowitz) ("Q.
Have you ever received cash from clients in the course of your business?  A.  Yes.  Q.  Is there
anything wrong with that?  A.  No.").  Moreover, far from concealing that he was being paid for
his work on this case, that Mr. McMahon received the cash in a highly public place, Panera Bread,
during lunchtime, *see* Exhibits 103A-F, and included it on a written McMahon Investigative Group
invoice that was preserved and voluntarily turned over to the Government by Mr. McMahon, *see*
Exhibit 3073, demonstrates an openness with respect to the receipt of this money that belies any
secretiveness and, with it, and criminal intent.[8]

Even more speculative is the Government's argument that Mr. McMahon concealed his
income by "fail[ing] to report the income he received from the PRC government on his taxes,"
Gov't Opp. at 59.[9]  Indeed, the argument that Mr. McMahon did not report this evidence was

---

[8] As will be discussed *infra* at pages 29 to 31, Mr. McMahon's actions with regard to depositing
monies into his joint bank account with his wife, his son's account (at the same bank, with the
same name), and accepting cash, also created no reasonable inference of a guilty conscience.

[9] This was the basis on which the Government sought to admit this evidence.  In its *in limine*
motions, the Government represented to the Court that "a comparison of McMahon Investigative
Group bank records and tax records filed by McMahon show that McMahon did not report the
over $13,000 received for his work surveilling the Victims as income in 2016 and 2017," *see* Gov't
Mot. *in Lim.* at 35, but, at trial, the Government presented only a purported summary chart
containing Mr. McMahon's earning in 2016 and 2017 and the total that Mr. McMahon declared
on his 2016 and 2017 tax returns, but which did not consider Mr. McMahon's business expenses
or otherwise show that Mr. McMahon failed to include the income from this matter on his returns.
Nonetheless, the Government argued, without any evidentiary support, both during summation
and rebuttal, that Mr. McMahon failed to report the income from this matter on his taxes, *see* Tr.
at 1982:1-1982:25 (Government summation) ("And that's not even the only way that McMahon's

wholly unsupported at trial.  Rather, the Government introduced Exhibit 452, a purported summary

chart containing Mr. McMahon's earnings in 2016 and 2017 and the total that Mr. McMahon

declared on his 2016 and 2017 tax returns.  That exhibit did not, however, show in any regard that

Mr. McMahon failed to include the income from this matter on his returns; instead, it simply

showed Mr. McMahon's monthly and total deposits for 2016 and 2017, as compared to what Mr.

McMahon declared on his 2016 and 2017 Tax Schedule C-Gross Profit.  No effort was made to

perform a proper tax calculation by showing Mr. McMahon's expenses, expenses which, in this

case for example, gobbled up a huge amount of what he was paid.[10]  Nor did the Government call

a tax expert to support its position, as would have been necessary to demonstrate some failure to

properly calculate and pay one's taxes.  Instead, the Government threw out some numbers and

invited the jury to speculate that they showed Mr. McMahon's failure to pay taxes—and with it,

---

financials demonstrate that he knew he was working for the Chinese government.  He earned over
$19,000 from the Xu Jin case. . . . And then you can see from this slide how he treated that money,
or I should say more broadly, what he reported on his tax returns.  There's a lot of information on
this slide, but really what it boils down to is this:  If you look at McMahon's business account, the
deposits into that account in 2016 were more than what he reported on his 2016 tax returns. . . .
McMahon didn't report his earnings from the Xu Jin case because he didn't want the U.S.
government to know that he had been working for the Chinese government.");  Tr. at 2142:3-14
(rebuttal) ("And the tax returns that we pointed to just cement this point.  He received a large
amount of money, and I'm not going to quibble about it; they claim its $11,000 not $19,000.  Even
if we're talking about net instead of gross profit, $11,000 for what they claim is five days of work
is quite a bit of money still.  He received a large amount of money that he ultimately did not report.
And as I expect you will hear, you are going to be instructed that willful intent or guilty knowledge
may be inferred from the secretive or regular manner in which a transaction is carried out.").

[10] The trial record showed that Mr. McMahon's expenses totaled approximately $8,000 of the
$19,000 that Mr. McMahon was paid in this matter.  *See* Exhibit 3101 (Absolute Investigations
LLC Invoice totaling $755.02 for surveillance conducted April 6, 2017); Exhibit 3095 (Stuyvesant
Investigative Group Invoice totaling $1,215.25 for surveillance conducted on April 5, 2017 and
April 10, 2017); Exhibit 3056 (email correspondence indicating that Mr. McMahon paid $1,030.00
for United States bank searches); Exhibit 3054 (email correspondence indicating that Mr.
McMahon paid $5,000.00 for international bank searches).

an intent to conceal his income—not in an effort to underpay taxes (though there was no evidence of that either) but because he wanted to hide that he was working for the PRC government.  Far from a reasonable inference or a logical conclusion, this is unsupportable guesswork and the opposite of legally sufficient proof beyond a reasonable doubt.

### b.    Illogical Inferences

Beyond mere speculation, the Government's case rests upon inferences that are not only unsupported but are unreasonable because they violate the "laws of logic."  *Pauling*, 924 F.3d at 656; *accord United States v. Navarrette-Aguilar*, 813 F.3d 785, 793 (9th Cir. 2015) ("[A]lthough we must draw all reasonable inferences in favor of the prosecution, a reasonable inference is one that is supported by a chain of logic, rather than mere speculation dressed up in the guise of evidence." (cleaned up)).  So, for instance, a court cannot conclude that a defendant knew about a kidnapping scheme based on circumstantial evidence that other co-defendants happened to bring zip ties with them as part of the scheme.  *Lee*, 416 F. Supp. 3d at 134-35.  Nor can the Court conclude that a defendant knowingly received and invested illicit funds simply through testimony that the defendant's family received those funds.  *Gotti*, 457 F. Supp. 2d at 409.  In both cases, the Government relied on inferences that do not pass the test of logic.  This case is characterized by numerous such inferences, some adverted to above, others described below.

First, the Government contends that the jury could reasonably infer that Mr. McMahon knew that he was working for the PRC government because "[t]he purported client for whom McMahon worked changed multiple times throughout the relationship," specifically: Mr. McMahon "was first contacted by Lina Xu [(Emily Hsu)]," who informed him that "the 'female client' was a 'Lady . . . [who] has been through a lot'"; the client then "changed to 'Mr. Jason Zhu,' who made clear that there were 'no attorneys involved,' despite purportedly seeking McMahon's assistance to collect on a debt Xu Jin owed to Defendant Zhu Yong,", and that Mr.

McMahon eventually reported to Eric Yan and Johnny Zhu.  Gov't Opp. at 55-56.  At best, the evidence cited by the Government supports an inference that Mr. McMahon was initially contacted (through a translator) by a woman who "has been through a lot," and required the services of a licensed private investigator.  It is unclear—and cannot be reasonably inferred—that this woman was an employee of the PRC government, a Chinese company, or anything else.  The fact that the client then "changed to Mr. Jason Zhu" is likewise unavailing; it still creates no inference that Mr. Jason Zhu was actually an agent of China.  Finally, that  Mr. McMahon then spoke to various other individuals, including Johnny Zhu and Eric Yan, who did represent themselves as employees of a Chinese company, cannot, in turn lead the jury to the inference that Mr. McMahon knew that he was working as an agent of the PRC government.  Directly to the contrary, the evidence at trial was that he was specifically told that he was being hired to collect a private debt.  Tr. at 1744:7-15 (testimony of Shi Liping) ("Q.  But before we get to that, what was it that [Zhu Yong] asked you to do?  A.  He asked me to locate a private investigator.  Q.  And did that private investigator have to be in any particular place?  A.  Licensed in New Jersey.  Q.  And did he tell you why he needed a private investigator licensed in New Jersey?  A.  He needs to locate someone in order to collect debt."); *see also* Exhibit 1022 ("Sorry Mike, I forgot to indicate Jin Xu's gender, Jin Xu is a gentleman who owned [sic] a lot of money from Mr. Jason Zhu.  Instead of repaying the money he owned, [sic] Mr. Xu chose to run away, and Mr. Zhu needs to find where does Jin Xu live and other relate[d] information.  Mr. Zhu said there's no attorneys involved.").  While the specific identity of Mr. McMahon's client may, in retrospect, have been somewhat mysterious, the notion that Mr. McMahon should have known—let alone did know—that he was therefore working for the PRC government is simply not a logical conclusion on which the Court can allow a conviction to rest.

Next, the Government argues that "[t]he amount and type of information [the] PRC clients provided [McMahon] during his work was also highly suspect" because, when Mr. McMahon "first learned Xu Jin's identity, Zhu Yong provided McMahon with a packet containing an extensive amount of personal identifying information about Xu Jin and his family," including "dates of birth, Chinese identification numbers, green card numbers, social security numbers," and travel information.  Gov't Opp. at 56.  But the Government, which initially identified, and then declined to call, an expert witness with regard to private investigation, did not show that this was the least bit unusual during the process of first retaining and then continuing the utilize the services of a private investigator.  To the contrary, it stands to reason that one who is requesting such services would provide information about the subject of the investigation.  And nothing was presented by the Government—nor does it point to any now—that would have allowed the jury to find, contrary to common sense, that the individuals who hired Mr. McMahon were in possession of Xu Jin's personal information because they were Government officials.  Rather, this would seem to be precisely the type of information that would or could be known by a private Chinese company that had employed Xu Jin, corroborating Mr. McMahon's understanding of the situation.  In sum, and at least in the absence of evidence to the contrary, the sinister inference that the Government seeks to draw from the information about the subject of his investigation is not a fair or reasonable one and ought not be allowed to stand as the basis, alone or with the other unreasonable or unsupported inferences discussed here, of a criminal conviction, lest innocent people everywhere be put in danger of criminal prosecution.

The Government, however, further argues that "significant information that McMahon was asked to obtain about Xu Jin and Xu Jin's family was plainly irrelevant to collection on a purported debt" including "details about Xu Jin's daughter, Xu Xinzi, including her graduate school and the

27

layout and location of the graduate residences in which she lived," as well as "international travel information about Xu Jin's wife, victim Liu Fang." Gov't Opp. at 56. Once again, the Government relies on an inference that is completely unreasonable for three reasons: *First*, as the Government notes, Mr. McMahon's investigation was not solely limited to tracing assets. Rather, as the Government articulates it, the inquiry here is whether Mr. "McMahon must have known that he was not actually working on debt collection *or a 'company' lawsuit*." Gov't Opp. at 56 (emphasis added). And working on a "company lawsuit," like the one that was ultimately filed in this matter (though evidence of such was not allowed to be adduced by the defense), would certainly explain a lot of Mr. McMahon's surveillance, including tracking the whereabouts of Liu Fang, Xu Jin's wife. *Second*, the Government did not, in fact, show that information regarding, for example, where Xu Jin's daughter lived and what she was doing would not be useful to tracking Xu Jin's expenditures of money in an effort to collect on a debt. *Finally*, and perhaps most significantly, the Government's argument cherry-picks the type of information that, based on the actual record at trial, Mr. McMahon sought to and did obtain in the course of his investigation regarding the family's assets and by way of seeking asset recovery. *See, e.g.*, Exhibit 3026 ("I have forwarded the report to Mr. Jason Zhu. . . . He wanted to know if you can get any of Jin Xu and his wife, Fang Liu's records of latest purchases through their SSN and driver license."); Exhibit 805B, at 9 (MCMAHON: "Car is owned (not leased) . . . ." ZHU: "Got it no finance no lease?" MCMAHON: "Correct"); *id.* at 20 (ZHU: "Is there anyway to get all the assets and property info from the company but not only the bank records And indeed. Is there anyway you can track their hidden assets like stock, bonds, investment activities?" MCMAHON: "Yes I can possibly do that. I can run the company and the officers of the company. If I can get their social security numbers. I should be able to track down their numbers."); Exhibit 2029 (ERIC YAN: "our request 1 ,

28

background of Joseph yang 2, offshore poverty investigation of xu jin,liu fang and xu xinzi 3, investigation of 8 account").  That is, viewed, as the Government argues the Court should, not in isolation but as part of the trial record as a whole, it is clear that the investigation overall was, in fact, focused on asset recovery.  Moreover, and again, just because Mr. McMahon investigated and uncovered other background information during his investigation does not—and cannot— generate a reasonable inference that Mr. McMahon therefore knew, beyond a reasonable doubt, that he was working as an agent of the PRC government.

The Government, however, argues that "a rational juror could infer that the forced visit from the United States of Xu Jin's father was an obvious sign to McMahon that he was not involved in ordinary debt collection or asset recovery work" because Mr. McMahon stated that the purpose of "the operation [was] to use Xu Jin's elderly and sickly father and 'honor for the [family] name,' to intimidate Xu Jin into returning to China for criminal prosecution."  Gov't Opp. at 56.  But that, of course, Mr. McMahon did not, in fact, tie the arrival of Xu Jin's father, to persuade his son to return to China to "honor … the family name," to any kind of criminal case, as the Government wishes he had said but did not.  Indeed, Mr. McMahon's reference to "honor[ing] . . . the family name" could apply as well to making restitution on an embezzlement; in fact in some way, that makes more sense, but even if it does not, the inference that the Government seeks, that Mr. McMahon should have known that the appearance of Xu Jin's father was indicative that the Chinese government was involved is one that is unsupported by either logic or by the evidence in this case.

Again, the Government seeks to prove Mr. McMahon's "consciousness of guilt" through his "financial activity" by the way in which Mr. "McMahon handled his income from the PRC in a manner indicative of someone attempting to evade detection."  Gov't Opp. at 58.  Thus, in

addition to the fact that "[o]ver the course of his work for the PRC government . . . McMahon received money for his work from at least four different sources, with several of the payments made in cash," which is discussed above, the Government contends that "after learning the Xu Jin was wanted by the PRC government, McMahon stopped depositing additional money for his work into his business account" and "[i]nstead, he subsequently used three other accounts, including his son's student checking account." *Id.* at 58-59. The Government contends that these actions were designed to hide the money he received, *see id.* at 67, pointing as well to the fact that "McMahon also received at least $5,000 in cash that he never put in any of his accounts," *id.* at 58-59. But, as detailed at length in the Moving Brief, *see* McMahon Moving Br. at 31-34, the inference that the Government asks the Court to find, is not reasonable: beyond the fact that, as is discussed above, there is nothing improper about receiving money from different sources, the inference that Mr. McMahon, a sole proprietor, was doing something inappropriate—let alone taking action because he wanted to hide that he was working for the PRC government—because he deposited the money he received into a joint account with his wife (which he could have done immediately after the money was transferred into his McMahon Investigative Group account anyway) and son, who shared the same name with him and had an account at the same bank as Mr. McMahon, *see* Exhibit 403F, is simply unreasonable, especially given the paper trail which showed that the deposit into Mr. McMahon's son's account only occurred after the individuals who hired Mr. McMahon attempted to deposit the money into the McMahon Investigative Group account, but were unable to complete the transaction. *See* Exhibit 3061. Nor can a reasonable inference be drawn that Mr. McMahon knew that he was working for the PRC government because he did not deposit the $5,000 payment he received in cash, not only because there is nothing wrong with cash payments, as is discussed above, but also because there was no evidence—for example, a text, email or

conversation, either recorded, or to which a witness testified (though there were none here)—that this occurred because he knew that he was working as an agent of the PRC government.  Indeed, any such inference would be particularly illogical given that Mr. McMahon continued to deposit money into his personal bank accounts after the cash payment at issue was made, *see* Exhibit 403I (showing wire transfers to his son's accounts on April 10 and 11, 2017), Exhibits 403K, 403L (showing wire transfer to Mr. McMahon and his wife's joint account on April 27, 2017).

Finally, and perhaps most extraordinarily, the Government argues that Mr. McMahon's guilt may be proved because while he was doing the surveillance he did in this case, he contacted local law enforcement to "to avoid being caught committing a crime because 'contact[ing] the local police [would] prevent them from interfering with the operation.'"  Gov't Opp. at 59. Obviously, the opposite inference—that one committing a crime would not contact law enforcement—is at last, if not much more reasonable, as Mr. McMahon argued to the jury.  Again, of course, absolutely no evidence was introduced to support that Mr. McMahon's purpose in informing law enforcement of his activities was to hide his activities.  But regardless of whether the inference that Mr. McMahon sought to draw was the right one (Mr. McMahon, of course, agreed and conceded in his papers that "any competing inferences that can be drawn from the evidence should be draw in favor of the verdict," Gov't Opp. at 67), the inquiry here is not one in favor of the inference that Mr. McMahon would prefer, as the Government argues he seeks over and over.  Instead, the question is whether the inference that the Government seeks—here, that Mr. McMahon contacted local law enforcement to avoid being caught while committing a crime— is a reasonable one.  It is not.

In sum, the inferences that the Government seeks to draw from the evidence presented at trial are not "reasonable" and, for this reason, beyond the fact that other "inferences" on which the

Government relies are not inferences at all but guesses, the Government presented insufficient evidence at trial to sustain Mr. McMahon's conviction of Count II of the Superseding Indictment.[11]

**B.     The Government Presented Insufficient Evidence to Convict Michael McMahon on Conspiracy to Commit Interstate Stalking (Count III) and Interstate Stalking (Count IV).**

The Government next argues that "[a]t trial, substantial evidence established that McMahon committed the substantive offense of aiding and abetting interstate stalking and harassment, in violation of 18 U.S.C. § 2261A, and that he conspired to commit interstate stalking and harassment, in violation of 18 U.S.C. § 371." Gov't Opp. at 68. Specifically, the Government contends that Mr. McMahon's arguments "ignore the evidence at trial, and principals of aiding and abetting and co-conspirator liability." *Id.* It argues "that McMahon knew of Hu Ji's, Zhu Feng's, Tu Lan's and others' interstate stalking and harassment campaign and acted together with

---

[11] For the same reasons, the Government's theory of conscious avoidance should be rejected. Indeed, the Government relies upon the very same inferences for its argument of actual knowledge as it does for its conscious avoidance theory. *See* Gov't Opp. at 61-62 ("The red flags about his work for the PRC described above—including the China Daily article about Operation Sky Net, the Interpol red notice, the changing client identities and contacts, the highly sensitive information about the victims that his client already possessed, the unusual information that his client requested McMahon to find (which had no relevance to the purported goal of asset reported) and Xu Jin's elderly father's forced visit to the United States—are more than sufficient to establish, at minimum, McMahon consciously closed his eyes to what would have otherwise been obvious to him: that he was working for the PRC government."). Nor is it the case that conscious avoidance can be shown because, as the Government argues, Mr. McMahon "should have known" that there was something awry, *see* Tr. at 2139:14-24 (rebuttal) ("I want to briefly address Mr. McMahon's law enforcement background a little bit more since it was a major point at the beginning of this case. Now, the evidence shows that McMahon consciously avoided knowing what was going on, consider this fact: If anyone should have known what he was doing was wrong, that there were major red flags that he should have looked into, that he was obviously participating in criminal activity, it was a former member of law enforcement."); criminal convictions cannot, in our system of justice, be based, as the Government fundamentally argues, upon negligence where the statute requires, as this one does, knowing and willful conduct, *see* 18 U.S.C. § 951(a); Tr. at 2191:25-2192:9 (jury instructions).

intent to contribute to its success" and "that McMahon knowingly and intentionally agreed with those same individuals to commit the offense of interstate stalking," *see* Gov't Opp. at 68. However, the Government's argument ignores both undisputed evidence and fundamental legal principles that govern aiding-and-abetting liability, resulting in a decision that, essentially, criminalizes the practice of private investigation.

First, with regard to the facts, the Government—unsurprisingly—continues to rely to a great extent (as it always has) on a text exchange between Mr. McMahon and Eric Gallowitz, who was assisting Mr. McMahon, on the final day of surveillance, April 11, 2017. *See* Gov't Opp. at 54, 70, 77. In that exchange, as retold by the Government, "Gallowitz texted McMahon a suggestion about how to conduct the surveillance of Xu Jin and his immediate family: 'Maybe overt surveillance. In their face. Sit in front of the house. Pictures. Video. Scare them,'" that Mr. McMahon responded, "'Yeah possibly- we did that in little ferry.'"[12] and that, subsequently, "[a] couple hours later, McMahon proposed the idea to Zhu Fung: 'I think if we harass Xu. Park outside his home and let him know we are there. I did that before in another case.'" Gov't Opp. at 70.[13] But, as the Government did throughout trial, it conveniently omits that Johnny Zhu vetoed the idea and replied: "We can't harass Xu like that lol." Exhibit 805B at 32.[14] And although the

---

[12] In its account of this exchange, the Government omits the next text message from Mr. McMahon: "Not sure it worked." Exhibit 4018B at 66. This omission is telling.

[13] The Government makes much of the fact that Mr. McMahon stated during his post-arrest interview that "his use of the word 'harass' was a 'typo,'" Exhibit 701A, but that nonsensical statement, whatever it meant, did not "evidence[] his state of mind and consciousness of guilt," Gov't Opp. at 71; rather, it only showed that Mr. McMahon was confused why he would have used the term "harass" in a text message. Either way, it was never anything anyone agreed to, as the record indisputably shows.

[14] Likewise, Mr. McMahon responded "lol" to Eric Gallowitz's suggestion of a possible "abduction" by the individuals who hired Mr. McMahon to perform investigative services. *See* Exhibit 4019B at 53-56. This too, is hardly evidence of an agreement but, in any event, Mr.

Government argues that Mr. McMahon's openness to Mr. Gallowitz's suggestion and his willingness to suggest it to his client is probative of his state of mind, *see* Gov't Opp. at 77, in fact, this exchange unequivocally shows that Mr. McMahon was never a party to any actual agreement to engage in the kind of harassment that the stalking statute requires, was made; thus, no conspiracy was ever formed.[15]  *See* McMahon Moving Br. at 43.

The Government, however, recycles all of the arguments that it raises in its defense of the jury's verdict on Count II, arguing that the very same facts that support Mr. McMahon's purported knowledge that he was working with the PRC government also do double duty and show that he shared the intent to stalk the Xu Jin and Liu Fang.  *Compare* Gov't Opp. at 53-67 (discussion of Count II), *with id.* at 68-77 (discussion of Counts III and IV).  As a result, the Government fails, as a matter of law to show, as it concedes it must, that Mr. McMahon knew "of the PRC government's interstate stalking campaign, agreed with his co-conspirators to participate in that campaign and acted with intent to further it, initially through surveillance and collection of intrusive information about the victims."  Gov't Opp. at 69.  But, as was the case with Count II, these arguments substitute guesswork and speculation for permissible inference, and seek to justify

---

Gallowitz's testimony made clear that this was all a joke, describing himself as "that guy, the guy who tells the crude joke, says inappropriate things, and that's what that is.  That's a joke. . . . [He] was making to joke", which he further described as "[d]ark police humor." Tr. at 1798 at 2-9.  Of course, this testimony further demonstrates that the intention of Mr. Gallowitz and Mr. McMahon's surveillance was not to "harass and intimidate Xu Jin and his immediate family," as the Government argues.

[15] Since Mr. McMahon did not join—or develop any intent to join—any conspiracy to engage in interstate stalking, *Pinkerton* is inapplicable.  *See United States v. Smith*, 223 F.3d 554, 573 (7th Cir. 2000) ("Before *Pinkerton* can be applied, it is of course necessary to show that a conspiracy existed that the defendant joined the conspiracy, that the other actor was also part of the conspiracy, and that the overt act was both foreseeable and in furtherance of the conspiracy.").

inferences that are not supported by logic or reason as they would have to be to survive.  *See supra* Section I.A.2.

Thus, the Government first argues that "in late October, McMahon met in person with Hu Ji and Zhu Yong at least twice" and that because Mr. McMahon "knew[] both Hu Ji and Zhu Yong flew to the United States from the PRC for these meetings," "[a] rational jury could infer . . . that during these meetings Hu Ji, Zhu Yong, and McMahon discussed the harassment campaign and agreed on the next steps for intrusive surveillance."  Gov't Opp. at 69.  Merely quoting the Government's argument reveals the quality of the inferences on which the Government's argument relies: they are not inferences at all but guesswork.  And they are not reasonable inferences in that they fail the "laws of logic," as discussed above.  Specifically, the evidence of Mr. McMahon's in-person meetings with Johnny Zhu and Eric Yan in October of 2016, coupled with the contents of Mr. McMahon's investigation in October 2016, cannot lead to an *inference* that Mr. McMahon agreed to assist them to stalk Xu Jin and Liu Fang, only a guess that, rather than discussing Mr. McMahon performing investigative services for Johnny Zhu and Eric Yan, there was a discussion in which Mr. McMahon agreed to engage in stalking—that is, under the terms of the statute, to travel in interstate commerce "with the intent to kill, injure, harass, or intimidate another person, and in the course of, or as a result of, such travel or presence engage[d] in conduct that cause[d], attempt[ed] to cause, or would be reasonably expected to cause substantial emotional distress to" Xin Ju and his family.  18 U.S.C. § 2261A(1)(B).  But, of course, there was no evidence of what was discussed during those meetings, as would usually be the case in a conspiracy prosecution like this one.  Nor does the fact that Mr. McMahon knew that Johnny Zhu and Eric Yan were flying in from China for these meetings lead, as a matter of logic, to the Government's desired conclusion that the three discussed a plan to harass Xu Jin and Liu Fang; the assertion that this may reasonably

35

be inferred disregards the fundamental requirement that any inference must, for it to be a legal sufficient basis for a conviction, be reasonable.  *See supra* Section I.A.2.

The Government, however, asserts that "in his first email to McMahon after that meeting, Hu Ji wrote to McMahon in a manner that indicated they had previously discussed their joint efforts to target the victims," citing to a November 13, 2017 email from Hu Ji to Mr. McMahon stating "already back to China and reported all we found to my boss of the company" to support the inference that Mr. McMahon was participating in a stalking campaign.  Gov't Opp. at 69 (citing Exhibit 3047).  This also does not follow; the only inference to be drawn from Exhibit 3047 is that Hu Ji—always known to Mr. McMahon as Eric Yan—went to China and discussed Mr. McMahon's investigative findings with another individual, purportedly the "boss of the company"; indeed, especially given Eric Yan's request in the same email asking Mr. McMahon to look into eight bank accounts, which is consistent with completely normal investigative practices in a case involving the detection of assets, Exhibit 3047, the Government's argument that one can reasonably infer from this evidence that Mr. McMahon knowingly agreed to assist in a stalking campaign, again misunderstands the requirement that inferences be reasonable.  This one is not, based on the evidence actually adduced.

Again, the Government cites to the fact that Mr. McMahon "agreed to pull extensive information about Xu Jin and Liu Fang's daughter, Xinzi Xu, including her major and dormitory" to support the assertion that "a rational jury could infer is irrelevant to a debt collection lawsuit but relevant to stalking and intimidation."  Gov't Opp. at 69.  This contention, which was also a lynchpin of the Government's argument that Mr. McMahon must have known that he was working for China, Gov't Opp. at 56, is fully addressed above, *see supra* Section I.A.2, at 20, 27-28, and will not be repeated here.  But it is worth reminding ourselves that the question for Counts III and

IV is whether Mr. McMahon aided and abetted or conspired with others to harass or intimidate, and to cause substantial emotional distress to Xu Jin and his family; this evidence does not support a finding that he did, particularly because there is no evidence that Mr. McMahon had any knowledge that anyone would stalk Xu Xinzi and concededly, never met or had anything to do with the people who did so, or with their activities in California, which occurred long after he had completed the activities with which he was here charged. *See* McMahon Moving Br. at 54 (citing Exhibit 713, at 25:13-21 (testimony of Xu Xinzi) ("Maybe just to make it clear, Mr. McMahon, can you put up your hand. . . . Q. Do you see the person who just put up his hand? A. Yes. Now I see him, yes. Q. Thank you very much. Have you ever seen him before today? A. No.")); *id.* at 56 (citing Exhibit 713, at 16:11-16 (testimony of Xu Xinzi) ("Q. I want to direct you to May of 2018. Did anything having to do with you or your loved ones' Facebook accounts stand out to you? A. Yes. My friends received Facebook messages from an account named Tony Lee that contained . . . derogatory information about me and my parents."); *id.* at 27:14 ("Q. So the question was: The first time that you received any messages of this sort was in early . . . 2018, correct? A. Correct. Q. Okay. And before that, there were no messages of this kind harassing you; is that right? A. Correct.")).

Other arguments from the Government's contentions with regard to Count II are recycled with respect to Counts III and IV as well, though the offenses alleged contain very different elements. Thus, the Government again argues that Mr. "McMahon improperly solicited sensitive border crossing information for the victims and provided to Hu Ji the information he obtained from a government database" to create the inference that Mr. McMahon was engaged in an interstate stalking campaign. Gov't Opp. at 69. But, as set forth above, there was no evidence that Mr. McMahon "solicited" information from Agent Finning, let alone that Mr. McMahon knew that

Agent Finning violated DHS policy by provided this information to him. *See supra* Section I.A.2.a, at 16-17; McMahon Moving Br. at 100-06. And, yet again, the Government predictably cites to the April 4, 2017 meeting at Panera Bread to support a speculative premise: that Mr. McMahon "met with Zhu Feng at a Panera Bread after Zhu Feng traveled from China to discuss the plan." Gov't Opp. at 71. As discussed *supra* at page 21, the jury could only guess as to what Zhu Feng and Mr. McMahon discussed at this meeting, as the only attendee of the April 4, 2017 meeting at Panera Bread testified that he did not sit near Johnny Zhu or Mr. McMahon, did not hear the contents of their conversations, and was not told about the contents of the discussions. Now, however, the Government invites speculation not just that the discussion at Panera Bread revealed to Mr. McMahon but also that the plan at issue was to be one involving stalking, *i.e.*, harassment and intimidation for the purpose of putting the victims in substantial emotional distress. Of course, there was no evidence that either was discussed at that restaurant, during the less than one hour that the participants in that meeting were together in that public restaurant. That they did is entirely a matter of impermissible speculation.

Likewise, and as is discussed above, the purported "direct and circumstantial evidence" cited by the Government did not "establish[] that McMahon was aware of this international operation and its goal—to harass and intimidate Xu Jin and his immediate family—[or] that he agreed with his principals and conspirators to further that goal." *See* Gov't Opp. at 70-74. For example:

- As discussed above, there was absolutely no evidence presented that the "package" referred to in Johnny Zhu's April 5, 2017 text to Mr. McMahon was a code word referencing Xu Jin's father, given Mr. McMahon response of "?" (a question mark), indicating that he did not know what this meant. *See* Exhibit 4010, at 3-5. Certainly no inference could be drawn from this fact that Mr. McMahon was aware of any scheme to harass, intimidate and cause substantial emotional distress to Xu Jin and his family. *See supra* Section I.A.2.a, at 21.

38

- Any inference that the meaning of Johnny Zhu's text to Mr. McMahon that "They definitely grant you a nice trip if they can get Xu back to China haha",  Exhibit 805N at 31-32, showed that Mr. McMahon agreed to harass and intimidate Xu Jin and his family is completely unreasonable, and turns on the notion that the only way that Xu would go back to China was if he were harassed and intimidated, a proposition that is not only not established by the record, but is indeed, belied by it insofar as the Government contends that Mr. McMahon understood that—as articulated in his post-arrest statement to which the Government repeatedly refers— "the father had flown in from I think he said China . . . To convince the son because of, you know, out of honor for the name" to attempt to get Xu Jin to "pay back the money basically," Exhibit 701A.  But that post-arrest statement, even if it somehow could show that Mr. McMahon knew that he was performing investigative services for China (which, as set forth *supra* Section I.A.1, at 9-12, it does not), certainly does not demonstrate that Mr. McMahon understood that he was involving himself in an interstate stalking scheme, as the Government argues, *see* Gov't Opp. at 70.

At the end of the day, there was just no evidence that Mr. McMahon sought to or did stalk or conspire to stalk Xu Jin and his family.  Did he perform surveillance?  Yes, of course—it was undisputed that he conducted surveillance, though the parties disagree as to whether Mr. McMahon conducted overt surveillance, and thereby harassed or intimidated the family.   Thus, the Government, again seeking to substitute speculation for inference, contends that a "rational jury could infer that McMahon's surveillance was, in fact, overt, because Liu Yan saw him on April 6, 2017."  Gov't Opp. at 75 n.34.  But this speculative conclusion was belied by the evidence: although Liu Yan testified that she believed she was being followed on April 6, 2017, *see* Tr. at 133:10-134:2, she also testified that she had never seen or met Mr. McMahon before, *see id.* at 128:14-19 ("Q.  Ms. Lu, do you recognize Mr. McMahon?  A.  I do not.  Q.  You've never seen him before?  A.  No.  Q.  You've never met him before?  A.  No.").  And no evidence was presented, either through documents or testimony, that Mr. McMahon actually conducted any surveillance at or near the Livingston Mall in connection with this matter.  Moreover, both Fang Liu and Xu Xinzi, named victims of the offense, testified that they had never seen or met Mr. McMahon.  *See id.* at 786:9-15 (testimony of Liu Fang) ("Q. Have you ever met Mr. McMahon before?  A.  No.  Q. Have you ever seen him before?  A.  No."); Exhibit 713 at 25:13-21 (testimony of Xu Xinzi)

("Maybe just to make it clear, Mr. McMahon, can you put up your hand. . . . Q.  Do you see the person who just put up his hand?  A.  Yes.  Now I see him, yes.  Q.  Thank you very much.  Have you ever seen him before today?  A.  No.").  And although Xu Jin testified that he believed he was being followed on April 7, 2017, he did not know who followed him, *see* Tr. at 1410:20-1411:7, and it could not have been Mr. McMahon, as it is undisputed that Mr. McMahon did not conduct surveillance on that day, *see, e.g.*, Exhibit 2011.  Nor was any evidence presented that Mr. McMahon knew of the activities of others, either others doing surveillance, whose activities were expressly hidden from him, *see* Tr. at 1093:1-23, those who appeared at Xin Ju's residence, on September 4, 2018, nearly a year-and-a-half after Mr. McMahon's last involvement with this matter, *see id.* at 1255:21-23, or those who harassed, using Facebook, Xu Jin's daughter, Xu Xinzi, which occurred in May 2018, a year after Mr. McMahon's last involvement with this matter, *see* Exhibit 713 at 16:11-16.  And, again, the April 11, 2017 text messages between Johnny Zhu and Mr. McMahon, on which the Government so heavily relies, came on the last day of Mr. McMahon's surveillance, and never resulted in the harassment that was discussed.[16]

Thus, although Mr. McMahon performed surveillance, the evidence did not show that he possessed the required intent to harass or intimidate Xu Jin or his family or that he actually did so.  Certainly, his culpable state of mind could not be established by virtue of his having conducted surveillance; while it amounts to his presence at the scene of the crime, it is insufficient, as a matter of law, to establish his guilt.  *See United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004) ("Mere

---

[16] Whether Mr. McMahon actually located the victims' residence was also disputed, and could only be a matter of speculation, given the presence of others, including Hongru Jin, who were also surveilling the victims, Tr. at 1955:18-20, and of public records that could have easily be used to ascertain their residence, for locating their home.  *See* Moving Br. at 56 (citing Tr. at 786:16-19, 1230:16-1231:14).

presence at the scene of a criminal act or association with conspirators does not constitute intentional participation in a conspiracy, even if the defendant has knowledge of the conspiracy." (cleaned up)); *United States v. Charles*, 313 F.3d 1278, 1284 (11th Cir. 2002) ("Although presence is certainly a factor to consider in determining whether a defendant joined a conspiracy, it is well settled that mere presence will not support a conviction." (citation omitted)).

Instead, the Government must show, at a minimum, "circumstantial evidence of knowledge and specific intent sufficient to sustain a conviction," including "some indicia of the specific elements of the underlying crime." *United States v. Torres*, 604 F.3d 58, 67 (2d Cir. 2010) (emphasis added) (cleaned up). Thus, for example, Mr. McMahon never traveled interstate, as is required to sustain a conviction on the substantive interstate stalking charge against him. *See* Tr. at 2198:7-2199:22 ("The first element that the Government must prove beyond a reasonable doubt is that the defendant traveled in interstate or foreign commerce as charged in the indictment. Travel in interstate or foreign commerce simply means travel between two states or between the United States and a foreign country."); 18 U.S.C. § 2261A(1)(B) (to establish that a defendant engaged in interstate stalking, the Government must show that the defendant "travel[ed] in interstate or foreign commerce"). This fact is also not disputed; rather, the Government argues that because Mr. "McMahon was aware that Zhu Feng and others involved in the operation traveled to the United States from the PRC, and from New York to New Jersey, to further the scheme," *see* Gov't Opp. at 71, the conviction on Count IV can be upheld, through an aiding-and-abetting theory of liability, *id.* at 68. But just as Mr. McMahon knew that Johnny Zhu and others traveled from China to the United States is insufficient to show that Mr. McMahon traveled interstate, it is also an elementary legal principle that such knowledge is an insufficient basis to establish guilt. *See United States v. Santos*, 541 F.3d 63, 71 (2d Cir. 2008) ("We have . . . overturned conspiracy

convictions where, although the defendant had knowledge of the conspiracy, there was insufficient evidence from which the jury could reasonably have inferred that the defendant intended to join it." (collecting cases)); *United States v. Young*, 745 F.2d 733, 764 (2d Cir. 1984) ("Even when viewed in the light most favorable to the government, the most this evidence established was that [the defendant] was aware of the conspiracy and associated with some of its members.  By no means, however, was it sufficient to show that she was a knowing participant in it."); *accord United States v. Jones*, 371 F.3d 363, 366 (7th Cir. 2004) ("Even if [the defendant] knew of [co-conspirator's illegal plan], his knowledge or approval of the illegal scheme is insufficient to sustain a conviction.").  Here, no evidence was produced to show that Mr. McMahon either knew of an interstate stalking scheme to harass or intimidate Xu Jin and his family, necessary to establish aiding-and-abetting liability, and then associated himself with that scheme, *see* Tr. at 2181:22-2182:5 ("To aid and abet another to commit a crime, a defendant must do two things.  First, he must knowingly associate himself in some way with the crime . . . . To establish that the Defendant you are considering knowingly associated themselves with the crime, the Government must establish that the Defendants knew and intended that the crimes charged would be committed."), or that he joined a conspiracy to engage in such stalking.  Mr. McMahon is truly innocent of these charges and for the reasons set forth in his prior submission herein, his conviction on Counts III and IV should be set aside and a judgment of acquittal entered.

One final point: in his Moving Brief, Mr. McMahon pointed out that if his conviction were to be sustained, the result would be to, "in effect, criminalize all surveillance activities, and thus, the private investigation profession itself."  McMahon Moving Br. at 31.  In response, the Government argues that this contention "is a red herring" because the "evidence showed that McMahon's work on behalf of Hu Ji, Zhu Yong, Zhu Feng, Tu Lan and others ran far afield of

ordinary private investigator services because it was designed to intimidate and harass the victims, particularly with respect to McMahon's assistance with the forced visit of Xu Jin's father from China in April 2017." Gov't Opp. at 76. For the reasons set forth above, that is untrue, unfair, and based on speculation (rather than a reasonable inference) or proposed inferences that defy reason and logic. In truth, these charges criminalize lawful private investigative services, for it was precisely those services—surveillance, background checks, asset recovery—which many need but few provide, that are here being labeled criminal, in a context in which that was precisely the opposite of what Congress intended in enacting the federal stalking statutes, as Mr. McMahon has shown. *See* McMahon Moving Br. at 51-52 (collecting sources and legislative history showing that "18 U.S.C. § 2261A was enacted to criminalize repeated harassing conduct across state lines" and "not to criminalize legal private investigative services performed by licensed private investigators"). Though the Government says that Mr. McMahon's conduct stepped over the line, it does not explain how, without proof that is absent here, that he knowingly assisted others to harass or intimidate, with the purpose of causing substantial emotional distress or reached an agreement with them to engage in such conduct. Mr. McMahon did not do that, and the Government has not proven otherwise, for the reasons set forth below.

## II.   THE VERDICTS RENDERED AGAINST MICHAEL MCMAHON WERE INCONSISTENT.

Next, resisting commonsense, the Government insists that the jury verdicts on Counts I and II of the Superseding Indictment were consistent, when clearly they were not. *See* Gov't Opp. at 80. The Government's argument is wrong for three reasons.

*First*, the Government attempts to sidestep Mr. McMahon's argument that the verdicts on Counts I and II are logically inconsistent by manufacturing a distinction that it never argued to the jury. That is, the Government now argues that "the jury could have concluded that McMahon did

not join a conspiracy with any of the Defendants or specifically alleged co-conspirators, but still knowingly acted at the PRC government's direction." Gov't Opp. at 81-82. This, even though it relied on the same evidence when arguing its case on both counts to the jury. *Compare* Tr. at 1964:7-1967:1 (Government summation on Count Two), *and id.* at 1974:14-1984:19 (same), *with id.* at 1987:12-15 (Government summation on Count One, with no discussion of the evidence independent of that discussed for Count Two). *See also id.* at 2128:20-2129:22 (Government rebuttal, discussing the evidence the jury should consider for Counts One and Two together). The Government's own evidence shows that it never asked the jury to infer that Mr. McMahon knowingly acted at China's direction; rather, it argued that Mr. McMahon acted at the direction of various Chinese individuals, every single one of whom was an alleged coconspirator in this case. *Compare* Gov't Opp. at 38 (describing co-defendant Zhu Yong's role in "hiring private investigator Michael McMahon" as the "go-between for McMahon and co-conspirators who lived in the PRC"), *and id.* at 55 (describing co-defendant Eric Yan (Hu Ji) and Johnny Zhu (Zhu Feng) as "intermediaries" between "the PRC government officials" and Mr. McMahon), *with* Gov't Opp. at 81 ("[T]he statute explicitly contemplates finding a person guilty if it can be proven that they [sic] worked for a foreign government, even if there is inadequate proof that they [sic] worked at the direction of a particular foreign official.").[17]

It is obvious why the Government pivots to this ahistorical version of the trial: the evidence that the Government proffered for both § 951 counts was identical; both Counts I and II of the Superseding Indictment required the jury to focus on a single disputed fact: Mr. McMahon's knowledge. *See* McMahon Moving Br. at 61-62 ("Indeed, the agreement to join a conspiracy,

---

[17] To the extent the Government seeks to rescue its verdict on Count II based on evidence that Mr. McMahon worked at the direction of the PRC Government but not the purported coconspirators here, its evidence is even more insubstantial; indeed, there is absolutely none.

which necessarily would have required that Mr. McMahon knew that he was working on behalf of the Chinse government, and Mr. McMahon's purported knowledge that he was performing investigative services on behalf of the Chines  government are, really, one in the same element – again, the only element that was contested in this matter, for purposes of both Counts.").  And, it is irrelevant that "[t]he knowledge elements for the two crimes are different."  Gov't Opp. at 79-80, 82.  As stated in the Moving Brief, the Government rested both counts on the same set of undisputed facts—and asked the jury to draw improper and unsupported  inferences about Mr. McMahon's intent from those very same facts.  McMahon Moving Br. at 61-62.

*Second*, the Government snubs the reasoning of *United States v. Zane*, 495 F.2d 683, 690 (2d Cir. 1974) and *United States v. Rigas*, No. S102CR1236, 2004 WL 2434965, at *1 (S.D.N.Y. Nov. 1, 2004).  Gov't Opp. at 83.  Although both cases recognize that "plainly inconsistent jury verdicts . . . are the jury's prerogative," *Zane*, 495 F.2d at 690, both also show that this rule is not nearly as absolute as the Government wishes it were.  Indeed, "[a]n acquittal on a conspiracy count would bar conviction on a substantive count *only if it constituted a 'determination favorable to the petitioner of the facts essential to conviction of the substantive offense.'*"  *Id.* at 691 (emphasis added); *Rigas*, 2004 WL 2434965, at *1 (same).  That, of course, is precisely the case here.

*Third*, and perhaps most problematically, throughout the Government's submission, the Government simply ignores the plain language of Federal Rule of Criminal Procedure 33, which commands that "the court may vacate any judgment and grant a new trial *if the interest of justice so requires*."  Fed. R. Crim. P. 33(a) (emphasis added).  Indeed, Rule 33 recognizes the logic of both *Zane* and *Rigas*; specifically, that a court may order a retrial when commonsense compels the conclusion that a miscarriage of justice has occurred.  As detailed in the Moving Brief, *see* McMahon Moving Br. at 63-64, a court may—consistent with principles of *res judicata* and

collateral estoppel, themselves rooted in the interests of justice, *see, e.g.*, *United States v. D'Amico*, 734 F. Supp. 2d 321, 345 (S.D.N.Y. 2010) ("Fundamentally, issue preclusion is necessary to give the acquitted defendant the full benefit of the protections in the Double Jeopardy Clause." (citation and quotation marks omitted))—bar a defendant's trial on a substantive count when a prior jury found the defendant innocent of conspiracy to commit that same substantive count. *See Sealfon v. United States*, 332 U.S. 575, 578 (1948) (reasoning that, though "commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses," "res judicata may be a defense in a second prosecution" (citation omitted)). That is precisely the case here: commonsense and the interest of justice instruct that the jury verdicts were plainly inconsistent and should not, if justice is to be done, be permitted to stand side by side.

## III. THE GOVERNMENT'S PUBLICATION OF DOCUMENTARY EVIDENCE WAS IMPROPER.

The worst thing that can happen in our legal system is the conviction of an innocent person. *See Schlup v. Delo*, 513 U.S. 298, 325 (1995) ("[C]oncern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system. That concern is reflected, for example, in the 'fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free.'" (quoting *Winship*, 397 U.S. at 372 (Harlan, J., concurring); and then citing T. Starkie, Evidence 756 (1824) ("The maxim of the law is . . . that it is better that ninety-nine . . . offenders should escape, than that one innocent man should be condemned."))). And for a criminal defense attorney, when that happens, one searches for reasons: how can a jury have reached such an unjust result? In considering that question, one answer emerges from the way that this case was tried—admittedly without the objection from the undersigned defense counsel that should have been interposed. Specifically, on reflection, the Government's lengthy renditions of multiple email and text-message chains,

without any opportunity to cross-examine, or any other procedural safeguards, was a practice that, most respectfully, appears to have contributed to Mr. McMahon's unjust conviction. As detailed in the Moving Brief, the back-and-forth between AUSAs and Government agents who were not involved in the investigation of this case, whereby a narrative was woven from admittedly admissible Government exhibits, allowed the Government to put its own gloss on documents that spoke for themselves, in a manner that risked—and then caused—an unfair process and an inaccurate, unjust result. *See* McMahon Moving Br. at 66-73.

In response, the Government acknowledges that "evidence itself [must be] properly admitted pursuant to the rules of Evidence" and cannot "run afoul of other safeguards like the Confrontation Clause," Gov't Opp. at 84 (quoting *United States v. Tragas*, 727 F.3d 610, 614 (6th Cir. 2013)), but nonetheless claims that "[p]ublishing admitted written evidence by reading it aloud verbatim is both permissible . . . and a commonly employed practice." *Id.* The Government argues that "[t]here is no prejudice in the government choosing to publish portions of evidence—already admitted into the record and made available to the jury—by reading it aloud verbatim," Gov't Opp. at 86, and that reading the text message chains to the jury did not constitute a "perform[ance] . . . in any meaningful sense," Gov't Opp. at 87 (quoting *Tragas*, 727 F.3d at 614).

But, while reading properly admitted evidence into the record is ordinarily permissible, the law is clear that there are circumstances in which it is not. Notably, the Government entirely ignores the case law holding that a court should exclude a demonstration under the "substantial similarity" test, where, as here, "that demonstration does not permit a fair comparison with the event at issue because it is 'insufficiently comparable to the circumstances [of] the case.'" *United States v. Stewart-Carrasquillo*, 997 F.3d 408, 421-22 (1st Cir. 2021) (alteration in original) (citation omitted). Nor does the Government even acknowledge the fact that "[a] decision to read

transcripts to the jury must be accompanied by safeguards." *United States v. Kennedy*, 46 F. App'x 200, 200 (4th Cir. 2002) (per curiam) (citation omitted).

Moreover, as explained in the Moving Brief, given his acquittal on the conspiracy charge in Count I of the Superseding Indictment, the admissibility of the communications between Mr. McMahon and his alleged co-conspirators, as reflected in many of these text-message chains of this evidence, is dubious at best. *See* McMahon Moving Br. at 71 n.25. Indeed, the Government does not even try to address the impact that Mr. McMahon's acquittal would have on the admissibility of this evidence under Federal Rule of Evidence 801(d)(2)(E), evidence which was not merely admitted, but also brought to life by the Government's presentation—a process that, in the interest of justice should not be revisited under Federal Rule of Criminal Procedure 33.

According to the Government, the Court's concern with its use of publishing witnesses stemmed from the fact that the witnesses' testimony "might be unnecessary and unduly time consuming in light of an unexpected weather event that caused early dismissal of court proceedings," and not at all the inappropriate nature of the Government's tandem readings. Gov't Opp. at 88. The Government may be correct: it was certainly the case that the Court was anxious about "finishing the trial" in light of its understanding of jurors' schedules, as well as "the strange weather or atmospheric conditions" that prevailed at the time. Tr. at 1174:10-11. But, while Mr. McMahon and his defense team do not pretend to know what was in the Court's mind, it seems that the time-consuming nature of this testimony was not the Court's only concern. Indeed, in the course of its discussion of the issue, the Court expressed its view that presenting "publishing witnesses who [were] simply reading records into evidence . . . [didn't] make any sense . . . because the documents [we]re already in evidence*." Id.* at 1174:5-7. The Court further explained that the Government could "simply show [the jury] [the messages] during [their] argument and say, here's

the chat, follow the story, as opposed to simply having this witness read in what [they're] going to re-present to them during closing," and acknowledged that the Government's repetitive tactic of reading in evidence that the jury would be re-presented with in closing "may not be necessary." *Id.* at 1175:14-24.

In response, the Government seeks to justify its conduct not by addressing the concerns raised by the defense but by arguing that Mr. McMahon's failure to point to specific examples in the transcript where "the government was able to choose what words to place emphasis on and modify his or her expressions and body mannerisms" leaves the defense without a remedy for what was, indisputably, the staged performance that took place. Gov't Opp. at 86 n.1 (quotation marks omitted); *see also id*. at 87. But the Government's burden-shifting approach ignores the reality of what occurred; as one Court put it, "[l]ost in the written word [of a transcript] are gestures, expressions, intensity of delivery, and other 'body language' which convey more than the printed page can hold." *United States v. Criden*, 648 F.2d 814, 831 (3d Cir. 1981) (Weis, J., concurring and dissenting in part); *see also Fanelli v. Centenary Coll*., 211 F.R.D. 268, 270 (D.N.J. 2002) ("[Because] words themselves may carry only a limited meaning, courts have also held that facial expressions, voice inflection and intonation, gestures, body language may all express a message" (cleaned up)). But, fortunately, this Court was present for the Government's dramatic performance and witnessed exactly what occurred. As detailed in the Moving Brief, *see* McMahon Moving Br. at 68-70, by allowing the Government to recreate something that never actually occurred—*i.e.*, orally performing written text messages—the Government was able to tell a biased, one-sided story by imparting its own meaning to the written words in the text messages; even if the AUSA and agents followed the script word-for-word, the Government was nonetheless able to portray the communications in a light most favorable to its case by choosing what portions of the messages to

49

read and what words to place emphasis on.  Whether that occurred or not, is a matter that simply cannot be ignored, or be immunized from analysis.  *See United States v. Allums*, No. S6 15-CR-153, 2018 WL 2128372, at *6 (S.D.N.Y. May 9, 2018) (denying relief where there was no analysis of whether the government's transcript reading was prejudicial, without discussing witness theatrics or length of testimony).

None of the other cases cited by the Government address the situation when a prosecutor and government agents—that have no firsthand knowledge of the evidence—performatively read text messages to the jury in the way, and at the length, that occurred here. To the contrary, those cases addressed other issues not raised here.  *See, e.g.*, *Bank of Nova Scotia v. United States*, 487 U.S. 250, 262-63 (1988) (analyzing whether IRS agents' reading from transcripts during a grand jury proceeding—in violation of Federal Rule of Criminal Procedure 6(d)—was unduly prejudicial); *United States v. Denton*, 944 F.3d 170, 185 (4th Cir. 2019) (analyzing whether a government agent's reading of internet posts crossed the line to impermissible expert opinion, without discussing witness theatrics or length of testimony); *United States v. Baker*, 923 F.3d 390, 397-98 (5th Cir. 2019) (analyzing whether a summary witness properly testified in a complex case with voluminous evidence).  Nor do any of them address the prejudice faced by a defendant who was, as a result, put in the position where he could not cross examine the performers, *i.e.*, the prosecutor or Government agent that read documentary evidence into the record at length—here, through four witnesses and over approximately 59 pages of transcript.

The Government relies largely on the decision of the Sixth Circuit in *Tragas*, but that non-binding decision actually explains the concern that Mr. McMahon expresses here.  In *Tragas*, the court recognized that "[a]s long as the evidence itself is properly admitted pursuant to the Rules of Evidence and does not run afoul of other safeguards like the Confrontation Clause, we do not see

how a defendant could be prejudiced if the evidence is read aloud to the jury." *Tragas*, 727 F.3d at 614. But the court did not close the door to the argument that reading text messages aloud—as this Court seemed to recognize—was improper: "A staged performance or re-enactment of an event by a prosecutor would undoubtedly be problematic insofar as it strayed from the direct evidence introduced at trial or reflected the prosecutor's opinions . . . ." *Id.* (citation omitted). And in all events, *Tragas* reveals that a lengthy tandem reading of evidence can lead to Confrontation Clause problems, which is precisely what happened here.

Indeed, the Government does not dispute that this critical testimony was placed beyond cross-examination. Rather, the Government claims that because Mr. McMahon had no right to cross-examine the text messages themselves, as the documents were already admitted into evidence, it makes no difference that Mr. McMahon could not cross-examine the AUSA and agents who read these messages aloud during trial. Gov't Opp. at 87-88. But the Government misses the point: there is no dispute that had the text messages been provided to the jury to read themselves or referenced during summation, they would have been outside the reach of cross-examination. That, however, is not what occurred here: the Government deliberately chose to call agents with no involvement in the investigation of this case to act out these messages and did not just enter these documents into evidence.

Having called a witness to testify at trial, the Government made cross-examination a right that the defendant could invoke. *See Pointer v. Texas*, 380 U.S. 400, 404 (1965) (reciting that the Confrontation Clause guarantees a criminal defendant the right "to confront the witnesses against him," which includes the right to cross-examine those witnesses); *United States v. Sponaugle*, 621 F. Supp. 3d 474, 493 (D. Del. 2022) ("Consistent with due process and federal practice, any witness called to the stand by a prosecutor to provide evidence to the factfinder as a basis for resolving a

fact dispute is subject to cross-examination." (citations omitted)).  By reading the text messages aloud to the jury, in a script-like fashion with the agents, the Government effectively stripped Mr. McMahon of this right, precluding him from challenging the reading of these messages.  That is because, by starring in this back-and-forth rendition, the AUSA was allowed to impermissibly insert his own testimony characterizing the evidence into the record, without being subjected to cross-examination.  Moreover, given the agents' lack of substantive knowledge about the facts in this case, Mr. McMahon's ability to thoroughly cross-examine these agents on the background and substance of the text messages that they read aloud was severely hampered.  Indeed, this was a reality that came to pass: Mr. McMahon's efforts to cross-examine witnesses on the substance of their testimony was unavailing.  *See, e.g.*, Tr. at 1228:19-1229:7 (testimony of Jeffrey Tarkin) ("Q. Do you see where it says Defendant McMahon 000625?  Do you know what that indicates?  MR. HEEREN: Objection, Your Honor.  THE COURT: Sustained. Sustained.  Q. I just want to make sure I understand what your role was. You testified that you reviewed the exhibits about which you have been reading from; correct?  A. Yes.  Q. Did you do any analysis at all of those exhibits?  A. No.  Q. Okay.  And so, for example, just in terms of the questions I'm asking, you don't know where those exhibits came from, how the Government got possession of them?  A. No."); *id.* at 463-64 (testimony of George Dietz) ("Q.  So just to be clear, let me make sure I understand what your testimony was.  The purpose of your testimony was to discuss all these exhibits that you've talked about for the last few hours, right?  A.  Correct, sir.  Q.  And how did you prepare to provide that testimony?  A.  I met with the government, I went through the exhibits that were provided and reviewed them.  In some instances, particularly with the emails, I received the original emails as well as the exhibits that were prepared, sir.  Q.  And I think you testified you were not involved in the actual investigation, your role was just to review those exhibits so you

could testify about them today, right?  A.  Correct, sir.  Q.  The exhibits you testified today were the ones that [the] government made available to you, right?  A.  That's correct.  Q.  You did not review the files otherwise to determine whether there were any other exhibits that were important to his matter [is that right?] . . .  A.  That's correct, sir."); *see also id.* at 409 (testimony of George Dietz) ("It says, 'It's called Operation SkyNet.'  Have you ever heard of Operation SkyNet?  A. I have never heard of Operation SkyNet.  Q. And you examined these documents; correct?  A. Yes.  Q. And they don't explain what Operation SkyNet is, do they?  A. I don't recall 100 percent of the content on here so it may, but to my recollection it does not."); *id.* at 1601:8-10 (testimony of Special Agent Marcus Rivera) ("Q. You don't know that Michael T. McMahon is the son of defendant Michael McMahon?  A.  I do now.  Q.  You do because of my question?  A.  Yes.").

Finally, the Government misconstrues Mr. McMahon's claim that the actual text messages are the best evidence of what occurred.  Mr. McMahon does not dispute that reading properly admitted exhibits into the record is ordinarily permissible; rather, his argument is that the messages themselves, as opposed to theatrical renditions, are the best evidence of their contents and did not require a live reading to the jury.[18]  *See Gordon v. United States*, 344 U.S. 414, 421 (1953) ("The elementary wisdom of the best evidence rule rests on the fact that the document is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description . . . .").  That is particularly so where that live reading risks the prejudice that actually

---

[18] As discussed *infra* at Part V, because of Mr. McMahon's acquittal on Count I, the admissibility of this evidence is highly questionable.  As the Government acknowledges, the best-evidence rule requires the admission of documentary evidence, here the text messages, prior to allowing such evidence to be read aloud to the jury.  *See* Gov't Opp. at 86 n.40 (quoting 1 McCormick on Evidence § 51 (8th ed.)).  Thus, without the messages themselves admitted into evidence, the Government's reading of them would be improper.  *See United States v. Miller*, 248 F. App'x 426, 429 (3d Cir. 2007) (noting that the best-evidence rule requires "a party [to] produce original documents if a witness testifies to the actual content of a writing").

occurred here, up to and including Mr. McMahon's conviction—one that is unjust but, fortunately

can be redressed by granting him a new trial under Federal Rule of Criminal Procedure 33.

## IV.    THE GOVERNMENT'S REBUTTAL WAS IMPROPER.

In his Moving Brief, Mr. McMahon moved for a new trial based on the Government's

having raised new matters in rebuttal to which he did not have a chance to respond, and having

included false or unsupported statements in that jury address, at a time when the defense could not

set the record straight.  McMahon Moving Br. at 73-86.  The Government argues that this motion

should be denied for four reasons.  Gov't Opp. at 89.

*First*, the Government contends that Mr. McMahon waived any argument about the

impropriety of the Government's rebuttal by failing to object.  Gov't Opp. at 89.  Here, the

Government respects the common courtesy that counsel accord to one another during jury

addresses for knowing waiver; as well, counsel was cognizant of the Court's prior rulings, when

others objected, overruling those objections because it was just "argument."  *See, e.g.*, Tr. at

1967:2-7 ("MR. GOLDBERGER: Objection.  That's not the evidence.  THE COURT: Overruled.

You'll have your opportunity to make your argument, as well.  This is the Government's argument,

again, ladies and gentleman.").  As well, the rebuttal came at a time when the trial was, as far as

the defense knew, getting very close to its conclusion, and a time at which jurors would not be

available to deliberate, militating against interruptions, as well as against a request for sur-rebuttal.

*See id.* at 1376:23-1377:20 (colloquy discussing schedule with regard to concluding the trial:

"THE COURT: All right.  We are getting into somewhat dangerous territory, is all I can say, in

terms of finishing by Friday, because the jury obviously needs time to deliberate."); *see also id.* at

1478:14-24 (THE COURT: "But bear in mind the jurors, based on the estimate given during jury

selection and I think at the beginning of trial, are expecting that they'll be getting the case before

the end of next week.  And some of them have already said that they're not going to be available

the week after or they have some issues with the week after, not to mention that Monday is a court holiday. So, again, everyone will still have to do what they think they must, with respect to their respective cases, but I just want us all to be on the same wavelength with respect to some potential time restrictions or pressures that we have.").

In any event, the undersigned counsel's failure to object during the Government's summation and rebuttal should not be held against Mr. McMahon; nor, of course, does anything prevent the Court from redressing the resulting injustice and unfairness now, *see* Fed. R. Crim P. 33(a) (permitting trial judge to grant a new trial "if the interest of justice so requires"); 2 Federal Trial Handbook: Criminal, ch. 74, § 74:9 (Dec. 2022) (outlining the "several options available to the court" for intervening "to preserve a constitutionally fair trial for the defendant," including granting a mistrial resulting from improper prosecutorial remarks). The Court can and should exercise its discretion to address the issue now, rather than wait until this same argument arises as an ineffective-assistance-of-counsel claim in a subsequent § 2255 motion based on the failure to object.

*Second*, the Government attempts to cherry-pick statements from the trial, *see* Gov't Opp. at 90-93, to hide the issue raised by Mr. McMahon: in numerous respects, the Government's rebuttal ventured to places never developed during its summation or elsewhere, preventing Mr. McMahon from responding to these issues during his summation. *See* McMahon Moving Br. at 73-85. As Mr. McMahon argued in the Moving Brief, *see* McMahon Moving Brief at 74-76, "[f]airness would dictate that a [defendant not be confronted] with a new theory (albeit based on record evidence) at almost literally the last minute of a long trial." *United States v. Gleason*, 616 F.2d 2, 26 (2d Cir. 1979); *United States v. Yakobowicz*, 427 F.3d 144, 153 (2d Cir. 2005) (deducing that closing procedure is "a process that increasingly locks in the prosecution to a particular theory

of the case while putting off the defense's commitment to a theory until the last practical moment and even then allowing the defense merely to seek to poke holes in the government's case"); *United States v. Alegria*, No. 90-cr-450, 1991 WL 238223, at *12 (S.D.N.Y. Nov. 6, 1991) (reasoning that the Government may not "adopt[] a 'wait-and-see approach'" that "deprive[s the defendant] of his rightful opportunity to respond").

Turning to the issues that the Government does address, Mr. McMahon does not dispute, as the Government contends, that the parties discussed the concept of conscious avoidance during the pendency of this matter; for example, during the discussion of jury instructions. *See* Gov't Opp. at 90. But that is not the point of Mr. McMahon's argument, which is that this theory did not appear during the Government's principal summation. And here, the Government concedes that its summation never *expressly* referred to any theory of liability about conscious avoidance, as the rebuttal most certainly did. *See id.* at 91-92. Accordingly, defense counsel did not respond to a conscious-avoidance theory of liability during its summation.[19] Instead, the Government waited to develop this theory on rebuttal, preventing defense counsel from any meaningful argument on the subject. *Compare* Tr. at 1975:7-9 (Government summation) ("That should have been a red flag to anybody and certainly to a private investigator with McMahon's lengthy law enforcement history."), *with id.* at 2139:17-24 (rebuttal) ("Now, the evidence shows that McMahon knew what

---

[19] Indeed, had the Government asserted a conscious-avoidance theory during its summation, defense counsel could have addressed it by citing to the Court's jury instructions on this point and argued that Mr. McMahon did not "close[] his eyes" to the truth, but rather was mistaken in his belief that he was performing investigative services for a private Chinese company. *See* Tr. at 2171:20-2172:5 ("If you find beyond a reasonable doubt that the Defendants you are considering acted . . . with or that the defendant's floor positive in nor rans was solely and entirely the result of a conscious purpose of avoid leaning the truth, then this element may be satisfied, however guilty knowledge may not be established by demonstrating that the Defendant was merely neglect, foolish or mistaken. It is entirely up to you whether you find the Defendant deliberately closed his eyes and any inferences to be drawn from the evidence on this issue.").

the was doing, regardless of his background.  *But to the extent that you need consider whether McMahon consciously avoided knowing what was going on*, consider this fact: If anyone should have known what he was doing was wrong, that there were major red flags that he should have looked into, that the was obviously participating in criminal activity, it was a former member of law enforcement." (emphasis added)).

Nor was it fair for the Government to drop a few hints in its summation only to then fully develop an argument proposing a whole theory of prosecution, at a time when defense counsel is powerless to respond.  Indeed, the Government's preferred case, *United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012), does not give the Government license to proceed in this matter.  In *Coplan*, the Government summarily presented an argument in its summation as "one of the most galling examples" of the defendant's fraud and returned to that argument in its rebuttal.  *Id.* at 86.  But that was not the case here, where the Government, in its summation, made one vague reference to a "red flag" in the broader context of Mr. McMahon's knowing participation with the PRC government, without arguing the applicability of the law of conscious avoidance, or making an argument that Mr. McMahon consciously avoided this knowledge, which would have been a specific reference to a particular doctrine, and jury instruction on that subject.  Of course, one reference to a "red flag" is a far cry from the "most galling example," which was the issue in *Coplan*.

The same error infects the Government's argument responding to Mr. McMahon's argument that the Government had never, before rebuttal, even mentioned the notion that his calls to law enforcement were meant to make "it less likely that they would show up and inquire about Gallowitz and McMahon's conduct," and thus were incriminating, as opposed to exculpatory, as Mr. McMahon had argued throughout.  *See* Gov't Opp. at 93.  The Government claims that it

"unambiguously developed this argument through witness testimony and documentary evidence," *id.*, but fails to engage with the argument that Mr. McMahon does make: that the Government, instead of advancing this argument in summation, laid a trap that it then exploited in a genuine case of "gotcha" on summation. Indeed, on closer inspection, the Government's contention that it "developed" the issue during trial is a significant overstatement; to the contrary, the Government's argument turns on a single question asked to a defense witness, Eric Gallowitz. *See* Tr. at 1831:9-12 (testimony of Eric Gallowitz) ("Q. No? Okay. And when you called the police to let them know you're there, you know that if they get a call for a suspicious vehicle, they're less likely to show up, right? A. Correct."). Perhaps it is true that this should have signaled to the defense that this would be the Government's position, but when it was not raised on summation, the defense reasonably did not address it in Mr. McMahon's summation. When it then came up for the first time on rebuttal, Mr. McMahon was essentially deprived of the opportunity to argue the contrary inference—that Mr. McMahon's calls to local law enforcement demonstrated transparency and a lack of criminal intent and, more specifically, was not, in fact, an effort to stop law enforcement from showing up at the place of his surveillance activities. Certainly, the Government never "developed" its theory of why Mr. McMahon notified local law enforcement of his surveillance activities during trial—and certainly did not do so to the level of the prosecutors in *Coplan*, 703 F.3d at 87, which presented "ample evidence to support" a reasonable inference made for the first time in rebuttal.

*Third*, the Government's contention that the false or misleading statements that it made on rebuttal were, instead, reasonable inferences from evidence fails, for several reasons. *See* Gov't Opp. at 93-95. Initially, as is discussed *supra* at Section I.A.2.b and in the Moving Brief, *see* McMahon Moving Br. at 81-85, the "inferences" which the Government sought to draw for the

first time on rebuttal—(1) that Liu Yan saw Mr. McMahon surveilling her while she was bringing

Xu Jin's father to the Livingston Mall; (2) that the substance of the *China Daily* article stated that

the actions at issue here fell under the aegis of Operation Sky Net, though that program, unlike

what happened here, is an operation specifically designed to get back to China through legal

means; and (3) that Mr. McMahon switched to cash payments after reading the *China Daily* article

were completely belied by the evidence presented at trial, and, specifically, deprived Mr.

McMahon of the opportunity to argue that the statements were, indeed, false.  To briefly reiterate:

- It was not reasonable to conclude, for the first time on rebuttal, that, based on the fact that Liu Yan saw a "non-Chinese person following her when she drove her elderly relative to meet with Xu Jin," Gov't Opp. at 94, this "non- Chinese person" must have been Mr. McMahon.  This is especially so, given that she could not identify Mr. McMahon at trial.  *See* Tr. at 128:14-19 ("Q.  Ms. Liu, do you recognize Mr. McMahon?  A.  I do not.  Q.  You've never seen him before?  A. No.  Q.  You've never met him before?  A.  No.").  *See supra* Section I.B, at 39-40.

- It was also plainly false for the Government to state, once again, for the first time on rebuttal, that the *China Daily* article states that "Operation Skynet is an operation to get people back to China," Tr. at 2129:12-13, when the heading of the China Daily article read: "Interpol launches global dragnet for 100 Chinese fugitives" and the subheading only stated that: "It's called Operation Sky Net.  Amid the nation's intensifying anti-graft campaign, arrest warrants were issued by Interpol China for former State employees and others suspected of a wide range of corrupted practices."  Exhibit 434.  That is, the article actually describes a lawful process, effected by Interpol, to repatriate people; it does not discuss operations like the one at issue here, a point that Mr. McMahon did not have the opportunity to make following the Government's misleading characterization.  *See supra* Section I.A.2.a, at 13-15.

- The Government's statement that "after [Mr. McMahon] does the research and finds that China daily article about Skynet, he transferred the cash, the $5,000 in cash that doesn't make its way into a bank account," Tr. at 2137:1-9, is likewise, simply false.  That is, the Government's rebuttal did not state, as it does in its opposition brief, that, after the initial payment to Mr. McMahon's business account, the remaining payments "went to a joint personal account, his son's bank account, or were never put into a bank account and apparently held in cash."  Gov't Opp. at 95.  Nor does the Government's rebuttal note that the very next payment that Mr. McMahon received after the October 5, 2016 check from Transperfect Language Services that was deposited into his McMahon Investigative Group business account, *see* Exhibits 403B; 403E, was a wire transfer on December 13, 2016 in the amount of $5,945.00, which went into Mr. McMahon and his wife's joint checking

account in their own names, *see* Exhibit 430A; 403K, only after the wire failed to transfer into the McMahon Investigative Group business account several days earlier, on December 9, 2016, *see* Exhibit 3061.  *See supra* Section I.A.2.b, at 30-31.

In sum, the Government's characterizations of the evidence, appearing for the first time in rebuttal, were—at the very least—sufficiently misleading that they demanded the kind of response that was not available after rebuttal.  Clearly, the Government used rebuttal not only to get the last word in, as is allowed in the federal system, but to do so at a time when the defense would have no opportunity to set the record straight.

*Fourth*, and finally, the Government downplays the substantial prejudice that its abusive rebuttal had on the jury. The Government hypothesizes, for instance, that "there is little doubt that McMahon would still be convicted even absent these specific remarks."  Gov't Opp. at 97.  But that argument is belied by the Government's own remarks: if these points were so innocuous, they would not have been included in the rebuttal at all, let alone held until they could not be responded to.  Moreover, the split (and, as set forth below, inconsistent) verdicts show that the jury believed this case to be a close one—rendering these improper prosecutorial remarks in rebuttal potentially dispositive.  In the interests of justice, they demand a new trial.  *See United States v. Ballard*, 727 F. App'x 6, 10 (2d Cir. 2018) (remanding for a new trial and finding government's misconduct during rebuttal "undermine[d] a defendant's constitutional right to present a defense" and "appear[ed] to reduce the government's burden to prove guilt beyond a reasonable doubt at trial" (citations omitted)); *United States v. Friedman*, 909 F.2d 705, 709 (2d Cir. 1990) (remanding for a new trial and holding that, during its rebuttal, "the prosecutor managed in one breath to undermine the presumption of innocence, the Government's obligation to prove guilt beyond a reasonable doubt, and the standards of propriety applicable to public prosecutors").

In sum, the Government's tactical decision to raise new theories and unsupported facts on rebuttal that had not been raised in particular, during its principal summation was inappropriate and even constitutionally problematic. For these reasons, as well as the others set forth in this brief, the Court should grant this motion for a new trial under Rule 33, in the interest of justice.

## V.   EXHIBIT 704A WAS NOT PROPERLY ADMITTED AT TRIAL, PURSUANT TO RULE 801(D)(2)(E).

In his Moving Brief, Mr. McMahon argued that a critical exhibit, Government Exhibit 704A, which was the transcript of a meeting among three people, none of whom testified, and which was admitted under Federal Rule of Evidence 801(d)(2)(E), should not have been admitted under that Rule. The Government, not surprisingly, disagrees. Gov't Opp. at 98. The Government's analysis is incorrect, and troubling.

As an initial matter, the Government suggests that Mr. McMahon waived this argument by not specifically objecting to Exhibit 704A's admission at trial on Rule 801(d)(2)(E) grounds, though he did oppose it on authentication grounds. Gov't Opp. at 98. It is true that Mr. McMahon's objection was not as fulsome as it should have been, which is regrettable. Fortunately, however, the Court can—and now it should—consider Mr. McMahon's argument post-trial and correct the injustice caused by the admission of this tape recording, upon which the Government relied so heavily in its arguments to the jury. *See* Tr. at 1946:6-17 (Government summation) ("Tu Lan was emphatic. She directed Johnny Zhu to tell McMahon everything. She said, and I quote, Tell him clearly, I mean, you need to tell him clearly about everything. You can see that in GX 704A. The next day, on April 4, 2017, the team began carrying out that plan. Johnny Zhu met with McMahon at the same place he had met with Zhu Yong and Hu Ji previously, the Panera bread in New Jersey. They met for nearly an hour. You can conclude that at that meeting, just as Tu Lan directed, Johnny Zhu told McMahon everything."); *id.* at 1983:16-1984:8 ("Back on April

3rd, 2017, there was a meeting with Tu Lan and Zhu Feng. That meeting, Tu Lan – again, the Chinese prosecutor tasked with bringing Xu Jin back to China – specifically said, talking about McMahon: Tell him clearly. I mean, you need to tell him clearly about everything. That's GX 704-A. April 4th, 2017 is the meeting at Panera Bread that you've heard about. You can see from these surveillance photos that the meeting lasted almost an hour. That was the day after the hotel meeting at which Tu Lan instructed that McMahon should be told clearly about everything."); Tr. at 2133:13-2134:11 (rebuttal) ("Again, context is everything. The surveillance photo of Mr. McMahon walking into the Panera Bread with his co-conspirators is not the only evidence. The evidence is the day before, Prosecutor Tu Lan directed Johnny Zhu to tell McMahon everything. Then they had a meeting, an hour-long meeting. Defense counsel conceded as much, yes, it is an hour-long meeting. They weren't talking about the weather for an hour."). Indeed, correcting such an injustice is the very purpose of Rule 33. *See United States v. Aiyer*, 470 F. Supp. 3d 383, 410 (S.D.N.Y. 2020) (reasoning that courts may consider evidentiary arguments made for the first time in Rule 33 motions if a "manifest injustice" would otherwise occur). As noted in the Moving Brief, admission of Exhibit 704A was extremely prejudicial to Mr. McMahon because of the centrality of it to the Government's case. *See* McMahon Moving Br. at 92-93 (collecting cases).

Highlighting the prejudice that Exhibit 704A poses to Mr. McMahon is its suspicious origins. As outlined in his Moving Brief, Mr. McMahon inquired of the Government who recorded the tape recording and whether that conversation was recorded at the direction of the Government—an inquiry which the Government rebuffed, refusing to provide any information. McMahon Moving Br. at 93 n.29. Accordingly, Mr. McMahon asked the Court to formally inquire into the tape recording's origin, *id.*, a request to which the Government did not respond in its opposition brief. Of course, the Government's snub only enhances the air of mystery around the

tape recording; after all, the entire complexion of the case—and certainly of the nature of the conversation at issue—changes if Johnny Zhu was a Government informant. But the Government's opacity also deprives the Court of the opportunity to make the kind of careful admissibility analysis of Exhibit 704A, which will certainly turn on the origin of the tape recording. That is, without knowing the circumstances in which this tape recording was made, the Court cannot reasonably assess whether Johnny Zhu's "efforts as an agent of the government supplant his efforts as an agent of his co-conspirators." *United States v. Monteleone*, 257 F.3d 210, 220-22 (2d Cir. 2001); *see also United States v. Eisenberg*, 596 F.2d 522, 527 (2d Cir. 1979) (admitting statements made by government informants under co-conspirator hearsay exception because the government informants "were not [acting as] agents for the Government but were off on a frolic and detour for their own private profit"). Though this may not trouble the Government, it should— again in the interests of justice—be of significant concern to the Court.

Moreover, regardless of Mr. McMahon's request for an inquiry surrounding Exhibit 704A's origins, the Government's response, and particularly the cases which it cites in support of its argument, do not address Mr. McMahon's fundamental argument, which is that the Government failed to prove a conspiracy involving Mr. McMahon prior to April 3, 2017. *See* Gov't Opp. at 100-01. Although it is true that a court may admit co-conspirator statements made before a later-proven conspiracy was formed under the theory that the defendant "assumes the risk for what has already happened," *United States v. Farhane*, 634 F.3d 127, 161 n.35 (2d Cir. 2011) (citations omitted), the Government misses the point: the evidence that the Government adduced at trial attempted to show that Mr. McMahon was *always* part of a conspiracy, not that Mr. McMahon joined it on April 4, 2017. *See* Gov't Opp. at 54 (arguing the fact that Mr. McMahon found out that Xu Jin was wanted by Interpol in October of 2016 somehow created an inference that Mr.

McMahon knew that he was working for the PRC government, the same evidence used to prove Count I against Mr. McMahon).  As is set forth above, that theory—understandably rejected by the jury—turns on speculation or unreasonable inference.  *See supra* Section I.A.2.a, at 20.  Thus viewed, the Government has failed to show that "the statements or acts of the coconspirator [Mr. McMahon] were made while the conspiracy was active, that is after it was formed and before it ended." *United States v. Saneaux*, 365 F. Supp. 2d 493, 499 (S.D.N.Y. 2005) (citation omitted); *see also, e.g.*, *United States v. Patel*, No. 31-cr-220, 2023 WL 2643815, at *48 (D. Conn. Mar. 27, 2023) ("Therefore, the statements related to the alleged agreement with Individual One may be admissible if the Government can show by a preponderance of evidence that the charged conspiracy existed for a certain time period, the statements were made in furtherance of the charged conspiracy, and *that each Defendant was a member of the charged conspiracy*." (emphasis added)).  Mr. McMahon was not a coconspirator of anyone at any time, let alone of the participants in the conversation captured in Government Exhibit 704A.  He should not have been tagged with their statements, especially given the uncertainty as to the origin of the tape recording.

## VI.   THE GOVERNMENT FAILED TO FULFILL ITS PROMISES TO THE COURT AND INTRODUCED HIGHLY PREJUDICIAL AND INADMISSIBLE EVIDENCE AGAINST MR. MCMAHON.

Finally, Mr. McMahon argued that the Government was able to persuade the Court to admit certain evidence based on its representations about the evidentiary support it would present at trial, but then proceeded to provide none of that support.  Specifically, Mr. McMahon challenged the Government's failure to prove—as it promised to do—that Mr. McMahon impermissibly accessed Government databases for his investigation in this matter and that Mr. McMahon failed to report the income generated on his tax records.  McMahon Moving Br. at 94-109.  The Government responds that it neither misrepresented the evidence it promised to adduce nor failed to provide the support to justify the admission of evidence about Mr. McMahon's purportedly improper

acquisition of Department of Motor Vehicle and Homeland Security records and supposed underreporting of his income on his tax returns.  Gov't Opp. at 102-07.  For the reasons in the Moving Brief and below, his motion for a new trial, alone or in combination with the other grounds here, *see United States v. Moten*, 582 F.2d 654, 660 (2d Cir. 1978) (noting that, "to determine whether any grounds exist for a motion for a new trial," "the entire picture should be explored" (citations omitted)), should be granted.

*First*, as to the NJMVC information, the Government asserts that because "McMahon signed an agreement indicating he understood that the NJMVC 'prohibits using records to conduct surveillance or to investigate or locate an individual for reasons not specifically related to motor vehicle activity,'" but nevertheless "conducted a search of NJMVC records, at the request of Zhu Feng, for information related to the victim and his family, and then provided Zhu Feng with the results," "it was both accurate and appropriate for the government to urge the inference that McMahon's conduct amounted to 'surveillance or to investigate an individual' unrelated to 'motor vehicle activity,' and therefore constituted a direct violation of NJMVC rules and regulations." Gov't Opp. at 102-03.  Thus, the Government argues, Mr. McMahon's assertions "that his use was lawful" was "merely [an] alternative inference[] which the jury was free to reject, not proof that the government's inferences were false."  *Id.* at 103.  But this is not a matter of inference: the question is whether there was sufficient evidence to justify admission of this evidence in the first place.  Indeed, as is detailed in the Moving Brief, *see* McMahon Moving Br. at 96-100, the Government specifically promised, pretrial, to adduce evidence from "an individual who actually works for the New Jersey motor vehicle database that controls the records essential that are at issue," Tr. at 58:12-14, that Mr. McMahon unlawfully accessed NJ CAIR.  *See* Gov't Mot. *in Lim*., at 32-33.  That the Government should have been required to present such evidence was made

clearer only by the evidence at trial, which showed that Mr. McMahon's action did not in fact violate NJMVC rules or regulations: (1) NJMVC allows private investigators to use the NJ CAIR database, *see* Tr. at 1537:10-21 (testimony of Jessica O'Connor); (2) Mr. McMahon disclosed his intended use of the NJ CAIR database on his initial application, *see* Exhibit 408D; and (3) NJMVC conducted an audit of Mr. McMahon's use of the NJ CAIR database in a similar matter, *see* Exhibit 408I, and allowed him to continue using the NJ CAIR database thereafter, Exhibit 408H.

Mr. McMahon argued pretrial that evidence of his purported violation of NJMVC rules should not have been allowed under Federal Rule of Evidence 403. *See* ECF No. 217 ("McMahon Mot. *in Lim.*") at 19-20. The Court, however, allowed this evidence based on the Government's representation that it would show that Mr. McMahon's actions were unlawful and that this fact was somehow relevant to whether he understood that he was working for the PRC Government and was committing stalking. As discussed *supra* at pages 17 to 18, that inference is an unreasonable one. Nor would the Court have allowed the evidence in the first place, as it made clear, *see* Tr. at 519:3-10 ("But the Government should be permitted to counter that narrative by saying no, in fact, some of the acts they say he did as part of the charged conspiracy were not open and were not honest. They were secretive *and they violated the terms of his access to certain databases* . . . ." (emphasis added)), but for the Government's promise to produce proof, which, as it turned out, it did not, *see* Gov't Mot. *in Lim.* at 32-33 (arguing that the Government would be able to prove at trial that Mr. McMahon violated "applicable federal and New Jersey state privacy laws, including Title 18, United States Code, Section 2721, which prohibits the release and use of certain personal information from State motor vehicle records"). Under these circumstances, the Court's decision to admit the evidence at issue was error, and the admission requires that a new trial be granted.

*Second*, the Government, in response to Mr. McMahon's argument "that the government failed to prove that he did anything improper related to DHS records,"— again, something that it promised to do during pretrial proceedings—contends that the evidence presented at trial was "more than sufficient to support the inference that McMahon obtained information from the DHS records from Finning." Gov't Opp. at 103-04. But this was not the basis on which the Government sought to introduce this evidence; it was adduced, as the Government made clear pretrial, to show that Mr. McMahon had knowingly violated the law, a fact which—the Government argued, and Mr. McMahon continues to challenge, *see supra* Section I.A.2.a, at 16-17; Gov't Mot. *in Lim.* at 34-35; McMahon Mot. *in Lim.* at 18—purportedly shows that Mr. McMahon is more likely to have committed the offenses here. But the Government, again, failed to make that showing, as it had promised to do. For example, it did not call Agent Finning to the stand after explicitly representing to the Court that it would. *See* Tr. at 498-99. Beyond this not shedding light on whether Mr. McMahon knew or could have known that what he was doing was wrong, the Government's failure to call Agent Finning also left the Government with no way of showing that the searches run through the DHS database related to Xu Jin and his family were even at Agent Finning's direction, a fact that was otherwise unproven, and not susceptible of an inference. *See supra* Section I.A.2.a, at 17-18; Tr. at 1460:19-20, 1471:4-10 (testimony of Special Agent Habeeb, during which she admitted that she did not recall who asked her to run the searches), or for the benefit of Mr. McMahon, *see* Tr. at 1462:2-1464:3 (colloquy with the Court, during which the Court recognized that Special Agent Habeeb was "not an appropriate person" to connect the DHS searches to Mr. McMahon); *see also id.* at 1470:18-1471:3, 1471:19-24 (testimony of Special Agent Habeeb, during which she admitted she did not know if the searches were ran in connection with an ongoing investigation relating to foreign money laundering in China); Exhibit 429 (email transmitting

travel information related to Xu Jin and Liu Fang containing a disclaimer that the proper dissemination of information received from the DHS is the responsibility of the DHS employee). In sum, for the reasons detailed in the Moving Brief, *see* McMahon Moving Br. at 100-06, the witness that the Government presented in lieu of Agent Finning could not—no matter how many times the Government argues to the contrary—show that the searches related to Xu Jin and his family were improper or, especially, that Mr. McMahon *knew* that Agent Finning providing him with the information he did violated DHS policy.  The Government, then, failed to make good on its promise to provide the foundation for the admission of this evidence, which should have therefore not been admitted, as Mr. McMahon argued pretrial.  *See* McMahon Mot. *in Lim.* at 11-20.  Moreover, this evidence's admission was highly prejudicial; indeed, it was a centerpiece of both the Government's summation, *see* Tr. at 1877:21-1979:1, and its rebuttal, *see id.* at 2132:21-2133:6.  This error requires that a new trial be granted under Rule 33(a).

*Third*, the Government continues to argue, really inexplicably, that "the evidence at trial shows no broken promises" to the Court about Mr. McMahon's purported failure to report his income related to this matter on his tax returns.  Gov't Opp. at 105-06.  To the contrary, although the Government resisted Mr. McMahon's pretrial motion to preclude this evidence on the basis that it was so obviously prejudicial in that it would leave the jury with the impression that Mr. McMahon was a law-breaker, and argued that it would "show that McMahon did not report the over $13,000 received for his work surveilling the Victims as income in 2016 and 2017," Gov't Mot. *in Lim.* at 35, as it turned out, no competent evidence was presented at trial to demonstrate that Mr. McMahon had in fact failed to report this income to the IRS.  *See supra* Section I.A.2.a, at 23-25.  Thus, the Court admitted evidence that Mr. McMahon purportedly failed to report the income on his taxes specifically based upon the Government's promises of proof at trial.  *See* Tr.

at 65:7-11 ("I think the fact that Mr. McMahon . . . failed to report the income on his taxes, could give rise to an inference to the jury that he was somehow concealing what he was doing."). Despite the Government's attempt to reduce this dispute to a math problem, *see* Gov't Opp. at 105, as detailed in the Moving Brief, *see* McMahon Moving Br. at 107-09, the Government called no tax expert, did not account for business deductions, and never traced the $13,000 in allegedly underreported taxes to any illegal activity. *E.g.*, Tr. at 1600:22-23 (testimony of Special Agent Marcus Rivera) ("Q. And, by the way, are you a tax expert?  A. No."). Though it had failed, therefore, to fulfill the promise of its offer of proof, the Government was able to argue to the jury in both summation, *see* Tr. at 1982:10-25, and rebuttal, Tr. at 2142:3-14, that Mr. McMahon was a tax cheat. The prejudice is obvious.

*Fourth*, and finally, the Government argues that, even if "there was some material difference in what the government expected the evidence to prove and what the evidence in fact showed at trial," Mr. McMahon "provides no legal basis for why such an issue warrants a new trial under the Rule 33 legal standard" and that, "at no point in the trial did McMahon ask the court to reconsider its rulings of admissibility or seek some other curative instruction." Gov't Opp. at 106. This invitation to avoid the consequences of its own failure, cannot succeed.

Most significantly, the evidence at issue was vigorously challenged pretrial, not only preserving the issue for further litigation but also providing the Government with the roadmap for how to admit these proofs—a roadmap the Government declined to follow. The Government cites no authority, and there obviously is none, to support the argument that the defense was required to object to this evidence again and again, when it was the Government, after all, that had failed to do what it had promised. Indeed, the law is directly to the contrary. *E.g.*, *United States v. Lui*, 941 F.2d 844, 846 (9th Cir. 1991) ("A pretrial motion in limine preserves for appeal the issue of

admissibility of that evidence if the substance of the objection has been thoroughly explored during the hearing and the district court's ruling permitting introduction of evidence was explicit and definitive." (citation omitted)); *Tellez v. OTG Interactive, LLC*, No. 15-8984, 2020 WL 704844, at *2 (S.D.N.Y. Feb. 12, 2020) ("Defense counsel did not ask the Court to strike plaintiff's testimony, but his earlier objection to further explanation, combined with his motion in limine on the subject were sufficient to preserve the issue.").  And even clearer, the defense preserved its objection on the issue, *see* Tr. at 55:24-56:3, 67:18-19; accordingly, no further request to "the court to reconsider its rulings of admissibility or seek some other curative instruction," Gov't Opp. at 106, was required.

    In any event, once again, the introduction of this evidence helps to explain the inexplicable verdict in this case, and the Government's failed promises based on which this evidence was introduced, allows the Court to grant a new trial because "the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Mr. McMahon's motion should be granted.

## CONCLUSION

    For the reasons set forth above, in Mr. McMahon's Moving Brief and at oral argument, which Mr. McMahon respectfully requests, his motions for a judgment of acquittal under Federal Rule of Criminal Procedure 29 or, in the alternative, for a new trial under Federal Rule of Criminal Procedure 33, should be granted.

Respectfully submitted,
**GIBBONS P.C.**
*Attorneys for Defendant*
*Michael McMahon*

By:    <u>/s/ Lawrence S. Lustberg</u>
        Lawrence S. Lustberg, Esq.
        Genna A. Conti, Esq.

Date: October 23, 2023