UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
UNITED STATES OF AMERICA,

        - against –

MICHAEL McMAHON, ZHENG
CONGYING, and ZHU YONG,

                  Defendants.
-----------------------------------------------------------x

**MEMORANDUM & ORDER**
21-CR-265 (PKC)

PAMELA K. CHEN, United States District Judge:

On June 16, 2023, at the conclusion of a 13-day jury trial, Defendants Michael McMahon ("McMahon"), Zhu Yong ("Zhu"), and Zheng Congying ("Zheng") (collectively, "Defendants") were convicted of various crimes connected to an international effort led by the government of the People's Republic of China ("PRC" or "China") to repatriate, through intimidation and other tactics, Chinese nationals living outside of that country to face criminal charges in China. This effort has been labeled "Operation Fox Hunt" and "Operation SkyNet" by the Chinese government. Defendants now move pursuant to Federal Rule of Criminal Procedure ("Rule") 29 to vacate the guilty verdicts rendered against them, and for a new trial pursuant to Rule 33. (Zhu Mot. to Vacate and for a New Trial, Dkt. 277 (hereinafter "Zhu Mot."); Zheng Mot. to Vacate and for a New Trial, Dkt. 278 (hereinafter "Zheng Mot."); McMahon Mot. to Vacate and for a New Trial, Dkt. 279-1 (hereinafter "McMahon Mot.").) For the reasons set forth below, these motions are denied.

## BACKGROUND

### I.    The Charges

On July 21, 2021, Defendants and six other individuals, including fugitives Hu Ji (also known as "Eric Yan"), Li Minjun, Tu Lan, and Zhu Feng (hereinafter "Johnny Zhu"), were charged

in a Superseding Indictment with: (1) conspiracy to act as an agent of a foreign government without prior notification to the Attorney General, in violation of 18 U.S.C. § 371 ("Count One"); (2) acting as an agent of a foreign government without prior notification to the Attorney General, in violation of 18 U.S.C. § 951(a) ("Count Two"); (3) conspiracy to engage in interstate stalking in violation of 18 U.S.C. § 371 ("Count Three"); and (4) stalking, in violation of 18 U.S.C. § 2261A(1)(B) ("Count Four").  (First Superseding Indictment (hereinafter "S-1 Indictment"), Dkt. 77.)  Counts Two and Four also charged Defendants with aiding and abetting or willfully causing the offenses charged in those counts, under 18 U.S.C. § 2.

## II.    The Trial

Construed in the light most favorable to the government, *see United States v. White*, 7 F.4th 90, 98 (2d Cir. 2021), the government's proof at trial—which included 25 witnesses and a large volume of documentary, photographic, and video evidence—established that, beginning around the spring of 2016, the PRC engaged in a multi-year campaign to coerce Chinese national Xu Jin and his wife, Liu Fang, to return to China after they defected to the United States from that country.  While the Court assumes the parties' familiarity with the trial record, the factual details relevant to the Court's analysis are provided below.

### A.    Operation Fox Hunt

For context on the sociopolitical background in this case, the government offered the testimony of Andrew Wedeman, a political science professor at Georgia State University who specializes in the study of Chinese domestic politics.  (Tr. 531–32.)  Wedeman explained the structure of the Chinese government, the Chinese Communist Party, and China's campaign to repatriate its citizens living abroad who "the Chinese government believes have committed criminal offenses," called "Operation Fox Hunt."  (Tr. 568.)  Operation Fox Hunt was eventually

merged into another effort dubbed "Operation Skynet," which was a project with a similar goal of repatriating Chinese citizens and also to "cut off the flow of illegal money out of China and into China." (Tr. 569.)

Wedeman explained Operation Fox Hunt's major goals: (1) a policing goal of locating Chinese nationals living abroad and bringing them back to China; (2) a deterrent goal of signaling to "corrupt officials and those who may be contemplating corruption" that if a criminal act is committed by a government official in China, the Chinese government will pursue him or her; and (3) the broad goal of informing the Chinese public that the PRC government "is willing and able to pursue suspects to the far corners of the world and bring them back to face Chinese justice." (Tr. 568–69.) The Ministry of Public Security—the PRC's central government policing agency— which, according to Wedeman, is "roughly equivalent" to the Federal Bureau of Investigation ("FBI") in the United States (Tr. 567; *see also* GX 441), is the agency responsible for locating and detaining suspects who are repatriated to China. (Tr. 571.) The Supreme People's Procuratorate— the central prosecutorial authority in the PRC—"roughly equivalent" to the Department of Justice in the United States (Tr. 566–67; *see also* GX 441), according to Wedeman, is "tasked with investigating and prosecuting individuals accused of offenses[,] including corruption." (Tr. 571.)

The PRC employs various methods to coerce Chinese nationals back to China, including approaching the family members of the wanted individual and urging those family members to put pressure on their relative to return.[1] (Tr. 574.) According to Wedeman, because "family is the fundamental unit" in Chinese culture, approaching a target's family signals to that person that his or her "lack of return to China is putting the family in danger." (Tr. 576.)

---

[1] These efforts rely on "voluntary return," as the United States does not have an extradition treaty with China. (Tr. 574–75, 587.)

At trial, the government established that several individuals charged as defendants and co-conspirators in the case (though not on trial) were PRC government officials. Defendant Hu Ji was a policeman with the Wuhan Public Security Bureau (GX 431B, at 2), and Defendant Tu Lan was a prosecutor in the Hanyang People's Procuratorate (GX 431O, at 3).

### B.    The Victims

Mr. Xu Jin—the primary target of Defendants' repatriation and stalking efforts in this case—had lived in the United States for 13 years at the time of the trial. (Tr. 1385.) Before moving to the United States, he and his family lived in Wuhan, China. (*Id.*) At all times relevant to this case, Xu Jin and his wife, Ms. Liu Fang, lived in Warren, New Jersey. (Tr. 684.) They have an adult daughter named Xu Xinzi (hereinafter "Sabrina Xu"), who was living in California at times relevant to this matter. (Tr. 684–85.) Xu Jin's mother and his father, Xu Cewei, still live in Wuhan. (Tr. 1387.) Xu Jin knew that he and his wife were targets of Operation Fox Hunt. (Tr. 1388.) Knowing that the PRC government was after them, Xu Jin and his wife, Liu Fang, endeavored to hide their address from publicly available resources. (Tr. 699.)

From approximately 2016 to 2019, a number of steps were taken by individuals, some of whom were acting on behalf of the PRC government, to locate and compel Xu Jin back to China. Beginning as early as the spring of 2016, Xu Jin's sister-in-law (Liu Fang's younger sister), Liu Yan, who lived in neighboring Short Hills, New Jersey (Tr. 1386), was approached by an unknown individual who showed up on her doorstep looking for her brother-in-law. (Tr. 76–77.) Concerned for Xu Jin's safety, Liu Fang told the person at her door, who she believed was working for the PRC government, that she could not help him meet with her brother-in-law. (Tr. 77.) Given her response, the individual at the door gave Liu Yan the following message: tell Xu Jin to go back to China. (Tr. 77.) Around Thanksgiving that same year, another person showed up at Liu Yan's

Short Hills home and told her to inform her brother-in-law that if he did not go back to China on his own, his family members in China would be in trouble, and that if he did not "admit [his] crime," he would "disappear." (Tr. 78–79.)

       1.    <u>April 2017 Coercion Attempt Using Xu Jin's Elderly Father</u>

Several months passed, and on April 5, 2017, Xu Jin received a call from his sister-in-law, Liu Yan, during which she told him that Xu Jin's father, Xu Cewei, had been "suddenly brought to her home by the . . . prosecutor's office in Wuhan[.]" (Tr. 1388–89.) According to Liu Yan, the Chinese official was a woman named "Dr. Li." (Tr. 1389.) Xu Jin's first impression of his father being in New Jersey was "shock" and then anger due to the fact that his father was 82 years old and in poor health. (Tr. 1396–97.) Xu Jin's wife, Liu Fang, discussed a plan with her sister, Liu Yan, over the phone, and decided that the father, Xu Cewei, would stay at Liu Yan's home in Short Hills for the night and meet with his son, Xu Jin, the next day. (Tr. 95.)

The next morning, on April 6, 2017, Xu Jin met his sister-in-law and father at the nearby Livingston Mall in New Jersey. (Tr. 1390.) Xu Jin chose this public, heavily trafficked location because he did not want to be "surveyed or monitored" by "Chinese spies" who he assumed were near his sister-in-law's home. (*Id.*) Xu Jin met with his father in the food court of the mall, where Xu Cewei reported to his son that he was brought to the United States to persuade him to come back to China and to ask Xu Jin "not to speak negatively about a certain leader in the U.S. before the China 19[th] Party Congress commenced." (Tr. 1391.) Xu Cewei reported to his son that he was brought to United States by prosecutor Tu Lan and "Dr. Li," and that when he had initially resisted the idea of traveling to the United States, Tu Lan told him that if he did not accompany them on the trip, his daughter (i.e., Xu Jin's younger sister) would be sent to jail. (Tr. 1391–92.)

After the father, Xu Cewei, spent the night of April 6, 2017 in Liu Yan's home, Xu Jin picked his father up from that home and brought him to his own home in Warren. (Tr. 1392.) During the drive from Short Hills to Warren, Xu Jin noticed a car following him and suspected that he and his father were "being stalked." (Tr. 1393.) After attempting to lose the car by driving in circles, Xu Jin stopped and the pursuing car did as well. (*Id.*) Since that car "was not hiding," the two cars were in a "standstill." (*Id.*) When the car that had been following Xu Jin and his father finally drove away, Xu Jin brought his father home. (*Id.*) Xu Jin was "afraid" at the beginning of the stalking episode, and then became "frightened" during the standstill, because he "realized that the car was not following [him] discr[eet]ly, rather it was a threat." (Tr. 1393–94.) Xu Jin was initially "panicking" but then became outright "scared." (Tr. 1394.)

2.    Harassment Involving Sabrina Xu

Xu Jin's daughter, Sabrina Xu, was also targeted in the harassment campaign involving her parents. In May 2018, she learned that some of her friends had received messages on social media from a stranger's account regarding her parents' alleged corruption. (GX 713, at 16–17.)[2] The messages said that her parents were "wanted by [the] International Criminal Police Organization . . . as they were involved in massive corruption within public office in China," that Sabrina Xu knew "all about her parents' corruption," and that her family's "defiance and evasion of laws should be condemned by the public." (GX 107.) Learning of these communications made her feel "stressed" and "unsafe." (GX 713, at 23.) This message prompted her to text her mother, Liu Fang, an emoji every day to let her mother know that she was safe. (*Id.*)

---

[2] Sabrina Xu testified via a Rule 15 deposition. *See* Fed. R. Crim. P. 15(a)(1); *see also* 5/5/2023 Docket Order (granting government's request to conduct Rule 15 deposition).

3.    <u>September 2018 Posting of Threatening Note at Warren Home</u>

At approximately 11 a.m. on September 4, 2018, Kuang Zebin ("Kuang," also known as "Vincent Kuang")[3] and Defendant Zheng traveled from New York City to Xu Jin's home in Warren, New Jersey.  (Tr. 1255.)  While there, the two young men walked around the house, including walking onto the back porch and looking into the house through the glass doors located there, knocked on the front door of the house, and taped three notes on the door.  (Tr. 1259, 1262.)

Kuang's involvement in the incident arose out of a phone call he had received earlier that morning from a friend, Chen Chaohong ("Chen"), who asked Kuang to accompany Defendant Zheng to New Jersey with pieces of paper bearing the message, handwritten in Mandarin characters, "[I]f you are willing to go back to China to serve . . . ten years [in] prison[,] . . . your wife and your children will be okay.  That's the end of this matter."  (Tr. 1244; *see also* GX 505A.) At Chen's direction, Kuang wrote this message on three pieces of paper in his home in Brooklyn before meeting up with Zheng to drive to New Jersey.  (Tr. 1246–47.)  Chen mentioned on the call, which took place via WeChat, that Kuang and Defendant Zheng might receive compensation for carrying out this task.  (Tr. 1247.)  Kuang met Zheng approximately two years before the date of the incident at a hair salon at which Kuang worked.  (Tr. 1236–37.)

Defendant Zheng picked up Kuang—who had the three notes with him—in a silver Lexus from Kuang's Brooklyn home, and the two drove to Warren, New Jersey.  (Tr. 1234, 1250–52.) When they arrived at Xu Jin's home, they parked across the street and got out of the car, Kuang carrying his cell phone and the handwritten notes, and Zheng carrying a tape dispenser.  (Tr. 1256– 57.)  The two men approached the front door of the house while Kuang called Chen on his phone.

---

[3] Kuang Zebin testified as a cooperating witness in this case.  (Tr. 1240–41.)  As part of his cooperation agreement, Kuang pled guilty to one count of conspiracy to engage in interstate stalking.  (Tr. 1240.)

(Tr. 1257.)  Kuang then videotaped Zheng knocking on the door, ringing the doorbell, and subsequently taping the three notes on the front door when no one answered.  (Tr. 1259.)  Then, at Chen's direction, Kuang and Zheng went around to the back of the house, walked onto the deck, and looked into the house through the back glass doors.  (Tr. 1262–63.)  Kuang observed a lot of dust in the house, giving him the impression that no one had occupied the home in some time.  (Tr. 1263.)  After peering into the house from the back deck, Kuang and Zheng returned to the front door of the house to rip down two of the three notes, again, at Chen's direction, because Chen thought it would look too conspicuous to have three notes posted on the front door.  (Tr. 1263–64.)  Defendant Zheng then ripped down two of the three notes and threw them in the bushes underneath the front staircase leading to the front door.  (Tr. 1264.)  The two men then left the premises.

However, at some point shortly thereafter, Kuang received another call from Chen or one of his associates requesting that Kuang and Defendant Zheng go *back* to the house and see if the note had been moved, in order to determine whether someone was in the house, but "deliberately not coming out."  (Tr. 1265.)  As directed, the two men went back to the house and placed an additional piece of tape over the note on the front door.  (Tr. 1267.)

Unbeknownst to Kuang and Zheng, Xu Jin and Liu Fang were indeed in the home at the time of the two men's initial visit.  (Tr. 1397.)  Xu Jin became immediately "alarmed" when he heard "pounding" on his front door as opposed to "normal knocking."  (*Id.*)  When he approached the front door, he realized that the people outside the door were "twisting the door handle forcibly," attempting to get into his home.  (*Id.*)  Xu Jin then watched Kuang and Zheng through surveillance cameras set up around the house.  (Tr. 1397–98.)  When the men were gone, Xu Jin called the FBI, who told him to examine the scene to see what the men may have done.  (Tr. 1399.)  Xu Jin opened

his front door and found the note taped to the door.  (*Id.*)  The note's message made Xu Jin realize that the threats made to him by the Chinese government were no longer "mental" but "physical," and he became "very worried about [the] safety" of his wife and daughter.  (Tr. 1400–01.)

The next day, Defendant Zheng returned to Xu Jin's home, and Xu Jin observed Zheng "walking towards the [front] door" and standing there for a while before leaving.  (Tr. 1402.) Physical evidence corroborated Zheng's presence at Xu Jin's Warren home, including Zheng's DNA found on a discarded cigarette butt outside the home and Zheng's fingerprints on the note that was taped to the home.  (*See* GX 503, 503A.)

After these two episodes, Xu Jin "reinforced the lock" for every door at his home and also purchased a baseball bat.  (Tr. 1405.)

### 4.    Menacing Mailings from Wuhan Received in 2019

At some point in 2019, Xu Jin's sister-in-law, Liu Yan, began receiving a large volume of mail addressed to Liu Yan's husband, Xu Bai, and sent to their Short Hills home from Wuhan, China.  (Tr. 390, 1405–06; *see also* GX 506B, GX 507B.)  Xu Jin reviewed one of these pieces of mail, which was written and signed by Xu Jin's younger sister, Xu Qin.  (Tr. 1406.)  Xu Jin could tell from the tone of the message that, while handwritten and signed by his sister, it was not drafted by her.  (Tr. 1406–07.)  In addition to this mailing, Liu Yan received a package that felt like it contained a CD ROM, which Xu Jin gave to the FBI without opening it.  (Tr. 1407.)  A portion of the CD ROM contained an edited video titled "A Family Letter to Brother—Xu Qin,"[4] which featured footage of Xu Jin's mother, father, and sister (Xu Qin) sitting in a living room with subtitles and a montage of old family photos.  One of the subtitles said, "When parents are alive, you can still call someplace a home; when parents are gone, you can only prepare for your own

---

[4] Xu Qin is Xu Jin's younger sister.

tomb." (GX 506G.)  The footage shows Xu Jin's mother crying.  (*Id.*)  Describing the impact of the mail being sent to her sister's home, Xu Jin's wife, Liu Fang, testified that she perceived her sister Liu Yan as "suffering in pain" and feeling "stressed and also angry by the persecution suffered by her relatives in China."  (Tr. 732.)  As for herself, Liu Fang said that her life was "turned upside down at 180 degrees overnight" due to the various events designed to coerce her husband and her back to China, and she isolated herself from friends and family members in order to protect them from Chinese authorities.  (*Id.*)

### C.    McMahon's Role in the Scheme to Repatriate Xu Jin

The evidence at trial established that McMahon was hired by Zhu to perform surveillance on Xu Jin and his relatives at the direction of Chinese officials, that McMahon knew—or at least consciously avoided learning—that he was working at the direction of agents of the PRC government, and that his investigative and surveillance work contributed to the harassment of Xu Jin and his family.

McMahon is an American citizen who was a licensed private detective in New Jersey at all times relevant to this matter.  (S-1 Indictment, at I.6.)  McMahon worked for the New York City Police Department ("NYPD"), eventually rising to the rank of "detective sergeant" before retiring. (Tr. 1773, 1780.)  Though the circumstances of his retention on the Xu Jin investigation are murky, the government's evidence showed that McMahon—someone with experience and savvy in the investigation field—did not probe into the origin of this investigative work or the people for whom he was working.  (*See* GX 3004, at 1 (email from Emily Hsu of Transperfect Language Services Inc. that McMahon's client was a "lady . . . [who] probably has been through a lot"); GX 3009 (retention agreement signed by Zhu); GX 3005 (email between McMahon and Transperfect Language Services Inc. in which McMahon says he "do[es]n't know what the case is about").)

10

Notably, one of the few facts McMahon knew was that lawyers were not involved in the case. (GX 3011 (McMahon receiving a negative response from Transperfect Language Services Inc.'s email address to the question of whether a lawyer was involved).)   McMahon learned from translator and intermediary Emily Hsu that Xu Jin owed Zhu money and had "run away" from the debt.  (*Id.*)  From Zhu, McMahon got information about the targets of the investigation, including driver licenses and social security numbers of the target family, address information for their relatives, and Chinese government-issued identification information, such as their Chinese identification numbers and permit information for travel to and from Hong Kong and Macau.  (GX 901D at 9–11, 13–14; GX 1025.)

The true identities of the people for whom McMahon was working did not remain obscure. Through the course of his work, McMahon met in person with his clients on several occasions. McMahon met with Zhu and Chinese police officer Hu Ji at a Panera Bread in Paramus, New Jersey on October 27, 2016.[5]  (Tr. 326; GX 902D–902E.)   McMahon met with these two individuals at Zhu's request, which was communicated through intermediary and translator Lina Xu, who got the impression that Zhu "really need[ed] to talk to [McMahon] in person."  (Tr. 426 –27; *see also* GX 4004, at 788.)  McMahon participated in at least one other meeting with Zhu and possibly Hu Ji on November 1, 2016.  (GX 4008, at 841–43.)

Because McMahon received unclear or conflicting information regarding his assignment from Zhu and Hu Ji, McMahon began piecing together information on his own beginning in October 2016.  For example, on or about October 5, 2016, McMahon learned that Xu Jin—the target of his investigation—was wanted by the Chinese government through a Comprehensive

---

[5] There is no evidence, however, that McMahon was specifically advised of Hu Ji's position as a Chinese police officer at any time.

Report he obtained from the TLO database,[6] which identified Xu Jin as "INTERPOL MOST WANTED." (GX 4012, at 3.) On the same day, McMahon shared this information with fellow investigator Eric Gallowitz ("Gallowitz"), whom McMahon had hired to help with the surveillance work, noting in a text that "Tlo says he wanted by INTERPOL wow!!" and telling Gallowitz to "[b]ring [his] gun" while conducting this surveillance work. (GX 4019B, at 119–20.) Later, on October 5, 2016, McMahon also discovered an April 23, 2015 article published by *China Daily* headlined, "Interpol Launches Global Dragnet for 100 Chinese Fugitives." (GX 434; GX 4019B, 121–22.) The article featured photographs of Xu Jin and Liu Fang as "former State employees and others suspected of a wide range of corrupt practices." (GX 434.) With this newfound knowledge, McMahon texted translator Lina Xu, also on the night of October 5, 2016, who was still acting as an intermediary between McMahon and Zhu, stating, "Looks like he's wanted in China for corruption." (GX 4004, at 781.) When Lina Xu asked in response if she could share this information with Zhu, McMahon responded, "I'm sure he knows this but he didn't tell us," and "I think he should have." (GX 4004, at 782.) In response, Lina Xu said, "I see. I think now [I] know what's going on with JIN XU's case." (GX 4004, at 783.) As part of his testimony offered in the defense case, Gallowitz said that the information McMahon gleaned from the *China Daily* article made this surveillance work "atypical" and also noted that there was some indication that "criminality" was involved because McMahon had showed him information regarding the Interpol warrant. (Tr. 1778, 1801–02.) Acknowledging the unusual nature of the work, at one point Gallowitz texted McMahon, asking him, "You trust them?" and McMahon responded, "No." (GX 4019B, at 239–40.)

---

[6] Eric Gallowitz, an investigator colleague of McMahon, testified that TLO was a "proprietary database[]" for which "you have to either be law enforcement or a private investigator or some other type of professional," in order to gain access. (Tr. 1775, 1778.)

Shortly after obtaining this background information, McMahon conducted surveillance in Short Hills in mid-October of 2016 on the targets with the apparent goal of obtaining Xu Jin's address. (*See, e.g.*, GX 1048; GX 1049 (McMahon Investigation Group surveillance reports from October 11, 2016).) Notably, McMahon also obtained the address information of Xu Jin's daughter living in California on or around October 19, 2016, including information on her university dormitory, conveying that he was not able to find out what academic subject she was majoring in, despite being asked to obtain that information. (GX 3027; GX 3028, at 3.)

McMahon's work on the investigation resumed five months later in April 2017. On April 4, 2017, the day before Xu Jin's elderly father was brought to New Jersey by Chinese government officers, McMahon again met in person with his clients at the same Panera Bread—but this time, instead of Zhu and Hu Ji, McMahon met with Johnny Zhu (i.e., Defendant Zhu Feng) and co-conspirator Jin Hongru.[7] (Tr. 1033.) At the meeting, McMahon was paid $5,000 in cash. (GX 3073.) Jin Hongru testified at trial that he sat at a different table from Johnny Zhu and McMahon and did not hear the substance of their conversation. (Tr. 1035.) The government, however, introduced an audio recording of Jin Hongru speaking with Johnny Zhu and Tu Lan—one of the Chinese officials who accompanied Xu Cewei on the trip from China to New Jersey—the day before this meeting took place.[8] (*See* GX 704A.) In this recording, Tu Lan talks about McMahon's

---

[7] Jin Hongru pled guilty to two charges, pursuant to a cooperation agreement, in a separate prosecution: (1) conspiring to act as an agent for the PRC without registering and (2) conspiring to engage in interstate stalking. (*See* Criminal Information, *United States v. Hongru Jin*, No. 21-CR-313 (PKC), ECF No. 57 (E.D.N.Y. June 14, 2021); *see also* 6/14/2021 Minute Entry).)

[8] McMahon disputed the admissibility of this audio recording at trial, arguing that it could not be properly authenticated through Jin Hongru because he testified that he did not make the recording. (McMahon Mot., at 87 n.27; *see also* Tr. 1003.) The Court ruled that the recording had been adequately authenticated because Jin Hongru testified that it was a fair and accurate recording of the conversation he had with Johnny Zhu and Tu Lan on April 3, 2017, (Tr. 1003–

involvement in the case, and says to Johnny Zhu about McMahon, "clearly, I mean, you need to tell him clearly about everything." (GX 704A, at 3.)[9]

The next day, April 5, 2017, McMahon conducted surveillance around Liu Yan's Short Hills home. The same day, McMahon got a heads up from Johnny Zhu that the "package" had arrived, and that his estimated time of arrival was 7:40 p.m. (GX 4010, at 848.) McMahon texted Johnny Zhu a question mark at 8:43 p.m., and when Johnny Zhu responded by asking how McMahon's surveillance was going, McMahon responded that it was quiet and asked if Johnny Zhu had driven by. (*Id.*) Johnny Zhu texted back that he had not driven by and that, "I'm not there at all after I drop Xu." (*Id.*)

The next day, McMahon again returned to Short Hills to surveil Liu Yan's property. McMahon put out calls to local law enforcement authorities informing them of his surveillance activities. (GX 4019B, at 216–19.) In texts with Johnny Zhu, McMahon indicated that his "subject" was on Route 78 heading west, and that he would send pictures to Johnny Zhu. (GX 805B, at 4–5.) When Johnny Zhu responded asking for the subject's destination, McMahon sent him the address of Xu Jin's Warren home. (*Id.* at 5.) That night, in a text chat with Gallowitz, McMahon said that he "[g]ot em," explaining that Xu Jin had engaged in "[v]ery evasive maneuvers – followed him an hour away and got where he's living." (*Id.* at 246–49.) McMahon

---

04), and as a co-conspirator statement pursuant to Rule 801(d)(2)(E). (Tr. 1005–06.) The Court discusses the admission of GX 704A further *infra* Section IV.B.2.

[9] Buried in a page-long footnote, McMahon requests that the Court conduct a "proper inquiry" into whether Johnny Zhu was a government informant and that it was through this relationship that the government obtained the audio recording at GX 704, as it would "have enormous ramifications for this case," raising "the possibility of entrapment." (McMahon Mot., at 93 n.29.) The Court declines to entertain this post-verdict Hail Mary speculation about entrapment—never previously raised, despite McMahon knowing of Johnny Zhu's role in the repatriation scheme and his interactions with McMahon from the outset of the case—because there is no legal or factual basis to conduct such an inquiry.

further reported that their "[c]lient [was] very happy" with the day's results and that McMahon was "waiting for a call" to find out about next steps. (*Id.* at 252–55.) Gallowitz responded, "Yeah. From NJ State Police about an abduction," to which McMahon texted back, "Lol." (*Id.* at 256–57.)

Several days into Xu Cewei's visit, McMahon and Johnny Zhu texted about when the father would go back to China and how long Johnny Zhu would stay in the area to carry out the investigation. (GX 805B, at 21.) Johnny Zhu responded that it could be "long work" since "[t]hey already told me they will try everything they can to get Xu plead and return the money." (*Id.* at 22.) The next day, Johnny Zhu reinforced the strong desire to have the Xu Jin case resolved: "They definitely grant [you] a nice trip if they can get Xu back to China haha." (*Id.* at 32.) McMahon responded, "Oh nice." (*Id.*)

By April 11, 2017, Gallowitz and McMahon were still surveilling Xu Jin and his family, and Gallowitz suggested increasing the pressure to get results. He texted McMahon, "Maybe overt surveillance. In their face. Sit in front of the house. Pictures. Video. Scare them." (GX 4019B, at 297.) McMahon responded: "Yeah possibly- we did that in little ferry," an apparent reference to a previous investigation of McMahon's. (*Id.* at 298.) McMahon proposed this idea to Johnny Zhu a couple hours later by saying, "I think if we harass Xu. Park outside his home and let him know we are there. I did that before on another case." (GX 805B, at 32.) Johnny Zhu responded, "We can't harass Xu like that lol." (*Id.*)

### D.    McMahon's Post-Arrest Statement

McMahon was arrested in connection with this case on October 28, 2020. (Tr. 1484–85.) After agreeing to speak with law enforcement officials upon his arrest, McMahon provided information regarding his work on the Xu Jin matter. Notably, when asked what the goal of the

job was, McMahon responded, "I think he[10] had mentioned to me that they were trying to get him to come back to China. . . . So they could prosecute him. . . . And then the father had flown in from I think he said China. . . . To convince the son because of, you know, out of honor for the name. . . . You got to face the consequences back in China." (GX 701B, at 4–5.)[11] McMahon elaborated that the goal was for Xu Jin to "just . . . pay back the money basically" and when asked by the agent if McMahon ever discussed the possibility that Xu Jin would face jail time, McMahon said that it was "never discussed." (*Id.* at 5.) When confronted with the text message he sent to Johnny Zhu about harassing Xu Jin, McMahon responded, "I don't know why I would even say something like that . . . [u]nless it was a typo or something." (*Id.* at 2.)[12]

_____

[10] McMahon did not specifically identify this person and the context of the statement does not permit a clear inference as to whom McMahon was referring.

[11] The Court notes that GX 701B is a transcript of portions of McMahon's post-arrest statement and was not formally entered into evidence. The underlying video footage of the post-arrest interview was admitted as GX 701A.

[12] In a footnote of his brief, McMahon discusses the portions of his post-arrest interview that the Court did not permit to be introduced under Federal Rule of Evidence 106, known as the rule of completeness. (*See* McMahon Mot., at 19 n.8; Tr. 889–90 (citing *United States v. Williams*, 930 F.3d 44, 58 (2d Cir. 2019) (concluding that "a party cannot circumvent the hearsay rule simply by invoking the doctrine of completeness so as to render otherwise inadmissible evidence admissible for its truth").) In those portions, McMahon tells the law enforcement officers that he was under the belief that he was working for individuals who were "part of [a] construction company" to which Xu Jin owed money, and that he "thought it was a civil case" and that Xu Jin "stole money from the company." (*Id.*) In the sequential footnote, McMahon discusses the fact that McMahon's statements were voluntary and cites to *United States v. Biaggi* for the proposition that where there is "evidence of a defendant's innocent state of mind," it is "critical to a fair adjudication of criminal charges." (McMahon Mot., at 19–20 n.9 (citing 909 F.2d 662, 692 (2d Cir. 1990)).) These brief references to the Court's evidentiary ruling, which McMahon relegates to two footnotes, fall short of an actual challenge on sufficiency grounds and do nothing to transform what the Court concluded was a self-serving statement into evidence that should have been admitted under Rule 106. *See, e.g.*, *United States v. Ramsey*, No. 21-CR-495 (ARR), 2023 WL 2523193, at *3 (E.D.N.Y. Mar. 15, 2023) ("Mere allusions by a party to 'fairness' or 'context' do not satisfy the party's burden to demonstrate why the evidence should be admitted."); *see also United States v. Odiase*, 312 F. Supp. 3d 432, 437 (S.D.N.Y. 2018) (rejecting post-trial challenge to the court's exclusion under the rule of completeness of a portion of the defendant's post-arrest

### E.    Zhu's Post-Arrest Statement

Zhu was also arrested on October 28, 2020. Zhu agreed to speak with a law enforcement agent and provided details of his involvement in this case through a translator. (GX 703A.) Zhu began by saying that he did not know why he had been arrested and that to the extent he was involved in the Xu Jin matter, he simply wanted to "make some money." (*Id.* at 27.) As the interview progressed, Zhu explained that Hu Ji "told [Zhu] to make the arrangements" and asked Zhu to "look for somebody who could help look for that person," indicating that Zhu was asked to hire a private investigator to help look for Xu Jin. (*Id.* at 30.) Zhu then said that he found Transperfect Language Services to help act as an interpreter between McMahon and himself, and Hu Ji. (*Id.* at 31.)

When confronted with WeChat messages Zhu sent containing Xu Jin's social security number, Zhu explained that this information was "public" because "these people are wanted in China." (*Id.* at 27.) He elaborated that he knew Xu Jin and his family were wanted in China because Hu Ji and another unidentified man Zhu was driving were "talking" in "the back of the car" about how Xu Jin was "a fugitive from Wuhan." (*Id.*) Zhu continued, "My feeling is these people come, they just going through the motions[;] . . . the Communist Party not treat it very seriously." (*Id.*) While Zhu claimed that he simply drove the Chinese officials around, he also indicated that he knew that Hu Ji was part of the Overseas Chinese Affairs Office—the "overseas affairs office for the government"—and that Hu Ji was looking for Xu Jin, because "[w]hoever finds him first, you know, gets an award." (*Id.* at 13, 29.)

---

statement that defendant alleged "explained her apparent lack of knowledge" about aspects of the crime).

F.    **The Verdict and Post-Trial Motions**

After the presentation of evidence, the jury deliberated over two days and came back with the following verdict: (1) McMahon was convicted of acting as an unregistered foreign agent (Count Two), but acquitted of the related conspiracy (Count One), and convicted of both conspiracy to engage in interstate stalking and the substantive interstate stalking count (Counts Three and Four); (2) Zhu was convicted of all four Counts; and (3) Zheng was acquitted of Counts One and Two—the unregistered foreign agent charges—and convicted of Counts Three and Four—the interstate stalking charges.  (Verdict Sheet, Dkt. 257.)

On August 9 and 10, 2023, Defendants submitted their post-trial motions to the Court and the government submitted its opposition on October 5, 2023.  (McMahon Mot.; Zhu Mot.; Zheng Mot.; *see also* Gov't Opp'n, Dkt. 286.)  On October 21 and 23, 2023, Zhu and McMahon filed reply briefs (Zhu Reply, Dkt. 288; McMahon Reply, Dkt 291), and Zheng submitted a letter informing the Court that he was relying solely on his opening brief (Zheng Letter, Dkt. 290).[13]

III.    **Rule 29 Motion**

A.    **Legal Standard**

Under Rule 29, "a district court will grant a motion to enter a judgment of acquittal on

---

[13] The Court notes the excessive length of McMahon's post-trial briefing.  McMahon's opening brief totals 109 pages; his reply brief 70 pages.  In civil cases, the Court imposes a 25-page limit on opening briefs and a ten-page limit on replies.  (*See* Judge Pamela K. Chen Individual Practices and Rules 3.B. ("Unless prior permission has been granted, memoranda of law in support of and in opposition to motions are limited to 25 pages, not including exhibits, appendices or attachments[.]").  Though this page limit does not expressly apply to the Court's criminal matters, it should have been considered as a guide to the Court's preference that parties avoid a kitchen-sink approach, which hinders the Court's analysis more than it helps it.  Here, McMahon's voluminous briefing contained dozens of pages of out-of-circuit caselaw, near wholesale re-publication of the Court's jury instructions, and repetitive recitations of evidence, which served only to undermine and obscure McMahon's arguments.

grounds of insufficient evidence if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (citing Fed. R. Crim. P. 29(a), (c)). "[A] defendant challenging the sufficiency of the evidence 'bears a heavy burden.'" *United States v. Martoma,* 894 F.3d 64, 72 (2d Cir. 2017) (quoting *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012)), *cert. denied,* 139 S. Ct. 2665 (2019). A Rule 29 motion may be granted "only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *United States v. Guadagna,* 183 F.3d 122, 130 (2d Cir. 1999) (quoting *United States v. White*, 673 F.2d 299, 301 (10th Cir. 1982)). In considering such a motion, "[n]ot only must the evidence be viewed in the light most favorable to the Government and all permissible inferences drawn in the Government's favor, but the jury verdict must be upheld if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Jackson*, 336 F.3d at 180 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (cleaned up). "Moreover, 'the evidence must be viewed in its totality, as each fact may gain color from others.'" *United States v. Landesman*, 17 F.4th 298, 319 (2d Cir. 2021) (quoting *United States v. Cassese*, 428 F.3d 92, 98-99 (2d Cir. 2005)). Furthermore, "the Government need not negate every theory of innocence." *Id.* (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)).

Given this, the Court should not weigh "competing inferences and explanations" in an effort to determine "which explanation is more likely," *United States v. Friedman*, 998 F.2d 53, 56 (2d Cir. 1993), and instead must leave it to the jury to "choose among competing inferences." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995) (citation omitted). However, while

courts "defer to a jury's assessments with respect to credibility and conflicting testimony, and to its choice between the competing inferences that can be drawn from the evidence, the jury's inferences must be reasonably based on evidence presented at trial, not on speculation." *United States v. Varanese*, 417 F. App'x 52, 53 (2d Cir. 2011) (quoting *United States v. Torres,* 604 F.3d 58, 67 (2d Cir. 2010)) (internal quotation marks and citation omitted)). Where "a fact to be proved is also an element of the offense, then it is not enough that the inferences in the government's favor are permissible but rather we must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element . . . is established beyond a reasonable doubt." *Id.* (internal quotation marks omitted).

### B.    McMahon's Rule 29 Motion

McMahon's central argument is that the evidence was insufficient for the jury to find that he knew or was willfully blind to the fact that he was working for the Chinese government. Rather, McMahon argues, the evidence only showed that he was working for a Chinese company that held a debt owed by Xu Jin. In support of this argument, McMahon points to evidence of his communications with Hu Ji, Johnny Zhu, and others where a company was referenced. (*See, e.g.*, GX 3047 (email from Hu Ji to McMahon stating that he reported McMahon's findings "to my boss of the company"); GX 3056 (email from Hu Ji referencing a "finance man[a]ger"); GX 805B, at 13 (Johnny Zhu texting McMahon that he "spoke with [his] company").) McMahon's general contention is that the government's case, in trying to prove otherwise, relied on the stacking of impermissible inferences that led to improper speculation on the part of the jury. (McMahon Mot., at 5–6.) The Court finds that the jury did not engage in improper speculation and instead chose among competing inferences, as they were entitled to do, in reaching their verdict. McMahon's

attempt to relitigate the facts of this case in piecemeal fashion does not compel the conclusion he seeks.

1.    There Was Sufficient Evidence to Convict McMahon of Acting As an Unregistered Foreign Agent (Count Two)

The focus of McMahon's Rule 29 motion with respect to his conviction under Count Two is the mens rea element—whether the evidence was sufficient for the jury to find that McMahon *knew* he was working for the Chinese government.  (McMahon Mot., at 9.)  At trial, the Court instructed the jury that in order to find McMahon guilty of Count Two, they had to find that: (1) McMahon acted as an agent of a foreign government or official of China; (2) he failed to notify the Attorney General that he would be acting as an agent of the government or an official of China; (3) he acted knowingly, and (4) he acted, at least in part, as an agent for the government or an official of China while in the United States.  (*See* Jury Instrs., Dkt. 256; *see also* Tr. 2191–92.) With respect to the knowledge element, the Court instructed the jury that this element could be met not only if the jury found that McMahon *knew* that he was working for PRC officials, but also if they found that he "consciously avoided" the reality of his clients' affiliations.  (Jury Instrs., Dkt. 256, at 18 ("In determining whether a defendant acted knowingly, you may also consider whether the defendant deliberately closed his eyes to what would otherwise have been obvious to him.").)  The jury was also instructed more generally that evidence of a criminal defendant's knowledge is almost always premised on circumstantial evidence and that it is rare that a defendant's state of mind can be proved directly.  (Tr. at 2172); *see United States v. Vaccarelli*, No. 18-CR-92 (JBA), 2020 WL 1329695, at *2 (D. Conn. Mar. 23, 2020) (finding that a rational jury had enough circumstantial evidence to determine the defendant's state of mind) (citation omitted)).  Based on these and other instructions given to the jury and the evidence introduced at

21

trial, the Court finds that there was sufficient evidence under both or either of these theories of
McMahon's mens rea for Count Two.

*First*, the jury could have reasonably inferred that the nature of McMahon's retention as a
private investigator and the mandate of the Xu Jin case were proof that he knew or consciously
avoided knowing that he was working at the direction of the Chinese government.  His retention
was shrouded in mystery.  It started with shifting narratives that made it difficult for him to
understand the exact nature of the case, a situation compounded by having to work through
intermediaries Lina Xu and Emily Hsu.  For example, McMahon was first told that his client was
a "lady who . . . has been through a lot," but was then told that Xu Jin owed money to Zhu.  (GX
3004; GX 3009.)  Indeed, McMahon told Emily Hsu that he "d[id]n't know what the case is about."
(GX 3005.)  Then, McMahon was provided sensitive data on Xu Jin, including his social security
number, driver license information, Chinese identification and passport numbers, and his exit-
entry permit number for travel to and from Hong Kong and Macau.  (GX 901D at 9 –11, 13–15;
GX 1020 at 1–2.)  McMahon also received the social security number, driver license, exit-entry
permit number, and green card number of Xu Jin's wife, Liu Fang, and much of the corresponding
information for Xu Jin's daughter.  (GX 1020, at 1–2.)  Even if the bulk of this information could
be considered routine information provided to a private investigator, the jury could have
reasonably concluded that the Chinese identification information was obtained from the PRC
government, and that the provision of Liu Fang and Sabrina Xu's sensitive information brought
this case outside the realm of debt collection.  Additionally, McMahon was asked to gather
information with seemingly no relevance to asset recovery.  For example, McMahon was asked to
track down information about Xu Jin and Liu Fang's college-age daughter and he proceeded to

run her prior addresses and share information regarding her school's dormitory.[14]  He also obtained

Liu Fang's border crossing information, which he subsequently shared in an email to Hu Ji.  (GX

3051.)  Yet, despite the murkiness of the job and its purpose, McMahon, a seasoned investigator,

never probed his clients about the assignment or why his clients wanted McMahon's assistance.

At a minimum, these circumstances support the conclusion that McMahon consciously avoided

acquiring guilty knowledge of his work on the Xu Jin case.  *See, e.g.*, *United States v. Kozeny*, 667

F.3d 122, 134 (2d Cir. 2011) ("[C]onscious avoidance may be established where[] a defendant's

involvement in the criminal offense may have been so overwhelmingly suspicious that the

defendant's failure to question the suspicious circumstances establishes the defendant's purposeful

contrivance to avoid guilty knowledge.") (cleaned up) (quoting *United States v. Svoboda*, 347 F.3d

471, 480 (2d Cir. 2003)).

*Second*, McMahon participated in three in-person meetings with his clients, where he could

have learned more about the precise nature of the Xu Jin case and the true affiliation of his clients.

In particular, the government introduced evidence that the night before McMahon's April 4, 2017,

meeting with Defendant Johnny Zhu and co-conspirator Jin Hongru, Defendant Tu Lan directed

Johnny Zhu to tell McMahon "about everything."  (GX 704A, at 3.)  While there is no direct

evidence as to whether Johnny Zhu, in fact, told McMahon "about everything" at the April 4

meeting since Jin Hongru was seated away from the two men, the jury could have drawn that

inference based on the audio recording of Johnny Zhu, Jin Hongru, and Tu Lan's meeting.

---

[14] In summation, McMahon argued that the substance of these reports was incorrect and that Sabrina Xu no longer lived at the addresses contained in the information he sent to his clients. (Tr. 2042–43.)  However, the accuracy of the information is not what is important, rather it is the fact that McMahon was asked to gather seemingly irrelevant—and invasive—personal information regarding the main target's daughter.

McMahon counters that this is "pure speculation" that "cannot rise to the level of a permissible inference." (McMahon Mot., at 16.)  The Court disagrees.  While, as the Second Circuit has noted, "[a]t times it may be difficult to distinguish between inference and speculation, as some speculation may indeed be reasonable," *United States v. Pauling*, 924 F.3d 649, 657 (2d Cir. 2019), "[a]n inference is not a suspicion or a guess.  It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist."[15]  *Id.* (quoting *Siewe v. Gonzales*, 480 F.3d 160, 168 (2d Cir. 2007)).  Applied to the facts surrounding the April 4, 2017 meeting, the government established that Tu Lan told Johnny Zhu to tell McMahon "everything" about their scheme.  First, the government introduced evidence that Tu Lan was a prosecutor from the PRC who appeared to be leading the operation to force Xu Cewei to travel to New Jersey from Wuhan, China.  It would have been reasonable for the jury to conclude that Johnny Zhu followed Tu Lan's order not only because she was supervising Xu Cewei's visit, but because having McMahon, an experienced American investigator, understand the goal of the operation—given his demonstrated willingness to work with them—could aid their efforts.  The jury, then, could have reasonably inferred that McMahon learned of the details of the repatriation scheme the next day at the designated meeting.  If the jury reached the conclusion that McMahon had the requisite knowledge for Count Two based upon this evidence, that conclusion would not be the product of mere speculation.

*Third*, there was evidence that McMahon learned directly, on his own, that the target of his investigation was "wanted" by the Chinese government and that McMahon was working with and

---

[15] Indeed, this was part of the instruction on circumstantial evidence given to the jury at trial.  (Tr.  2154; *see also* Jury Instrs., Dkt. 256, at 4 ("On the basis of reason, experience, and common sense, you infer the existence or nonexistence of a fact from one or more established facts.").)

for agents of the PRC.  For example, within days of being hired by Zhu, McMahon obtained a "Comprehensive Report" from the TLO database that designated Xu Jin as "Interpol Most Wanted," with Xu Jin's criminal offenses being described as "embezzlement, abuse of power, [and] acceptance of bribes."  (GX 4012, at 3.)  McMahon shared this newfound knowledge with Gallowitz, and, seemingly appreciating that there was a dangerous dimension to this assignment, admonished Gallowitz to "[b]ring [his] gun" when conducting surveillance.  (GX 4019B, at 119–20.)  McMahon also found the *China Daily* article with the headline, "Interpol Launches Global Dragnet for 100 Chinese Fugitives."  (GX 434.)  The sub-headline of the article was, "It's called Operation Sky Net.  Amid the nation's intensifying anti-graft campaign, arrest warrants were issued by Interpol China for former State employees and others suspected of a wide range of corrupt practices."  (*Id.*)  The article contained a headshot of Xu Jin, which McMahon pointed out to translator and intermediary Lina Xu was the same photo she had initially provided to McMahon. (GX 4004, at 782–83.)

Indeed, McMahon's actual knowledge that the Chinese government was seeking to repatriate Xu Jin to face criminal charges was corroborated by his post-arrest statement that he knew his clients' goal was getting Xu Jin "back to China . . . [s]o they could prosecute him."  (GX 701B, at 4.)  And even though, as McMahon argued at trial and contends in his post-trial motion, the word "prosecute" is often used in the context of civil litigation (McMahon Mot., at 20 n.10; *see also* June 1, 2023 Letter Mot., Dkt. 232), the jury had ample evidence from which to conclude that McMahon, a veteran New York City police officer and private investigator who had seen the articles about Xu Jin's wanted status, meant "criminal" prosecution when he made his statement to the arresting agents.

* * *

For all of these reasons, the Court finds that there was sufficient evidence for the jury to conclude that McMahon had knowledge that he was working for the PRC government, or in the alternative, that he consciously avoided learning the truth of his employment by Zhu, Johnny Zhu, Hu Ji, and other Chinese officials or agents.[16]

### 2.    McMahon's Conviction on Count Two was Not Inconsistent with His Acquittal on Count One

McMahon additionally argues that he is entitled to a judgment of acquittal on Count Two on the grounds that his conviction of this crime was inconsistent with his acquittal on Count One, claiming that it is "logically impossible" for the jury to have convicted him of the former yet acquitted him of the latter.  (McMahon Mot., at 59.)  The Court disagrees.

As an initial matter, "Second Circuit law 'clearly preclude[s]' challenges based on inconsistent verdicts."  *United States v. Serrano*, No. 13-CV-58 (KBF), 2015 WL 81974, at *4 (S.D.N.Y. Jan. 6, 2015) (quoting *United States v. Chang An-Lo*, 851 F.2d 547, 560 (2d Cir. 1988)), *aff'd* 640 F. App'x 94 (2d Cir. 2016).[17]  This is the case because such challenges would either "be based upon pure speculation or would improperly intrude upon the jury's deliberations."  *Chang An-Lo*, 851 F.2d at 560.  Moreover, even if a fair reading of the jury's verdict shows an inconsistency between the counts, "such an inconsistency is not within the province of the Court

---

[16] While the Court has focused on the evidence discussed above in finding sufficiency, the government points to other evidence that it argues supports the jury's finding of guilt with respect to Count Two.  (*See* Gov't Opp'n, at 58–61.)  Given the Court's finding of sufficiency, the Court need not, and does not, consider this other evidence.

[17] To the extent McMahon moves for relief under Rule 33 because of what he sees as inconsistent verdicts, the Court concludes that both the acquittal on Count One and the conviction on Count Two may stand and that the interest of justice does not require a new trial on Count One. *See United States v. Powell*, 469 U.S. 57, 65 (1984) ("Inconsistent verdicts . . . present a situation where . . . it is unclear whose ox has been gored. Given this uncertainty, and the fact that the Government is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course.").

to remedy based solely on that inconsistency." *United States v. Harris*, 192 F. Supp. 3d 337, 345 (W.D.N.Y. 2016) (collecting cases).  Because one of the core principles guiding a Court considering post-trial motions is that it "must be careful to avoid usurping the role of the jury," finding McMahon's acquittal on Count One and conviction on Count Two to be inconsistent would not only be inappropriate, but also precluded by a long line of Supreme Court and Second Circuit precedent.  *Guadagna*, 183 F.3d at 129; *see also United States v. Ghailani*, 761 F. Supp. 2d 167, 192 (S.D.N.Y. 2011) ("This principle [that consistent verdicts are not necessary] has been restated repeatedly by the Supreme Court and our Circuit[.]").  Indeed, "where truly inconsistent verdicts have been reached, the most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." *Powell*, 469 U.S. at 64–65 (1984) (internal quotation marks omitted).

3.    The Evidence was Sufficient to Convict McMahon of Counts Three and Four

As an initial matter, the Court addresses McMahon's assertion that his convictions of Counts Three and Four "essentially outlaw the practice of private investigation, criminalizing the surveillance and record gathering that is the essence of that licensed profession, of which Mr. McMahon was a practitioner."  (McMahon Mot., at 3.)  This argument requires a revisionist perspective on the evidence presented at trial.  As the facts established at trial show, the dubious circumstances under which McMahon was hired, the scope of work he was asked to perform, the scheme's objective, and certain unsettling activity—namely, the use of Xu Jin's elderly father, via a compelled visit to the United States, to repatriate his son—sets the work he performed for the PRC government apart from that of a typical private investigative assignment.  The legitimate practice of private investigation is not unfairly impacted, no less "outlawed," by the limits imposed

by the interstate stalking statute.[18]

The Court next addresses McMahon's sufficiency arguments.  McMahon contends that the evidence was insufficient to establish that he knowingly entered into the interstate stalking campaign or that he engaged in the substantive act of interstate stalking.

a.  Count Three – Conspiracy to Engage in Interstate Stalking

To convict McMahon of conspiracy to engage in interstate stalking, the jury had to find that: (1) two or more persons entered into an unlawful agreement to travel in interstate and foreign commerce with the intent to harass and intimidate, and place under surveillance with the intent to harass and intimidate Xu Jin, Liu Fang, and Sabrina Xu; (2) McMahon knowingly and intentionally became a member of this conspiracy; and (3) an overt act was committed in furtherance of this conspiracy.  (*See* Jury Instrs., Dkt. 256, at 20, 35.)

Focusing on the second element, McMahon argues that the government's evidence failed to establish that he "entered into an agreement to stalk anyone."  (McMahon Mot., at 37–45.)  He claims that there was no evidence at trial that he was "ever informed of any plans to harass Xu Jin," and argues that "he did not otherwise enter into an agreement to engage in interstate stalking." (McMahon Mot., at 41.)  The evidence presented at trial, however, could have led the jury to reasonably conclude that McMahon entered into this very type of agreement.

---

[18] McMahon takes issue with the interstate stalking statute being used in the context of this case, as 18 U.S.C. § 2261A's legislative history indicates that the law was enacted to protect individuals from predators, often in the domestic violence context.  (McMahon Mot., at 51 (discussing the statute's legislative history)).  He suggests in a footnote that given this history, applying it to "the normal conduct of a licensed private investigator . . . raises a serious issue regarding whether the interstate stalking statute is impermissibly vague."  (McMahon Mot., at 55 n.21.)  In the absence of a clearly articulated Constitutional challenge to this statute, the Court does not engage with this undeveloped aside, but notes, as it has before, that McMahon's conduct in this case went beyond that of a "normal" private investigator, and, as the jury found, crossed the line into prohibited conduct.

First, there is documentary evidence that McMahon agreed to work for Zhu and the other defendants in this case. (GX 3009.) Second, there is testimonial, photographic, and video evidence establishing that McMahon met in person with his clients—including Zhu, Hu Ji, and Johnny Zhu—on several occasions, and as discussed *supra* Section III.B.1, that Johnny Zhu was directed to tell McMahon "everything" about the scheme to repatriate Xu Jin at the April 4, 2017 meeting at Panera Bread. (GX 704A.) Indeed, McMahon evidenced a clear understanding of the objective of the Xu Jin case—to get him to return to China so that "they" could prosecute him. (GX 701B.) McMahon also indicated that the means of achieving this result was to bring Xu Jin's elderly father from China to New Jersey "[t]o convince the son because of, you know, out of honor for the name." (*Id.* at 4.) And when it appeared that this campaign was not working, it was McMahon who suggested to Johnny Zhu that they apply more pressure by going overt and "harass[ing] Xu." (GX 4019B, at 297–82; GX 805B at 32 (Gallowitz suggesting on April 11, 2017 that they increase the pressure through overt surveillance to "[s]care them" and McMahon proposing the idea to Johnny Zhu a few hours later, saying "I think if we harass Xu. Park outside his home and let him know we are there. I did that before on another case.").) Because of the evidence that McMahon knew of, and agreed to pursue, the scheme's objectives, the Court finds that there was sufficient evidence that McMahon knowingly became a member of the conspiracy to commit interstate stalking.

Furthermore, while there is sufficient evidence to satisfy the overt act element of Count Three by looking at the actions of McMahon's co-defendants, McMahon himself took steps to effectuate the stalking campaign. He did this by sitting outside of Liu Yan's Short Hills home observing Xu Cewei and communicating with Johnny Zhu about the elderly man's movements. This surveillance culminated in McMahon's discovery of the location of Xu Jin's home in Warren (GX 4019B, at 249 ("Very evasive maneuvers – followed him an hour away and got where he's

living.")), which facilitated the harassment of Xu Jin for years to come.  McMahon's parallel communications with Gallowitz betray both men's knowledge that their work exceeded the ambit of routine surveillance and crossed the threshold into something more sinister and potentially illegal.  After uncovering Xu Jin's address, McMahon told Gallowitz that their "[c]lient [was] very happy" with the results and that he was waiting to hear about next steps.  (GX 4019B, at 252–55.)  Gallowitz replied, "Yeah.  From NJ State Police about an abduction" to which McMahon texted back, "Lol."  (*Id.*, at 256.)

Nevertheless, McMahon argues that there was not "one whit of evidence that [he] knew of the activities of others."[19]  (McMahon Mot., at 42.)  This argument fails as a matter of law because it is well established that "[t]he government need not prove that the defendants knew the details of the conspiratorial scheme or the identities of all of the conspirators."  *United States v. Downing*, 297 F.3d 52, 57 (2d Cir. 2002) (citing *Blumenthal v. United States*, 332 U.S. 539, 557 (1947)).  Instead, the government need only prove that the defendant "participated with knowledge of at least some of the purposes or objectives of the conspiracy."  *United States v. Ogando*, 547 F.3d 102, 106 (2d Cir. 2008); (*see also* Jury Instrs., Dkt. 256, at 27–28).  Additionally, "a defendant's conscious avoidance of knowledge of its illegal purpose may substitute for knowledge of the illegal purpose."  *Svoboda*, 347 F.3d at 479.  Given this, it does not matter that McMahon may not have known all of the details or scope of the scheme to repatriate Xu Jin, though there is compelling

---

[19] McMahon spends much of his brief discussing the text McMahon sent to Johnny Zhu saying, "I think if we harass Xu.  Park outside his home and let him know we are there," and Johnny Zhu's response of, "We can't harass Xu like that lol." (GX 805B, at 32; *see also* McMahon Mot., at 43.)  While this evidence does not conclusively prove that McMahon *actually* harassed Xu Jin, as Johnny Zhu rejected McMahon's preferred course of action, it is, as previously discussed, compelling circumstantial evidence that McMahon knew what the objective of his assignment was, i.e., to scare Xu Jin into returning to China to be criminally prosecuted, which supports McMahon's conviction on the interstate stalking conspiracy charge in Count Three.

evidence that he was aware of a number of people who were hard at work to achieve this outcome.

b. <u>Count Four – Interstate Stalking</u>

To convict McMahon of interstate stalking, the jury had to find that: (1) he traveled in interstate commerce; (2) with the intent to harass or intimidate or place under surveillance with the intent to harass or intimidate Xu Jin or Liu Fang; and (3) in the course of or as a result of such travel, he caused, attempted to cause, or reasonably expected to cause substantial emotional distress to Xu Jin or Liu Fang or a member of either of their immediate families. (*See* Jury Instrs., Dkt. 256, at 37.)  The Court also instructed the jury that it could consider Count Four in the context of co-conspirator liability, also known as *Pinkerton* liability.  Under this theory of liability, the jury could have found McMahon guilty of Count Four if: (1) the substantive crime of interstate stalking was committed by someone; (2) the person or persons who actually committed the crime were members of the conspiracy the jury found existed; (3) the interstate stalking was committed pursuant to the common plan and understanding among conspirators; (4) McMahon was a member of the conspiracy at the time interstate stalking was committed; and (5) McMahon could have reasonably foreseen that interstate stalking might be committed by his co-conspirators. (*See id.* at 27.)

As to the first factor required for a conviction of interstate stalking, because McMahon did not travel in interstate commerce during his involvement in this case and instead operated in New Jersey only, he was charged with Count Four under an aiding and abetting theory.  Under 18 U.S.C. § 2(a), an aider and abettor "is punishable as a principal."  18 U.S.C. § 2(a).  A person aids and abets a crime under 18 U.S.C. § 2(a) if he or she "(1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission."  *United States v. Delgado*,

31

972 F.3d 63, 73 (2d Cir. 2020) (quoting *Rosemond v. United States*, 572 U.S. 65, 71 (2014)), *as amended* (Sept. 1, 2020), *cert. denied sub nom.*, *Anastasio v. United States*, 141 S. Ct. 1114 (2021).

At the outset, McMahon argues that the government's aiding and abetting theory fails because he did not know that the crime of interstate stalking was being committed and that he did not act in a way that was intended to bring about the success of the stalking scheme. (McMahon Mot., at 50.) As previously discussed, there was sufficient evidence for the jury to conclude that McMahon had knowledge of the stalking scheme and that he took actions to carry it out, including tracking Xu Jin's elderly father and finally uncovering the address of Xu Jin's Warren home. Even if the evidence could not establish that McMahon himself took steps to further the scheme, the jury could have concluded that by nature of McMahon's participation in the conspiracy, he was liable under a *Pinkerton* theory for the reasonably foreseeable interstate stalking engaged in by his co-conspirators. Therefore, the first element of Count Four is satisfied.

Jumping to the third factor required for a conviction of stalking, there can be no doubt that the actions of McMahon and his co-conspirators caused the victims substantial emotional distress. There was ample evidence that Xu Jin, Liu Fang, and their immediate family members—Sabrina Xu and Liu Yan—were terrified and emotionally scarred by the actions taken by the individuals working to repatriate Xu Jin back to China to face untold consequences. (*See, e.g.*, Tr. 1396 (Xu Jin explaining that seeing his father forced to travel from China to New Jersey felt "very shocking" and made him feel "very angry"); Tr. 1393–94 (Xu Jin testifying that he began "panicking" and became outright "scared" when his car was being followed in April 2017); Tr. 126 (Liu Yan stating that her sister Liu Fang isolated herself from family members out of concern for their safety and noting that her sister was "on the verge of collapsing" as a result of the harassment campaign and that Liu Yan was "scared that [Liu Fang] would not be able to take it anymore").) Indeed,

McMahon acknowledges in his motion briefing that Liu Yan was crying on the witness stand while recounting how the surveillance activity made her feel.  Nevertheless, McMahon holds her to textual precision, stating that because Liu Fang did not utter the words "substantial emotional distress," but rather "shock," she in fact did not suffer the former.  (McMahon Mot., at 57.)  This argument plainly fails.

McMahon also argues that because his surveillance efforts "remained covert," there was no way his actions could have caused substantial emotional distress.  (McMahon Mot., at 41.)  First, the government was not required to show that McMahon's (or his co-conspirators') actions caused substantial emotional distress, but that these actions "attempted to cause," or were "reasonably expected to cause" such distress.  (Jury Instrs., Dkt. 256, at 37.)  Second, "[t]here is no requirement that a victim know of the threat at the exact moment that the threat occurs."  *United States v. Curley*, No. 08-CR-404 (SCR), 2009 WL 10688209, at *2 (S.D.N.Y. July 15, 2009) (sustaining a conviction under 18 U.S.C. § 2261(A)).  Third, the evidence showed that McMahon's work, despite being covert, in fact led to and caused the targets of the investigation—Xu Jin, Liu Yan, and Sabrina Xu—to suffer significant emotional distress.  It was McMahon's uncovering of the home address of Xu Jin, through surveillance and tailing, that enabled the co-conspirators to target these victims for harassment and intimidation.  This evidence was sufficient for the jury to find a causal link between McMahon's knowing and intentional conduct and the victims' emotional distress.  There is no requirement in the statute or caselaw that McMahon had to have gone "overt" or physically confronted or harassed the victims to have caused their distress.  This purported requirement is a fiction created by McMahon.[20]

---

[20] As part of this argument, McMahon states that "[d]efense counsel have been unable to locate any interstate stalking cases where an individual's conduct remained completely covert,

The second factor necessary for a stalking conviction, which required the jury to find that McMahon possessed the intent to harass Xu Jin or Liu Fang, presents a closer question, but one that is still easily resolved by examining the relevant evidence and the principles of co-conspirator liability. For example, McMahon clearly knew that he was participating in a scheme in which Xu Jin's elderly father traveled to the United States to coerce his son to return to China, and that McMahon's efforts to locate Xu Jin's home, through his surveillance of the meeting between Xu Jin and his father at the Short Hills Mall, were part of this effort. A jury could reasonably conclude that McMahon knew that this action was calculated to cause substantial emotional distress to Xu

---

likely because the Government rightly does not, as it cannot, under the statute, prosecute individuals who do not harass, intimidate[,] or cause emotional distress of any kind to another person." (McMahon Mot., at 54–55 n.20.) Putting aside the tautological nature of this statement and the fact that there *was* evidence that McMahon's actions caused the victims' emotional distress, the Court notes that there is at least one other case with materially similar facts where covert surveillance was sufficient to support an interstate stalking conviction under 18 U.S.C. § 2261(A). In *United States v. Ledezma-Cepeda*, two defendants were convicted of violating the interstate stalking statute for their role in tracking the location of an individual wanted by a drug cartel. *See* 894 F.3d 686 (5th Cir. 2018), *cert. denied sub. nom.*, *Cepeda-Cortes v. United States*, 139 S. Ct. 467 (2018). Defendant Ledezma was a private investigator hired by a cartel leader to locate an individual that this leader believed was responsible for his father's death. *Id*. at 687. Ledezma recruited his cousin Cepeda to assist him in this effort. *Id*. at 687–88. The two men used various covert methods to track down the target, including putting GPS trackers on the target's brother's vehicles and monitoring the target's brother's movements by sending regular reports and pictures to the cartel leader. *Id*. at 688. They also tracked the target's sister-in-law using similar means. *Id*. Watching the sister-in-law proved to be the investigation's big break, because she eventually led the investigators to their target, whose location they provided to the cartel leader. *Id*. This information led to the murder of the target. *Id*.

As here, Cepeda argued that he lacked "the mental state for stalking" and that "he believed [the target] was a white-collar criminal who had stolen money from Mexican banks and that the investigation was legitimate." *Id*. at 689. Also as here, the government introduced evidence demonstrating Cepeda's knowledge that the target of the investigation was an attorney for a drug cartel who likely could be the target of criminal prosecution or murder. *See* Gov't Resp., *United States v. Cepeda-Cortes*, No. 4:14-CR-151, ECF No. 355, at 3 (N.D. Tex., June 8, 2016). The trial court denied Cepeda's post-trial motion for acquittal on the interstate stalking charge, based on "the reasons urged by the government." Order, *id*., ECF No. 363 (N.D. Tex., July 27, 2016).

Jin. And even if it could be said that McMahon did not specifically perform an intimidating act, his co-conspirators certainly did through Xu Cewei's forced visit.[21]

*    *    *

For these reasons, the Court denies McMahon's motion for acquittal on Counts Three and Four.

### C.    Zheng's Rule 29 Motion[22]

Zheng argues that there was insufficient evidence to convict him of Count Three—conspiracy to engage in interstate stalking—because the government did not establish a single conspiracy under that count.[23]  (Zheng Mot., at 8.)  The Court disagrees.

As Zheng points out, "the question of whether there were multiple conspiracies or a single conspiracy is one for the jury to decide."  *United States v. Parrilla*, No. 13-CR-360 (AJN), 2014

---

[21] The Court is wholly unconvinced by McMahon's argument that "there was in fact no evidence whatsoever to support the notion that Mr. McMahon knew that the arrival of Xu Jin's father was 'an intimidation and harassment tactic,' as opposed to an appeal to return to China to clear the family name, including repaying the victim of an embezzlement[.]" (McMahon Mot., at 44–45.)  Gallowitz and McMahon joked about an "abduction" and how New Jersey state authorities may have to become involved as a result of Xu Cewei's presence in New Jersey. (GX 4019B, at 256–57.)  Additionally, the government introduced evidence that Johnny Zhu was directed to tell McMahon "everything" about the scheme. (GX 704A.)  Regardless, McMahon is essentially arguing an alternative inference from the evidence, which is unavailing under Rule 29's mandate, as the Court is required to draw all permissible inferences in the government's favor. *Jackson*, 335 F.3d at 180.

[22] Zheng does not appear to contest his guilt on Count Four, the substantive interstate stalking count.  In fact, at trial, he opened on the fact that he would not deny that he went to Xu Jin's home in Warren, New Jersey, and pasted notes on the front door of the home. (Tr. 55.)  The Court therefore will not *sua sponte* disturb the Count Four conviction as to Zheng, finding, in any event, that the jury had more than sufficient evidence before them to conclude that Zheng committed interstate stalking.

[23] The Court notes that Zheng concedes that he "participated in a conspiracy with co-defendant Kuang Zebin and unindicted co-conspirator Chen Chaohong on September 4th and 5th 2018," the days that Zheng traveled to Warren, New Jersey. (Zheng Mot., at 17.)

WL 7496319, at *7 (S.D.N.Y. Dec. 23, 2014) (citing *United States v. Johansen*, 56 F. 3d 347, 350 (2d Cir. 1995)). Post-conviction, a defendant who argues that multiple conspiracies existed bears the burden of showing "that no rational trier of fact could have concluded that a single conspiracy existed based on the evidence presented." *United States v. Sureff*, 15 F.3d 225, 230 (2d Cir. 1994) (citation omitted). If a court determines that there was insufficient evidence of a single conspiracy, it then must assess "whether the defendant was substantially prejudiced by the variance between the indictment and the proof." *Johansen*, 56 F.3d at 350.

At trial, the jury was instructed on Zheng's theory of multiple conspiracies. (*See* Jury Instrs., Dkt. 256, at 29–30; Tr. 2187–88.) This instruction, which Zheng does not argue was improper, informed the jury that "multiple conspiracies exist when there are separate unlawful agreements to achieve distinct purposes." (Jury Instrs., Dkt. 256, at 30; Tr. 2187.) Zheng's counsel argued to the jury at trial, and reiterates now, that the evidence failed to prove the existence of the interstate stalking conspiracy charged in the S-1 Indictment and also failed to prove Zheng's joining the charged conspiracy. (*See* Tr. 2063; *see also* Zheng Mot., at 8–12.) As it did at trial, the government again argues that the evidence established the existence of a single, classic hub-and-spoke conspiracy. (*See* Gov't Opp'n, at 111–12.) The Court finds that the evidence was sufficient to establish a single hub-and-spoke conspiracy to engage in interstate stalking of Xu Jin and his family members that Zheng joined, even if only briefly.

In a hub-and-spoke conspiracy, "one person typically acts as a central point while others act as spokes by virtue of their agreement with the central actor." *United States v. Ulbricht*, 31 F. Supp. 3d 540, 554 (S.D.N.Y. 2014) (internal quotation marks and citation omitted). In order to prove a single conspiracy of this type, "the Government must show that there was a rim around the spokes such that the spokes became coconspirators with each other." *Id.* (internal quotation

marks omitted).  The key question in determining "whether the spoke participants may be found to be members along with the core conspirators depends on whether or not the 'spokes' knew or had reason to know of the existence, but not necessarily the identity, of one or more of the other spoke participants[.]" *United States v. Pauling*, 256 F. Supp. 3d 329, 335 (S.D.N.Y 2017) (quoting *United States v. Manarite*, 448 F.2d 583, 589 (2d Cir. 1971)), *aff'd*, 924 F.3d 649 (2d Cir. 2019). However—and most importantly here—where an alleged conspiracy "encompass[es] members who neither know one another's identities . . . nor specifically know of one another's involvement," *Sureff*, 15 F.3d at 230 (internal citations omitted), it is permissible for the jury to find that there was a single conspiracy so long as a reasonable juror could conclude "beyond a reasonable doubt (1) that the scope of the criminal enterprise proven fits the pattern of the single conspiracy alleged in the indictment, and (2) that the defendant participated in the alleged enterprise with a consciousness of its general nature and extent.'" *United States v. Eppolito*, 543 F.3d 25, 47–48 (2d Cir. 2008) (internal quotation marks omitted) (quoting *United States v. Rosa,* 11 F.3d 315, 340 (2d Cir. 1993)).  Finally, "[c]hanges in membership, differences in time periods, and/or shifting emphases in the location of operations do not necessarily require a finding of more than one conspiracy," *United States v. Jones*, 482 F.3d 60, 72 (2d Cir. 2006), and "a single conspiracy is not transformed into multiple conspiracies . . . so long as there is sufficient proof of mutual dependence and assistance." *United States v. Berger*, 224 F.3d 107, 114–15 (2d Cir. 2000) (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990)).

Here, the government adduced sufficient evidence of the existence of a single conspiracy to harass or intimidate the victims identified in the S-1 Indictment and Zheng's knowing participation in that conspiracy.  The government's primary proof against Zheng rested on the testimony of cooperating witness Kuang, Zheng's friend.  (Tr. 1236.)  Kuang testified, *inter alia*,

that another friend, Chen Chaohong, called him on the morning of September 4, 2018 and asked him to accompany Zheng to New Jersey to bring a certain written message to a certain address. (Tr. 1243–44.)  Chen told Kuang what to write and mentioned at the beginning of their conversation that Kuang might get paid for doing this task.  (Tr. 1247.)  The message Kuang was told to write was: "If you are willing to go back to mainland to serve a 10-year prison, [] your wife and children will be okay, this is the end of the case."  (Tr. 1287.)  Kuang met Zheng in Brooklyn later that morning and Zheng drove them to New Jersey.  (Tr. 1251–52.)  During the ride, the two men talked casually about recent events in their lives and a "little bit" about what they were supposed to do that day.  (Tr. 1252.)  Physical evidence and videographic evidence confirmed that, as directed by Chen, the two men posted the threatening notes on the front door of Xu Jin's home in Warren that day.  (GX 709B–L.)  On cross-examination, Kuang testified that he did not plead guilty to the crime of acting as an agent of a foreign government because he did not believe that he was working for the PRC government.  (Tr. 1291–92; 1303.)  Kuang also testified that Zheng told him that they were leaving notes on behalf of a "Dai Lo," or a gang leader from Macau.  (Tr. 1291.)

The government, however, introduced evidence to support an inference that Zheng agreed to work in a hub-and-spoke conspiracy with a hub common to his co-defendants—i.e., PRC officials.  For example, Kuang testified that he had "read some reports" regarding the Chinese government making efforts to get Chinese officials back to China on the "Chinese version of TikTok" and that Zheng also had this version of Chinese TikTok because "every Chinese person would have it."  (Tr. 1255.)  Additionally, when Kuang called Chen, while Kuang and Zheng were at the Warren home, Chen's "cousin" Ma Yongshun and "a middle-aged man" were on the line as well.  (Tr. 1260–61.)  Kuang heard the voices say, "something like it seems like no one had been

back to this home for a long time." (Tr. 1261.) Finally, Kuang testified that the government of China runs the prisons in that country. (Tr. 1290.)

In summation, the government asked the jury to conclude that Zheng might have known about Operation Fox Hunt or China's repatriation efforts generally through social media; that the other voices on the phone with Chen could have been individuals working in furtherance of Operation Fox Hunt; and that, since the Chinese government runs prisons in China, the two men were conveying messages from the PRC government itself. Alone or together, this evidence is certainly no smoking gun. However, "there is something more." *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1191 (2d Cir. 1989) (finding sufficient evidence of a single rather than multiple conspiracies), *cert. denied sub. nom.*, *Lavery v. United States*, 493 U.S. 933 (1989). Namely, it is clear to the Court that the actions taken by Zheng had the same singular objective as the actions taken by the other defendants and alleged co-conspirators—to coerce Xu Jin to return to China. *See Ulbricht*, 31 F. Supp. 3d at 554 (stating that to prove a hub-and-spoke conspiracy, the government must prove that "each defendant . . . participated in the conspiracy with the common goal or purpose of the other defendants"). Zheng's knowledge of the harassing purpose of the conspiracy is evidenced, at a minimum, by the note that Zheng and Kuang taped on Xu Jin's door, as well as their unsolicited and unannounced appearance at Xu Jin's home, during which, according to Xu Jin, the men attempted to open the front door. The Court therefore finds that there was sufficient proof "that the scope of the criminal enterprise proven fit[] the pattern of the single conspiracy alleged in the indictment." *Eppolito*, 543 F.3d at 48.

And certainly the actions taken by Zheng's co-defendants were not at "cross purposes" to Zheng's September 4, 2018 actions. *Beech-Nut Nutrition Corp.*, 871 F.2d at 1192 (quoting *United States v. Heinemann*, 801 F.2d 86, 92 n.1 (2d Cir. 1986)). Indeed, the jury reasonably could have

concluded that Zheng and Kuang were supplied the address of Xu Jin's home from the fruits of McMahon's April 2017 surveillance efforts, which is evidence of "interrelationship and interdependency" between McMahon and Zhu on one side and Kuang and Zheng on the other. *Id.* at 1191 (quoting *United States v. Alessi*, 638 F.3d 466, 473 (2d Cir. 1980)). That the government did not introduce evidence that McMahon or Zhu knew of Zheng's existence or vice versa, did not preclude them from finding the existence of single conspiracy, the object of which was to harass Xu Jin and his family, which all three men knowingly joined.

There was also sufficient evidence to satisfy the second prong of the *Eppolito* analysis— "that the defendant participated in the alleged enterprise with a consciousness of its general nature and extent." *Eppolito*, 453 F.3d at 48 (internal quotation marks omitted). While Kuang's testimony indicated that he and Zheng took their actions on September 4, 2018 at the direction of Chen, who in turn might have been doing a favor for a gang-affiliated individual in Macau, the identity of the person from whom Kuang and Zheng took their orders is not legally dispositive because "the essence of the unlawful scheme"—to harass Xu Jin—was the same. *Blumenthal*, 332 U.S. at 555. In *Blumenthal*, the Supreme Court analyzed a conspiracy to sell whiskey at inflated prices and granted certiorari to determine whether the evidence proved a single conspiracy or multiple conspiracies, given the participation of many different individuals who took orders from various people in charge, some of whom were unknown to the defendants. *Id.* at 541–42. In concluding that there was sufficient evidence of a single conspiracy, the Supreme Court reasoned, "[t]he gist of the conspiracy lay not in who actually owned the whiskey, but in the agreement to sell it in this unlawful fashion, regardless of who might own it." *Id.* at 555–56. So too, here. The government submitted sufficient evidence of a conspiracy that "contemplate[d] a continuity of purpose and a continued performance of acts." *United States v. Ramirez*, No. 15-CR-379 (PKC),

2021 WL 2554442, at *8 (S.D.N.Y. June 22, 2021) (rejecting defendant's sufficiency challenge). The evidence at trial adequately established a single, continuing conspiracy to intimidate and harass Xu Jin and his family as charged in the Indictment and that Zheng participated in this conspiracy with the knowledge of its general nature and extent.

*     *     *

Accordingly, the Court denies Zheng's Rule 29 motion.

### D.     Zhu's Rule 29 Motion

1.     <u>The Evidence was Sufficient to Convict Zhu of Count One</u>

Although Zhu purports to argue that there was a lack of evidence "on the second element that the Defendant Zhu knowingly and intentionally becomes [sic] a member of the conspiracy" charged in Count One[24] (Zhu Mot., at 10), his argument, in reality, is that he was "dropped or eliminated from the circle" on or after October 28, 2016.  (*Id.*)  To the extent Zhu is arguing that the evidence showed that he withdrew from the conspiracy, that argument falls flat.  Instead of demonstrating any steps taken on Zhu's part to withdraw from the conspiracy, Zhu's argument errantly focuses on the alleged actions of members of the PRC government.  Zhu argues that "even if [he] wanted to be the [sic] member, the evidence established that the Chinese Officials did not want him to be part of their circle or group."  (*Id.* at 11.)  Because "[o]ur case law, as well as Supreme Court case law, has explained that conspirators must engage in an affirmative act to withdraw from a conspiracy," *United States v. Hoskins*, 44 F.4th 140, 156 (2d Cir. 2022), Zhu's withdrawal argument plainly fails.  There was no evidence at trial that Zhu took an affirmative act to withdraw from the conspiracy charged in Count One.

---

[24] Zhu does not challenge the jury's verdict finding him guilty of Count Two, the substantive crime of acting as an agent of a foreign government without prior notification to the Attorney General.  (Zhu Mot., at 1.)

Zhu's secondary argument is that there was no evidence of his knowledge of the fact that he was working for the PRC government.  (Zhu Mot., at 11.)  The Court disagrees.  There was substantial evidence adduced at trial from which the jury could have reasonably concluded that Zhu knowingly and intentionally became a member of a conspiracy to work as an agent of the PRC.  First, Zhu engaged in a pattern of travel to the PRC that aligned with efforts to track down Xu Jin and his family.  For example, shortly after returning from China in late July 2016 (GX 402Y), Zhu enlisted a New York attorney to find a private investigator to locate the victims.  (Tr. 1744.)  Zhu returned from a trip to China one day before he met with McMahon and Hu Ji at the Panera Bread in Paramus.  (GX 402Y.)  Zhu also traveled to China only a few days after he obtained surveillance photos of Liu Yan's home in May 2018.  (GX 402Y; 902D, at 2–3.)  Second, Zhu acted as the "middleman" between McMahon and PRC officials, including Hu Ji.  (GX901E.)  Indeed, Zhu said in his post-arrest statement that he knew that Hu Ji was a member of the Overseas China Affairs Office, which was part of the Chinese government.  Zhu also knew that Xu Jin was "wanted in China" as a "fugitive."  (GX 703A, at 27; Tr. 574.)  Zhu also knew that there were "a lot of departments" looking for Xu Jin and that there would be an "award" for the first person to find him.  (GX 703A, at 29, 37, 41.)  Third, Zhu provided the sensitive personal information of Xu Jin and his family to McMahon, including Xu Jin's Chinese identification number, and his exit-entry permit number for travel to and from Hong Kong and Macau.  (GX 1020 at 1–2.)

From this evidence, the jury could have reasonably inferred that Zhu entered into a conspiracy to act as an agent as a foreign government in violation of 18 U.S.C. § 951(a).  For example, the jury could have determined that Zhu traveled to and from China at times that corresponded with his activity in tracking down Xu Jin because he was receiving directions about how to participate in this initiative during his travels to the PRC.  Additionally, the jury could have

inferred that Zhu obtained the victims' sensitive personal identifying information from PRC officials. Finally, Zhu himself admitted knowing that Hu Ji worked for a Chinese party-state organization in his post-arrest statement. The Court concludes that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Guadagna*, 183 F.3d at 130.

### 2.    The Evidence was Sufficient to Convict Zhu of Counts Three and Four

Zhu's Rule 29 motion also argues that the evidence at trial was insufficient to prove beyond a reasonable doubt that he possessed the intent to harass Xu Jin and his family, or that he reasonably foresaw, or caused, substantial emotional distress. (Zhu Mot., at 6–10.) Again, the Court disagrees with the notion that Zhu was an unwitting tagalong to this conspiracy. Afterall, "[t]he government need not prove that the defendants knew the details of the conspiratorial scheme or the identities of all of the conspirators." *Downing*, 297 F.3d at 57. Here, however, Zhu was closer to the hub of the conspiracy, i.e., the Chinese officials overseeing the scheme, than many of the other conspirators, and the evidence as to him was more than sufficient to show that: (1) he possessed the intent to harass the victims; and (2) his actions caused substantial emotional distress.

First, Zhu admitted that he knew the purpose of the surveillance of Xu Jin—whether it was covert or not—was to monitor Xu Jin because he was "wanted in China" as a "fugitive from Wuhan." (GX 703A, at 27.) To make this happen, Zhu acted as a catalyst by "mak[ing] the arrangements" to retain McMahon, as directed by Hu Ji, and hire an interpreter so that Hu Ji could communicate with McMahon. (*Id.* at 30–31.) Zhu also transferred sensitive information— information that was likely available only through PRC governmental authorities—to McMahon to facilitate his tracking of Xu Jin. (GX 901D, at 9–13.) Zhu met with McMahon and Hu Ji. (GX 902E.) Finally, Zhu took additional action a year and a half after the main surveillance activity in

this matter, returning to Liu Yan's Short Hills home in May 2018 to take pictures of her vehicle and her house.[25]  (GX 902D, at 2–3.)  It was therefore reasonable for the jury to infer that Zhu's efforts—which were complex, sustained, involved sensitive personal information and multiple trips to China, and undertaken at the direction of a PRC police officer—were intended to harass Xu Jin and Liu Fang into returning to China.

Second, and as discussed, there was ample evidence that Zhu's actions caused substantial emotional distress to Xu Jin and his immediate family.  Xu Jin, Liu Fang, Sabrina Xu, and Liu Yan all testified to feeling "afraid," "frightened," "scared," and other emotions in between.  This is enough to sustain Zhu's conviction on Count Four.

*    *    *

The Court therefore denies Zhu's Rule 29 Motion.

## IV.    Rule 33 Motions

### A.    Legal Standard

Under Rule 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Although a "trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, . . . it nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'"  *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *United States v. Sanchez*,

---

[25] Zhu's argument that he did not travel to Short Hills in 2018 for the purpose of committing interstate stalking, but "to collect information about Xu Jin's sister's address" (Zhu Mot., at 9), is self-defeating and unavailing.  The Court finds that it was reasonably foreseeable to Zhu that his actions in tracking Xu Jin's sister-in-law would cause substantial emotional distress.  Indeed, Liu Yan began receiving harassing mailings from Wuhan at her home subsequent to Zhu's visit.  The content of these packages were manipulative and menacing efforts to convince Xu Jin to return to the PRC.

44

969 F.2d 1409, 1414 (2d Cir. 1992)).  The Court's analysis boils down to whether "it would be a manifest injustice to let the guilty verdict stand."  *Sanchez*, 969 F.2d at 1414.

In evaluating a Rule 33 motion, the Court "is not required to view the evidence in the light most favorable to the government," *United States v. Lopac*, 411 F. Supp. 2d 350, 359 (S.D.N.Y. 2006), but instead must "examine the entire case, take into account all facts and circumstances, and make an objective evaluation," *Ferguson*, 246 F.3d at 134.  The Court is entitled to weigh the evidence for itself, but "must strike a balance between weighing the evidence and credibility of witnesses and not wholly usurping the role of the jury."  *Id.* at 133 (internal quotation marks, brackets, and citation omitted).  "[A] district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand."  *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020) (internal quotation marks and citation omitted).  Under the "preponderates heavily" standard, "a district court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable."  *Id.* at 188 (internal quotation marks omitted).

### B.    McMahon's Rule 33 Motion

McMahon argues a number of bases for why the Court should grant him a new trial.  None are persuasive. [26]

---

[26] To the extent the Court does not explicitly discuss each of McMahon's Rule 33 arguments, the Court does not find these arguments persuasive.  In particular, the Court finds that it does not need to fully analyze the government's evidence related to McMahon's access to certain investigative databases and his finances because: (1) even without this evidence, there was sufficient evidence to convict McMahon of his crimes of conviction; and (2) the introduction of this evidence in no way led to a manifestly unjust verdict.

1.    The Government's Rebuttal

First, McMahon argues that the government provided an "improper rebuttal" by making "brand new arguments" for the first time during their rebuttal summation, and making false or unsupported statements at a time when McMahon could not correct them.  (McMahon Mot., at 73–86.)  Specifically, McMahon complains that the government argued for the first time on rebuttal that: (1) McMahon consciously avoided the fact that he worked at the direction of PRC officials; and (2) McMahon made calls to local law enforcement on the days he was conducting surveillance in Short Hills to conceal his activities.  Although McMahon is correct that the purpose of rebuttal is for the government to respond to the defense's closing arguments, *see United States v. Alegria*, No. 90-CR-450 (RWS), 1991 WL 238223, at *12 (S.D.N.Y. Nov. 6, 1991) ("Government counsel should not be allowed to develop new arguments on rebuttal, but should be restricted to answering the arguments put forth by defense counsel."), it is equally true that "[t]he prosecution and the defense are generally entitled to wide latitude during closing arguments, so long as they do not misstate the evidence."  *United States v. Tocco*, 135 F.3d 116, 130 (2d Cir. 1998).

As an initial matter, McMahon arguably waived any objection to the government's rebuttal as he did not contemporaneously object.  *See United States v. Frazier*, No. 15-CR-153 (VSB), 2019 WL 761912, at *13 (S.D.N.Y. Feb. 21, 2019) (noting that a defendant's failure to object regarding the characterization of something during the government's rebuttal means that the "challenge was arguably not preserved"); (*see also* McMahon Mot., at 76 ("Although the defense neither objected nor sought relief, as was understandable under the circumstances[,] . . . that failure cannot serve to preclude the manifest injustice of denying Mr. McMahon a fair trial.").)

Even assuming McMahon did not forfeit this challenge, the Court finds that the government did not raise any new arguments in its rebuttal.  As to the first purportedly new

argument McMahon identifies, "conscious avoidance," it was plainly responsive to the defense summation about McMahon lacking the requisite knowledge and mens rea to commit the crimes with which he was charged.  Furthermore, McMahon cannot claim any surprise as to this argument. The government made clear even before trial that it was pursuing a theory of conscious avoidance when it submitted its proposed jury instructions on May 1, 2023, nearly a month before the trial began.  (*See* Dkt. 193, at 22.)  The government also opened on the theory that McMahon turned a blind eye to the reality of his employment.  (Tr. 30 (arguing McMahon "looked the other way as the story . . . kept changing.").)  The same holds true as to the second purportedly "new" point about McMahon's calls to local law enforcement informing them of his surveillance being designed to conceal the real nature of his activities.  It could hardly be surprising to the defense that the government argued that McMahon's calls to local law enforcement informing them of his surveillance was designed to conceal the real nature of his activities.  During its cross-examination of Gallowitz, whom McMahon had called as a defense witness, the government elicited that one reason someone calls the local authorities to alert them to surveillance work is that if someone were to report a suspicious vehicle (i.e., that of the person doing the surveillance work), the local authorities would be less likely to show up.  (Tr. 1831.)  Furthermore, the government's argument was precisely what rebuttal is intended for: to rebut the argument made by McMahon's counsel in his closing that the fact that McMahon alerted the local authorities to his surveillance showed that he did not have the requisite mens rea.  (Tr. 2014 ("The evidence before you will show that when Mike McMahon went and did surveillance in the towns of Short Hills and Warren, he informed the local police of that . . . Is that something he would do if he thought he was illegally working for the Chinese?").)  Having invited the government's counter-argument on this issue, McMahon

cannot now cry foul.  Thus, the government's use of the fact in its rebuttal can hardly be a surprise to the defense nor remotely unfair.

The Court next turns to McMahon's assertion that he deserves a new trial due to "unsupported" or "false" comments made by the government during rebuttal.  Having considered each of the three pieces of evidence over which McMahon takes issue—(1) the comment that Liu Yan saw McMahon at the Livingston Mall on April 6, 2017; (2) the government's characterization of the substance of the *China Daily* article; and (3) the manner in which McMahon changed the way he received payments after learning about the *China Daily* article—the Court finds absolutely no basis for concluding that the government mischaracterized the evidence or so exceeded the broad latitude it has during closing arguments as to be improper or unfair.

### 2.    The Court's Evidentiary Ruling to Admit GX 704A

McMahon also takes aim at the Court's decision to admit into evidence GX 704, the audio recording of Tu Lan, Johnny Zhu, and Jin Hongru speaking on April 3, 2017, principally on the ground that the government did not adduce sufficient evidence to establish McMahon as a member of the conspiracy charged in Count One, making this inadmissible as a co-conspirator statement. (McMahon Mot., at 88 ("As it turns out, the Government failed to establish, by a preponderance of the evidence, the first factor needed to admit the recording under Rule 801(d)(2)(E), i.e.[,] 'that a conspiracy existed that included the defendant and the declarant.'" (citing *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999)).)  To admit evidence pursuant to Rule 801(d)(2)(E), a court must find, by a preponderance of the evidence, two things: (1) "that a conspiracy existed that included the defendant and the declarant"; and (2) "that the statement was made during the course of and in furtherance of that conspiracy."  *Gigante*, 166 F.3d at 82.

At trial, the Court admitted this recording over McMahon's authenticity objection, finding that since Jin Hongru was present for the conversation and testified that the recording represented a true and accurate representation of that conversation, it was authentic. (Tr. 1003–07.) McMahon did not raise any issue regarding its classification as a co-conspirator statement at that time. (*Id.*)

McMahon's motion for a new trial due to the admission of this evidence fails for two reasons. First, McMahon's acquittal on Count One does not necessarily negate a finding by *a preponderance of the evidence* that McMahon participated in a conspiracy to violate 18 U.S.C. § 951(a). Second, even though McMahon was acquitted of the conspiracy charged in Count One, given the Court's conclusion *supra* Section III.B.3 that there was sufficient evidence to convict McMahon of the interstate stalking conspiracy charged in Count Three, GX 704A was admissible as a co-conspirator statement related to that conspiracy.

### 3.    The Manner in Which the Government Presented Evidence

McMahon also seeks a new trial on the basis that the government used "publishing witnesses" in order to "engage[] in lengthy theatrical renditions of multiple text message chains," thus providing the jury with the government's "independent interpretation" of the evidence. (McMahon Mot., at 66–67.) McMahon acknowledges that because he did not object to these alleged issues contemporaneously, the plain error standard applies. (*Id.* at 68 n.4.) Thus, the Court would need to find that the manner in which the government presented evidence affected McMahon's substantial rights. "In the ordinary case, to meet this standard an error must be 'prejudicial,' which means that there must be a reasonable probability that the error affected the outcome of the trial." *United States v. Marcus*, 560 U.S. 258, 262 (2010) (citations omitted). The Court finds that the government's use of "publishing witnesses" in this case did not come close to affecting McMahon's substantial rights so as to constitute plain error.

As an initial matter, the Court recognizes the government's "need for evidentiary richness and narrative integrity in presenting [its] case[.]" *Old Chief v. United States*, 519 U.S. 172, 183 (1997) (noting that a judge must make evidentiary rulings "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case"); (*see also* Tr. 1173–74 (the Court suggesting to the government that reading exhibits into the record "may not be necessary" but also noting that the Court was "not going to tell the government how to put on its case").)  Here, the Court has no basis for concluding that the government witnesses' reading of the text message chains into the record, as opposed to the jury reading those text strings silently to themselves as the government published them on the video monitors in the courtroom (or on paper during deliberations), prejudiced McMahon in any way.  *See United States v. Allums*, No. 15-CR-153 (VSB), 2018 WL 2128372, at *6 (S.D.N.Y. May 9, 2018) (rejecting Rule 33 motion for a new trial on similar grounds).  First, having heard the government witnesses' recitations of the texts, the Court strongly disagrees with McMahon's characterization of them as "theatrical."  Far from it.  In fact, as the Court's above-noted comment to the government suggests, the Court found the readings rather dry, albeit properly so, and thus somewhat unnecessary.  Second and more fundamentally, the government was entitled to present these texts orally to ensure that the jury actually received and focused on them[27] and in a manner that conveyed the "evidentiary richness and narrative integrity" of the government's case.

The only in-circuit case McMahon points to for the proposition that the government's presentation of evidence was inappropriate is wholly inapposite.  McMahon cites to a products liability multi-district litigation in which the district court excluded a video re-creation of an

---

[27] Relatedly, in choosing to both display and read the texts into the record, it was fair for the government to consider whether all jurors had the same level of reading ability and comprehension.

automobile accident due to the fact that the re-creation occurred in a controlled environment that did not exist during the accident at issue. *See In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2016 WL 4077117, at *8 (S.D.N.Y. Aug. 1, 2016). There is nothing comparable or analogous about that case and this one. The reading of text messages is not at all similar to a video re-creation or simulation of a car accident, especially where the circumstances of the accident itself are disputed. Here, the existence and substance of the text messages was undisputed, and the oral presentation of the text communications did not so transform the underlying evidence so that it lacked a "substantial similarity" to its original form.

Nevertheless, McMahon argues that the jurors may have been misled because they did not "fully appreciate how variations in the surrounding conditions, as between the original occurrence and the staged event, can alter the outcome." (McMahon Mot., at 69.) The Court rejects this argument for two reasons. First, as discussed, the reading of the evidence was not delivered in a manner that created any editorial spin on the contents. The government and its witnesses read exactly what was printed in front of them without dramatizing the material. Second, even assuming *arguendo* that the text messages were read in a "theatrical" manner, there is no reason to believe that the jury—which had all of the admitted evidence in hard-copy and electronic format in the jury room for their deliberations—would be unable to assess the credibility of witnesses or the import of the government's other evidence. This is what the jurors were selected and sworn to do—exercise their common sense and judgment to evaluate the evidence and reach a just and reasoned conclusion. (Tr. 2204 ("The parties and the Court are relying on you to give full conscientious deliberation and consideration to the issues and evidence before you. In so doing, you carry out to the fullest your oaths as jurors to well and truly try the issues of this case and render a true verdict.").)

Further, McMahon complains that the agent-witnesses used to publish the text messages were chosen based on their limited interaction with the case in order to "significantly constrain[]" McMahon's ability to cross-examine them.  (McMahon Mot., at 70.)  Even assuming the government did so, McMahon cites no on-point precedent to support the contention that this was improper.  The decisions upon which he relies, all out-of-circuit, discuss the reading of *trial testimony* (as opposed to documentary evidence) to the jury instead of calling the witness to actually testify before the jury.

### C.     Zheng's Rule 33 Motion

Zheng first argues that the jury's conviction of him on Counts Three and Four (the interstate stalking charges) was against the weight of the evidence.  (Zheng Mot., at 13.)  While the Court need not view the evidence in the light most favorable to the government for a Rule 33 motion, *Lopac*, 411 F. Supp. 2d at 359, it "may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand."  *Archer*, 977 F.3d at 188.

Given the high standard for granting a new trial based upon the weight of the evidence, the Court denies Zheng's motion on these grounds.  Taken as a whole, the evidence presented at trial clearly showed that Zheng traveled from Brooklyn to New Jersey on September 4, 2018, in order to post a threatening note on the door of Xu Jin's family home.  Significantly, Zheng knew the threatening nature of the note before traveling to New Jersey with Kuang.  (Tr. 1250–51.)  The fact that Zheng participated in the conspiracy charged in Count Three for "less than twenty-four hours" (Zheng Mot., at 13), does not change the nature of the actions he took in that short time frame.  The duration of Zheng's conduct and participation in the conspiracy does not negate his

commission of the crime. Therefore, Zheng's convictions are not against the weight of the
evidence.

Additionally, Zheng claims that the Court improperly curtailed the cross-examination of
certain of the government's witnesses on topics that Zheng argues were relevant, including: (1) the
victims' financial status; (2) details of the victims' background and employment in China; and (3)
the existence of a civil lawsuit in New Jersey against the victim. (*Id.* at 16.) The Court disagrees.

Federal Rule of Evidence 611(a) provides: "[t]he court should exercise reasonable control
over the mode and order of examining witnesses and presenting evidence so as to: (1) make those
procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses
from harassment or undue embarrassment." Fed. R. Evid. 611(a). "Trial judges retain wide
latitude to impose reasonable limits on cross-examination based on concerns about, among other
things, harassment, prejudice, confusion of issues, the witness's safety, or interrogation that is
repetitive or only marginally relevant." *United States v. Raniere*, No. 18-CR-204 (NGG) (VMS),
2023 WL 3092991, at *4 (E.D.N.Y. Apr. 26, 2023) (quoting *Cordero v. Rivera*, 677 F. Supp. 2d
684, 699 (S.D.N.Y. 2009)) (cleaned up). Challenges to a trial court's decision to restrict cross-
examination are reviewed for abuse of discretion. *See United States v. Lawes*, 292 F.3d 123, 131–
32 (2d Cir. 2002).

First, the Court excluded certain cross-examination related to the victims' financial status,
concluding that this evidence was irrelevant and potentially prejudicial. Zheng now argues that
this information "is relevant to [Xu Jin's] credibility[] because it concerns the lengths to which
willing [sic] to lie to protect his wealth." (Zheng Mot., at 16.) At trial, counsel for Zheng attempted
to elicit testimony from Liu Yan regarding her brother-in-law's wealth. (Tr. 147.) The Court
sustained the government's objection, citing the fact that it called for hearsay. (*Id.*) Despite the

Court's clear directive, Zheng's counsel continued to ask questions that hinted at Xu Jin's alleged wealth. (Tr. 147–48.) At sidebar, the Court asked Zheng's counsel to explain the relevance of his line of questioning. Zheng's counsel responded, "Because it's part of the case, isn't it?" (Tr. 149.) The Court responded, "No, it is not part of the case. The question is whether or not [Xu Jin] was subject to some sort of campaign or harassment or threats[.]" (*Id.*) Zheng's *post hoc* attempt to characterize this information as relevant to Xu Jin's credibility, i.e., the lengths to which Xu Jin would go in order to protect his wealth, is equally unpersuasive, especially in light of the abuse of discretion standard that applies. *See United States v. Stewart*, 433 F.3d 273, 311 (2d Cir. 2006) ("We review a trial court's evidentiary rulings. . . for abuse of discretion."). The probative value of Xu Jin's finances with respect to his credibility would have been far outweighed by the potential prejudice. *See United States v. Hamlett*, No. 19-3069, 2021 WL 5105861, at *3 (2d Cir. Nov. 3, 2021) (stating that it is reasonable to limit cross-examination to preclude questioning where a court is concerned "about the potentially irrelevant and prejudicial nature of such questioning"). The inference that Xu Jin was lying about being harassed by the Chinese government—harassment that was established by considerable undisputed evidence at trial—to protect his wealth is tentative at best. If Xu Jin wanted to protect his wealth, it is unlikely he would have gone to U.S. authorities and publicized his situation by cooperating with their investigation and prosecution. At the same time, allowing the jury to focus on Xu Jin's financial means could have resulted in irrelevant speculation about the source of that wealth, e.g., corrupt activities in China, and led the jury to improperly conclude that the Chinese government was justified in trying to repatriate Xu Jin to face corruption charges. (*See* Tr. 142–43 (Court's admonitions to the parties, *inter alia*, that "what happened in China is irrelevant. Whether he is guilty of a crime is irrelevant[.]").) Thus, even if

Zheng had timely raised this basis to justify this line of cross-examination at trial, the Court would have denied it as not probative and unduly prejudicial.

Second, the Court excluded inquiry into Xu Jin's alleged criminal conduct in China on the basis that it was irrelevant and prejudicial. Zheng now argues that it "created a one-sided narrative that [Xu Jin] did not commit any crimes in PRC" and that it led the jury to believe he was a "dissident, rather than a fugitive." (Zheng Mot., at 15.) This information is plainly irrelevant to Zheng's crimes of conviction—conspiracy to engage in interstate stalking and the substantive count of interstate stalking. Zheng claims that the notion that Xu Jin was a dissident was "introduced numerous times" at trial, but points to no example of the government introducing such evidence. (*Id.*) Zheng provides only two instances where this topic arguably came up—neither raised by the government. One was a response given by Xu Jin's wife, Liu Fang, on cross-examination by Zhu's counsel. (Tr. 795–96 ("Q: Will you consider you are a group people [sic] who holds different political views from the Chinese Government? . . . A: I believe my husband became the target of the Chinese Government because he is upright and he believes in justice and he opposed a principle and he did not want to do any harm to the interest of the people and he did not want to violate the laws, and he upset those in power.").) The government objected to further questioning on the topic of Xu Jin's background in China, which the Court sustained. (Tr. 796.) The other instance was when Zheng himself tried to introduce evidence of the substance of the criminal allegations against Xu Jin on cross-examination of Liu Yan. (Tr. 139 ("Q: What was the amount of money that your brother-in-law was alleged to have stolen from the Chinese government?").) At the ensuing sidebar, the Court acknowledged that the government had partially opened the door to discuss the fact that there were certain allegations by the PRC government of criminal wrongdoing on the part of Xu Jin. (Tr. 140–41.) However, the Court also

made clear that any evidence about the substance of the allegations was "unduly prejudicial because it's confusing to the jury and invites nullification to go further into or to try to prove essentially that . . . the victim did commit a crime." (Tr. 142.)  The Court instructed the parties that "nobody should be offering for the truth any hearsay statements, evidence, documents about what purportedly he did in China[, which is] . . . [t]he only way this seems to be coming in now." (*Id.*)  The Court went on to say, "what happened in China is irrelevant.  Whether he is guilty of a crime is irrelevant.  I don't want the jury to nullify based on the notion that they think bounty hunting is fine if he is guilty." (Tr. 142–43.)  At the end of the trial, the Court gave a limiting instruction with respect to Xu Jin's alleged criminal activity.  (Tr. 2165 ("Throughout this trial, there have also been references to alleged crimes committed by Xu Jin . . . and/or his family members in the People's Republic of China[.]  Whether these crimes were committed or not has no bearing on the case before you, and you should not consider or speculate about the merits of these allegations.").)

There is ample precedent supporting the Court's position that evidence regarding a victim-witness's alleged crimes is not relevant material for cross-examination.  *See United States v. McCain*, No. 21-2982, 2023 WL 2335332, at *4 (2d Cir. Mar. 3, 2023) (affirming district court's exercise of discretion in limiting cross-examination of the victim-witness about his alleged drug dealing activity because it was not probative of his credibility); *United States v. Rossy*, No. 22-CR-550 (NSR), 2023 WL 8039500, at *3 (S.D.N.Y. Nov. 20, 2023) (ruling *in limine* to exclude any evidence of the victim's prior bad acts because they were "irrelevant to any ultimate issue at trial"); *see also United States v. Flaharty*, 295 F.3d 182, 190 (2d Cir. 2002) (affirming district court's decision to curtail cross-examination of cooperating witness's alleged involvement in a particular crime because it bore no relevance on his credibility).

Third, the Court limited cross-examination regarding the existence of a New Jersey civil lawsuit against Xu Jin "involving relevant Chinese entities" because the parties provided no foundation as to its admissibility.  However, Zheng now claims that, because Xu Jin was presumably served this lawsuit at his Warren home, the Warren address would have been "known to other individuals," and the exclusion of this evidence "impermissibly" led the jury to believe that McMahon's surveillance was the only way that Zheng could have gotten Xu Jin's Warren address.  (Zheng Mot., at 16.)  The multiple layers of hypothetical conjecture embedded in this argument are apparent.  At no point did Zheng's counsel advise the Court that they could or would present evidence that Zheng knew of the New Jersey lawsuit; nor does Zheng make that claim now.  Therefore, the Court properly barred cross-examination on this topic at trial.

### D.    Zhu's Rule 33 Motion

Zhu moves under Rule 33 for a new trial on all counts, arguing that "codefendant's counsel's closing arguments infused racial animus and xenophobia into the proceeding."  (Zhu Mot., at 1.)  Zhu claims that McMahon's counsel "repeatedly stated that the United States government should have protected his client from the Chinese *defendants*" in his summation.  (*Id.* at 3 (emphasis added).)

As an initial matter, this argument is unpreserved because Zhu's counsel did not object to these statements at the time they were made.  (Tr. 2045.)  Even if this argument were preserved, Zhu misrepresents the factual content of McMahon's summation.  What McMahon's counsel said in summation was, "[t]he evidence in this case does show just how far China is willing to go to repatriate those who they wish to prosecute[,]" and "the Government didn't protect [McMahon]." (Tr. 2045, 2047.)  At no point did McMahon point a finger at the other defendants in his summation.    At most McMahon's counsel criticized the Chinese government, arguably

characterizing it as ruthless. But it is more than a stretch to say that this criticism of the PRC "by implication" referred to the other two defendants because they are Chinese. (Zhu Mot., at 3.) McMahon's comments were not xenophobic—but were based on the evidence introduced by the government about the PRC's Operation Fox Hunt and Skynet programs—and had nothing to do with Zhu (or Zheng). Therefore, the Court finds that McMahon's statements in no way caused Zhu substantial prejudice.[28] *See United States v. Truman*, 688 F.3d 129, 143 (2d Cir. 2012) (finding district court exceeded its discretion in conditionally granting a new trial due to prosecutorial misconduct on summation).

*    *    *

Therefore, Defendants' Rule 33 motions are denied.

## CONCLUSION

For the foregoing reasons, McMahon, Zhu, and Zheng's motions for acquittal, or in the alternative, a new trial, are denied.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 1, 2024
Brooklyn, New York

---

[28] Zhu argues that McMahon's summation "transformed McMahon's counsel into a second prosecutor" (Zhu Mot. at 2), implying that Zhu's and McMahon's respective defenses were mutually antagonistic. The Court rejects this argument. Zhu never moved to sever his case from that of McMahon and, indeed, actually relied on the same witness and documentary evidence in his defense that McMahon did. This shows a unity of interests, not a conflict or antagonism. Indeed, based on the government's evidence, the jury could have found any of the three defendants guilty without finding the other defendants guilty. *See United States v. James*, 712 F.3d 79, 105 (2d Cir. 2013) ("[T]o obtain a severance on the ground of antagonistic defenses, a defendant must show that the conflict is so irreconcilable that acceptance of one defendant's defense requires that the testimony offered on behalf of a codefendant be disbelieved.") (quoting *United States v. Benitez*, 920 F.2d 1080, 1085–86 (2d Cir. 1990)).